# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSLVANIA

A&B CAMPBELL FAMILY LLC;                    :       **Case No. _____**
EUGENE J. BARRETT, JR. and LORI R.          :
BARRETT; JAMES T. BARRETT and CINDY E.      :       **JURY TRIAL**
BARRETT, Individually and trading as BCF    :       **DEMANDED**
FAMILY LIMITED PARTNERSHIP;                 :
JOHN M. BARRETT trading as JOHN M.          :
BARRETT FAMILY LIMITED PARTNERSHIP;         :
BARTO FAMILY LLC;  CLARK H. BEEBE,          :
Individually and as Trustee of the JOSEPH J. :
BEEBE TRUST, and with DONNA L. BEEBE, as    :
Trustees of the BEEBE LIVING TRUST DATED    :
JUNE 10, 2010; DAVID J. BRIDE and DIANE V.  :
BRIDE, Individually and trading as          :
BRIDE FAMILY LIMITED PARTNERSHIP;           :       **COMPLAINT**
MICHAEL R. BRIDE and SHIRLEY BRIDE          :
trading as MARSHVIEW FAMILY LIMITED         :
PARTNERSHIP; RUSSELL E. BULICK and          :
CATHY ANN BRADY; RONALD L.                  :
CAMPBELL; JAMES E. CANFIELD and             :
FREDA L. CANFIELD; RICHARD A.               :
CARD, JR. and CANDY S. CARD;                :
ERVEN W. CRAWFORD and JUNE                  :
CRAWFORD; DJH & PAH, LLC trading as         :
WGH & HBH, LP; DJH & WGH, LLC, trading as   :
HENRY BROTHERS, L.P.; PAUL                  :
DENAULT and VALARIE DENAULT;                :
ROBERT L. DIBBLE, JR. and LYNN DIBBLE;      :
DP INVESTMENTS, LLC; CHARLES L.             :
EMERSON and PAMELA L. EMERSON;              :
EPLER FAMILY LLC; F & M ROBINSON, LLC       :
trading as FRANCIS & MAXINE ROBINSON        :
FAMILY LIMITED PARTNERSHIP; FOSTER          :
FAMILY LLC; E. LARRY FRANKLIN and           :
CAROL FRANKLIN; THOMAS R.                   :

[CAPTION CONTINUED ON NEXT PAGE]

FREDERICK and DEBORAH FREDERICK       :
a/k/a DEBORAH S. FREDERICK trading as       :
FH RANCH FAMILY LIMITED PARTNERSHIP:
THEODORE B. GATTO a/k/a THEODORE       :
GATTO, Individually and as Administrator of the   :
ESTATE OF PENNY JUNE GATTO, Deceased;   :
JAMES E. GRIMES and BARBARA P. GRIMES; :
ERIC J. HARNISH and MICHELLE L.       :
HARNISH; F. ROBERT HAUSS and CAROL       :
HAUSS trading as HAUSS FAMILY LIMITED       :
PARTNERSHIP; WALTER G. HENRY, JR. and   :
CHERYL A. HENRY; RICHARD W.       :
JACKSON and DOLORES B. JACKSON,       :
Trustees of the JACKSON TRUST DATED       :
JULY 1, 2002; THEODORE A. JOHNSON;       :
LITTLE FALL R&R INC.; RICHARD D.       :
MARSHALL and  SANDRA L. MARSHALL;       :
DAVID W.  MOON and MARY J. MOON       :
trading as MOONHAVEN FAMILY LIMITED       :
PARTNERSHIP; MORCHAR LLC trading as       :
M&C FASSETT FAMILY LIMITED       :
PARTNERSHIP; KENT L. MORGAN and       :
M. PATRICIA NELSON; WESLEY G.       :
MOSIER and BARBARA E. MOSIER a/k/a       :
BARBARA E. KISSELL; MOSIER REAL       :
ESTATE CO., LLC, trading as MOSIER       :
FAMILY ROYALTY MANAGEMENT, LP;       :
MS & JC DOSS, LLC trading as M & J       :
DOSS LP; DORIS J. NEWTON; H. TIMOTHY       :
NEWTON and RENEE S. NEWTON;       :
SHAWN PATRICK NEWTON and NICOLE D.   :
NEWTON; WALTER E. NEWTON, III and       :
DARLENE R. NEWTON; WALTER E.       :
NEWTON, III and SHAWN NEWTON trading as :
NEWTON FAMILY LIMITED PARTNERSHIP;   :
OUTDOOR INVESTMENT, LLC trading as       :
WHITE TAIL MOUNTAIN WELL, LP;       :

[CAPTION CONTINUED ON NEXT PAGE]

JACQUELINE T. PLACE a/k/a JACQUELINE J.  :
PLACE; JERRY L. PRICE and CLAUDIA C.  :
PRICE; MILTON REPSHER a/k/a MILTON H.  :
REPSHER, SR. and NETA REPSHER a/k/a  :
NETA V. REPSHER trading as M&N REPSHER  :
PARTNERS LIMITED PARTNERSHIP;  :
DAVID L. SANDT, a/k/a DAVID LEO  :
SANDT and MARYANNE SANDT; REXFORD  :
SCHOONOVER; PAUL R. SITES and SUE A.  :
SITES trading as SITES FAMILY LIMITED  :
PARTNERSHIP; SL ALLEN LLC trading as  :
SHIRLEY L. ALLEN FAMILY LIMITED  :
PARTNERSHIP; JAMES P. SNELL; JOHN R.  :
SNELL and MICHELLE S. SNELL trading as  :
OUTBACK FAMILY LIMITED PARTNERSHIP;:
PETER P. SOLOWIEJ and KENDRA P.  :
SOLOWIEJ; ROBERT H. STOUDT, JR. and  :
PATTI L. STOUDT, trading as STOUDT FARM  :
LIMITED PARTNERSHIP; and TOR  :
TAMARACK, LLC trading as THOMSON  :
BUSINESS VENTURES, L.P. f/k/a THOMSON  :
FAMILY LIMITED PARTNERSHIP;  :
                                                                    :
                         Plaintiffs,                       :
                                                                    :
              v.                                              :
                                                                    :
CHESAPEAKE ENERGY CORPORATION;  :
CHESAPEAKE APPALACHIA, L.L.C.;  :
CHESAPEAKE ENERGY MARKETING, INC.;  :
CHESAPEAKE OPERATING L.L.C., as  :
successor by conversion to CHESAPEAKE  :
OPERATING, INC.; CHESAPEAKE  :
EXPLORATION, L.L.C., as successor by  :
merger to CHESAPEAKE EXPLORATION, INC.;:
WILLIAMS PARTNERS, L.P., f/k/a  :
ACCESS MIDSTREAM PARTNERS, L.P.;  :

[CAPTION CONTINUED ON NEXT PAGE]

ACCESS MLP OPERATING, L.L.C.;            :
APPALACHIA MIDSTREAM SERVICES, L.L.C.:
ANADARKO E&P ONSHORE LLC, as successor :
by conversion to and f/k/a ANADARKO E&P   :
COMPANY LP; STATOIL USA ONSHORE          :
PROPERTIES, INC.; MITSUI E&P USA LLC;     :
                                          :
                  Defendants.             :
_____:

## COMPLAINT

The above-named plaintiffs, by and through their undersigned attorneys, assert the following claims for damages, equitable relief, an accounting, declaratory relief and attorneys' fees against above-named defendants. Plaintiffs make the allegations set forth in this Complaint upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based in part upon investigation conducted by and through their attorneys.

## INTRODUCTION

1.      Plaintiffs hold royalty interests under oil and gas leases relating to properties located in Bradford County, Pennsylvania, or in nearby townships located in Sullivan or Wyoming Counties, Pennsylvania.[1]

2.      Defendants Anadarko E&P Onshore LLC, as successor by conversion to and f/k/a Anadarko E&P Company LP ("Anadarko E&P"), Chesapeake

_____

[1] In the aggregate, the plaintiffs in this action hold royalty interests in the natural gas produced from over 6,000 acres of leasehold land.

Appalachia, L.L.C. ("Chesapeake Appalachia"), Statoil USA Onshore Properties, Inc. ("Statoil USA"), and Mitsui E&P USA LLC ("Mitsui USA" and, together with Anadarko, Chesapeake and Statoil, the "Lessee Defendants"), hold working interests in the leases in which Plaintiffs hold royalty interests, either as the original lessee party to the lease or as the assignees of all or part of the right, title and interest of the original lessee party.

3.     Chesapeake Appalachia, directly or through its affiliates identified below, serves as the operator of the wells drilled pursuant to the leases, on behalf of itself, the other Lessee Defendants, and other entities holding working interests in the leases. Each of the Lessee Defendants is responsible for accounting for and distributing its share of the royalties due and owing to royalty interest owners, including Plaintiffs, in connection with the leases in which the respective Lessee Defendants hold working interests. Chesapeake Appalachia, on information and belief, is also responsible for accounting for and distributing royalties payable to Plaintiffs by certain other owners of working interests in the leases.

4.     Acting in violation of their express and/or implied contractual obligations under the terms of the leases under which Plaintiffs hold royalty interests, defendants Chesapeake Appalachia, Anadarko E&P and Mitsui USA have underpaid, and continue to underpay, the royalties due and owing by them (and, in the case of Chesapeake Appalachia, by certain other holders of working or

overriding interests in the Leases, for which Chesapeake Appalachia is responsible for accounting for and distributing royalties), to Plaintiffs. The underpayment of royalties stems from the respective defendants: (i) basing the royalty payments on artificial gas prices lower than the effective price actually received by them for the gas produced under Plaintiffs' leases; and/or (ii) effectively deducting from Plaintiffs' royalties impermissible amounts for purported post-production costs, such as purported costs of gas gathering, marketing and transportation, in calculating the royalties payable to Plaintiffs.

5.      The use of such artificial prices and deductions violates the express language of the leases, which requires royalties to be calculated based on the market value at the well of gas sold, and does not permit the deduction of post-production costs in calculating the royalty payable under the lease.

6.      Alternatively, even if the Lessee Defendants otherwise are entitled to deduct or give effect to post-production costs in calculating the royalties payable to Plaintiffs, each of the Lessee Defendants has violated the implied covenant of good faith and fair dealing inherent in each of the leases under which the Plaintiffs hold royalty interests, by deducting, or giving effect to the deduction of, purported post-production costs which were and are arbitrary, grossly excessive and unreasonable in amount.

7.     Until recently, defendant Statoil USA, a joint venture partner of Chesapeake Anadarko, has not expressly itemized or disclosed on its check stubs or royalty statements to Plaintiffs any deductions for gathering or transportation costs in the calculation of their royalties, even though Statoil USA receives revenues from the same gas, produced from the same wells, subject to the same leases, as to which the other Lessee Defendants are taking substantial post-production deductions. At the same time, Statoil USA consistently reports to Plaintiffs substantially lower unit prices on its royalty statements for its share of the same gas, produced from the same wells, for the same months, as to which the other Lessee Defendants take and disclose post-production deductions. The consistent and substantial price differentials reported by Statoil USA suggest that Statoil USA either (a) interprets the applicable royalty provisions of Plaintiffs' Leases differently than the other Lessee Defendants, or (b) is actually taking deductions for post-production costs without disclosing them, and then simply paying royalties on the resulting lower net unit price. The relief sought by Plaintiffs in this action includes an accounting, which will enable them to determine, among other things, the actual basis for the price differential.

8.     The arbitrary, excessive and unreasonable deductions for purported gas gathering and transportation costs being deducted in calculating the royalties payable to Plaintiffs are the product and intended result of: (i) an unlawful and

anticompetitive contract, combination or conspiracy among defendants Chesapeake Energy Corporation ("Chesapeake Energy"), Chesapeake Energy Marketing, Inc. ("Chesapeake Marketing"), Chesapeake Operating, Inc. ("Chesapeake Operating"), and Chesapeake Exploration, L.L.C., as successor by merger to Chesapeake Exploration, L.P. ("Chesapeake Exploration" and, together with Chesapeake Energy, Chesapeake Marketing, and Chesapeake Operating, "Chesapeake"), Appalachia Midstream Services, L.L.C., Williams Partners, L.P. f/k/a Access Midstream Partners, L.P., and Access MLP Operating, L.L.C. (together, "Access Midstream"), to fix, raise, maintain and stabilize the price of gas gathering and intrastate transportation services in the relevant geographic area; (ii) the unlawful attempt by Chesapeake and Access Midstream to monopolize, or the actual unlawful monopolization by them of, the market for gas gathering and intrastate transportation services in the relevant geographic area; and (iii) the accompanying participation by Chesapeake and Access Midstream in a scheme involving the conduct of the affairs of one or more de facto enterprises through what amounted to a pattern of racketeering activity.

9.     The Lessee Defendants other than Statoil (which has not, until recently, disclose any deductions for post-production costs) provide Plaintiffs with only cryptic, cursory, incomplete and misleading summaries of the deductions taken in calculating their royalties. Until recently, defendant Statoil simply reported a lower

net price for gas, without any explanation, thereby implying that it was not taking or allowing for any deductions for post-production costs. Certain of the Plaintiffs have recently received letters in which Statoil has stated that it intends to revise the method by which it accounts for royalties, and in connection with the revision to make certain retroactive adjustments to royalties previously paid.

10.    Although the full facts are presently not known to Plaintiffs, and are peculiarly within the control of Defendants, and although the cryptic, cursory, incomplete, misleading and confusing manner in which the Lessee Defendants have listed (or, in the case of Statoil, failed to list) the deductions on the check stub/royalty statements provided to Plaintiffs make it impossible for Plaintiffs to plead in detail, without a full accounting, Plaintiffs believe and aver, on information and belief, based on the information known to them,  that they have been materially underpaid for the royalties due and owing to them by all of the Lessee Defendants.

11.    As outlined in a March 13, 2014 article published online in *ProPublica,* entitled *Chesapeake   Energy's   $5   Billion   Shuffle*,   available   at http://www.propublica.org/article/chesapeake-energy's-5-billion-shuffle (last accessed September 10, 2014) (the "ProPublica Report"), Chesapeake conspired with Access Midstream to accelerate and continue its scheme to extract improperly

inflated royalty deductions from lessors such as Plaintiffs.[2] According to the *ProPublica* Report, in calculating the royalties payable to lessors, Chesapeake decided to further artificially inflate the deductions that it took from the proceeds that it received at the point of sale of the natural gas that it produced from the lessors' properties in order to enable it to obtain and satisfy what amounted to a $5 billion off-balance-sheet loan from Access Midstream, disguised as asset sales, to enable Chesapeake to hide its need to "raise billions of dollars quickly," without alarming financial markets by the extent of its financial troubles, at a time when it was already saddled by billions of dollars in debt. *See id.*

12.     Access Midstream, Chesapeake's co-conspirator, had a strong financial incentive to participate in the scheme. In return for "purchasing" $4.76 billion in gas transportation lines from Chesapeake, Access Midstream was guaranteed to recover $5 billion plus a supra-competitive 15% annual return on its investment over the next decade – a material part of which Access Midstream and Chesapeake knew and

---

[2]  According to its website, "*ProPublica* is an independent, non-profit newsroom that produces investigative journalism in the public interest." http://www.propublica.org/about/  (last accessed January 29, 2015). *ProPublica* was awarded the 2011 Pulitzer Prize for National Reporting and a 2010 Pulitzer Prize for Investigative Reporting and a Peabody Award (the highest honor in broadcast journalism) in 2013. http://www.propublica.org/awards/ (last accessed January 29, 2015). *ProPublica*'s investigative publications have been cited and relied upon by federal courts when evaluating the sufficiency of plaintiffs' pleadings. *See, e.g., Garden City Employees' Retirement System v. Psychiatric Solutions, Inc.*, 2011 WL 1335803, at *27 (M.D.Tenn. Mar. 31, 2011). By citing and making certain allegations based on the *ProPublica* Report, Plaintiffs do not intend to adopt or admit the accuracy of all of the factual allegations contained in the report.

intended would come at the expense of royalty interest owners such as Plaintiffs, in the form of artificially and improperly inflated royalty deductions. *See id.*

13.    From the perspective of Access Midstream, the deal terms were highly attractive and favorable. As described by J. Michael Stice, Access Midstream's Chief Executive Officer, "[i]t doesn't get any better than this." *See id.* For Plaintiffs and other lessors to Chesapeake, however, the Chesapeake/Access Midstream deal could hardly get any worse.

14.    As several Pennsylvania state officials have recognized, Plaintiffs are not the only Pennsylvania gas royalty interest owners who have been harmed by Chesapeake's improper deduction of post-production costs in calculating royalty payments. In a letter dated February 13, 2014 to Robert D. Lawler, Chesapeake's Chief Executive Officer, then-Governor Tom Corbett noted that, for some time, he had received complaints from his constituents and Chesapeake's leaseholder "regarding practices of Chesapeake Energy which strike many as unfair and perhaps illegal." In particular, Governor Corbett noted that:

> Deductions of post-production costs, in a manner which seemingly few if any other operators in Pennsylvania utilize, has caused a significant erosion of the trust and goodwill the natural gas industry has established with Pennsylvania leaseholders and local communities.

Governor Corbett also noted that, by copy of the letter, he was urging Attorney General Kathleen Kane to examine the issue. *Id.*

15. By letter dated February 14, 2014 to Doug McLinko, Chairman of the Bradford County Board of Commissioners, then-Governor Corbett noted that he had grown increasingly concerned about the treatment of Pennsylvania leaseholders with respect to the deduction of post-production costs, and stated that "our efforts to receive straightforward answers [regarding deduction of post-production costs] have led to even more confusion…."

16. Plaintiffs bring this action for treble damages, injunctive relief and costs, including reasonable attorneys' fees, with respect to the injuries they have sustained in connection with their statutory claims, and for damages, equitable relief, declaratory relief and attorneys' fees and costs, and an accounting, in connection with the injuries they have sustained, and are continuing to sustain, as a result of the contractual breaches and tortious conduct of the respective Defendants.

## JURISDICTION AND VENUE

17. Plaintiffs bring the claims set forth in the First, Second and Third Causes of Action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for treble damages and injunctive relief, as well as reasonable attorneys' fees and costs, with respect to the injuries sustained by Plaintiffs arising from violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. As a result, this Court has original subject matter jurisdiction over the claims set forth in the First, Second

and Third Causes of Action pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 15 and 26.

18.     Plaintiffs bring the claim set forth in the Fourth Cause of Action for violations of the provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, et seq., to recover the damages they have sustained as a result of the participation by Chesapeake and Access Midstream in a scheme involving the conduct of the affairs of one or more de facto enterprises through what amounted to a pattern of racketeering activity.  As a result, this Court has original jurisdiction over the Fourth Cause of Action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 18 U.S.C. §§ 1962 and 1964 (prohibited activities; civil remedies).

19.     This Court has personal jurisdiction over Defendants because each of them systematically and continuously transacts substantial business in the United States and in this District.

20.     This Court also has supplemental jurisdiction over the claims and parties named the Fifth through Ninth Causes of Action, pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction), as the claims set forth therein are sufficiently related to the claims over which the Court has original jurisdiction that they form part of the same case or controversy.

21.   In addition, or in the alternative, this Court has subject matter jurisdiction over the claims set forth in the Fifth through Ninth causes of action pursuant to 28 U.S.C. § 1332, because the aggregate matter in controversy in such claims, as to each Plaintiff, exceeds the sum or value of $75,000, exclusive of interest and costs, and the claims are between citizens of different states, resulting in complete diversity of citizenship.

22.   Venue is proper in this District pursuant to: 15 U.S.C. § 22 – which provides for venue of suits under the antitrust laws against a corporation in any district in which it may be found or transacts business; 18 U.S.C. § 1965(a) – which provides for venue in any district in which a RICO defendant transacts his affairs; and pursuant to 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2), because a substantial portion of the events giving rise to Plaintiff's claims occurred in this District, and Defendants are subject to personal jurisdiction in this District.

23.   Defendants' respective business activities that are the subject of this Complaint are within the flow of, and substantially have affected, interstate trade and commerce.

# PARTIES

## A.    Plaintiffs

24.    Plaintiff A&B Campbell Family LLC ("Campbell FLLC") is a Pennsylvania limited liability company with its principal place of business in Wyalusing, Pennsylvania. Each of the members of Campbell FLLC resides in and is a citizen of the Commonwealth of Pennsylvania. Campbell FLLC is the successor in interest to Andy Campbell a/k/a Andy D. Campbell, and to Bonnie L. Campbell, in royalty interests in the oil, gas and other minerals produced from a real property situated in Albany Township, in Bradford County, Pennsylvania, described as Tax Parcel Number 02-124-42, consisting of approximately 164.48 acres in the aggregate (the "Campbell Property").

25.    Plaintiffs Eugene J. Barrett, Jr. and Lori R. Barrett are adult individuals residing in Towanda, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Asylum Township, Bradford County, Pennsylvania, described as Tax Parcel Number 04-113.00-14, consisting of approximately 108 acres (the "Eugene Barrett Property).

26.    Plaintiffs James T. Barrett and Cindy E. Barrett, individually and trading as BCF Family Limited Partnership ("BCF"), are adult individuals residing in Towanda, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of BCF, a Pennsylvania limited partnership which is the owner of

royalty interests in the mineral rights to real property situated in Asylum Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 04-113-05 and 04-112-51, consisting of approximately 422.73 acres (the "James Barrett Property).

27.     Plaintiff John M. Barrett trading as John M. Barrett Family Limited Partnership ("John Barrett FLP"), is an adult individual residing in Towanda, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the sole general partner of John Barrett FLP, a Pennsylvania limited partnership with its principal place of business in Towanda, Pennsylvania. Each of the limited partners of John Barrett FLP also resides in and is a citizen of the Commonwealth of Pennsylvania. John Barrett FLP is the owner of real property situated in Asylum Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 04-113.00-008-000 and 04-113.00-012-000, consisting of approximately 271.9 acres in the aggregate (the "John Barrett FLP Property).

28.     Plaintiff Barto Family LLC ("Barto FLLC") is a Pennsylvania limited liability company with its principal place of business in Wyalusing, Pennsylvania. Each of the members of Barto FLLC resides in and is a citizen of the Commonwealth of Pennsylvania. Barto FLLC is the owner of real property situated in Terry and Asylum Townships, Bradford County, Pennsylvania, described as Tax Parcel Number 46-113-130, consisting of approximately 86.88 acres (the "Barto FLLC Property).

29.     Plaintiff Clark A. Beebe, Individually and as Trustee of the Joseph J. Beebe Trust, is an adult individual residing in Sussex County, New Jersey, a citizen of the State of New Jersey, and in his individual capacity is the owner of real property situated in Asylum Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 04-100.00-130-000-000, 04-100.00-176-000-000,04-100.00-186-000-000, 04-100.00-190-000-000, 04-100.00-191-000-000, and Tax Parcel Number 04-101.00-160-000-000 and 04-101.00-161-000-000, consisting of approximately 333 acres in the aggregate (collectively, the "Beebe Property").

30.     Plaintiffs Clark A. Beebe and Donna L. Beebe, Trustees of the Beebe Living Trust dated June 21, 2010 (the "Beebe Living Trust"), are adult individuals residing in Morris County, New Jersey, and citizens of the State of New Jersey. Each of the beneficiaries of the Beebe Living Trust also resides in and is a citizen of the State of New Jersey. The Beebe Living Trust is the owner of real property situated in Asylum Township, Bradford County, Pennsylvania, described as Tax Parcel Number 04-100.00-149-000-000, consisting of approximately 78 acres of land, more or less (collectively, the "Beebe Living Trust Property"), which was formerly owned by Clark A. Beebe, in his capacity as Trustee of the Joseph J. Beebe Trust.

31.     Plaintiffs David J. Bride and Diane V. Bride, Individually and trading as Bride Family Limited Partnership ("Bride FLP"), are adult individuals residing in Towanda, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the

general partners of Bride FLP, a Pennsylvania limited partnership with its principal place of business in Towanda, Pennsylvania. Each of the limited partners of Bride FLP also is a citizen of the Commonwealth of Pennsylvania. Bride FLP is the owner of real property situated in Asylum Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 04-101.00-169 (consisting of approximately 134.450 acres) and 04-101.00-140-002-000 (consisting of approximately 25.620 acres) (collectively, the "Bride FLP Property").

32.     Plaintiffs Michael R. Bride and Shirley Bride trading as Marshview Family Limited Partnership ("Marshview FLP") are adult individuals residing in Towanda, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of Marshview FLP, a Pennsylvania limited partnership with its principal place of business in Towanda, Pennsylvania. Each of the limited partners of Marshview FLP also resides in and is a citizen of the Commonwealth of Pennsylvania. Marshview FLP is the owner of real property situated in Asylum Township, Bradford County, Pennsylvania, described as Tax Parcel Number 04-101-168, consisting of approximately 291.9 acres in the aggregate (the "Marshview FLP Property").

33.     Plaintiffs Russell E. Bulick and Cathy Ann Brady are adult individuals residing in Towanda, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Terry Township, Bradford County,

Pennsylvania, described as Tax Parcel Number 46-113-129.1, consisting of approximately 20.26 acres (the "Bulick/Brady Property").

34.     Plaintiff Ronald L. Campbell is an adult individual residing in Wyalusing, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of real property situated in Wyalusing Township, Bradford County, Pennsylvania, described as Tax Parcel Number 61-103-97 (consisting of approximately 74.8 acres) and 61-103-92 (consisting of approximately 104.3 acres), together consisting of a total of approximately 179.1 acres in the aggregate (collectively, the "Ronald Campbell Property").

35.     Plaintiffs James E. Canfield and Freda L. Canfield are adult individuals residing in New Albany, Pennsylvania, citizens of  the Commonwealth of Pennsylvania, and the owners of real property situated in Albany Township, Bradford County, Pennsylvania, described as Tax Parcel Number 02-124-92, consisting of approximately 30.5 acres (the "Canfield Property").

36.     Plaintiffs Richard A. Card, Jr. and Candy S. Card are adult individuals residing in Laceyville, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Tuscarora Township, Bradford County, Pennsylvania, described as Tax Parcel Number 54-104-106.3, consisting of approximately 17.3977 acres (the "Card Property").

37.    Plaintiff Loretta M. Casey-Sotherden is an adult individual residing in Elmira, New York, a citizen of the State of New York, and the owner of real property situated in Litchfield Township, Bradford County, Pennsylvania, described as Tax Parcel Number 23-009.00-018-000-000, consisting of approximately 67.8000 acres (the "Casey-Sotherden Property").

38.    Plaintiffs Erven E. Crawford and June Crawford are adult individuals residing in New Albany, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Terry Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 46-136-11 (consisting of approximately 37.00 acres) and 46-124-156 (consisting of approximately 166.9000 acres (the "Crawford Property").

39.    Plaintiff DJH & PAH, LLC, trading as WGH & HBH, LP, is a Pennsylvania limited liability company with its principal place of business in New Albany, Pennsylvania, and is the general partner of WGH & HBH, LP, a Pennsylvania limited partnership also with its principal place of business in New Albany, Pennsylvania. All of the members of DJH & PAH, LLC, and all of the limited partners of WGH & HBH, LP, reside in and are citizens of the Commonwealth of Pennsylvania. WGH & HBH, LP is the owner of real property, or royalty interests in the mineral rights to real property, situated in Albany Township, Bradford County, Pennsylvania, including but not limited to: a property

20

described as Tax Parcel  02-123-120 (consisting of approximately 10.00 acres); an undivided two-thirds (2/3) interest in a property described as Tax Parcel Numbers 02-123-121 (consisting of approximately 125.500 acres); and a property described as Tax Parcel Number 02-123-125 (consisting of approximately 27.6 acres), as well as an additional ten acres, the tax parcel number of which is not known (collectively, the "WGH & HBH, LP Property").

40.    Plaintiff DJH & WGH, LLC, trading as Henry Brothers, L.P., is a Pennsylvania limited liability company with its principal place of business in New Albany, Pennsylvania, and is the general partner of Henry Brothers, L.P., a Pennsylvania limited partnership also with its principal place of business in New Albany, Pennsylvania. All of the members of DJH & WGH, LLC, and all of the limited partners of Henry Brothers, L.P., reside in and are citizens of the Commonwealth of Pennsylvania. Henry Brothers, L.P. is the owner of real property, or royalty interests in the mineral rights to real property, situated in Albany Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 02-123-110 (consisting of approximately 22.9 acres); 02-123-111 (consisting of approximately 1.7700 acres); and 02-123-113 (consisting of approximately 18.0 acres) (the "Henry Brothers, L.P. Property").

41.    Plaintiff DP Investments, LLC ("DP Investments") is a Pennsylvania limited liability company with its principal place of business in New Albany,

Pennsylvania. Each of the members of DP Investments resides in and is a citizen of the Commonwealth of Pennsylvania. DP Investments is the owner by assignment of an undivided one-eighth interest in all of the lessor's rights under an oil and gas lease to property situated in Albany Township, Bradford County, Pennsylvania, described as Tax Parcel Number 02-5-5G, consisting of approximately 150.02 acres (the "DP Investments Property").

42.    Plaintiffs Paul DeNault and Valarie DeNault are adult individuals residing in New Albany, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situate in New Albany Township, Bradford County, Pennsylvania, described as Tax Parcel Number 02-124.00-152.001, consisting of approximately 2.0 acres (the "DeNault Property").

43.    Plaintiff Robert L. Dibble, Jr., is an adult individual residing in New Albany, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of real properties situated in Albany Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 02-124-150 (consisting of approximately 1.12 acres) and 02-135-61 (consisting of approximately 59.17 acres) (collectively, the "Dibble Property").

44.    Plaintiffs Charles L. Emerson and Pamela J. Emerson are adult individuals residing in Wysox, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Standing Stone Township,

Bradford County, Pennsylvania, described as Tax Parcel Number 43-075.00-196-000, consisting of approximately 21.376 acres (the "Emerson Property").

45.     Plaintiff Epler Family LLC ("Epler FLLC") is a Pennsylvania limited liability company with its principal place of business in New Albany, Pennsylvania. Each of the members of Epler FLLC resides in and is a citizen of the Commonwealth of Pennsylvania. Epler FLLC is the owner of real property situated in Albany Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 02-124-114 and 02-124-116, consisting of approximately 146.16 acres in the aggregate (the "Epler Property"), pursuant to a Corrective Deed dated June 18, 2010, and recorded March 4, 2011, at Instrument No. 201106242, from Robert H. Epler and Judy N. Epler.

46.     Plaintiff F & M Robinson, LLC ("Robinson LLC") trading as Francis & Maxine Robinson Family Limited Partnership ("Robinson FLP"), is a Pennsylvania limited liability company with its principal place of business in Towanda, Pennsylvania, and is the general partner of Robinson FLP, a Pennsylvania limited partnership also with its principal place of business in Towanda, Pennsylvania. All of the members of Robinson LLC, and all of the limited partners of Robinson FLP, reside in and are citizens of the Commonwealth of Pennsylvania. Robinson FLP is the owner of real property situated in Monroe Township, Bradford County, Pennsylvania, described as Tax Parcel Number 25-100-34, consisting of

approximately 167.22 acres in the aggregate (collectively, the Robinson FLP Property").

47.     Plaintiff Foster Family Farm LLC ("Foster FLLC") is a Pennsylvania limited liability company with its principal place of business in Towanda, Pennsylvania. All of the members of Foster FLLC reside in and are citizens of the Commonwealth of Pennsylvania. Robsinson FLLC is the owner of real property situated in Wysox Township, Bradford County, Pennsylvania, described as Tax Parcel Number 62-74-14, consisting of approximately 284.96 acres (the "Foster FLLC Property").

48.     Plaintiffs E. Larry Franklin and Carol Franklin are adult individuals residing in Laceyville, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Braintrim Township, Wyoming County, Pennsylvania, described as Tax Parcel Number 01-089.00-028-24-00-00, consisting of approximately 3.000 acres ("Franklin Property 1") and real property situated in Wilmot Township, Bradford County, consisting of approximately 24.55 acres ("Franklin Property 2").

49.     Plaintiffs Thomas R. Frederick and Deborah Frederick a/k/a Deborah S. Frederick trading as FH Ranch Family Limited Partnership ("FH Ranch FLP"), are adult individuals residing in Wyalusing, Pennsylvania, are citizens of the Commonwealth of Pennsylvania, and are the general partners of FH FLP, a

Pennsylvania limited partnership with its principal place of business in Wyalusing, Pennsylvania. Each of the limited partners of FH FLP also resides in and is a citizen of the Commonwealth of Pennsylvania. FH FLP is the owner of real property situated in Herrick and Standing Stone Townships, Bradford County, described as Tax Parcel Numbers 20-89-85 and 20-89-86, consisting of approximately 148.58 acres in the aggregate (the "FH Ranch FLP Property").

50. Plaintiff Theodore B. Gatto a/k/a Theodore Gatto, Individually and as Administrator of the Estate of Penny June Gatto, Deceased, is an adult individual residing in New Albany, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of real property situated in Terry and Albany Townships, Bradford County, Pennsylvania, described as Tax Parcel Number 46-136-11, consisting of approximately 79 acres (the "Gatto Property"). All of the beneficiaries of the Estate of Penny June Gatto also reside in and are citizens of the Commonwealth of Pennsylvania.

51. Plaintiffs James E. Grimes and Barbara P. Grimes are adult individuals residing in Wysox, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Wysox Township, Bradford County, Pennsylvania, described as Tax Parcel Number 62-75-119, consisting of approximately 215.90 acres (the "Grimes Property").

52.     Plaintiff F. Robert Hauss and Carol Hauss trading as Hauss Family Limited Partnership ("Hauss FLP") are adult individuals residing in New Albany, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of Hauss FLP, a Pennsylvania limited partnership with its principal place of business in New Albany, Pennsylvania. Each of the limited partners of Hauss FLP also resides in and is a citizen of Pennsylvania. Hauss FLP is the owner of real property situated in Albany Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 02-124-16 and 02-124-108.1, consisting of approximately 146.16 acres in the aggregate (collectively, the "Hauss FLP Property").

53.     Plaintiffs Walter G. Henry, Jr. and Cheryl A. Henry (a/k/a Cheryl R. Henry) are adult individuals residing in New Albany, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Albany Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 02-123-112 (consisting of approximately 0.78 acres), 02-113-123 (consisting of approximately 1.350 acres) and 02-113-124 (consisting of approximately 4.0 acres), and an undivided one-third interest in Tax Parcel No. 02-123-121 (consisting of approximately 62.750 acres) (collectively, the "Walter and Cheryl Henry Property").

54.     Plaintiffs Richard W. Jackson and Dolores B. Jackson, Trustees of the Jackson Trust dated July 1, 2002 (the "Jackson Trust"), are adult individuals residing in Mansfield, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the

owners of a 55.23607% undivided interest in and to all of the oil, gas and any and all hydrocarbons including those located within any minerals in and under and that may be produced from land situated in Wyalusing Township, Bradford County, Pennsylvania, described as Tax Parcel Number 61-101.00-171-000-000, consisting of approximately 106 acres (the "Jackson Trust Property"). All of the beneficiaries of the Jackson Trust also reside in and are citizens of Pennsylvania.

55.    Plaintiff Theodore A. Johnson is an adult individual residing in Towanda, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of real property situated in Asylum Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 04-101.00-130-000 (consisting of approximately 48 acres), 04-101.00-145-000 (consisting of approximately 32.95 acres), and 04-101.00-146-000 (consisting of approximately 3.5 acres (collectively, the "Theodore Johnson Property").

56.    Little Fall R & R, Inc. ("Little Fall"), is a Pennsylvania corporation with its principal place of business in Albany Township, Bradford County, Pennsylvania, and the owner of real property situated in Albany Township, Bradford County, Pennsylvania, described as Tax Parcel Number 02-124-87 (consisting of approximately 54 acres) (the "Little Fall Property").

57.    Plaintiffs Richard D. Marshall and Sandra L. Marshall are adult individuals residing in Wyalusing, Pennsylvania, citizens of the Commonwealth of

Pennsylvania, and the owners of real property situated in Terry Township, Bradford County, Pennsylvania, described as Tax Parcel Number 46-114-10.1, consisting of approximately 20.42 acres (the "Marshall Property").

58.    Plaintiffs David W. Moon and Mary J. Moon trading as Moonhaven Family Limited Partnership ("Moonhaven FLP") are adult individuals residing in New Albany, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of Moonhaven FLP, a Pennsylvania limited partnership with its principal place of business in New Albany, Pennsylvania. Each of the limited partners of Moonhaven FLP also resides in and is a citizen of Pennsylvania. Moonhaven FLP is the owner of real property situated in Windham Township, Wyoming County, Pennsylvania, described as Tax Parcel Numbers 29-067.00-003-02-00-00, consisting of approximately 3.04 acres ("Moonhaven FLP Property 1"), and real property situated in Albany and Terry Townships, Bradford County, Pennsylvania, described as Tax Parcel Numbers 02-124-152 and 02-135-63 (Albany Township) and 46-136-10 (Terry Township), consisting of approximately 193.53 acres in the aggregate (originally described as 131.89 acres, but subsequently increased, following survey, by Amendment and Ratification of Oil and Gas Lease effective May 11, 2006 and recorded on April 12, 2013  ("Moonhaven FLP Property 2").

59.     Plaintiff MorChar, LLC ("MorChar") trading as M&C Fassett Family Limited Partnership ("M&C FLP"), is a Pennsylvania limited liability company with its principal place of business in Laceyville, Pennsylvania, and is the general partner of M&C FLP, a Pennsylvania limited partnership also with its principal place of business in Laceyville, Pennsylvania. All of the members of MorChar, and all of the limited partners of M&C FLP, reside in and are citizens of the Commonwealth of Pennsylvania. M&C FLP is the owner of real property situated in Tuscarora Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers: 54-091.00-083-000-000;  54-091.00-083-001-000;  54-091-00-084-000-000;  and  54-104.00-110-000-000; consisting of approximately 286.712 acres in the aggregate (collectively, the M&C FLP Property").

60.     Plaintiffs Kent L. Morgan and M. Patricia Nelson are adult individuals residing in Englewood, Florida, citizens of the State of Florida, and the owners of real property situated in Fox Township, Sullivan County, Pennsylvania, described as Tax Parcel Numbers 9-106-65 and 9-92-16, consisting of approximately 176.643 acres in the aggregate (collectively, the "Morgan/Nelson Property").

61.     Plaintiffs Wesley G. Mosier and Barbara E. Mosier, a/k/a Barbara E. Kissell are adult individuals residing in Towanda, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of three parcels of real property totaling approximately 313.32 acres, including: (a) a property situated in North

Towanda Township, Bradford County, Pennsylvania, described as Tax Parcel Number 51-73-167 (consisting of approximately 296.66 acres); (b) a property situated in Asylum Township, Bradford County, Pennsylvania (consisting of approximately 12.07 acres); and (c) a property situated in Asylum Township, Bradford County, Pennsylvania (consisting of approximately 4.59 acres) (collectively, the "Mosier Property").

62.     Plaintiff Mosier Real Estate Management Co., LLC ("Mosier LLC") is a Pennsylvania limited liability company with its principal place of business in Towanda, Pennsylvania, and is the general partner of Mosier Family Royalty Management, LP ("Mosier Family LP"), a Pennsylvania limited partnership also with its principal place of business in Towanda, Pennsylvania. All of the members of Mosier LLC, and all of the limited partners of Mosier Family LP, reside in and are citizens of the Commonwealth of Pennsylvania. Mosier Family LP is the owner by assignment from Wesley Mosier and Barbara Mosier of all right, title and interest in and to royalties under certain oil and gas leases of two parcels of real property totaling approximately 309 acres, including: (a) a property situated in North Towanda Township, Bradford County, Pennsylvania, described as Tax Parcel Number 51-73-167 (consisting of approximately 296.66 acres); and (b) a property situated in Asylum Township, Bradford County, Pennsylvania, described as Tax

Parcel Number 4-101-53 (consisting of approximately 12.07 acres) (together, the "Mosier Family LP Property").

63.     MS & JC Doss, LLC ("Doss LLC") trading as M & J Doss, LP ("Doss LP"), is a Pennsylvania limited liability company with its principal place of business in Albany Township, Pennsylvania, and is the general partner of Doss LP, a Pennsylvania limited partnership also with its principal place of business in Albany Township, Pennsylvania. Each of the members of MS & JC Doss, LLC, and each of the limited partners of Doss LP, resides in and is a citizen of the Commonwealth of Pennsylvania. Doss LP holds royalty interests in the oil, gas and other minerals produced from a real property situated in Albany and Monroe Townships, Bradford County, Pennsylvania, described as Tax Parcel Number 02-124-86 (consisting of approximately 91.6 acres) and Tax Parcel Number 25-123-32 (consisting of approximately 19.9 acres) (together, the "Doss LP Property"), pursuant to assignment of an oil and gas lease from Michael Doss and Joan Doss.

64.     Plaintiff Doris J. Newton is an adult individual residing in Wyalusing, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of real property situated in Asylum and Terry Townships, Bradford County, Pennsylvania, described as Tax Parcel Numbers: 04-113-132 (consisting of approximately 28.145 acres); 04-101-118 (consisting of approximately 90.55 acres);

and 04-113-42 (consisting of approximately 8 acres), consisting of approximately 126.695 acres in the aggregate (collectively, the "Doris Newton Property").

65.     Plaintiffs H. Timothy Newton and Renee S. Newton are adult individuals residing in Wyalusing, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Terry Township, Bradford County, Pennsylvania, described as Tax Parcel Number 46-113-105, consisting of approximately 21.75 acres (the "Timothy and Renee Newton Property").

66.     Plaintiffs Shawn Patrick Newton and Nicole D. Newton are adult individuals residing in Wyalusing, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Terry Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 46-125-55.1 (consisting of approximately 45.42 acres) and 46-125-56 (consisting of approximately 10.41 acres), consisting of approximately 55.83 acres in the aggregate (collectively, the "Shawn and Nicole Newton Property").

67.     Plaintiffs Walter E. Newton, III and Darlene R. Newton are adult individuals residing in Wyalusing, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Terry Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers: 46-125-50 (consisting of approximately 1.5 acres); 46-125-51 (consisting of approximately 26.95 acres); 46-125-62 (consisting of approximately 2 acres); 46-125-63 (consisting of

approximately 7 acres); 46-125-49 (consisting of approximately 10 acres); and 46-125-55 (consisting of approximately 48.81 acres); consisting of approximately 96.29 acres in the aggregate (collectively, the "Walter and Darlene Newton Property").

68.    Plaintiffs Walter E. Newton, III and Shawn Newton trading as Newton Family Limited Partnership ("Newton FLP") are adult individuals residing in New Albany, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of Newton FLP, a Pennsylvania limited partnership with its principal place of business in New Albany, Pennsylvania. Each of the limited partners of Newton FLP also resides in and is a citizen of Pennsylvania.  Newton FLP is the owner of real property located in Terry Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers: 46-124-160; 46-124-171; 46-125-25; 46-124-164; and 46-125-128; consisting of approximately 366.93 acres (collectively, the Newton FLP Property").

69.    Plaintiff Outdoor Investment, LLC ("Outdoor LLC") trading as White Tail Mountain Well, L.P. ("White Tail LP") is a Pennsylvania limited liability company with its registered office in Newtown, Bucks County, Pennsylvania, and is the general partner of White Tail LP, a Pennsylvania limited partnership also with its principal place of business in New Albany, Pennsylvania. Each of the members of Outdoor LLC and each of the limited partners of White Tail LP resides in and is a citizen of either the State of New Jersey or the Commonwealth of Pennsylvania.

White Tail LP is the owner by assignment of all of the rights and privileges of the lessor under an oil and gas lease dated May 2, 2006 with Anadarko, relating to a real property situated in Wysox Township, Bradford County Pennsylvania, described as Tax Parcel Number 02-123-116, consisting of approximately 150.02 acres (the "White Tail LP Property"):

70.    Plaintiff Jacqueline T. Place a/k/a Jacqueline J. Place is an adult individual residing in Wyalusing, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of real property situated in Terry Township, Bradford County, Pennsylvania, described as Tax Parcel Number 46-113-103.2, consisting of approximately 35.3 acres (the "Place Property").

71.    Plaintiffs Jerry L. Price and Claudia C. Price are adult individuals residing in Wyalusing, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Terry Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers: 46-113-117 and 46-114-14.1 (together consisting of approximately 184.31 acres); and 46-124-187.1 (consisting of approximately 1 acre); consisting of approximately 185.3 acres in the aggregate (the "Price Property").

72.    Plaintiffs Milton Repsher a/k/a Milton H. Repsher, Sr., and Neta Repsher a/k/a Neta V. Repsher trading as M&N Repsher Partners Limited Partnership ("Repsher LP") are adult individuals residing in Laceyville,

Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of Repsher LP, a Pennsylvania limited partnership with its principal place of business in Laceyville, Pennsylvania. Each of the limited partners of Repsher LP also resides in and is a citizen of the Commonwealth of Pennsylvania. Repsher LP is the owner of real property situated in Tuscarora and Wilmot Townships, Bradford County, Pennsylvania, described as Tax Parcel Numbers: 54-104-106.2 (consisting of approximately 47.2 acres); 54-104-105 (consisting of approximately 50 acres); 54-104-106 (consisting of approximately 14.71 acres); and 58-127-82 (consisting of approximately 24.55 acres); consisting of approximately 136.46 acres in the aggregate (collectively, the Repsher LP Property").

73.     Plaintiffs David L. Sandt a/k/a David Leo Sandt, and Maryanne Sandt are adult individuals residing in Wyalusing, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of an undivided interest in real property situated in Herrick Township, Bradford County, Pennsylvania, described as Tax Parcel Number 20-090.00-124-000-000, consisting of approximately 179 acres (the "Sandt Property"). Plaintiff David L. Sandt also is the owner of a one-third interest as a joint tenant in a separate real property situated in Herrick Township, Pennsylvania, described as Tax Parcel Number 20-090.00-112-000-000, consisting of approximately 43.00 acres (the "David Sandt Property").

74.    Plaintiff Rexford Schoonover is an adult individual residing in Wysox, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of real property situated in Standing Stone and Wysox Townships, Bradford County, Pennsylvania, described as Tax Parcel Number 42-88-111, consisting of approximately 163 acres (the "Schoonover Property").

75.    Plaintiffs Paul R. Sites and Sue A. Sites trading as Sites Family Limited Partnership ("Sites FLP") are adult individuals residing in Monroeton, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of Sites FLP, a Pennsylvania limited partnership with its principal place of business in Monroeton, Pennsylvania. Each of the limited partners of Sites FLP also resides in and is a citizen of the Commonwealth of Pennsylvania. Sites FLP is the owner of real properties situated in Monroe Township, Bradford County, Pennsylvania, the first designated as Tax Parcel Numbers 25-99-40.1 and 25-99-29.2, consisting of a total of 21.175001 acres (initially 23.59 acres, prior to the sale of 2.411 acres in February 2010) in the aggregate (collectively, the "Sites FLP Property 1"), and the second designated as Tax Parcel Number 25-99-29, consisting of approximately 23.7800 acres (initially 24.41 acres) ("Sites FLP Property 2").

76.    Plaintiff SL Allen LLC trading as Shirley L. Allen Family Limited Partnership ("Shirley Allen FLP") is a Pennsylvania limited liability company with its principal place of business in Wysox, Pennsylvania, and is the general partner of

36

Shirley Allen FLP, a Pennsylvania limited partnership also with its principal place of business in Wysox, Pennsylvania. Each of the members of SL Allen LLC, and each of the limited partners of Shirley Allen FLP, also resides in and is a citizen of the Commonwealth of Pennsylvania. Shirley Allen FLP is the owner of real property situated in Wysox Township, Bradford County Pennsylvania, described as Tax Parcel Numbers: 62-75-40 (consisting of approximately 2.67 acres); 62-75-49 (consisting of approximately 224.16 acres); 62-75-81 (consisting of approximately 134.8 acres); 62-75-24 (consisting of approximately 1.15 acres); 62-75-64 (consisting of approximately 16.7 acres); and 62-75-56 (consisting of approximately 29.94 acres); together consisting of approximately 409.42 acres in the aggregate (collectively, the Shirley Allen FLP Property").

77.    Plaintiff James P. Snell is an adult individual residing in Towanda, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of real property situated in Towanda Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 50-86-86002 (consisting of approximately 14.93 acres), 50-86-132 (consisting of approximately 70.0 acres), and 50-86-133 (consisting of approximately 26.18 acres), together comprising approximately 111.11 acres (the "James Snell Property").

78.    Plaintiffs John R. Snell and Michele S. Snell trading as Outback Family Limited Partnership ("Outback FLP") are adult individuals residing in Towanda,

Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of Outback FLP, a Pennsylvania limited partnership with its principal place of business in Towanda, Pennsylvania. Each of the limited partners of Outback FLP also resides in and is a citizen of the Commonwealth of Pennsylvania. Outback FLP is the owner of real property situated in Asylum Township, Bradford County, Pennsylvania, descried as Tax Parcel Number 04-101-33, consisting of approximately 61.37 acres (the "Outback FLP Property").

79.    Plaintiffs Peter P. Solowiej and Kendra D. Solowiej are adult individuals residing in Bradford County, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Wyalusing Township, Bradford County, Pennsylvania, described as Tax Parcel Number 61-102-64, consisting of approximately 65.57 acres (the "Solowiej Property").

80.    Plaintiffs Robert H. Stoudt, Jr. and Patti L. Stoudt trading as Stoudt Farm Limited Partnership ("Stoudt Farm LP") are adult individuals residing in New Albany, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of Stoudt Farm LP, a Pennsylvania limited partnership with its principal place of business in New Albany, Pennsylvania. Each of the limited partners of Stoudt Farm LP also resides in and is a citizen of the Commonwealth of Pennsylvania. Stoudt Farm LP is the owner of real property situated in Overton and

Albany Townships, Bradford County, Pennsylvania, descried as Tax Parcel Numbers 28-134-18, 28-134-20, 28-134-20.1 and 28-134-21, consisting of approximately a total of approximately 176.66 acres (the "Stoudt Farm LP Property").

81.     Plaintiff Tor Tamarack, LLC trading as Thomson Business Ventures, L.P. f/k/a Thomson Family Limited Partnership ("Thomson LP") is a Pennsylvania limited liability company with its principal place of business in Wysox, Pennsylvania, and is the general partner of Thomson LP, a Pennsylvania limited partnership also with its principal place of business in Wysox, Pennsylvania. Each of the limited partners of Thomson LP also resides in and is a citizen of the Commonwealth of Pennsylvania. Thomson LP is the owner of real property situated in Standing Stone Township, Bradford County, Pennsylvania, designated as Tax Parcel Numbers: 43-088.00-112.000 (consisting of approximately 22.90000 acres); 43-088.00-113.000 (consisting of approximately 382.275000 acres); 43-089.00-138.000 (consisting of approximately 56.06400 acres); 43-089.00-138.002 (consisting of approximately 16.0000 acres); 43-088.00-112.000 (consisting of approximately 20.495308 acres); and 43-088.00-113.000 (consisting of approximately 118.797787 acres); together consisting of a total of approximately 477.190 acres in the aggregate (collectively, the "Thomson LP Property").

B.   **Defendants**

82.   Defendant Chesapeake Energy Corporation ("Chesapeake Energy") is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma. Chesapeake Energy is a publicly traded oil and gas company which, through its subsidiaries, including but not limited to Chesapeake Appalachia, is one of the largest producers of natural gas in the United States.

83.   Chesapeake Energy provides the following summary of its business on its corporate website:

> Founded in 1989, Chesapeake's operations are focused on discovering and developing onshore, unconventional oil and natural gas fields in the U.S. We currently hold leading positions in the Eagle Ford, Utica, Granite Wash, Cleveland, Tonkawa, Mississippi Lime and Niobrara unconventional liquids plays and the Marcellus, Haynesville/Bossier and Barnett unconventional natural gas shale plays. The company also owns substantial marketing and compression businesses.
>
> As one of the first to recognize the vast potential of shale resources unlocked by advances in horizontal drilling techniques, Chesapeake has grown to become the second-largest producer of natural gas, 11th largest producer of oil and natural gas liquids, and the most active driller of onshore wells in the country.[3]

---

[3]   http://www.chk.com/About/Pages/Default.aspx (last visited December 8, 2014)

84.     Defendant Chesapeake Appalachia is an Oklahoma limited liability company with its principal place of business in Oklahoma City, Oklahoma. Defendant Chesapeake Energy is the sole member of Chesapeake Appalachia.

85.     Defendant Chesapeake Energy Marketing, Inc. ("CEMI"), is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma. CEMI is a wholly-owned subsidiary of defendant Chesapeake Energy.

86.     CEMI provides natural gas, oil and NGL marketing services, commodity price structuring, contract administration and nomination services, for Chesapeake, other interest owners in Chesapeake-operated wells and other producers. Among its other activities, CEMI aggregates volumes of gas produced from multiple wells, including wells located on separately owned properties pursuant to multiple different mineral leases, which are then sold to various intermediary markets, end markets and pipelines.

87.     Defendant Chesapeake Operating, Inc. ("COI"), is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma. COI is a wholly-owned subsidiary of defendant Chesapeake Energy.

88.     COI is responsible for the production of gas from leases in which Chesapeake entities hold the operating interest.

89.     Defendant   Chesapeake   Exploration,   L.L.C.   ("Chesapeake Exploration"), is an Oklahoma limited liability company with its principal place of

business in Oklahoma City, Oklahoma. Chesapeake Exploration is the successor in interest to Chesapeake Exploration, L.P. Chesapeake Exploration, is comprised of three members: defendant COI (discussed above), Chesapeake E&P Holding Corporation (a corporation organized under Oklahoma law with its principal place of business in Oklahoma City, Oklahoma), and defendant Chesapeake Appalachia (discussed above).

90.     Defendant Williams Partners, LP, f/k/a Access Midstream Partners, L.P. ("Access Midstream"), is a publicly-traded Delaware limited partnership with its principal place of business in Tulsa, Oklahoma. Chesapeake Energy formed Access Midstream (formerly known as Chesapeake Midstream Partners, L.P.) in 2010 to own, operate, develop and acquire natural gas, natural gas liquids and oil gathering systems and other midstream energy assets.  The business of Access Midstream is principally focused on natural gas and NGL gathering, the first segment of midstream energy infrastructure that connects natural gas and NGLs produced at the wellhead to third-party takeaway pipelines.

91.     Defendant Access MLP Operating, L.P. ("Access Operating"), is a Delaware limited partnership with its principal place of business in Oklahoma City, Oklahoma. On information and belief, Access Operating is a direct or indirect subsidiary of Access Midstream, and serves as the operating entity for the natural gas gathering and transportation business of Access Midstream.

92.     Defendant Appalachia Midstream Services, L.L.C. ("Appalachia Midstream"), is an Oklahoma limited liability company with its principal place of business in Oklahoma. On information and belief, Appalachia Midstream was at times relevant to this action a direct or indirect subsidiary of Chesapeake Energy.

93.     Defendant Anadarko E&P Onshore LLC, successor by conversion to and f/k/a Anadarko E&P Company, L.P. ("Anadarko E&P"), is a Delaware limited liability company with its registered address in Delaware and its principal place of business in Houston, Texas. It is wholly-owned by Anadarko USH1 Corporation, a Delaware corporation with its principal place of business in Houston, Texas. Anadarko E&P is a subsidiary of Anadarko Petroleum Corporation ("Anadarko").

94.     Defendant Statoil USA Onshore Properties, Inc. ("Statoil USA") is a Delaware corporation with its principal place of business in Houston, Texas. Statoil USA is a subsidiary of Statoil ASA ("Statoil").

95.     Defendant Mitsui E&P USA LLC ("Mitsui USA"), is a Delaware limited liability company with its principal place of business in Houston, Texas. On information and belief, it is a wholly-owned direct or indirect subsidiary of Mitsui & Co., Ltd. ("Mitsui"), a public company organized and existing under the laws of Japan, with its principal place of business in Japan.

## FACTUAL BACKGROUND

**A.    The Production, Gathering, Processing and Transportation of Natural Gas**

96.    After natural gas is extracted from the ground at the wellhead, and before it enters interstate transmission pipelines governed by regulations established by the  Federal Energy Regulatory Commission ("FERC"), the gas is first moved through a system of "gathering" pipelines, which consist of relatively low pressure and smaller diameter (in comparison to interstate transmission pipelines) *intrastate* pipelines that transport raw natural gas from the wellhead, either to a processing plant, for subsequent delivery either to intrastate transportation pipelines (which are typically larger diameter, and some of which are subject to FERC jurisdiction, while others or not), or to major interstate transmission pipelines, or directly to such intrastate or interstate pipelines. As illustrated in defendant Access Midstream's 2013 Annual Report filed with the Securities and Exchange Commission ("SEC") on Form 10-K on February 21, 2013, Access Midstream's business focuses on the gathering and processing of natural gas between the wellhead and the major transportation pipelines:



97.     Although FERC regulations limit the rates that can be charged for the transmission of natural gas through *interstate* pipelines, to prevent price gouging, such regulations generally do not apply to limit the rates that can be charged for the transmission of natural gas through gathering systems and *intrastate* pipelines.

**B.     The Vertically Integrated, Highly Leveraged Business Models of Chesapeake and Anadarko**

98.     Once the potential returns from horizontal drilling and fracking became clear, many oil and gas production companies, including Anadarko and Chesapeake Energy, embarked on aggressive programs to acquire oil and gas leases to properties located above multiple shale formations throughout the United States, including the Marcellus Shale, which is located in Pennsylvania. As Chesapeake Energy explained in its 2010 Annual Report on Form 10-K, filed on March 1, 2011:

> … [W]e embarked on an aggressive lease acquisition program, which we have referred to as the "gas shale land grab" of 2006 through 2008 and the "unconventional oil land grab" of 2009 and 2010. We believed that the winner of these land grabs would enjoy competitive advantages for decades to come as other companies would be locked out of the best new unconventional resource plays in the U.S.

Chesapeake Energy Corporation Annual Report on Form 10-K, filed March 1, 2011, at 4.

99.     At the same time, both Chesapeake and Anadarko pursued vertically integrated business models that included not only the production of natural gas, but

also related interlocking business opportunities in midstream gathering pipelines and services, and, in the case of Chesapeake, in compression, drilling, marketing and trucking services.

100.   To fund its gas shale land grab, and the related aggressive growth and development of its interlocking vertical businesses, Chesapeake Energy borrowed increasingly greater amounts of money, resulting in it having a highly leverage balance sheet, including current liabilities of $7 billion, and long term liabilities of almost $17 billion, by the end of 2011.

### C.   Anadarko and Chesapeake Acquire Oil and Gas Leases In and Around Bradford County

101.   The Marcellus Shale formation, located in and beyond Pennsylvania, soon was determined to contain one of the largest natural gas reserves in the world.

102.   Both Anadarko and Chesapeake targeted Bradford County, Pennsylvania for an aggressive lease acquisition program, and for development of the natural gas gathering systems that would be necessary to support their respective drilling and production businesses.

103.   Beginning in or about 2006, Anadarko E&P acquired hundreds of oil and gas leases to properties in Bradford County, Pennsylvania, and in surrounding counties, both by entering into such leases itself and through T.S. Calkins & Associates, Inc. ("T.S. Calkins").

**D.** **Anadarko Assigns Working Interests in Its Leases to Chesapeake and Mitsui**

104.   On information and belief, Anadarko E&P entered into a Joint Exploration Agreement dated September 1, 2006 with Chesapeake Appalachia (and/or its affiliates), and also assigned, subject to certain reservations and exceptions, fifty percent (50%) of its right, title and interest in and to the Leases under which Plaintiffs hold royalty interests to Chesapeake Appalachia, pursuant to a series of Partial Assignments of Oil and Gas Leases.

105.   Anadarko E&P subsequently entered into an Appalachian Area Participation Agreement, dated effective January 1, 2010, with Mitsui USA, and also assigned, subject to certain reservations and exceptions, undivided interests in its right, title and interest in and to the Leases under which Plaintiffs hold royalty interests to Mitsui USA, pursuant to a series of Partial Assignments of Oil and Gas Leases.

**E.** **The Joint Venture Between Chesapeake and Statoil**

106.   In November 2008, Chesapeake entered into an industry participation agreement (commonly referred to as a joint venture) with Statoil, pursuant to which Chesapeake sold Statoil and certain of its subsidiaries, including Statoil USA, minority interests in Chesapeake's leaseholds, producing properties and other assets located in the Marcellus Shale play (including working interests in the leases in which Plaintiffs hold royalty interests, as well as certain gathering systems) in

consideration for an upfront cash payment of $1.250 billion plus a commitment by Statoil to pay 75% of Chesapeake's drilling and completion costs in the play until $2.125 billion has been paid. Chesapeake serves as the operator, and conducts all leasing, drilling, completion, operations and marketing activities in connection with the Statoil joint venture.

### F.   Plaintiffs' Royalty Interests

107.   Each of the following Plaintiffs or their respective predecessors in interest entered into a fully paid up oil and gas lease with Anadarko E&P, pursuant to which the respective Plaintiffs hold royalty interests in the natural gas produced and marketed from the leases premises:

| PLAINTIFF(S) | LEASED PREMISES | ORIGINAL LESSOR(S) | LEASE DATE |
|---|---|---|---|
| A&B Campbell Family LLC | Campbell Property | Andy Campbell | 08/07/2006 |
| Barto Family LLC | Barto FLLC Property | George E. & Dolores Barto | 3/4/2006 |
| Russell E. Bulick & Cathy Ann Brady | Bulick/Brady Property | Plaintiffs | 7/18/2006 |
| Ronald L. Campbell | Ronald Campbell Property | Plaintiff | 8/1/2006 |
| James E. Canfield & Freda L. Canfield | Canfield Property | Plaintiffs | 7/20/2006 |
| Richard A. Card, Jr. & Candy S. Card | Card Property | Plaintiffs | 6/7/2006 |
| Erven E. Crawford & June Crawford | Crawford Property | Plaintiffs | 5/17/2006 |

| DJH & PAH, LLC t/a WGH & HBH, LP | WGH & HBH, LP Property | Donald J. Henry & Patricia A. Henry | 5/2/2006 |
|---|---|---|---|
| DJH & WGH, LLC t/a Henry Brothers, L.P. | Henry Brothers, L.P. Property | Donald J. Henry Patricia A. Henry, Walter G, Henry & Cheryl A. Henry | 5/2/2006 |
| Paul DeNault & Valarie DeNault | DeNault Property | Plaintiffs | 5/11/2006 |
| Robert L. Dibble, Jr. | Dibble Property | Plaintiff | 5/22/2006 |
| DP Investments, LLC | DP Investments Property | Gustaves's Seven Bucks Club | 5/2/2006 |
| Charles & Pamela Emerson | Emerson Property | Plaintiffs | 6/28/2006 |
| Foster Family Farm LLC | Foster FLLC Property | Rosemarie Foster and Gregory Foster | 4/6/2006 |
| E. Larry Franklin and Carol Franklin | Franklin Property 2 | Plaintiffs | 5/23/2006 |
| Thomas R. Frederick & Deborah Frederick t/a FH Ranch Family Limited Partnership | FH Ranch FLP Property | Thomas R. Frederick & Deborah Frederick | 5/20/2006 |
| Theodore B. Gatto, Individually and as Admin. of the Estate of Penny June Gatto, Deceased | Gatto Property | Penny Gatto | 5/17/2006 |
| Walter G. Henry, Jr. and Cheryl A. Henry a/k/a Cheryl R. Henry | Walter and Cheryl Henry Property | Plaintiffs | 5/2/2006 |

| Richard W. Jackson and Dolores B. Jackson, Trustees of the Jackson Trust dated July 1, 2002 | Jackson Trust Property | Shirley L. Jackson, widow, by William W. Them, Attorney in Fact | 7/12/2006 |
|---|---|---|---|
| Theodore A. Johnson | Theodore Johnson Property | Plaintiff | 6/24/2006 |
| Little Fall R & R Inc. | Little Fall Property | Plaintiff | 6/29/2006 |
| Richard D. & Sandra L. Marshall | Marshall Property | Plaintiffs | 4/18/2006 |
| David W. Moon & Mary J. Moon t/a Moonhaven Family LP | Moonhaven FLP Property 2 | David W. Moon & Mary J. Moon | 5/11/2006 |
| MorChar , LLC t/a M&C Fassett Family LP | M&C FLP Property | Morris P. Fassett & Charlotte Fassett | 6/5/2006 |
| Kent L. Morgan & M. Patricia Nelson | Morgan/Nelson Property | Plaintiffs | 4/26/2006 |
| Wesley G. Mosier & Barbara E. Mosier, a/k/a Barbara E. Kissell | Mosier Family LP Property | Plaintiffs | 5/8/2006 |
| Mosier Real Estate Co., LLC t/a Mosier Family Royalty Management, LP | Mosier Family LP Property | Wesley G. Mosier and Barbara E. Mosier | 5/8/2006 |
| MS & JC Doss, LLC t/a M & J Doss, LP | Doss LP Property | Michael S. Doss & Joan C. Doss | 6/29/2006 |
| Doris J. Newton | Doris Newton Property | Plaintiff | 3/30/2006 |
| H. Timothy Newton & Renee S. Newton | Timothy and Renee Newton Property | Plaintiffs | 3/30/2006 |
| Shawn Patrick Newton and Nicole D. Newton | Shawn and Nicole Newton Property | Plaintiffs | 3/20/2006 |
| Walter E. Newton, III and Darlene R. Newton | Walter and Darlene Newton Property | Plaintiffs | 3/20/2006 |
| Walter E. Newton, III and Shawn Newton t/a Newton Family LP | Newton FLP Property | WAJA Farms, Inc. | 3/30/2006 |

| Outdoor Investment, LLC t/a White Tail Mountain Well, L.P. | White Tail LP Property | Gustave's Seven Bucks Club, Inc. | 5/2/2006 |
|---|---|---|---|
| Jacqueline T. Place a/k/a Jacqueline J. Place | Place Property | Plaintiff | 8/14/2006 |
| Jerry L. Price & Claudia C. Price | Price Property | Plaintiffs | 7/14/2006 |
| Milton Repsher a/k/a Milton H. Repsher, Sr. and Neta Repsher a/k/a Neta V. Repsher t/a M&N Repsher Partners Limited Partnership | Repsher LP Property | Milton Repsher & Neta Repsher | 6/7/2006 |
| David Leo Sandt | David Sandt Property | David Leo Sandt, Susan Sandt and Nancy Sandt | 3/7/2006 |
| Rexford Schoonover | Schoonover Property | Plaintiff | 4/11/2006 |
| Paul R. Sites and Sue A. Sites t/a Sites Family Limited Partnership | Sites FLP Property 1 | Paul R. & Sue A. Sites | 7/14/2006 |
| Paul R. Sites and Sue A. Sites t/a Sites Family Limited Partnership | Sites FLP Property 2 | Paul R. & Sue A. Sites | 7/14/2006 |
| James P. Snell | James Snell Property | Plaintiff | 6/13/2006 |
| Peter P. Solowiej and Kendra D. Solowiej | Solowiej Property | Plaintiffs | 8/11/2006 |
| Robert H. Stoudt, Jr. and Patti L. Stoudt t/a Stoudt Family Limited Partnership | Stoudt Farm LP | | 5/8/2006 |
| Tor Tamarack , LLC t/a Thomson Business Ventures, L.P. | Thomson LP Property | Thomson Family Limited Partnership d/b/a Tor Tamarack Farms | 5/4/2006 |

108.   Each of the following Plaintiffs or their respective predecessors in interest entered into a fully paid up oil and gas lease with T.S. Calkins, to which Anadarko E&P is the successor in interest, pursuant to which the respective Plaintiffs hold royalty interests in the natural gas produced and marketed from the leases premises:

| PLAINTIFF(S) | LEASED PREMISES | ORIGINAL LESSOR(S) | LEASE DATE |
|---|---|---|---|
| Eugene J. Barrett, Jr. & Lori R. Barrett | Eugene Barrett Property | Plaintiffs | 2/2/2006 |
| James Barrett & Cindy Barrett, Individually and t/a BCF Family Limited Partnership | James Barrett Property | James T. Barrett (a/k/a James Barrett) and Cindy E. Barrett | 2/9/2006 |
| John M. Barrett t/a John M. Barrett Family Limited Partnership | John Barrett FLP Property | John M. Barrett | 2/9/2006 |
| Clark A. Beebe | Beebe Property | Plaintiffs | 2/18/2006 |
| Clark A. Beebe & Donna L. Beebe, Trustees of the Beebe Living Trust dated June 21, 2010 | Beebe Living Trust Property | Clark A. Beebe, Individually and as Trustee of the Joseph J. Beebe Trust | 2/18/2006 |
| David J. Bride and Diane V. Bride, t/a Bride Family Limited Partnership | Bride FLP Property | David J. Bride & Diane V. Bride | 1/20/2006 |
| Michael R. Bride & Shirley Bride t/a Marshview Family Limited Partnership | Marshview FLP Property | Michael R. & Shirley A. Bride | 12/29/2005 |

| Epler Family LLC | Epler Property | Robert Harry & Larry R. Epler | 2/2/2006 |
|---|---|---|---|
| F&M Robinson, LLC t/a Francis & Maxine Robinson Family Limited Partnership | Robinson FLP Property | Francis E. Robinson & Maxine P. Robinson | 1/11/2006 |
| James E. Grimes & Barbara P. Grimes | Grimes Property | Plaintiffs | 2/22/2006 |
| F. Robert Hauss & Carol Hauss t/a Hauss Family Limited Partnership | Hauss FLP Property | F. Robert Hauss & Carol Hauss | 2/10/2006 |
| David L. Sandt a/k/a David Leo Sandt & Maryanne Sandt | Sandt Property | Jane M. Pratt, Trustee of Eva Mae Sandt Irrevocable Residential/ Income Only Trust dated August 5, 2004 | 3/3/2006 |
| SL Allen LLC t/a Shirley L. Allen Family Limited Partnership | Shirley Allan FLP Property | Shirley L. Allen | 2/18/2006 |
| John R. Snell & Michelle S. Snell t/a Outback Family Limited Partnership | Outback FLP Property | John R. Snell & Michelle S. Snell | 2/28/2006 |

109.   The Oil and Gas Leases described in which the respective Plaintiffs hold royalty interests above are sometimes referred to below individually as a "Lease" and collectively as "Plaintiffs' Leases" or the "Leases."

### G.   The Royalty Provisions in Plaintiffs' Leases

110.   Anadarko E&P and T.S. Calkins each used substantially the same preprinted form of Lease in connection with each Lease that it entered into with one

of the Plaintiffs, or with his, her or its predecessor in interest, each of which contains

the following provisions regarding royalties:

A.   The LESSEE covenants and agrees as follows:

1st – LESSEE … shall pay the LESSOR on gas … produced from the premises and used off the premises or lands pooled therewith or in the manufacture of gasoline, or other products therefrom, or sold (whether to an affiliated or non-affiliated purchaser) the market value at the well of one-eighth (1/8th) of the gas so used or sold. In no event shall the gas royalty payable hereunder be computed on the basis of a price the collection of which by LESSEE is unlawful or prohibited by order or regulation of any governmental authority having jurisdiction, and market value at the well shall not exceed the amount realized by LESSEE for such production computed at the well…. LESSEE may pay all taxes and fees levied upon LESSOR's royalty share of production of oil and gas and deduct the amount so paid from any monies payable to LESSOR hereunder….

\*          \*          \*          \*

B.   It is mutually agreed by and between LESSOR and LESSEE as follows:

6th – LESSEE is hereby granted the right to pool or unitize all or any part of the premises with any other leases, lands, oil or gas estates, or any of them whether owned by the LESSEE or others, so as to create one or more drilling or production units. Such units shall not exceed 640 acres in extent provided, however, that if any Federal or State law, Executive order, rule or regulation shall prescribe a spacing pattern for the development of the field or allocate a producing allowable on acreage per well, then such units may embrace as much additional acreage as may be prescribed or as may be use in such allocation or

allowable. LESSEE shall record a copy of the unit operation designation in the county in which the premises are located…. As to each such unit, LESSOR agrees to accept, in lieu of the royalty herein described, such proportion of such royalty as the acreage in the premises in such unit bears to the total acreage included in such unit….

111. Certain of Plaintiffs' Leases include addenda or exhibits which contain language increasing the royalty rate specified in the body of the preprinted form of Lease to a higher specified rate.

**H.    The Pooling and Unitization of the Leases and Commencement of Production of Natural Gas.**

112. Following the execution of the Leases of the respective Plaintiffs, or their predecessors in interest, the Lessee Defendants pooled, unitized and combined each of the respective Leases, along with the lands covered by the Lease and the oil and gas estates therein, with other properties, into one or more production units, and commenced the drilling of one or more wells in each unit and the production of gas from such wells, on dates that varied by Lease and by well.

113. Following the commencement of production of gas from the wells drilled in each unit into which all or any portion of each Lease was combined, the Lessee Defendants began accounting for and paying royalties to those Plaintiffs who had acreage covered by a Lease under which they held royalty interests included in the unit.

I.   **The Lessee Defendants Have Taken or Allowed for Deductions of Post-Production Costs Which Are Impermissible, or Otherwise Arbitrary, Excessive and Unreasonable, in Calculating the Royalties Payable to Plaintiffs, Resulting in the Material <u>Underpayment of Royalties Due and Owing to Plaintiffs.</u>**

114.   In calculating and paying royalties to Plaintiffs under their respective Leases, certain of the Lessee Defendants, including Chesapeake Appalachia, Anadarko E&P and Mitsui USA (and potentially Statoil USA as well), directly or indirectly, have taken, allowed for or otherwise passed along to Plaintiffs, deductions for purported post-production costs, including, but not limited to, purported costs of gas gathering and transportation, in calculating the royalties payable to Plaintiffs, even though such costs: (i) are not expressly permitted by the terms of the respective Leases under which Plaintiffs hold royalty interests; (ii) were not charged at arms-length by or on behalf of entities unaffiliated with the respective defendants, but were instead charged by entities which were initially owned by Chesapeake Energy, for the gathering and transportation of gas through intrastate pipelines owned by some or all of the Lessee Defendants, or their affiliates; and (iii) were arbitrary, excessive and unreasonable in amount.

115.   The imposition of such charges on the royalties payable to Plaintiffs breaches the express terms of the relevant Leases and assignments or, in the alternative, the covenant of good faith and fair dealing by the Lessee Defendants that is implied in each of the Leases.

**J.**    **Plaintiffs Have Satisfied, or Should Be Equitably Excused from Satisfying, the Condition Precedent to the Breach of Contract Claim Asserted in this Action, If and to the Extent it is Applicable**

116.   The Anadarko E&P and T.S. Calkins forms of Lease contain the following provision conditioning the liability of the Lessee for any failure to perform its obligations or covenants under the Lease, and the right of the Lessor to commence a judicial action for damages for breach of the Lease, on the failure of the Lessee to satisfy or perform its obligation, covenant or condition for a period of one year following express and specific written demand by Lessor:

> C.    It is mutually agreed by and between LESSOR and LESSEE as follows:
>
> 7th – . . . This Lease shall not be terminated, in whole or in part, nor Lessee held liable for any failure to perform unless such obligation, covenant or condition remains unsatisfied and unperformed for a period of one year following the express and specific written demand upon Lessee by Lessor for such satisfaction and performance.... No judicial action may be commenced by Lessor for forfeiture of this Lease or for damages until after said period.

117.   By its terms, the foregoing condition does not apply to any of the claims asserted in this action against the defendants other than the Lessee Defendants, and does not apply to any of the claims asserted against the Lessee Defendants, other than the claim for breach of contract asserted in the Fifth Cause of Action.

118.   If and to the extent the foregoing condition applies to the breach of contract claims asserted against the Lessee Defendants in the Fifth Cause of Action,

a majority of the Plaintiffs satisfied the foregoing condition by causing one of their undersigned counsel, Christopher D. Jones, Esquire, to submit written demands upon each of the Lessee Defendants, by letters dated November 21, 2012, that they cure their respective breach of the respective Plaintiffs' Leases arising out of their "improperly taking deductions for post-production costs" from their royalty payments to the clients identified in the letters, and by the subsequent failure and refusal of Chesapeake Appalachia, Anadarko E&P and Mitsui USA to satisfy or perform their respective obligations for a period of over one year following the demands.

119.   Because the Lessee Defendants have failed and refused to satisfy or perform their respective obligations to pay royalties without improperly taking deductions for post-production costs following written demand by or on behalf of a majority of the Plaintiffs, it would be futile to require any further demand by the remaining Plaintiffs, and all Plaintiffs should be deemed to have satisfied, or to be equitably excused from satisfying, the condition, if and to the extent it is applicable

**K.     Chesapeake Engaged in Self-Dealing, Including the Use of Non-Arms'-Length Contracts and Artificial "Prices" Based on Comingled Gas and Transactions With Its Own Subsidiaries and Affiliates, to Determine The Royalties Payable to Plaintiffs**

120.   Chesapeake has used, and continues to use, non-arms'-length contracts and transactions with its own subsidiaries and affiliates to produce, process and market the gas in which Plaintiffs' own royalty interests, and artificially constructed "prices," to determine the royalties payable to Plaintiffs in connection with such gas.

121.   After gas is produced from a well, Chesapeake Appalachia purportedly sells the gas to its affiliate, CEMI, in a transaction which is not at arms'-length. At that point, CEMI takes title to and possession of the gas at the wellhead. Access Midstream (formerly known as Chesapeake Midstream Partners, L.P.), aggregates, commingles and gathers the gas with gas produced from multiple other wells subject to other leases into a downstream pool and transports it to a central point. CEMI then delivers the gas to one of several "points of delivery," which are physical locations where Access Midstream's system connects to larger interstate pipelines owned and operated by unaffiliated third party interstate pipeline companies. The gas is then transported downstream from these points of delivery to various "points of sale." It is only at these points of sale that title to the gas passes from CEMI to third-party purchasers.

122.   According to written statements previously made by Chesapeake Energy in correspondence to royalty interest owners, CEMI determines a weighted

average sales price (sometimes referred to by the acronym "WASP") for the gas sold from the pool on a monthly basis. CEMI purportedly calculates the WASP by averaging the price received by CEMI from individual sales from the pool across the entire volume contained in the pool. CEMI then purportedly pays Chesapeake Appalachia 97% of the sales price that CEMI receives in third-party sales, retaining a 3% "marketing fee, which is purportedly borne solely by Chesapeake Appalachia, and not passed-along to Plaintiffs, *less* the costs CEMI incurs between the initial point of sale (the wellhead) and what it characterizes as the "value-added downstream points of sale," which include a compression fee, a gathering fee and a transportation fee.

123.   On information and belief, Chesapeake makes royalty payments to owners of royalty interests, including Plaintiffs, based on a weighted average sales price calculated on these sales to various third party purchasers.

124.   In reality, Chesapeake receives a much higher "effective" price for gas produced under Leases in which Plaintiffs hold royalty interests than the WASP it uses to calculate the royalties payable to Plaintiffs.

125.   On information and belief, Chesapeake purports to sell certain of the gas produced under Plaintiffs' Leases pursuant to forward future contracts, called prompt month contracts (with smaller amounts sold each month at spot prices, or pursuant to same-day contracts).

126.   Because Chesapeake knows that prompt month futures contracts typically bring lower prices than longer-term contracts, and because of the high volatility of the market for prompt month future contracts, Chesapeake also bought and sold derivatives (puts, calls, collars, options) of farther forward sales of gas to lock-in significantly higher prices for gas produced in the Marcellus Shale region, including gas produced under Plaintiffs' Leases.

127.   Chesapeake does not, however, calculate or pay royalties based on the substantially higher "effective" price it receives for its physical production of gas, but instead uses the substantially lower, artificial WASP.

**L.     After Initially Taking No Deductions for Post-Production Costs, Chesapeake Appalachia Unilaterally and Retroactively Changes the Method by Which It Calculates and Pays Royalties**

128.   When Chesapeake initially began paying royalties to Plaintiffs, it did not deduct post-production costs in calculating, accounting for and paying royalties to Plaintiffs. In or about January 2012, however, Chesapeake sent letters to Plaintiffs notifying them that, based on the Pennsylvania Supreme Court's decision in *Kilmer v. Elexco Land Services, Inc.*, 605 Pa. 413, 990 A.2d 1147 (2010), Chesapeake would be retroactively changing the manner in which it calculated and paid the royalties due and owing to Plaintiffs in connection with their respective Leases, by deducting post-production costs from the proceeds received by Chesapeake

Appalachia at the point of sale in calculating the royalties payable to the respective Plaintiffs.

129.   In its opinion in *Kilmer*, the Pennsylvania Supreme Court held that oil and gas leases which expressly provide for a royalty in the amount of one-eighth of the proceeds actually received by the lessee from sales of production, *less a proportionate share of post-production costs*, does not violate the Pennsylvania Guaranteed Minimum Royalty Act, 58 P.S. § 33, which invalidates oil or gas leases which do not "guarantee the lessor at least one-eighth royalty on all oil, natural gas or gas of other designation removed or recovered from the subject real property."

130.   Subsequent to the *Kilmer* decision, despite the fact that Plaintiffs' Leases, unlike the oil and gas leases at issue in *Kilmer*, do *not* expressly permit the deduction of post-production costs, Chesapeake sent letters notifying Plaintiffs that, based on the *Kilmer* decision, Chesapeake would be retroactively changing the manner in which it calculated and paid the royalties due and owing to Plaintiffs in connection with their respective Leases, effective as of the date of the *Kilmer* decision, by deducting post-production costs from the purported proceeds received by Chesapeake Appalachia at the point of sale in calculating the royalties payable to the respective Plaintiffs on gas produced from their respective properties.

131.  Chesapeake then: (a) re-calculated the royalties it had previously accounted for and paid to Plaintiffs, arbitrarily and unilaterally applying the new

method of calculating royalties retroactively; (b) determined, based on the new methodology, that it had overpaid Plaintiffs; and (c) unilaterally and wrongfully sought to and did recoup the purported past overpayments, from and after the date of the *Kilmer* decision, by offsetting such purported overpayments against current royalties due and owing to Plaintiffs (both calculated using the new methodology), resulting in Chesapeake reducing or suspending royalty payments to the Plaintiffs until Chesapeake fully recovered the amounts of its purported overpayments, by offset.

132.   From the time that Chesapeake resumed making royalty payments to the respective Plaintiffs, and continuing to the present, Chesapeake, acting without any authority to do so, has wrongfully deducted post-production costs from the proceeds purportedly received by Chesapeake Appalachia at the point of sale, and imposed such deductions in determining the revenues on which Chesapeake Appalachia calculated and paid royalties to Plaintiffs.

133.   Neither Chesapeake Appalachia nor any of the other Lessee Defendants provides any explanation to royalty interest holders, including Plaintiffs, of the nature or basis of the purported post-production costs which are deducted in calculating the royalties paid to Plaintiffs. Instead, royalty checks are accompanied only by a short-form, cursory check-stub type summary or abbreviated statement

listing of the deductions, with cryptic descriptions that provide no detail as to the nature of the services provided, the basis for the fees, or the identity of the payees.

## M. The Lessee Defendants Deduct Excessive and Unwarranted Charges for Gathering Services and Related Post-Production Services

134. In addition to acquiring oil and gas leases and producing natural gas in the Marcellus Shale region, Anadarko and Chesapeake Energy, through their respective subsidiaries and affiliates, also invested in, developed and operated gathering systems and processing facilities to gather, treat and process the natural gas that it produced. Chesapeake, Anadarko E&P, Statoil USA and Mitsui USA, or their respective corporate parents or affiliates, also came to have ownership interests in the gas gathering pipelines which serviced the wells drilled under Plaintiffs' Leases in which the Lessee Defendants held working interests.

135. On February 29, 2008, Chesapeake Energy formed Chesapeake Midstream Development, L.P. ("CMD"), to own, operate and develop midstream energy assets.

136. In September 2009, Chesapeake Energy and Global Infrastructure Partners-A, L.P, and affiliated funds managed by Global Infrastructure Management, LLC, and certain of their respective subsidiaries and affiliates (collectively, "GIP"), formed a joint venture to own and operate natural gas midstream assets. As part of the transaction, CMD contributed certain natural gas

gathering systems (which, on information and belief, did not include Marcellus Shale midstream assets) to the newly formed joint venture entity, and GIP purchased an interest for $588 million in cash.

137.   In 2010, Chesapeake Energy and GIP formed Chesapeake Midstream Partners, L.P. ("CHKM"), a master limited partnership, to own, operate, develop and acquire gathering systems and other midstream energy assets.

138.   CHKM completed its initial public offering of common units on August 3, 2010. In connection with the closing of the public offering, Chesapeake Energy and GIP contributed the interests of the midstream joint venture's operating subsidiary to CHKM.

139.   Prior to the end of 2011, Chesapeake Energy provided gas gathering and related post-production services in the Marcellus Shale region through its own subsidiaries and affiliates, initially including, but not limited to, CMD and one of CMD's subsidiaries, Appalachia Midstream.

140.   The post-production costs which Chesapeake began to deduct from proceeds received by Chesapeake Appalachia at the point of sale in calculating the royalties payable Plaintiffs were based entirely on purported post-production services by Chesapeake affiliates and subsidiaries, in self-dealing, related party transactions.

141.   Although the royalty statements that the Lessee Defendants issue to Plaintiffs provide only cursory, cryptic, misleading and confusing descriptions (or, in the case of Statoil USA, no description) of the deductions taken from the proceeds received by the Lessee Defendants or their affiliates at the point of sale in determining the revenues on which the Lessee Defendants pay royalties, Plaintiffs believe and aver, based on comparisons of the royalty statements that they receive from the Lessee Defendants with royalty statements of other oil and gas companies that, even if the Lessee Defendants were otherwise authorized to take or give effect to such deductions (which Plaintiffs dispute), many of the deductions taken by the Lessee Defendants were arbitrary, excessive and unreasonable.

### N.   Chesapeake's Liquidity Crisis

142.   Chesapeake financed its aggressive campaign to acquire leases in the Marcellus Shale region and in other parts of the country by incurring massive amounts of debt, resulting in it having an unusually highly leveraged balance sheet, and increasingly onerous and ongoing debt servicing and repayment obligations. By the end of 2011, Chesapeake owed approximately $10 billion in debt.

143.   As long as the price of natural gas increased or at least remained stable, Chesapeake was able to service and refinance its growing debt obligations.

144.   By the end of 2011, however, Chesapeake found itself faced with a liquidity crisis, precipitated by an unexpected decline in the market price for natural

gas, which threatened Chesapeake's ability to continue to service and refinance or pay the massive debt obligations on its highly-leveraged balance sheet. As described by a journalist writing for Forbes:

> Chesapeake Energy is in a bind. It's the second-biggest natural gas producer in the country after ExxonMobil. But with natgas prices having fallen to their lowest levels in a decade ($2.40 per thousand cubic feet), Chesapeake isn't generating enough cash.
>
> Chesapeake has curtailed its drilling in some plays, and in January said it would shut in production of marginal gas fields. But the company has $10 billion in debt to service and is obligated to keep drilling wells on newer oil and gas leases in order to hold the land. Over the course of 2012, if gas prices were to stay where they are now, Chesapeake would face a cash shortfall of several billion dollars.[4]

**O.   Chesapeake's Scheme to Use Gas Gathering and Related Agreements to Solve Its Liquidity Crisis**

145.   As part of its efforts to address its impending liquidity crisis, Chesapeake decided to "sell" certain of its midstream assets, including its natural gas gathering system and intrastate pipeline operations in the Marcellus Shale region, through a series of complex and unusual transactions with Access Midstream.

---

[4]   Christopher Helman, *Chesapeake Energy's New Plan: Desperate Measures for Desperate Times*, (Forbes Feb. 13, 2012) (the "Forbes Article"). http://forbes.com/sites/christopherhelman/2012/02/13/chesapeake-energys-new-plan-desparate-measures-for-desparate-times/

146.   On December 29, 2011, CHKM acquired from CMD all of the issued and outstanding equity interests in Appalachia Midstream, for total consideration of $879.3 million, consisting of 9,791,605 common units and $600.0 million in cash.

147.   As of its acquisition by CHKM, Appalachia Midstream operated 100 percent of, and owned an approximate average 47 percent interest in, 10 integrated gas gathering systems that consisted of approximately 549 miles of gas gathering pipeline in the Marcellus Shale, which serviced (and continue to service) approximately 250 natural gas wells. The remaining 53 percent interest in the assets was owned, directly or through subsidiaries and affiliates, primarily by Statoil ASA, Anadarko Petroleum Corporation, and Mitsui & Co., Ltd., which were and are, respectively, the corporate parents of defendants Statoil USA, Anadarko E&P and Mitsui.

148.   Appalachia Midstream was and is party to long-term (15-year) gas gathering agreements with certain subsidiaries and affiliates of Chesapeake, and also with Statoil, Anadarko, Mitsui, Epsilon Energy Ltd., and Chief Oil & Gas LLC ("Chief"). Pursuant to these gas gathering agreements, which are not publicly available, and the terms of which Chesapeake maintains as confidential, Chesapeake and some or all of the other producer-parties to the agreements granted Appalachia Midstream what CHKM has publicly characterized as "extensive acreage

dedications" (i.e., exclusivity) in the areas within which it operated in the Marcellus Shale region.[5]

149.    Although the terms of the gas gathering agreements were and are largely confidential, and not publicly available, CHKM has publicly disclosed that its gas gathering agreements generally contain certain terms, including the following:

- opportunity to connect natural gas drilling pads and wells of the counterparties of these agreements within our acreage dedications to our gathering systems in all of our regions; [and]

- fee redetermination mechanisms, which are designed to support a return on invested capital and allow our gathering rates to be adjusted, subject to specified caps in certain cases, to account for variability in revenues, capital, expenditures and compression and certain other expenses….[6]

150.    The long-term gas gathering agreements functioned to limit (if not to entirely eliminate) any direct exposure and risk to Appalachia Midstream and CHKM from changes in the market price of natural gas.

151.    Effective July 24, 2012, CHKM changed its names to Access Midstream Partners, L.P.

---

[5]      *See* Chesapeake Midstream Partners, L.P., SEC Form 8-K, filed February 1, 2012, Ex. No. 99.1, at 1-2.
https://www.sec.gov/Archives/edgar/data/1483096/000119312512034455/d292771d8k.htm
https://www.sec.gov/Archives/edgar/data/1483096/000119312512034455/d292771dex991.htm
Chesapeake Midstream Partners, L.P. SEC Form 10-K, filed February 29, 2011, at 1-3.
https://www.sec.gov/Archives/edgar/data/1483096/000119312512089268/d283045d10k.htm

[6]   Chesapeake Midstream Partners, L.P., SEC Form 10-K, filed February 29, 2011, at 2.

152.   On December 20, 2012, Access Midstream acquired from CMD and certain of CMD's affiliates one hundred percent (100%) of the issued and outstanding equity interests in Chesapeake Midstream Operating, L.L.C. ("CMO") for total consideration of $2.16 billion (the "CMO Acquisition"). Through the CMO Acquisition, Access Midstream acquired certain midstream assets in the Eagle Ford, Utica and Niobrara regions, and also extended its existing assets and operations in the Marcellus and other regions. Access Midstream also assumed various gas gathering and processing agreements associated with the assets that have terms ranging from 10 to 20 years and that, in certain cases, include cost of service or fee redetermination mechanisms.

153.   When Chesapeake sought to spin-off its gathering assets, it turned to J. Michael Stice – who then served as Chief Executive Officer of Chesapeake Midstream GP, L.L.C (the general partner of CHKM), as Senior Vice President— Natural Gas Projects of Chesapeake Energy, and as President and Chief Operating Officer of Chesapeake's primary midstream subsidiaries – to run the operation. Stice became the Chief Executive Officer of Access Midstream upon its acquisition of the CMO midstream assets.

154.   Dominic J. Dell'Osso, Jr. – who then served as the Executive Vice President of Chesapeake, and who had served as the Chief Financial Officer of

Chesapeake Midstream from August 2008 to November 2010 – also was fully familiar with and intimately involved in the scheme.

155. Stice and Dell'Osso also served as directors of Access Midstream's general partner, Access Midstream Partners GP, L.L.C., since July 2012 and July 2011, respectively.

156. According to the *ProPublica* Report, post-spinoff agreements between Chesapeake and Access Midstream also guarantee that Chesapeake and certain of its subsidiaries and affiliates will receive a rebate of some of the monies that they pay out to Access Midstream, in the form of payments for services and additional assets.[7]

157. As part of the transaction, Chesapeake agreed that certain of its personnel and employees would be made available to Access Midstream during a transitional period, and that it would provide certain services to Access Midstream (for which it would be paid) going forward.[8]

158. As a result, Access Midstream has been managed and directed by former or current Chesapeake officer, has made extensive use of other Chesapeake employees in conducting its operations, and continues to pay Chesapeake and certain of its affiliates and subsidiaries for a variety of services.

---

[7]      *See ProPublica* Report.

[8]      Access Midstream Partners, L.P., Form 10-K, filed Feb. 25, 2013; *see also* Access Midstream Partners, L.P., Form 8-K, Exhibit 10.2, filed Dec. 19, 2012; Access Midstream Partners, L.P., Form 8-K, Exhibit 10.2, filed June 20, 2012

159.   In connection with the CMO Acquisition, Access Midstream not only acquired existing gas gathering agreements, but also entered into certain new gas gathering agreements (the "New Gas Gathering Agreements") with certain Chesapeake Energy subsidiaries, including Chesapeake Appalachia.[9]

**P.      Defendants Leverage Their Monopoly Power Over Gathering and Intrastate Transportation Pipeline Systems In Contractually Dedicated Areas to Enable Chesapeake to Address Its Liquidity Crisis, and to Enable Access Midstream to Generate Supra-Competitive Profits, at the Expense of Plaintiffs and Other Royalty Interest Owners.**

160.   Chesapeake and Access Midstream sought and received from the SEC confidential treatment of the New Gas Gathering Agreements, and have not otherwise made the agreements public. As a result, Plaintiffs do not presently have access to or knowledge of all of the terms and conditions of the New Gas Gathering Agreements, which are within the exclusive knowledge of Chesapeake, Access Midstream and the SEC (subject to confidentiality). As set forth below, however, certain terms of the New Gas Gathering Agreements have been described in public filings by Chesapeake Energy and Access Midstream, and in the *ProPublica* Report.

161.   Under the gathering agreements established and entered into in connection with the CMO Acquisition,   Chesapeake agreed to dedicate all of the

---

[9]      *See* Access Midstream SEC Form 8-K, filed December 19, 2012, at 2-5.
http://www.sec.gov/Archives/edgar/daa/1483096/00119312514085/d457818d8k.htm

natural gas owned or controlled by it, and produced from or attributable to existing and future wells with a surface location within designated dedicated areas (the "Dedicated Acreage") to Access Midstream, and to procure gathering, compression, dehydration and treating services for such gas *exclusively* from Access Midstream.[10] Chesapeake's dedication of the natural gas produced from the Dedicated Acreage runs with the land, and binds successors to the Chesapeake's interest, as well as any new natural gas interests in the Dedicated Acreage which subsequently may be acquired by Chesapeake. *Id.*

162. By engaging in CMO Acquisition and related transactions, Access Midstream effectively acquired a monopoly in the market for gathering, compression, dehydration and treating services within the Dedicated Acreage specified in its existing and new gathering agreements, for at least the duration of the long-term gathering agreements.

163. Although Plaintiffs do not have access to the gathering agreements that cover the natural gas produced from their properties by Chesapeake, Plaintiffs believe and aver that much of Bradford County, including all of Plaintiffs' properties that are subject to Leases with Chesapeake, falls within the Dedicated Acreage

---

[10]     *See* Access Midstream Partners, L.P., SEC Form 8-K (filed Dec. 26, 2012)
https://www.sec.gov/Archives/edgar/data/1483096/000119312512514085/d457818d8k.htm
Exhibit 10.1 (Non-Solicitation Agreement , dated as of Dec. 20, 2012), at 1-2
https://www.sec.gov/Archives/edgar/data/1483096/000119312512514085/d457818dex101.htm

specified in one or more of the gathering agreements transferred or established as part of the CMO Acquisition.

164.   In its public filings with the SEC, Access Midstream acknowledges that, because it has long-term gathering agreements with its producer customers, including Chesapeake, which have provided it with "long term acreage dedications," it faces no competition within such acreage dedications:

> Given that substantially all of the natural gas gathered and transported through our gathering systems and processing facilities is owned by producer customers with whom we have long-term gathering contracts, we do not currently face significant competition for our natural gas volumes…. Chesapeake and other producers have provided long-term acreage dedications in the Marcellus Shale region….
>
> We face competition for production drilled outside of our acreage dedications and in attracting third-party volumes to our systems.[11]

---

[11]   Access Midstream Partners, L.P. Form 10-K (filed Feb. 21, 2014), at 8. https://www.sec.gov/Archives/edgar/data/1483096/000156459014000295/acmp-10k_20131231.htm

165.   In other words, by virtue of its long-term exclusive contracts with Chesapeake and other producers in the Marcellus Shale region, **Access Midstream effectively has a one hundred percent (100%) share of the market for gas gathering and related post-production services in the relevant geographic market.**

166.   There were and are no economically practicable or reasonable means for a prospective competitor to enter into the market to compete with Access Midstream in the delivery of gas gathering and related post-production services in the relevant geographic market. The barriers to entry into the market include: (a) the substantial capital costs and regulatory barriers associated with the construction and operation of the necessary gathering pipelines; and (b) Access Midstream's long-term exclusive contracts with Chesapeake, the dominant producer in the relevant geographic market, and other producers in the market. As a result, Access Midstream acquired in the CMO Acquisition, and continues to possess, effective monopoly power in the market for gas gathering and related post-production services in the relevant geographic market, as defined by the exclusive dedicated acreage granted in its long-term gathering agreements.

167.   The New Gas Gathering Agreements included agreements between Access Midstream and Chesapeake Appalachia for the gathering of natural gas produced by Chesapeake Appalachia from its operations the Marcellus Shale Region

(the "Marcellus Gas Gathering Agreements").[12] Under the Marcellus Shale Gas Gathering Agreements, Chesapeake Appalachia's payments to Access Midstream for gas gathering and transportation services were referred to as the "Marcellus fee." *Id.*

168.   Access Midstream attempts to characterize of the amounts that Chesapeake Appalachia has been required to pay for gas gathering and transportation services (which Access Midstream sometimes refers to as the "Marcellus fee") as a "cost-of-service based fee." This characterization, however, is false and misleading.

169.   As the *ProPublica* Report details, the fees charged to Chesapeake Appalachia by Access Midstream for purported post-production services were not and are not "cost-of service based," but instead were and are based on a transaction structured to provide Access Midstream with a long-term, guaranteed, above-market return on its investment, as an incentive and as consideration for the payments it made to Chesapeake. As explained by *ProPublica*, "[a]n executive at a rival company who reviewed the deal at ProPublica's request said it looked like

---

[12]   *See* Access Midstream SEC Form 8-K, filed December 19, 2012, at 5

**Chesapeake had found a way to make the landowners pay the principal and interest on what amounts to a multi-billion dollar loan to the company from Access Midstream.**"[13]

170.   Access Midstream's own public disclosures show that the fees paid to it in connection with the Marcellus Gathering Agreement are not based on the cost of the gathering services provided under the agreement. To the contrary, according to Access Midstream, the agreement is a long-term agreement that guarantees it a specified rate of return on its investment:

> Effective on January 1, 2014 and January 1st of each year thereafter for a period of 15 years from July 1, 2012, the Marcellus fee will be redetermined based on a cost-of-service calculation that provides a specified pre-income tax rate of return on invested capital.[14]

171.   Although neither Chesapeake nor Access Midstream filed the Marcellus Gathering Agreement with the SEC, *ProPublica* has reported that the rate of return guaranteed to Access Midstream is 15% per year: "Chesapeake has pledged to pay Access enough in fees to **repay the $5 billion plus a 15 percent return** on its pipelines."[15]

---

[13]      *See ProPublica* Report.

[14]      Access Midstream SEC Form 8-K, filed Dec. 19, 2012, at 5
http://www.sec.gov/Archives/edgar/data/1483096/000119312512514085/d457818d8k.htm

[15]      *See ProPublica* Report

172.   Both Chesapeake and Access Midstream acted with full knowledge that the rate of return being guaranteed to Access Midstream was well in excess of the rate of return that would have been available in a competitive market.   Both Chesapeake and Access Midstream also acted with full knowledge that, in the absence of sudden and unanticipated increases in the market price of natural gas, and in light of the condition of Chesapeake's cash flow and balance sheet, Chesapeake's ability to deliver on its promise to provide Access Midstream with an above-market rate of return would require Chesapeake to treat the payments that it would be making to Access Midstream as purported post-production costs, and to then deduct and pass-on the artificial purported post-production costs in calculating royalty payments to Chesapeake's lessors, including Plaintiffs, thereby reducing the royalties payable to them.

173.   Both Chesapeake and Access Midstream further acted with full knowledge that the resulting purported post-production costs that Chesapeake inevitably would have to pass-on to its lessors, including Plaintiffs, would be artificially inflated, and in excess of the true market rates of such services.

174.   The structure and terms of the CMO Acquisition and related agreements, including the ability to fund the commitments undertaken by Chesapeake at the expense of its royalty interest owners, including Plaintiffs, depended and relied on the existence and abuse by Access Midstream of the

monopoly power already possessed by Chesapeake Energy and its subsidiaries in the market for gathering services in the Dedicated Areas, which was effectively conveyed to Access Midstream in connection with the CMO Acquisition, and which was augmented by the new gathering agreement entered into by Defendants and their affiliates as part of the transaction.

175.   Defendants acted with the intent of using the artificial reduction of the royalties due and owing to Plaintiffs (and other royalty interest owners) to finance their scheme.

176.   In Chesapeake Energy's 2013 Annual Report on Form 10-K, filed with the SEC on February 27, 2014, Chesapeake for the first time publicly disclosed the financial magnitude of the gathering and transportation  commitments that it made to Access Midstream in connection with the CMO Acquisition, as well as fact that its royalty interest owners would be bearing a portion of those costs:

> We have contractual commitments with midstream service companies and pipeline carriers for future gathering, processing and transportation of natural gas and liquids to move certain of our production to market. Working interest owners and *royalty interest owners, where appropriate, will be responsible for their proportionate share of these costs*.[16]

---

[16]     Chesapeake Energy Corporation SEC Form 10-K (filed Feb. 27, 2014), Item 8, Note 4, at 93.(available at https://www.sec.gov/Archives/edgar/data/895126/000089512614000104/chk-20131231_10xk.htm) (last accessed Sept. 11, 2014).

(emphasis added). According to Chesapeake Energy, its aggregate undiscounted commitments under gathering, processing and transportation agreements, "excluding any reimbursement from working interest and royalty interest owners," amounts to a staggering $17 Billion.[17]

177.   Although Chesapeake was impermissibly deducting inflated and improper post-production costs in calculating their royalties, resulting in the underpayment of royalties, even *before* the CMO Acquisition closed, the problem grew worse following the closing of the CMO Acquisition.

178.   As part of the CMO Acquisition, Chesapeake not only agreed to guaranty Access Midstream an above-market rate of return on its investment, but also agreed to pay Access Midstream supra-competitive prices for natural gas gathering services going forward that are many multiples of Access Midstream's actual costs, and far more than the costs previously deducted by Chesapeake Appalachia when Chesapeake's own subsidiaries and affiliates owned the gathering system.

---

[17]      *Id.*

179.   The *ProPublica* Report details how Chesapeake has charged and deducted amounts far in excess of not only the market rate, but also far in excess of its own and Access Midstream's actual costs for gathering services. In one example reported by *ProPublica*, the markup was in excess of 3,000%.[18]



180.   As also detailed in the *ProPublica* report, Chesapeake sometimes charges and deducts fees at different rates for neighboring lessors with royalty interests in production from the same wells.

181.   Notably, as also mentioned in the *ProPublica* Report, and as reflected in the royalty statements received by many of the Plaintiffs from other oil and gas companies who hold interests in the gas produced from the same wells, Chesapeake reports lower sales prices, and also deducts vastly more for gathering services, than other oil companies which hold participating interests in the same wells, despite the fact that they share the same contractual royalty payment obligation, and the same entitlement (or lack of entitlement) to take such deductions.

---

[18]      *See ProPublica* Report.

182.   The deductions taken by Chesapeake were and are artificially inflated, improper, and unrelated to any legitimate market "cost of services." Many of the deductions were for purported services which did not enhance the marketability of the gas in which Plaintiffs hold a royalty interest, but instead merely served to enrich the co-conspirators who devised the scheme.

183.   The benefits that Access Midstream derived from the scheme are clear. Access Midstream's predominant source of revenue is gathering fees, and Chesapeake accounts for approximately 84% of Access Midstream's business.[19]

184.   Due in large part to Stice's positive descriptions of, and other disclosures about, the guaranteed revenue stream that Access Midstream would enjoy as a result of the CMO Acquisition, the broader market also plainly understands and appreciates the benefits of the transaction to Access Midstream. As of June 16, 2014, Access Midstream's publicly traded common units (NYSE: ACMP) were trading at $66.57 per share, more than double the price at which they were trading on December 14, 2012, the week before the CMO Acquisition closed.

---

[19]    *Id.*

## FIRST CAUSE OF ACTION

### (Contract, Combination or Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

185.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

186.   Plaintiffs assert this First Cause of Action against defendants Chesapeake Energy, CEMI, COI, Chesapeake Exploration, Access Midstream, Access Operating and Appalachia Midstream only.

187.   The relevant geographic market for purposes of this claim is the portion of (i) the aggregate Dedicated Acreage, and (ii) any additional dedicated acreage, as defined in any gathering agreements which obligate Chesapeake Energy or any of its subsidiaries or affiliates to procure gathering, compression, dehydration or treating services with respect to natural gas exclusively from Access Midstream, Access Operating, or an entity, pipeline or facility operated by either of them, to the extent such Dedicated Acreage or additional dedicated acreage is located in Bradford, Sullivan, Susquehanna, or Wyoming County, Pennsylvania, including, if and to the extent they otherwise fall within the foregoing definition, but not limited to, the dedicated areas specified in the following Gathering Agreements listed on Schedule A to the Non-Solicitation Agreement entered into on December 20, 2012, among Access Midstream, CMD, COI, CEMI and Chesapeake Energy, filed as

Exhibit 10.1 to the SEC Form 8-K filed by Access Midstream on December 26, 2012:

- The contracts designed as "5. Marcellus" with a date TBD, with Mid-Atlantic Gas Services, L.L.C., or its successors or assigns;

- The contract designated as "8. Anchor Shipper Gas Gathering Agreement for Marcellus" with an Effective Date of January 1, 2012, with Appalachia Midstream Gas Services, L.L.C., or its successors or assigns; and

- The contract designated as "9. Anchor Shipper Gas Gathering Agreement for Northern Pennsylvania" with an Effective Date of January 1, 2012, with Appalachia Midstream Gas Services, L.L.C., or its successors or assigns; and

The geographic market as defined above is referred to below as the "Exclusive Dedicated Acreage."

188.   Although the exact parameters of the Exclusive Dedicated Acreage have been kept secret by Defendants, the potential and likely scope, relevance and significance of the Exclusive Dedicated Acreage are apparent from a Company Gas Map dated October 11, 2012, published by the Bradford County Planning Commission, which shows the geographic concentration of gas wells operated by Chesapeake Appalachia in Bradford County.[20]

189.    The relevant product or service markets for purposes of this claim are, in the alternative, the markets for: (i) the provision or sale of natural gas gathering

---

[20]  *See*  http://www.bradfordcountypa.org/Images/Gas-Map-Pdfs/Maps/CompanyGasMap.pdf

services; (ii) the use or purchase of natural gas gathering services; and (iii) the market for the production and marketing of natural gas located beneath land within the relevant geographic market.

190.  Prior to the CMO Acquisition, Chesapeake Energy, directly and through its controlled subsidiaries, held ownership interests in most, if not all, of the gathering pipelines located in the Exclusive Dedicated Acreage, and also served as the operator of the gathering systems comprised of such pipelines, in which Chesapeake Energy, along with Anadarko, Statoil and Mitsui (and, in some cases, other gas companies), through their respective subsidiaries and affiliates, held ownership interests. As a result, Chesapeake Energy and its subsidiaries possessed market power in the market for the provision or sale of gas gathering services in the Exclusive Dedicated Acreage.

191.  Prior to the CMO Acquisition, Chesapeake Energy, directly and through its controlled subsidiaries, held working interests in and to Plaintiffs' Leases, and also served as the operator of the natural gas wells drilled pursuant to the respective Leases. As a result, Chesapeake Energy and its subsidiaries also possessed market power in the market for the use or provision of gas gathering services in the Exclusive Dedicated Acreage.

192.  Through the CMO Acquisition, and the new gathering agreements executed in connection with the transaction, Chesapeake Energy and its affiliates not

only transferred its existing market power to Access Midstream and its affiliates, but also effectively bolstered and extended such market power in the hands of Access Midstream.

193.   Prior to and after the CMO Acquisition, Chesapeake Energy, directly and through its controlled subsidiaries, in combination with Anadarko E&P, Statoil USA and Mitsui USA, also possessed market power in the market for the production and marketing of natural gas located beneath land within the Exclusive Dedicated Acreage.

194.   By entering into and closing the CMO Acquisition, and the various contracts involved in that transaction, including the Marcellus Gathering Agreement, defendants Chesapeake Energy, CEMI, COI, Chesapeake Exploration, Access Midstream, Access Operating and Appalachia Midstream contracted, combined or conspired to unreasonably restrain competition in the relevant product and service markets described above.

195.   Defendants Chesapeake Energy, CEMI, COI, Chesapeake Exploration, Access Midstream, Access Operating and Appalachia Midstream took steps in furtherance of their contract, combination or conspiracy by, among other things, closing the CMO Acquisition, and by Access Midstream and its affiliates paying, and  Chesapeake Energy and its affiliates accepting and receiving, the agreed consideration, and by Access Midstream thereafter providing natural gas gathering

systems and services, and related natural gas post-production services, to Chesapeake Energy and its affiliates, with respect to natural gas produced in the Exclusive Dedicated Acreage, at supra-competitive prices.

196.   In negotiating and entering into the CMO Acquisition, Chesapeake Energy, and Access Midstream acted with knowledge that the gathering and transportation costs that Chesapeake was committing to pay to Access Midstream or its affiliates were excessive and unreasonable, and based on the amount of money that Access Midstream was paying to Chesapeake Energy, rather than on the cost or value of such services, and that Chesapeake Energy and its affiliates intended to fund a material portion the ongoing supra-competitive cost of gathering and transportation services which they were committing to pay by effectively passing along a substantial portion of such costs to the owners of royalty interests in natural gas wells operated by Chesapeake within the Exclusive Dedicated Acreage, including Plaintiffs, by deducting a portion of such costs in calculating the royalties payable to such royalty interest owners, and thereby reducing the amount of the royalties.

197.   Chesapeake has in fact effectively passed along to Plaintiffs and other royalty interest owners a significant portion of the supra-competitive costs of gathering and transportation services that Chesapeake committed to pay in connection with the CMO Acquisition by deducting a portion of such costs in

calculating the royalties payable to Plaintiffs by Chesapeake Appalachia, thereby reducing the amount of the royalties paid to Plaintiffs.

198.   As lessors of natural gas rights and holders of royalty interests in natural gas produced and marketed within the Exclusive Dedicated Acreage through the commercial exploitation of such rights, Plaintiffs were and are within the area of the economy endangered by the breakdown in competitive conditions resulting from the contract, combination or conspiracy among defendants Chesapeake Energy, CEMI, COI, Chesapeake Exploration, Access Midstream, Access Operating and Appalachia Midstream, in unreasonable restraint of trade.

199.   The economic injury suffered by Plaintiffs was a necessary step in, integral to, or part of the essential means by which defendants Chesapeake and Access Midstream sought to achieve their illegal and anticompetitive ends. As a result, the economic injury suffered by Plaintiffs is inextricably intertwined with Defendants' wrongdoing. Defendants' conduct described herein constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. In the alternative, the conduct violates Section 1 of the Sherman act by virtue of the rule of reason.

200.   As a direct and proximate result of the past and continuing violations of Section 1 of the Sherman Act by defendants Chesapeake Energy, CEMI, COI, Chesapeake Exploration, Access Midstream, Access Operating and Appalachia Midstream, Plaintiffs have suffered injury and damages in amounts to be proven at

trial. The injury and damages sustained by Plaintiffs include being deprived of the royalties properly due and payable to them on the proceeds received by Chesapeake Appalachia at the point of sale from the sale of natural gas produced under Plaintiffs' respective Leases, as a result of Chesapeake's improper deduction of excessive, unwarranted and unreasonable costs.

201.   Plaintiffs seek money damages from Defendants, jointly and severally, for these violations.

202.   The actual damages sustained by Plaintiffs should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

## SECOND CAUSE OF ACTION

### (Combination or Conspiracy to Monopolize Trade or Commerce in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

203.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

204.   Plaintiffs assert this Second Cause of Action against defendants Chesapeake Energy, CEMI, COI, Chesapeake Exploration, Access Midstream, Access Operating and Appalachia Midstream only.

205.   The relevant geographic market is the Exclusive Dedicated Acreage.

206.   The relevant product or service markets for purposes of this claim are, in the alternative, the markets for: (i) the provision or sale of natural gas gathering services; (ii) the use or purchase of natural gas gathering services; and (iii) the

market for the production and marketing of natural gas located beneath land within the Exclusive Dedicated Acreage.

207.   By their respective conduct set forth above, defendants Chesapeake Energy, CEMI, COI, Chesapeake Exploration, Access Midstream, Access Operating and Appalachia Midstream willfully, knowingly and intentionally combined or conspired among themselves and with others with the specific intent to cause and permit Access Midstream to acquire, maintain, possesses and exercise monopoly power in the market for natural gas gathering systems and services, and for related natural gas post-production services, in the geographic market consisting of the Exclusive Dedicated Acreage .

208.   In furtherance of the combination or conspiracy, the respective Defendants have committed one or more overt acts, including, but not limited to: defendants Chesapeake and Access Midstream closed the CMO Acquisition; Access Midstream and its affiliates paid, and Chesapeake Energy and its affiliates accepted and received, the agreed cash consideration for the CMO Acquisition; Access Midstream, directly or through its subsidiaries and affiliates, has provided natural gas gathering systems and services, and related natural gas post-production services, to Chesapeake Energy and its affiliates, with respect to natural gas produced in the Exclusive Dedicated Acreage; and Chesapeake has paid Access Midstream or its affiliates the supra-competitive fees specified in the existing contracts transferred

and the new contracts entered into as part of the CMO Acquisition for gas gathering and transportation services.

209. By charging and accepting supra-competitive fees for gathering services pursuant to its combination or conspiracy with Chesapeake, Access Midstream has abused its monopoly power for gathering and midstream transportation services in the Exclusive Dedicated Acreage.

210. Defendants' conduct described herein constitutes a per se violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. In the alternative, the conduct violates Section 2 of the Sherman act by virtue of the rule of reason.

211. As a direct and proximate result of the foregoing past and continuing violation of Section 2 of the Sherman Act, Plaintiffs have suffered injury and damages in amounts to be proven at trial. The injury and damages sustained by Plaintiffs include being deprived of the royalties properly due and payable to them on the proceeds received by Chesapeake at the point of sale from the sale of natural gas produced from Plaintiffs' respective properties, as a result of Chesapeake's improper deduction of excessive, unwarranted and unreasonable costs before calculating the royalties payable to Plaintiffs on such revenues, which resulted in Plaintiffs receiving royalties in amounts substantially less than they would have been in the absence of the violations alleged.

212.   Plaintiffs seek money damages from defendants Chesapeake Energy, CEMI, COI, Chesapeake Exploration, Access Midstream, Access Operating and Appalachia Midstream, jointly and severally, for these violations.

213.   The actual damages sustained by Plaintiffs should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

## THIRD CAUSE OF ACTION

### (Unlawful Attempt to Monopolize or Monopolization of Trade or Commerce in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

214.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

215.   Plaintiffs assert this Third Cause of Action against defendants Access Midstream and Access Operating only.

216.   The relevant geographic market for purposes of this claim is the Exclusive Dedicated Acreage.

217.   The relevant product or service market for purposes of this claim is the markets for the provision or sale of natural gas gathering services.

218.   At all times relevant to this action, Access Midstream either possessed, or in the alternative was attempting to acquire, and had a dangerous probability of acquiring, monopoly power in the market for the provision or sale of natural gas gathering services.

219.   By its actions set forth above, Access Midstream has intentionally attempted to monopolize the market for natural gas gathering and midstream transportation services in the Exclusive Dedicated Acreage.

220.   As a direct and proximate result of Defendants' past and continuing violation of Section 2 of the Sherman Act, Plaintiffs have suffered injury and damages in amounts to be proven at trial.

221.   Plaintiffs seek money damages from defendant Access Midstream.

222.   The actual damages sustained by Plaintiffs should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

## FOURTH CAUSE OF ACTION

## (Violation of RICO, 18 U.S.C. § 1962(c) and (d))

223.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

224.   Plaintiffs assert this Fourth Cause of Action against defendants Chesapeake Energy, CEMI, COI, Chesapeake Exploration, Access Midstream, Access Operating and Appalachia Midstream only.

225.   Access Midstream and the association-in-fact enterprise of Access Midstream, Chesapeake Appalachia, and Chesapeake Energy, are each an "enterprise" as that term is used in 18  U.S.C. § 1961(4).

226.   Since 2012, the association-in-fact enterprise of Access Midstream, Chesapeake Appalachia and Chesapeake Energy had the purposes of entering into non-arm's length agreements to: (1) aid Chesapeake with its liquidity problems by transferring to it a payment of more than $2 Billion; (2) guaranteeing Access Midstream supra-competitive fees and a high rate of return on its multi-billion dollar payment to Chesapeake; (3) rebating to Chesapeake and certain of its subsidiaries and affiliates some of the inflated fees paid to Access Midstream; and (4) passing on the inflated fees charged by Access Midstream and paid by Chesapeake and/or its subsidiaries, through reduced royalty payments to oil and gas lessors, including Plaintiffs.

227.   The association-in-fact enterprise of Access Midstream, Chesapeake Appalachia and Chesapeake Energy were related by the non-arm's length agreements entered into between Access Midstream and Chesapeake Appalachia, or their respective affiliates, including the Marcellus Gas Gathering Agreement, as well as other agreements between Access Midstream and Chesapeake Appalachia's parent, Chesapeake Energy, and certain of Chesapeake Energy's other subsidiaries and affiliates.

228.   The foregoing enterprises have been engaged in activities which affect interstate commerce in that their gas gathering and transportation charges and deductions have reduced oil and gas royalty payments to lessors throughout the

United States and have been directed against lessors throughout the Commonwealth of Pennsylvania and other states. Further, the Gas Gathering Agreements and other non-arm's length agreements entered into by Chesapeake Appalachia and its co-conspirators, govern assets and employees located throughout the United States, and prescribe payments to be sent throughout the United States.

229.   Chesapeake Appalachia, Chesapeake Energy and Access Midstream (collectively, the "RICO Conspirators") are "persons" as that term is used in 18 U.S.C. § 1961(3).

230.   Starting in 2012, with the creation, financing and acquisition of the gas gathering operations of Chesapeake Midstream Operating, L.L.C., and continuing to the present time, the RICO Conspirators have participated in the conduct of the affairs of each of the enterprises identified above through a "pattern of racketeering activity" as that phrase is defined in 18 U.S.C. §§ 1961(1) and (5).

231.   The RICO Conspirators have shared common management and direction, including Stice and Dell'Osso, and have entered into non-arm's length agreements for the purpose of passing on inflated oil and gas gathering and transportation costs, through fraudulent royalty statements and payments to oil and gas lessors, delivered by the mails and wires.

232.   The conduct of the RICO Conspirators as described in this complaint constituted the execution of a scheme and artifice to deprive oil and gas lessors

throughout the United States, including but not limited to Plaintiffs, of royalties properly due them by means of fraudulent pretenses and representations through the use of the United States mail, in violation of 18 U.S.C. § 1341.

233.   The use of the mails formed a central feature of the scheme and included, by way of example and as described above, the use of the mails to send thousands of royalty statements and royalty payments to oil and gas lessors (including, but not limited to, Plaintiffs).   Each of these statements and payments falsely and fraudulently pretended and represented that deductions for gas gathering and transportation costs were legitimately incurred and constituted permissible deductions from royalties under the oil and gas leases.

234.   The conduct described above constituted multiple violations of 18 U.S.C. § 1341, which is a predicate offense for purposes of 18 U.S.C. § 1962(c).

235.   Further, on a monthly basis since 2012, the RICO Conspirators have sent by wire thousands of royalty statements and royalty payments to oil and gas lessors (including, but not limited to, Plaintiffs) which have fraudulently pretended and represented that deductions for gas gathering and transportation costs were legitimately incurred and constituted permissible deductions from royalties under the oil and gas leases. In addition, the RICO Conspirators have, on a monthly basis, on information and belief, transferred payments between themselves by wire, which payments were made pursuant to the non-arm's length and monopolistic agreements

described herein. This conduct constituted multiple violations of 18 U.S.C. § 1343, which is a predicate offense for purposes of 18 U.S.C. § 1962(c).

236.   With full knowledge of the deceptive, fraudulent and unlawful conduct described herein, the RICO Conspirators have conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). This conspiracy was consummated in 2012, by the non-arm's length Gas Gathering Agreements entered into by Access Midstream with certain Chesapeake subsidiaries. The Gas Gathering Agreements, including the Marcellus Gas Gathering Agreement, were the quid pro quo afforded Access Midstream whereby Chesapeake would guarantee Access Midstream a high rate of return on its purchase price of Chesapeake's midstream assets and supra-competitive fees. The RICO Conspirators knew that the Gas Gathering Agreements, including the Marcellus Gas Gathering Agreement, were not reached at arm's-length and, further, that they were not cost-of-service based agreements, as evidenced by their guaranteed 15% "pre-income tax rate of return on invested capital" to Access Midstream.

237.   The RICO Conspirators also knew that the fees charged by Access Midstream under the Gas Gathering Agreements, including the Marcellus Gas Gathering Agreement, were far in excess of the market rates of such fees.

238.   In addition, the RICO Conspirators also knew and agreed that Access Midstream would rebate a portion of these inflated fees to Chesapeake and certain

of its subsidiaries and affiliates, ostensibly for the use of other equipment and services to be utilized by Access Midstream.

239.   The RICO Conspirators also knew and agreed that the inflated gas gathering and transportation fees would be passed along to Pennsylvania oil and gas lessors, including Plaintiffs, in the form of cost deductions from the lessors' royalty payments.

240.   The unlawful conduct by the RICO Conspirators alleged above, through Access Midstream and the association-in-fact enterprise of Access Midstream, Chesapeake Appalachia and Chesapeake Energy, injured tens of thousands of victims, including but not limited to Plaintiffs, by depriving them of their rightful royalty payments, was continuous and open ended and was intended to continue, and indeed, it continues today.

241.   Plaintiffs, as oil and gas lessors to Chesapeake Appalachia, and as royalty interest owners, were among the intended targets of the scheme that was facilitated by the knowing and purposeful involvement of the RICO Conspirators. The financial harms suffered by Plaintiffs was the direct, intended and reasonably foreseeable consequence of such conduct.

242.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to threefold the damages they sustained, together with reasonable attorney's fees and costs.

## **FIFTH CAUSE OF ACTION**

### **(Breach of Contract – Express and/or Implied Covenants)**

243.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

244.   Each of the Plaintiffs asserts this Fifth Cause of Action against only the Lessee Defendants (defendants Chesapeake Appalachia, Anadarko E&P, Statoil USA and Mitsui USA) which hold working interests in, and have received revenues under, the Lease under which such Plaintiff holds his, her or its royalty interest.

245.   Each of the Lessee Defendants holds its respective interests in and to, and its associated obligations under, the Leases in which such Lessee Defendant holds a working interest either as the original party Lessee to such Lease or as the successor by assignment or partial assignment of the right, title and interest and obligations of the original Lessee.   The relevant Leases and assignments were and are valid and enforceable.

246.   Plaintiffs are the proper parties to sue to enforce the terms of their respective Leases, whether as the original party Lessors to such Leases or as successors to the rights and interests of the original party Lessors, by deed or assignment.

247.   Plaintiffs have performed, or have substantially performed, any and all necessary conditions precedent, dependent obligations, and/or dependent covenants

owed under their respective Leases and the related assignments. Plaintiffs are, and have been, entitled to performance by the Lessee Defendants of their obligations under their respective Leases and the related assignments.

248.   Under the terms of the respective Leases, the Lessee Defendants were not and are not entitled to deduct post-production costs from the proceeds received by them at the point of sale in calculating the royalties payable to Plaintiff.

249.   In material breach of their respective obligations under the terms of the Leases, defendants Chesapeake Appalachia, Anadarko E&P and Mitsui USA have deducted, and continue to deduct, post-production costs from their respective shares of the proceeds received at the point of sale in calculating the royalties payable to Plaintiffs, and as a result have improperly underpaid the royalties due and owing to Plaintiffs under the terms of their respective Leases.

250.   Chesapeake Appalachia also breached  its obligations under the terms of Plaintiffs' Leases, beginning in January 2012, when it unilaterally applied its new method of calculating royalties after deduction of post-production costs retroactively, by offsetting current royalties due and owing to the respective Plaintiffs against  purported prior overpayments to Plaintiffs (calculated using the new methodology), to retroactively recover prior post-production costs, resulting either in reductions in current royalties or, for some Plaintiffs, a temporary suspension of royalty payments.

251.   In the alternative, if any of Plaintiffs' Leases entitle the Lessee Defendants to deduct post-production costs in calculating the royalties payable under such Leases, such costs are implicitly limited to a pro rata share of the reasonable and actual charges actually paid by Chesapeake Appalachia for bona fide post-production services.

252.   Defendants Chesapeake Appalachia, Anadarko E&P and Mitsui USA materially breached their express or implied in fact obligations under each of Plaintiffs' Leases: (a) by deducting post-production costs from the proceeds received by it at the point of sale in calculating the royalties payable to the respective Plaintiffs; or, in the alternative, (b) by deducting amounts which were not bona fide post-production costs, or were otherwise in grossly excessive and unreasonable amounts, derived from artificial and self-serving contractual formulas intended to fund the supra-competitive profits that Chesapeake guaranteed to Access Midstream in connection with the CMO Acquisition.

253.   In addition, or in the alternative, to breaching their express or implied in fact obligations under Plaintiffs' Leases, defendants Chesapeake Appalachia, Anadarko E&P, Statoil USA and Mitsui USA materially breached their respective implied covenants of good faith and fair dealing inherent in the Leases by: (a) in the case of Chesapeake Appalachia, by selling the gas produced pursuant to the Leases to CEMI, a Chesapeake affiliate, in non-arms'-length transactions, at artificial, self-

serving and unreasonably low prices, and then calculating and paying royalties based on the substantially lower, artificial WASP, rather than the higher "effective" price it receives for its physical production of gas based on the derivative transactions in which Chesapeake engages; (b) in the case of Chesapeake Appalachia, Anadarko E&P and Mitsui USA, by charging, deducting, imposing, giving effect to and passing-along, and also, in the case of Chesapeake Appalachia, by unilaterally and retroactively recouping and recovering, arbitrary, capricious, grossly excessive, improper and unreasonable charges for gas gathering and transportation services, and as a result improperly reducing the royalties payable and actually paid to Plaintiffs under their Leases; and (c) in the case of defendant Statoil USA, by unreasonably failing to market and account for its share of the gas produced under Plaintiffs' respective leases in a manner which maximized the unit price on which Plaintiffs' royalties were calculated.

254.   As a direct, proximate and foreseeable result of the foregoing material breaches by the Lessee Defendants of their respective express and/or implied contractual obligations under the terms of the respective Plaintiffs' Leases, singularly and/or in any combination thereof, Plaintiffs have suffered financial injuries for which Plaintiffs now seek all expectation-interest damages, consequential and incidental damages, lost profits, out-of-pocket losses, and future damages.

255.   Plaintiffs believe that the relevant terms of the leases and assignments at issue clearly and unambiguously provide the rights and obligations described in the preceding paragraphs. In the alternative, however, plaintiffs plead and allege both (a) that the relevant terms of the leases and assignments at issue are ambiguous as a matter of law and (b) that the interpretation of the relevant leases and assignments stated in the preceding paragraphs represents the correct and proper interpretation of the relevant leases and assignments.

## SIXTH CAUSE OF ACTION

### (Action for Accounting)

256.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

257.   Each of the Lessee Defendants has received, and continues to receive, monies in connection with sale of natural gas produced and marketed from the leased premises, in which Plaintiffs hold royalty interests under the terms of their respective leases.

258.   The relationships created by the leases to which the respective Plaintiffs are parties imposes a legal obligation upon each of the Lessee Defendants which holds a working interest in such leases to account to the respective Plaintiffs for the monies received by or on behalf of such Defendants from the sale of natural gas produced and marketed from the leased premises.

259.   As a matter of law, each of the Plaintiffs is entitled to an accounting from each of the Lessee Defendants that holds a working interest in the Plaintiff's lease for the monies received by such Defendants from the sale of natural gas produced and marketed from the leased premises.

260.   In the alternative, each of the Plaintiffs is entitled to an equitable accounting from Chesapeake Appalachia and from each of the other Lessee Defendants, because the accounts involved in the calculation of the royalties payable to Plaintiffs are inherently complicated, and because the Lessee Defendants have failed to account for the purported post-production gathering and transportation costs which they have deducted, or threatened to deduct, in calculating the royalties payable to Plaintiffs. As a result, each of the Plaintiffs is entitled to an equitable accounting.

## SEVENTH CAUSE OF ACTION

### (Intentional Interference With Contractual Relations)

261.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

262.   Plaintiffs assert this Seventh Cause of Action against defendants Chesapeake Energy, CEMI, COI and Chesapeake Exploration only.

263.   By and through their respective actions set forth above, defendants Chesapeake Energy, CEMI, COI and Chesapeake Exploration, acting with malice

and without privilege or justification to do so, have intentionally and improperly interfered, and are continuing to intentionally and improperly interfere, with the existing and ongoing contractual relationships between the respective Plaintiffs and the Lessee Defendants. In particular, defendants Chesapeake Energy, CEMI, COI and Chesapeake Exploration have intentionally and improperly imposed, and caused, induced, permitted and/or encouraged the Lessee Defendants to wrongfully apply and give effect to unauthorized, or otherwise arbitrary, excessive, and unreasonable, post-production deductions from the revenues derived by these defendants from the sale of gas produced pursuant to Plaintiffs' Leases, in calculating the royalties payable to the respective Plaintiffs.

264. Defendants Chesapeake Energy, CEMI, COI and Chesapeake Exploration acted with the specific intent of depriving Plaintiffs of the royalties which they were and are entitled to receive under the terms of their respective Leases.

265. As a direct and proximate result of the intentional and improper interference by defendants Chesapeake Energy, CEMI, COI and Chesapeake Exploration with Plaintiffs' respective contractual relationships with the Lessee Defendants, Plaintiffs have been harmed by the loss of royalties which they were and are contractually entitled to receive, by virtue of the imposition and deduction

of arbitrary, capricious, grossly excessive and improper cost deductions in determining the royalties payable and actually paid to them.

266.   In intentionally and improperly interfering with Plaintiffs' contractual and professional relationships with the Lessee Defendants, as set forth above, defendants Chesapeake Energy, CEMI, COI and Chesapeake Exploration, and each of them, have acted, and are continuing to act, intentionally, willfully, outrageously and in conscious disregard of the rights and interests of Plaintiffs, entitling Plaintiffs to recover, in addition to compensatory damages, punitive and exemplary damages, in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

### (Civil Conspiracy)

267.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

268.   Plaintiffs assert this Eighth Cause of Action against defendants Chesapeake Energy, CEMI, COI and Chesapeake Exploration only.

269.   By engaging in the actions set forth above, defendants Chesapeake Energy, CEMI, COI and Chesapeake Exploration, and each of them, acting with the intent to injure royalty interest owners including Plaintiffs, and without privilege or justification to do so, wrongfully agreed, combined and conspired to deprive such royalty interest owners, including Plaintiffs, of the royalties which they were and are

entitled to receive under their respective leases, by imposing, and causing, enabling, inducing and permitting the respective Lessee Defendants to take or give effect to, impermissible, or otherwise arbitrary, excessive and unreasonable, deductions for purported post-production costs in calculating the royalties payable to such royalty interest owners, including Plaintiffs, and have taken, and are continuing to take, actions in furtherance of such agreement, combination and conspiracy.

270.   As a direct and proximate result of wrongful agreement, combination and conspiracy by and among defendants Chesapeake Energy, CEMI, COI and Chesapeake Exploration, and the actions taken by them in furtherance of the agreement, combination and conspiracy, Plaintiffs have been harmed, and continue to be harmed, by the loss and underpayment of royalties to which they were and are otherwise contractually entitled pursuant to their respective leases or assigned rights.

271.   In wrongfully agreeing, combining and conspiring to deprive Plaintiffs of the royalties to which they are contractually entitled, and in taking actions in furtherance of such agreement, combination and conspiracy, as set forth above, defendants Chesapeake Energy, CEMI, COI and Chesapeake Exploration, and each of them, have acted, and are continuing to act, intentionally, willfully, outrageously and in conscious disregard of the rights and interests of Plaintiffs, entitling Plaintiffs to recover, in addition to compensatory damages, punitive and exemplary damages, in an amount to be determined at trial.

## NINTH CAUSE OF ACTION

### (Declaratory Judgment)

272.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

273.   The Lessee Defendants have acted contrary to their obligations under the relevant leases and assignments. A substantial controversy of sufficient immediacy and reality exists between Plaintiffs and the Lessee Defendants so as to warrant this Court's declaration on the matters presented.

274.   Plaintiffs and the Lessee Defendants hold adverse legal interests.

275.   Plaintiffs seek a declaration as to the following rights and legal relations:

a.   That the Lessee Defendants cannot deduct, or allow for the deduction of, post-production costs and expenses in calculating the royalties to which Plaintiffs are and have been entitled; or, in the alternative,

b.   That the Lessee Defendants cannot deduct, or allow for the deduction, of post-production costs and expenses in calculating the royalties to which Plaintiffs are and have been entitled in any amounts in excess of the reasonable market price for the applicable service in a competitive market.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor, and against Defendants, on all of their respective causes of action, granting the following relief:

A.     As to the First Cause of Action, for Violation of Section 1 of the Sherman Act, an award of monetary damages to each of the Plaintiffs, as allowed by law, in favor of Plaintiffs and against defendants Chesapeake Energy, CEMI, COI, Chesapeake Exploration, Access Midstream, Access Operating and Appalachia Midstream, jointly and severally, including compensatory damages in such amounts as are determined at trial to have been sustained by each of the respective Plaintiffs, and treble damages pursuant to 18 U.S.C. § 1964(c), together with costs of suit, including reasonable attorneys' fees;

B.     As to the Second Cause of Action, for Violation of Section 2 of the Sherman Act, an award of monetary damages to each of the Plaintiffs, as allowed by law, in favor of Plaintiffs and against defendants Chesapeake Energy, CEMI, COI, Chesapeake Exploration, Access Midstream, Access Operating and Appalachia Midstream, jointly and severally, including compensatory damages in such amounts as are determined at trial to have been sustained by each of the respective Plaintiffs, and treble damages pursuant to 18 U.S.C. § 1964(c), together with costs of suit, including reasonable attorneys' fees;

C.      As to the Third Cause of Action, for violation of Section 2 of the Sherman Act, an award of monetary damages to each of the Plaintiffs, as allowed by law, in favor of Plaintiffs and against defendants Access Midstream and Access Operating, jointly and severally, including compensatory damages in such amounts as are determined at trial to have been sustained by each of the respective Plaintiffs, and treble damages pursuant to 18 U.S.C. § 1964(c), together with costs of suit, including reasonable attorneys' fees;

D.      As to the Fourth Cause of Action, for violation of RICO, an award of monetary damages to each of the Plaintiffs, as allowed by law, in favor of Plaintiffs and against defendants Chesapeake Energy, CEMI, COI, Chesapeake Exploration, Access Midstream, Access Operating and Appalachia Midstream, jointly and severally, including compensatory damages in such amounts as are determined at trial to have been sustained by each of the respective Plaintiffs, and treble damages pursuant to 18 U.S.C. § 1964(c), together with costs of suit, including reasonable attorneys' fees;

E.      As to the Fifth Cause of Action for breach of contract, an award of compensatory damages to each of the Plaintiffs, and against defendants Chesapeake Appalachia, Anadarko E&P, Statoil USA and Mitsui USA, in such amounts as may be determined at trial to have been sustained by each of the respective Plaintiffs;, together with costs of suit;

F.     As to the Sixth Cause of Action, for an accounting, an Order directing defendants Chesapeake Appalachia, Anadarko E&P, Statoil USA and Mitsui USA to account to each of the respective Plaintiffs for (i) the monies received by or on behalf of each such defendant from the sale of natural gas in which the respective Plaintiffs hold royalty interests, and (ii) the basis on which each such defendant has accounted for and paid royalties to the respective Plaintiffs, including the nature, extent and basis for any deductions taken or allowed for post-production costs;

G.     As to the Seventh Cause of Action, for intentional interference with contract, an award of compensatory damages to each of the Plaintiffs, and against defendants Chesapeake Energy, CEMI, COI and Chesapeake Exploration, jointly and severally, as allowed by law, in such amounts as are determined at trial to have been sustained by each of the respective Plaintiffs, together punitive damages, in an amount determined to be just and proper, and  costs of suit;

H.     As to the Eighth Cause of Action, for civil conspiracy, an award of compensatory damages to each of the Plaintiffs, and against defendants Chesapeake Energy, CEMI, COI and Chesapeake Exploration, jointly as severally, as allowed by law, in such amounts as are determined at trial to have been sustained by each of the respective Plaintiffs, together with punitive damages, in an amount determined to be just and proper, and costs of suit;

I.    As to the Ninth Cause of Action, for declaratory judgment, a declaration of the rights of the respective parties, as described above;

J.    As to all monetary damages awarded, an award to Plaintiffs and against the applicable Defendants of pre- and post-judgment interest on the amount(s) of the monetary damages awarded; and

K.    Granting such other and further relief as may be deemed necessary or appropriate.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all of their respective claims and issues in this action that are triable of right by a jury.

Dated: February 17, 2015                Respectfully submitted,


*/s/ Christopher D. Jones*
Christopher D. Jones
Attorney I.D. # 84049
GRIFFIN, DAWSEY, DePAOLA &
JONES, P.C.
101 Main Street
Towanda, PA  18848
Tel: (570) 265-2175

Taunya M. Knolles Rosenbloom
Attorney ID # 200635
LAW OFFICES OF TAUNYA M.
KNOLLES ROSENBLOOM
332 South Main Street, P.O. Box 309
Athens, PA  18810
Tel: (570) 888-0660

-and-

Thomas S. McNamara
Attorney ID #38479
INDIK & McNAMARA, P.C.
100 South Broad Street, Suite 2230
Philadelphia, PA  19110
T:  (215) 567-7125

*Attorneys for Plaintiffs*