# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSLVANIA

A&B CAMPBELL FAMILY LLC;　　　　:
AMBER ANN ADAMS; BURTON R.　　:
ADAMS and JOANNE M. ADAMS,　　:　　**CIVIL ACTION NO. 3:15-340**
Individually and trading as ADAMS'　:
TYLER MOUNTAIN LIMITED　　　　:　　**(JUDGE MANNION)**
LIMITED PARTNERSHIP; LIBBIE. A.　:
ADAMS; SHERWOOD G. ADAMS;　　:
TOBY L. ADAMS; JAMES P. AHERN;　:
EUGENE J. BARRETT, JR., and LORI R.　:
BARRETT; JAMES T. BARRETT and　:　　**AMENDED COMPLAINT**
CINDY E. BARRETT, Individually and　:
trading as BCF FAMILY LIMITED　　:
PARTNERSHIP; JOHN M. BARRETT,　:
trading as JOHN M. BARRETT FAMILY　:
LIMITED PARTNERSHIP; BARTO　　:
FAMILY LLC; CLARK H. BEEBE,　　:　　**Jury Trial Demanded**
Individually and as Trustee of the　　:
JOSEPH H. BEEBE TRUST, and with　:
DONNA L. BEEBE, as Trustees of the　:
BEEBE LIVING TRUST DATED　　　:
JUNE 10, 2010; DAVID J. BRIDE and　:
DIANE V. BRIDE, Individually and　　:
trading as BRIDE FAMILY LIMITED　:
PARTNERSHIP; MICHAEL R. BRIDE　:
and SHIRLEY BRIDE, trading as　　　:
MARSHVIEW FAMILY LIMITED　　:
PARTNERSHIP; RUSSELL E. BULICK　:
and CATHY ANN BRADY; PAULA A.　:
BRUYN; CAHILL REALTY BUSINESS　:
TRUST; RONALD L. CAMPBELL;　　:
JAMES E. CANFIELD and FREDA L.　:
CANFIELD; RICHARD A. CARD, JR.　:
and CANDY S. CARD; ERVEN W.　　:
CRAWFORD and JUNE CRAWFORD;　:
DJH & PAH, LLC trading as WGH &　:

[CAPTION CONTINUED ON NEXT PAGE]

HBH, LP; DJH & WGH, LLC, trading as    :
HENRY BROTHERS, L.P.; PAUL    :
DENAULT and VALARIE DENAULT;    :
ROBERT L. DIBBLE, JR. and LYNN    :
DIBBLE; DP INVESTMENTS, LLC;    :
BRIAN R. DRISCOLL; CHARLES L.    :
EMERSON and PAMELA L. EMERSON;    :
EPLER FAMILY LLC; F & M    :
ROBINSON, LLC trading as FRANCIS &    :
MAXINE ROBINSON FAMILY LIMITED :
PARTNERSHIP; FOSTER FAMILY LLC;    :
E. LARRY FRANKLIN and CAROL    :
FRANKLIN; THOMAS R. FREDERICK    :
and DEBORAH FREDERICK a/k/a    :
DEBORAH S. FREDERICK trading as    :
FH RANCH FAMILY LIMITED    :
PARTNERSHIP; THEODORE B. GATTO    :
a/k/a THEODORE GATTO, Individually and
as Administrator of the ESTATE OF    :
PENNY JUNE GATTO, Deceased;    :
GOWAN RESOURCE MANAGEMENT,    :
LLC trading as R&E GOWAN FAMILY    :
LIMITED PARTNERSHIP; JAMES E.    :
GRIMES and BARBARA P. GRIMES;    :
F. ROBERT HAUSS and CAROL HAUSS, :
trading as HAUSS FAMILY LIMITED    :
PARTNERSHIP; WALTER G.    :
HENRY, JR. and CHERYL A. HENRY;    :
RICHARD W. JACKSON and DOLORES    :
B. JACKSON, Trustees of the JACKSON    :
TRUST DATED JULY 1, 2002;    :
THEODORE A. JOHNSON; LITTLE    :
FALL R&R INC.; BONNIE C. LONG;    :
RICHARD D. MARSHALL and    :
SANDRA L. MARSHALL; WILSON F.    :
MARTIN a/k/a WILSON F. MARTIN, JR., :
and MARY ELLEN MARTIN; NEVA S.    :
MINARIK; DAVID W. MOON and    :

[CAPTIONED CONTINUED ON NEXT PAGE]

MARY J. MOON trading as                              :
MOONHAVEN FAMILY LIMITED                  :
PARTNERSHIP; MORCHAR LLC trading  :
as M&C FASSETT FAMILY LIMITED            :
PARTNERSHIP; KENT L. MORGAN and    :
M. PATRICIA NELSON; WESLEY G.             :
MOSIER and BARBARA E. MOSIER              :
a/k/a BARBARA E. KISSELL; MOSIER          :
REAL ESTATE CO., LLC, trading as            :
MOSIER FAMILY ROYALTY                         :
MANAGEMENT, LP; MS & JC DOSS,            :
LLC trading as M & J DOSS LP;                   :
DORIS J. NEWTON; H. TIMOTHY               :
NEWTON and RENEE S. NEWTON;             :
SHAWN PATRICK NEWTON and                 :
NICOLE D. NEWTON; WALTER E.              :
NEWTON, III and DARLENE R.                   :
NEWTON; WALTER E. NEWTON, III and :
SHAWN NEWTON trading as NEWTON     :
FAMILY LIMITED PARTNERSHIP;            :
OUTDOOR INVESTMENT, LLC trading    :
as WHITE TAIL MOUNTAIN WELL, LP; :
JAMES B. OWEN; LACINDA L.                    :
PETERMAN; JACQUELINE T. PLACE        :
 a/k/a JACQUELINE J. PLACE; JERRY L.  :
PRICE and CLAUDIA C. PRICE;               :
MILTON REPSHER a/k/a MILTON H.       :
REPSHER, SR. and NETA REPSHER a/k/a :
NETA V. REPSHER trading as M&N          :
REPSHER PARTNERS LIMITED               :
PARTNERSHIP; DAVID L. SANDT,          :
a/k/a DAVID LEO SANDT and                  :
MARYANNE SANDT; REXFORD               :
SCHOONOVER; PAUL R. SITES and        :
SUE A. SITES trading as SITES FAMILY :
LIMITED PARTNERSHIP; SL ALLEN       :
LLC trading as SHIRLEY L. ALLEN       :
FAMILY LIMITED PARTNERSHIP;         :

[CAPTIONED CONTINUED ON NEXT PAGE]

JAMES P. SNELL; JOHN R. SNELL and :
MICHELLE S. SNELL trading as :
OUTBACK FAMILY LIMITED :
PARTNERSHIP; PETER P. SOLOWIEJ :
and KENDRA P. SOLOWIEJ; ROBERT H. :
STOUDT, JR. and PATTI L. STOUDT, :
trading as STOUDT FARM LIMITED :
PARTNERSHIP; JOHN L. SULLIVAN :
a/k/a JOHN M. SULLIVAN and :
CHRISTINE L. SULLIVAN a/k/a :
CHRISTINE SULLIVAN, Individually and :
trading as 3 BORDERS FLP; MARY :
ALICE SULLIVAN and KATHERINE S. :
BARRETT, as Trustees of the SULLIVAN :
FAMILY TRUST, and Individually; :
and TOR TAMARACK, LLC, trading as :
THOMSON BUSINESS VENTURES, L.P. :
f/k/a THOMSON FAMILY LIMITED :
PARTNERSHIP, :
:
    Plaintiffs, :
:
   v. :
:
CHESAPEAKE ENERGY :
CORPORATION; CHESAPEAKE :
APPALACHIA, L.L.C.; CHESAPEAKE :
ENERGY MARKETING, LLC, as :
successor by conversion to CHESAPEAKE :
ENERGY MARKETING, INC.; :
CHESAPEAKE OPERATING L.L.C., as :
successor by conversion to CHESAPEAKE :
OPERATING, INC.; WILLIAMS :
PARTNERS, L.P., f/k/a ACCESS :
MIDSTREAM PARTNERS, L.P.; :
ACCESS MLP OPERATING, L.L.C.; :
APPALACHIA MIDSTREAM :
SERVICES, L.L.C.: ANADARKO E&P :

[CAPTION CONTINUED ON NEXT PAGE]

ONSHORE LLC, as successor by          :
conversion to and f/k/a ANADARKO E&P  :
COMPANY LP; STATOIL USA               :
ONSHORE  PROPERTIES, INC.; and        :
MITSUI E&P USA LLC,                   :
                                      :
                    Defendants.       :
_____:

## AMENDED COMPLAINT

The above-named plaintiffs, by and through their undersigned attorneys, file this amended complaint and assert the following claims against the above-named defendants, demanding trial by jury. Plaintiffs make the allegations set forth in this amended complaint upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based in part upon investigation conducted by and through their attorneys.

## I.   INTRODUCTION

1.      Plaintiffs hold royalty interests under oil and gas leases relating to properties located in Bradford County, Pennsylvania, or in nearby townships located in Sullivan or Wyoming Counties, Pennsylvania.[1]

2.      Defendants Chesapeake Appalachia, L.L.C. ("CALLC" or "Chesapeake Appalachia"), Anadarko E&P Onshore LLC, as successor by conversion to and f/k/a Anadarko E&P Company LP ("Anadarko E&P"), Statoil

---

[1] In the aggregate, the plaintiffs in this action hold royalty interests in the natural gas produced from over 12,000 acres of leasehold land.

USA Onshore Properties, Inc. ("Statoil USA"), and Mitsui E&P USA LLC ("Mitsui E&P" and, together with CALLC, Anadarko E&P, and Statoil USA, the "Lessee Defendants"), hold working interests in each of the oil and gas leases in which Plaintiffs hold royalty interests, either as the original lessee party to such lease or as the assignees of all or part of the right, title and interest of the original lessee party.

3.    CALLC, directly or through one or more of its affiliates identified below, also serves as the operator of the working interests in the leases, and of the wells drilled in pooled units established for the exploration, development and production of oil and gas pursuant to the leases in which Plaintiffs hold royalty interests, on behalf of itself, the other Lessee Defendants, and other entities holding working interests in the leases.

4.    Each of the Lessee Defendants is responsible for accounting for and distributing its share of the royalties due and owing to royalty interest owners, including Plaintiffs, in connection with the leases in which the respective Lessee Defendants hold working interests. CALLC, on information and belief, is also responsible for accounting for and distributing the royalties due and owing by certain other owners of working interests in the leases.

5.    Plaintiffs bring this action to recover the compensatory damages that they have sustained, punitive damages, a permanent injunction, and other

supplemental and ancillary declaratory and equitable relief, as a result of (a) unlawful conduct by Defendants in violation of the antitrust laws of the United States, (b) unlawful conduct by the Defendants in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, *et seq.*, (c) breaches of contract by certain of the Defendants, and (d) common law torts by certain of the Defendants, all of which have caused Plaintiffs to be wrongfully deprived of royalties which they are entitled to receive under the terms of the  respective leases in which they hold royalty interests, as a result of the wrongful deduction of unauthorized or artificially inflated, excessive and unreasonable post-production fees for gas gathering and transportation.

6.    As alleged in further detail below, Defendants have wrongfully deprived Plaintiffs, and are continuing to wrongfully deprive Plaintiffs, of the royalties to which they are entitled under their respective royalty interests, through a series of separate but related unlawful schemes. In addition, as also alleged in further detail below, the Lessee Defendants have breach their express or implied contractual obligations to Plaintiffs.

7.    Although all of the Defendants ultimately participated in the schemes, they were originated and orchestrated by defendant Chesapeake Energy Corporation ("Chesapeake Energy" and, together with its affiliated defendants, "Chesapeake"), the parent of defendants CALLC.

**A.      The Anticompetitive Scheme to Allocate Geographic Markets for the Acquisition of Gas Mineral Rights and Operating Working Interests in Oil and Gas Leases Through The Establishment and Abuse of Restrictive Areas of Mutual Interest**

8.      As alleged in further detail below, the Lessee Defendants and/or their respective corporate parents or affiliates, which otherwise are competitors in the business of natural gas exploration and production, sought to and did divide and allocate between and among themselves and other non-party competitors the geographic markets for Gas Mineral Rights, Operating Rights and Gathering Services (all as defined below), in multiple counties in Northern Pennsylvania, including, but not limited to, all or substantial portions of Bradford County, Pennsylvania, adjacent portions of Sullivan, Susquehanna and Wyoming Counties, and Lycoming County, Pennsylvania, with the intent and effect of  reducing, restraining or eliminating competition

9.      The Lessee Defendants implemented their scheme by, among other things, entering into a variety of contracts and establishing a variety of relationships, including joint venture agreements, joint exploration agreements, assignments and partial assignments of oil and gas leases, and agreements to exchange oil and gas assets, including the establishment of contractually designated "areas of mutual interest" ("AMI") (discussed in further detail below) located in Bradford County, Pennsylvania, in adjacent portions of Sullivan, Susquehanna and Wyoming Counties, Pennsylvania.

10.     An area of mutual interest, or AMI, is an area established pursuant to a contract that describes a geographic area in which two or more oil and gas exploration and production companies have interests, and typically defines the rights that each party does or will have (*i.e.* percentage interest) in the area, the length of time during which the contract will be in effect, and how the interests of the parties will be implemented.

11.     The Lessee Defendants involved in allocating the market for Gas Mineral Rights intended to and did (i) reduce, restrain or eliminate competition for Gas Mineral Rights, and for the right to operate working interests in oil and gas leases, within the defined AMI; (ii) fix, lower or maintain the price that they had to pay to acquire Gas Mineral Rights (in the form of both initial bonus payments and ongoing royalties) to landowners within the defined AMI; and (iii) enable themselves to then reduce, restrain or eliminate competition in the markets for Operating Rights and Gathering Services in and around the defined AMI.

12.     As a result of the scheme, CALLC and Anadarko E&P went from being horizontal competitors for Gas Mineral Rights, Operating Rights and Gathering Services, in Bradford County, and in surrounding portions of Sullivan, Susquehanna and Wyoming Counties, to a state of competitive détente, in which each of them ceded the right to be the operator of wells and units (and associated gathering systems) in certain counties to the other, while maintaining a working

interest in the leases, and a non-operating interest in the gathering systems, operated by the other.

13.    Although Anadarko E&P or its predecessor in interest, T.S. Calkins, secured and was sole initial party to all of the oil and gas leases that are at issue in this action, Anadarko E&P never became the operator of any of the wells drilled or units established pursuant to the leases in Bradford, Sullivan, Susquehanna and Wyoming Counties, or of any of the gathering systems developed to service such wells. To the contrary, as a result of the market allocation scheme, and pursuant to the AMI, CALLC became the sole operator of all of the wells drilled and units established pursuant to such leases, and Anadarko E&P does not serve as the operator, and has never served as the operator, of any wells in Bradford, Sullivan, Susquehanna or Wyoming Counties.

14.    The results of the successful market allocation scheme can be vividly seen in a map depicted on a slide titled "Northern Tier Drilling", which was included in a presentation by Representative Matt Baker of the 68th District, entitled "The Economic Impact of Marcellus Shale in Bradford and Tioga Counties, Pennsylvania". A copy of the slide is attached hereto as Exhibit A. As indicated on the slide, "Chesapeake Energy is the red wells". As reflected in the map, Chesapeake Energy (directly or through its affiliate CALLC) is the sole

operator of wells in most of Bradford County, and in much of the surrounding portions of Sullivan, Susequehanna and Wyoming Counties.

15.    As a result of the market allocation scheme, CALLC effectively became the sole purchaser of Gas Mineral Rights within the defined AMI, which then enabled CALLC and Chesapeake to control Operating Rights and Gathering Services in the AMI.

### B.    The Initial Scheme to Eliminate, Reduce and Restrain Competition in the Market for Gas Gathering Services

16.    As alleged in further detailed below, the same defendants who schemed to allocate the geographic market for Gas Mineral Rights and operating working interests in oil and gas leases, or their respective midstream affiliates, also agreed, combined and conspired to reduce, restrain or eliminate competition in the market for natural gas gathering services, in specified dedicated acreage in Bradford County, Pennsylvania, and adjacent portions of Sullivan, Susquehanna and Wyoming Counties, Pennsylvania, which, on information and belief, overlapped or was substantially similar or identical to the AMI establish as part of the market allocation scheme. The defendants effectively created a monopoly, by and through the use of pipelines in which each of them, directly or indirectly, held, and some or all of them continued to hold, ownership interests.

17.    By eliminating, reducing or restraining competition in the market for natural gas gathering services within the dedicated acreage, the Defendants

intended to enable themselves to fix, raise, or maintain, and to charge or benefit from, and then did fix, raise or maintain, and charge or benefit from, supra-competitive fees for gathering services.

The Defendants involved in the initial scheme to eliminate, reduce or restrain competition in gas gathering services within the dedicated acreage benefited from the supra-competitive prices both (a) through their shared ownership of the gathering pipelines used to provide the gathering services, in proportion to their working interests in the production units serviced by such pipelines, and (b) by passing-on a substantial portion of such supra-competitive fees to Plaintiffs and other owners of royalty interests in oil and gas leases in which such defendants or their affiliates held working interests, by deducting such fees from the royalties payable to Plaintiffs and other royalty interest owners.

## C.   The Subsequent Scheme to Transfer, Bolster and Extend the Unlawfully Acquired Monopoly on Gas Gathering Services

18.    As alleged in further detail below, Chesapeake ultimately agreed, combined and conspired with defendant Williams Partners, L.P., f/k/a Access Midstream Partners, L.P. ("Access"), to transfer to Access, and to bolster and extend, the monopoly on Gathering Services that Chesapeake unlawfully established in designated acreage that substantially coincided with the AMI, to enable Chesapeake to generate funds to stave-off a liquidity crisis that it faced as a result of the excessive debt that it undertook to acquire leases, drill wells and

establish gathering systems. The defendants implemented their scheme through a series of complex transactions detailed below which ultimately amounted to the equivalent of a multi-billion dollar an off-balance sheet loan, for which Plaintiffs and other royalty interest owners would end up paying a substantial share of the interest.

**D.**   **The Scheme to Defraud Plaintiffs of Their Royalties by the Misrepresentation of Unauthorized or Artificially Inflated Deductions**

19.   Finally, the Defendants executed a scheme and artifice to deprive Plaintiffs and other oil and gas lessors who own property within the dedicated acreage of the royalties properly due to them, by means of fraudulent pretenses and representations through the use of the United States mails, in violation of 18 U.S.C. § 1341, and by participating in the conduct of an enterprise through a pattern of racketeering acting, in violation of RICO. In particular, each of the Lessee Defendants issued periodic (usually monthly) royalty statements and royalty payments to Plaintiffs which reflected deductions for excessive, unreasonable and artificially inflated gas gathering and transportation fees, which were based on the commitments The Defendants used the mails as a central feature of their scheme

### E.     The Lessee Defendants' Breaches of Their Express and Implied Contractual Obligations to Plaintiffs

20.     Separate and apart from the schemes described above, Plaintiffs also contend that the Lessee Defendants breached the express or implied contractual obligations that they owed to Plaintiffs under the terms of their respective oil and gas leases.

21.     In particular, Plaintiffs contend that the Lessee Defendants, acting in violation of their express and/or implied contractual obligations under the terms of the leases under which Plaintiffs hold royalty interests, have underpaid, and continue to underpay, the royalties due and owing by them (and, in the case of CALLC, by certain other holders of working or overriding interests in the Leases, for which CALLC is responsible for accounting for and distributing royalties), to Plaintiffs. The underpayment of royalties stems from the respective defendants: (i) basing the royalty payments on artificial gas prices lower than the effective price actually received by them for the gas produced under Plaintiffs' leases; and/or (ii) effectively deducting from Plaintiffs' royalties unauthorized and impermissible amounts for purported post-production costs, such as purported costs of gas gathering, marketing and transportation, in calculating the royalties payable to Plaintiffs.

22.     The use of such artificial prices and deductions violates the express language of the leases, which require royalties to be calculated based on the market

value at the well of gas sold, and do not permit the deduction of post-production costs in calculating the royalty payable under the lease.

23.     Alternatively, even if the Lessee Defendants otherwise are entitled to deduct or give effect to post-production costs in calculating the royalties payable to Plaintiffs, each of the Lessee Defendants has violated the implied covenants of good faith and fair dealing inherent in the leases under which the Plaintiffs hold royalty interests by deducting, or giving effect to the deduction of, purported post-production costs which were and are arbitrary, grossly excessive and unreasonable in amount.

24.     Although the Lessee Defendants did not all appear to have started to take unauthorized or excessive deductions at the same time, or at least to have disclosed such deductions in their royalty accountings, they all ultimately began to do so. Until recently, defendant Statoil USA had not expressly itemized or disclosed on its check stubs or royalty statements to Plaintiffs that it was taking any deductions for gathering or transportation costs in the calculation of their royalties, even though Statoil receives revenues from the same gas, produced from the same wells, subject to the same leases, as to which the other Lessee Defendants takes substantial post-production deductions. At the same time, Statoil, reported substantially lower unit price for the gas produced from the same wells, for the same months, from which Plaintiffs infer that Statoil was actually taking

deductions for post-production costs without disclosing them, and then simply paying royalties on the resulting lower unit price.

25.     The arbitrary, excessive and unreasonable deductions for purported gas gathering and transportation costs being deducted in calculating the royalties payable to Plaintiffs are the product and intended result of: (i) an unlawful and anticompetitive contract, combination or conspiracy among defendants Chesapeake Energy, Chesapeake Energy Marketing, Inc. ("CEMI"), and Chesapeake Operating, Inc. ("COI"), Appalachia Midstream Services, L.L.C. ("AMS"), Williams Partners, L.P. f/k/a Access Midstream Partners, L.P. ("Access"), Access MLP Operating, L.L.C. ("Access MLP"), to fix, raise, maintain and stabilize the price of gas gathering and intrastate transportation services in the relevant geographic area; (ii) the unlawful attempt by Chesapeake and Access Midstream to monopolize, or the actual unlawful monopolization by them of, the market for gas gathering and intrastate transportation services in the relevant geographic area; and (iii) the accompanying participation by Chesapeake and Access Midstream in a scheme involving the conduct of the affairs of one or more de facto enterprises through what amounted to a pattern of racketeering activity.

26.     The Lessee Defendants provide Plaintiffs with only cryptic, cursory, incomplete and misleading summaries of the deductions taken in calculating their royalties.

27.    Despite extensive efforts and research, Plaintiffs have been unable to obtain copies of many of the key agreements and documents necessary to confirm, understand and allege with particularity operative details of Defendants' schemes. Such documents and information are not publicly filed by the Defendants, but instead are treated as highly confidential trade secrets or business information, and closely guarded by Defendants. As a result, such documents and information are peculiarly within the control of Defendants.

**F.    The ProPublica Report**

28.    As outlined in a March 13, 2014 article published online in *ProPublica,* entitled *Chesapeake Energy's $5 Billion Shuffle*, available at http://www.propublica.org/article/chesapeake-energy's-5-billion-shuffle (last accessed September 10, 2014) (the "ProPublica Report"), Chesapeake conspired with Access Midstream to accelerate and continue its scheme to extract improperly inflated royalty deductions from lessors such as Plaintiffs.[2] According to the *ProPublica* Report, in calculating the royalties payable to lessors, Chesapeake

---

[2]  According to its website, "*ProPublica* is an independent, non-profit newsroom that produces investigative journalism in the public interest." http://www.propublica.org/about/  (last accessed January 29, 2015). *ProPublica* was awarded the 2011 Pulitzer Prize for National Reporting and a 2010 Pulitzer Prize for Investigative Reporting and a Peabody Award (the highest honor in broadcast journalism) in 2013. http://www.propublica.org/awards/ (last accessed January 29, 2015). *ProPublica*'s investigative publications have been cited and relied upon by federal courts when evaluating the sufficiency of plaintiffs' pleadings. *See, e.g., Garden City Employees' Retirement System v. Psychiatric Solutions, Inc.*, 2011 WL 1335803, at *27 (M.D.Tenn. Mar. 31, 2011). By citing and making certain allegations based on the *ProPublica* Report, Plaintiffs do not intend to adopt or admit the accuracy of all of the factual allegations contained in the report.

decided to further artificially inflate the deductions that it took from the proceeds that it received at the point of sale of the natural gas that it produced from the lessors' properties in order to enable it to obtain and satisfy what amounted to a $5 billion off-balance-sheet loan from Access Midstream, disguised as asset sales, to enable Chesapeake to hide its need to "raise billions of dollars quickly," without alarming financial markets by the extent of its financial troubles, at a time when it was already saddled by billions of dollars in debt. *See id.*

29.     Access Midstream, Chesapeake's co-conspirator, had a strong financial incentive to participate in the scheme. In return for "purchasing" $4.76 billion in gas transportation lines from Chesapeake, Access Midstream was guaranteed to recover $5 billion plus a supra-competitive 15% annual return on its investment over the next decade – a material part of which Access Midstream and Chesapeake knew and intended would come at the expense of royalty interest owners such as Plaintiffs, in the form of artificially and improperly inflated royalty deductions. *See id.*

30.     From the perspective of Access Midstream, the deal terms were highly attractive and favorable. As described by J. Michael Stice, Access Midstream's Chief Executive Officer, "[i]t doesn't get any better than this." *See id.* For Plaintiffs and other lessors to Chesapeake, however, the Chesapeake/Access Midstream deal could hardly get any worse.

**G.      Pennsylvania Government Officials Acknowledge and
Attempt to Address the Problem**

31.      As several Pennsylvania state officials have recognized, Plaintiffs are
not the only Pennsylvania gas royalty interest owners who have been harmed by
Chesapeake's improper deduction of post-production costs in calculating royalty
payments. In a letter dated February 13, 2014 to Robert D. Lawler, Chesapeake's
Chief Executive Officer, then-Governor Tom Corbett noted that, for some time, he
had received complaints from his constituents and Chesapeake's leaseholder
"regarding practices of Chesapeake Energy which strike many as unfair and
perhaps illegal." In particular, Governor Corbett noted that:

> Deductions of post-production costs, in a manner
> which seemingly few if any other operators in
> Pennsylvania utilize, has caused a significant erosion of
> the trust and goodwill the natural gas industry has
> established with Pennsylvania leaseholders and local
> communities.

Governor Corbett also noted that, by copy of the letter, he was urging Attorney
General Kathleen Kane to examine the issue. *Id.*

32.      By letter dated February 14, 2014 to Doug McLinko, Chairman of the
Bradford County Board of Commissioners, then-Governor Corbett noted that he
had grown increasingly concerned about the treatment of Pennsylvania
leaseholders with respect to the deduction of post-production costs, and stated that

"our efforts to receive straightforward answers [regarding deduction of post-production costs] have led to even more confusion…."

## II.   <u>JURISDICTION AND VENUE</u>

33.     Plaintiffs bring the claims set forth in the First and Second Causes of Action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for treble damages and injunctive relief, as well as reasonable attorneys' fees and costs, with respect to the injuries sustained by Plaintiffs arising from violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. As a result, this Court has original subject matter jurisdiction over the claims set forth in the First, Second and Third Causes of Action pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 15 and 26.

34.     Plaintiffs bring the claim set forth in the Third and Fourth Causes of Action for violations of the provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, et seq., to recover the damages they have sustained as a result of the participation by Chesapeake and Access Midstream in a scheme involving the conduct of the affairs of one or more de facto enterprises through what amounted to a pattern of racketeering activity. As a result, this Court has original jurisdiction over the Fourth Cause of Action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 18 U.S.C. §§ 1962 and 1964 (prohibited activities; civil remedies).

35.    This Court has personal jurisdiction over Defendants because each of them systematically and continuously transacts substantial business in the United States and in this District.

36.    This Court also has supplemental jurisdiction over the claims and parties named the Fifth through Ninth Causes of Action, pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction), as the claims set forth therein are sufficiently related to the claims over which the Court has original jurisdiction that they form part of the same case or controversy.

37.    In addition, or in the alternative, this Court has subject matter jurisdiction over the claims set forth in the Fifth through Ninth causes of action pursuant to 28 U.S.C. § 1332, because the aggregate matter in controversy in such claims, as to each Plaintiff, exceeds the sum or value of $75,000, exclusive of interest and costs, and the claims are between citizens of different states, resulting in complete diversity of citizenship.

38.    Venue is proper in this District pursuant to: 15 U.S.C. § 22 – which provides for venue of suits under the antitrust laws against a corporation in any district in which it may be found or transacts business; 18 U.S.C. § 1965(a) – which provides for venue in any district in which a RICO defendant transacts his affairs; and pursuant to 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2), because a

substantial portion of the events giving rise to Plaintiff's claims occurred in this District, and Defendants are subject to personal jurisdiction in this District.

39.     Defendants' respective business activities that are the subject of this Complaint are within the flow of, and substantially have affected, interstate trade and commerce.

## III.   PARTIES

### A.   Plaintiffs

40.   Plaintiff A&B Campbell Family LLC ("Campbell FLLC") is a Pennsylvania limited liability company with its principal place of business in Wyalusing, Pennsylvania. Each of the members of Campbell FLLC resides in and is a citizen of the Commonwealth of Pennsylvania. Campbell FLLC is the successor in interest to Andy Campbell a/k/a Andy D. Campbell, and to Bonnie L. Campbell, in royalty interests in the oil, gas and other minerals produced from a real property situated in Albany Township, in Bradford County, Pennsylvania, described as Tax Parcel Number 02-124-42, consisting of approximately 164.48 acres in the aggregate (the "Campbell Property").

41.   Plaintiff Amber A. Adams is an adult individual residing in Wyalusing, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and is the owner of: (a) an undivided one-fourth (1/4) interest in real property situated in Colley Township, Sullivan County, Pennsylvania (a portion of which is situated in

Wilmot Township, Bradford County) described as Tax Parcel Number 02-093-0001, consisting of approximately 104.08 acres ("Amber Adams Property 1"); and (b) an undivided one-fifth (1/5) interest in the mineral rights to a real property situated in Colley Township, Sullivan County, Pennsylvania (a portion of which is situated in Wilmot Township, Bradford County) described as Tax Parcel Number 02-094-0001, consisting of approximately 104 acres ("Amber Adams Property 2")

42. Plaintiffs Burton R. Adams and Joanne M. Adams are adult individuals residing in Dushore, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of Adams' Tyler Mountain Limited Partnership, which is the owner of real property situated in Colley Township, Sullivan County, Pennsylvania, described as Tax Parcel Numbers 02-080-0001, 02-080-0004 and 02-081-0020, consisting of approximately 248.239 acres (the "Adams Tyler Mountain LP Property"). Burton R. Adams also owns an undivided one-fourth (1/4) interest in a separate real property situated in Colley Township, Sullivan County, Pennsylvania, described as Tax Parcel Number 02-080-0003, consisting of approximately 48.461 acres (the "Burton Adams Property").

43. Plaintiff Libbie A. Adams is an adult individual residing in Dushore, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and is the owner of: an undivided one-fourth (1/4) interest in real property situated in Colley Township, Sullivan County, Pennsylvania, described as Tax Parcel Number 02-

080-0003, consisting of approximately 48.461 acres (the "Libbie Adams Property").

44.     Plaintiff Sherwood G. Adams is an adult individual residing in Wyalusing, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and is the owner of an undivided one-fifth (1/5) interest in real property situated in Colley Township, Sullivan County, Pennsylvania (a portion of which also is located in Wilmot Township, Bradford County), described as Tax Parcel Numbers 02-094-0001, consisting of approximately 104.08 acres, and 02-080-0003-001, consisting of approximately 2.5 acres (the "Sherwood Adams Property").

45.     Plaintiff Toby L. Adams is an adult individual residing in Wyalusing, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and is the owner of: (a) an undivided one-fourth (1/4) interest in real property situated in Colley Township, Sullivan County, Pennsylvania, described as Tax Parcel Number 02-080-0003, consisting of approximately 48.461 acres (the "Toby Adams Property").

46.     Plaintiff James P. Ahern is an adult individual residing in Wyalusing, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of real property situated in Terry Township, Bradford County, Pennsylvania, described as Tax Parcel Number 46-113.00-046, consisting of approximately 105 acres (the "Ahern Property").

47.     Plaintiffs Eugene J. Barrett, Jr. and Lori R. Barrett are adult individuals residing in Towanda, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Asylum Township, Bradford County, Pennsylvania, described as Tax Parcel Number 04-113.00-14, consisting of approximately 108 acres (the "Eugene Barrett Property).

48.     Plaintiffs James T. Barrett and Cindy E. Barrett, individually and trading as BCF Family Limited Partnership ("BCF"), are adult individuals residing in Towanda, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of BCF, a Pennsylvania limited partnership which is the owner of real property situated in Asylum Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 04-113-05 and 04-112-51, consisting of approximately 422.73 acres (the "James Barrett Property).

49.     Plaintiff John M. Barrett trading as John M. Barrett Family Limited Partnership ("John Barrett FLP"), is an adult individual residing in Towanda, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the sole general partner of John Barrett FLP, a Pennsylvania limited partnership with its principal place of business in Towanda, Pennsylvania. Each of the limited partners of John Barrett FLP also resides in and is a citizen of the Commonwealth of Pennsylvania. John Barrett FLP is the owner of real property situated in Asylum Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 04-

113.00-008-000 and 04-113.00-012-000, consisting of approximately 271.9 acres in the aggregate (the "John Barrett FLP Property).

50. Plaintiff Barto Family LLC ("Barto FLLC") is a Pennsylvania limited liability company with its principal place of business in Wyalusing, Pennsylvania. Each of the members of Barto FLLC resides in and is a citizen of the Commonwealth of Pennsylvania. Barto FLLC is the owner of real property situated in Terry and Asylum Townships, Bradford County, Pennsylvania, described as Tax Parcel Number 46-113-130, consisting of approximately 86.88 acres (the "Barto FLLC Property).

51. Plaintiff Clark A. Beebe is an adult individual residing in Sussex County, New Jersey, a citizen of the State of New Jersey, and the owner of real property situated in Asylum Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 04-100.00-130-000-000, 04-100.00-176-000-000,04-100.00-186-000-000, 04-100.00-190-000-000, 04-100.00-191-000-000, and Tax Parcel Number 04-101.00-160-000-000 and 04-101.00-161-000-000, consisting of approximately 333 acres in the aggregate (collectively, the "Beebe Property").

52. Plaintiffs Clark A. Beebe and Donna L. Beebe, Trustees of the Beebe Living Trust dated June 21, 2010 (the "Beebe Living Trust"), are adult individuals residing in Morris County, New Jersey, and citizens of the State of New Jersey. Each of the beneficiaries of the Beebe Living Trust also resides in and is a citizen

of the State of New Jersey. The Beebe Living Trust is the owner of real property situated in Asylum Township, Bradford County, Pennsylvania, described as Tax Parcel Number 04-100.00-149-000-000, consisting of approximately 78 acres of land, more or less (collectively, the "Beebe Trust Property").

53.    Plaintiffs David J. Bride and Diane V. Bride, Individually and trading as Bride Family Limited Partnership ("Bride FLP"), are adult individuals residing in Towanda, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of Bride FLP, a Pennsylvania limited partnership with its principal place of business in Towanda, Pennsylvania. Each of the limited partners of Bride FLP also is a citizen of the Commonwealth of Pennsylvania. Bride FLP is the owner of real property situated in Asylum Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 04-101.00-169 (consisting of approximately 134.450 acres) and 04-101.00-140-002-000 (consisting of approximately 25.620 acres) (collectively, the "Bride FLP Property").

54.    Plaintiffs Michael R. Bride and Shirley Bride trading as Marshview Family Limited Partnership ("Marshview FLP") are adult individuals residing in Towanda, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of Marshview FLP, a Pennsylvania limited partnership with its principal place of business in Towanda, Pennsylvania. Each of the limited partners of Marshview FLP also resides in and is a citizen of the Commonwealth of

Pennsylvania. Marshview FLP is the owner of real property situated in Asylum Township, Bradford County, Pennsylvania, described as Tax Parcel Number 04-101-168, consisting of approximately 291.9 acres in the aggregate (the "Marshview FLP Property").

55.    Plaintiff Paula A. Bruyn is an adult individual residing in Wyalusing, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and is the owner of: an undivided one-fourth (1/4) interest in real property situated in Colley Township, Sullivan County, Pennsylvania, described as Tax Parcel Number 02-080-0003, consisting of approximately 48.461 acres (the "Bruyn Property").

56.    Plaintiffs Russell E. Bulick and Cathy Ann Brady are adult individuals residing in Towanda, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Terry Township, Bradford County, Pennsylvania, described as Tax Parcel Number 46-113-129.1, consisting of approximately 20.26 acres (the "Bulick/Brady Property").

57.    Plaintiff Cahill Realty Business Trust is a business trust organized and existing under Pennsylvania law with its primary place of business located in the Commonwealth of Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of a real property situated in Overton Township, Bradford County, Pennsylvania, described as Tax Parcel Number 28-122-5, consisting of approximately 2824 acres (the "Cahill Realty Property").

58.    Plaintiff Ronald L. Campbell is an adult individual residing in Wyalusing, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of real property situated in Wyalusing Township, Bradford County, Pennsylvania, described as Tax Parcel Number 61-103-97 (consisting of approximately 74.8 acres) and 61-103-92 (consisting of approximately 104.3 acres), together consisting of a total of approximately 179.1 acres in the aggregate (collectively, the "Ronald Campbell Property").

59.    Plaintiffs James E. Canfield and Freda L. Canfield are adult individuals residing in New Albany, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Albany Township, Bradford County, Pennsylvania, described as Tax Parcel Number 02-124-92, consisting of approximately 30.5 acres (the "Canfield Property").

60.    Plaintiffs Richard A. Card, Jr. and Candy S. Card are adult individuals residing in Laceyville, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Tuscarora Township, Bradford County, Pennsylvania, described as Tax Parcel Number 54-104-106.3, consisting of approximately 17.3977 acres (the "Card Property").

61.    Plaintiffs Erven E. Crawford and June Crawford are adult individuals residing in New Albany, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Terry Township,

Bradford County, Pennsylvania, described as Tax Parcel Numbers 46-136-11 (consisting of approximately 37.00 acres) and 46-124-156 (consisting of approximately 166.9000 acres (the "Crawford Property").

62.    Plaintiff DJH & PAH, LLC, trading as WGH & HBH, LP, is a Pennsylvania limited liability company with its principal place of business in New Albany, Pennsylvania, and is the general partner of WGH & HBH, LP, a Pennsylvania limited partnership also with its principal place of business in New Albany, Pennsylvania. All of the members of DJH & PAH, LLC, and all of the limited partners of WGH & HBH, LP, reside in and are citizens of the Commonwealth of Pennsylvania. WGH & HBH, LP is the owner of real property, or royalty interests in the mineral rights to real property, situated in Albany Township, Bradford County, Pennsylvania, including but not limited to: a property described as Tax Parcel  02-123-120 (consisting of approximately 10.00 acres); an undivided two-thirds (2/3) interest in a property described as Tax Parcel Numbers 02-123-121 (consisting of approximately 125.500 acres); and a property described as Tax Parcel Number 02-123-125 (consisting of approximately 27.6 acres), as well as an additional ten acres, the tax parcel number of which is not known (collectively, the "WGH & HBH, LP Property").

63.    Plaintiff DJH & WGH, LLC, trading as Henry Brothers, L.P., is a Pennsylvania limited liability company with its principal place of business in New

Albany, Pennsylvania, and is the general partner of Henry Brothers, L.P., a Pennsylvania limited partnership also with its principal place of business in New Albany, Pennsylvania. All of the members of DJH & WGH, LLC, and all of the limited partners of Henry Brothers, L.P., reside in and are citizens of the Commonwealth of Pennsylvania. Henry Brothers, L.P. is the owner of real property, or royalty interests in the mineral rights to real property, situated in Albany Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 02-123-110 (consisting of approximately 22.9 acres); 02-123-111 (consisting of approximately 1.7700 acres); and 02-123-113 (consisting of approximately 18.0 acres) (the "Henry Brothers, L.P. Property").

64.     Plaintiff DP Investments, LLC ("DP Investments") is a Pennsylvania limited liability company with its principal place of business in New Albany, Pennsylvania. Each of the members of DP Investments resides in and is a citizen of the Commonwealth of Pennsylvania. DP Investments is the owner by assignment of an undivided one-eighth interest in all of the lessor's rights under an oil and gas lease to property situated in Albany Township, Bradford County, Pennsylvania, described as Tax Parcel Number 02-5-5G, consisting of approximately 150.02 acres (the "DP Investments Property).

65.     Plaintiffs Paul DeNault and Valarie DeNault are adult individuals residing in New Albany, Pennsylvania, citizens of the Commonwealth of

Pennsylvania, and the owners of real property situate in New Albany Township, Bradford County, Pennsylvania, described as Tax Parcel Number 02-124.00-152.001, consisting of approximately 2.0 acres (the "DeNault Property").

66.   Plaintiff Robert L. Dibble, Jr., is an adult individual residing in New Albany, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of real properties situated in Albany Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 02-124-150 (consisting of approximately 1.12 acres) and 02-135-61 (consisting of approximately 59.17 acres) (collectively, the "Dibble Property").

67.   Plaintiff Brian R. Driscoll is an is an adult individual residing in Canton, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of undivided interests in real properties situated in Overton Township, Bradford County, Pennsylvania, including: (a) a one-sixth (1/6) interest a property described as Tax Parcel Numbers 28-122-006 (consisting of approximately 163.6 acres) ("Driscoll Property 1"); (b) a one-sixth (1/6) interest in a property described as Tax Parcel Number 28-133-012 (consisting of approximately 100 acres) ("Driscoll Property 2"); and (c) a one-fourth (1/4) interest in a property described as Tax Parcel Number 28-133-013 (consisting of approximately 140 acres) ("Driscoll Property 3").

68.     Plaintiffs Charles L. Emerson and Pamela J. Emerson are adult individuals residing in Wysox, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Standing Stone Township, Bradford County, Pennsylvania, described as Tax Parcel Number 43-075.00-196-000, consisting of approximately 21.376 acres (the "Emerson Property").

69.     Plaintiff Epler Family LLC ("Epler FLLC") is a Pennsylvania limited liability company with its principal place of business in New Albany, Pennsylvania. Each of the members of Epler FLLC resides in and is a citizen of the Commonwealth of Pennsylvania. Epler FLLC is the owner of real property situated in Albany Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 02-124-114 and 02-124-116, consisting of approximately 146.16 acres in the aggregate (the "Epler Property"), pursuant to a Corrective Deed dated June 18, 2010, and recorded March 4, 2011, at Instrument No. 201106242, from Robert H. Epler and Judy N. Epler.

70.     Plaintiff F & M Robinson, LLC ("Robinson LLC") trading as Francis & Maxine Robinson Family Limited Partnership ("Robinson FLP"), is a Pennsylvania limited liability company with its principal place of business in Towanda, Pennsylvania, and is the general partner of Robinson FLP, a Pennsylvania limited partnership also with its principal place of business in

Towanda, Pennsylvania. All of the members of Robinson LLC, and all of the limited partners of Robinson FLP, reside in and are citizens of the Commonwealth of Pennsylvania. Robinson FLP is the owner of real property situated in Monroe Township, Bradford County, Pennsylvania, described as Tax Parcel Number 25-100-34, consisting of approximately 167.22 acres in the aggregate (collectively, the Robinson FLP Property").

71.    Plaintiff Foster Family Farm LLC ("Foster FLLC") is a Pennsylvania limited liability company with its principal place of business in Towanda, Pennsylvania. All of the members of Foster FLLC reside in and are citizens of the Commonwealth of Pennsylvania. Robsinson FLLC is the owner of real property situated in Wysox Township, Bradford County, Pennsylvania, described as Tax Parcel Number 62-74-14, consisting of approximately 284.96 acres (the "Foster FLLC Property").

72.    Plaintiffs E. Larry Franklin and Carol Franklin are adult individuals residing in Laceyville, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Wilmot Township, Bradford County, Pennsylvania, described as Tax Parcel Number 58-127-92, consisting of approximately 24.55 acres ("Franklin Property 2").

73.    Plaintiffs Thomas R. Frederick and Deborah Frederick a/k/a Deborah S. Frederick trading as FH Ranch Family Limited Partnership ("FH Ranch FLP"),

are adult individuals residing in Wyalusing, Pennsylvania, are citizens of the Commonwealth of Pennsylvania, and are the general partners of FH FLP, a Pennsylvania limited partnership with its principal place of business in Wyalusing, Pennsylvania. Each of the limited partners of FH FLP also resides in and is a citizen of the Commonwealth of Pennsylvania. FH FLP is the owner of real property situated in Herrick and Standing Stone Townships, Bradford County, described as Tax Parcel Numbers 20-89-85 and 20-89-86, consisting of approximately 148.58 acres in the aggregate (the "FH Ranch FLP Property").

74.    Plaintiff Theodore B. Gatto a/k/a Theodore Gatto, Individually and as Administrator of the Estate of Penny June Gatto, Deceased, is an adult individual residing in New Albany, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of real property situated in Terry and Albany Townships, Bradford County, Pennsylvania, described as Tax Parcel Number 46-136-11, consisting of approximately 79 acres (the "Gatto Property"). All of the beneficiaries of the Estate of Penny June Gatto also reside in and are citizens of the Commonwealth of Pennsylvania.

75.    Plaintiff      Gowan       Resource      Management       LLC ("Gowan LLC"), trading as R&E Gowan Family Limited Partnership ("R&E Gowan FLP"), is a Pennsylvania limited liability company with its principal place of business in Wyalusing, Pennsylvania, a citizen of the Commonwealth of

Pennsylvania, and is the general partner of Gowan FLP, a Pennsylvania limited partnership which also has its principal place of business in Wyalusing, Pennsylvania. All of the members of Gowan LLC, and all of the limited partners of Gowan FLP, reside in and are citizens of the Commonwealth of Pennsylvania or the State of New York. R&E Gowan FLP is the owner of real property situated in Albany and Terry Townships, Bradford County, Pennsylvania, described as Tax Parcel Numbers: 02-124-33 (consisting of approximately 83 acres); and 46-124-186 (consisting of approximately 82.63 acres) (together, the "R&E Gowan FLP Property").

76.    Plaintiffs James E. Grimes and Barbara P. Grimes are adult individuals residing in Wysox, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Wysox Township, Bradford County, Pennsylvania, described as Tax Parcel Number 62-75-119, consisting of approximately 215.90 acres (the "Grimes Property").

77.    Plaintiff F. Robert Hauss and Carol Hauss trading as Hauss Family Limited Partnership ("Hauss FLP") are adult individuals residing in New Albany, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of Hauss FLP, a Pennsylvania limited partnership with its principal place of business in New Albany, Pennsylvania. Each of the limited partners of Hauss FLP also resides in and is a citizen of Pennsylvania. Hauss FLP is the owner of real

property situated in Albany Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 02-124-16 and 02-124-108.1, consisting of approximately 146.16 acres in the aggregate (collectively, the "Hauss FLP Property").

78.   Plaintiffs Walter G. Henry, Jr. and Cheryl A. Henry (a/k/a Cheryl R. Henry) are adult individuals residing in New Albany, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Albany Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 02-123-112 (consisting of approximately 0.78 acres), 02-113-123 (consisting of approximately 1.350 acres) and 02-113-124 (consisting of approximately 4.0 acres), and an undivided one-third interest in Tax Parcel No. 02-123-121 (consisting of approximately 62.750 acres) (collectively, the "Walter and Cheryl Henry Property").

79.   Plaintiffs Richard W. Jackson and Dolores B. Jackson, Trustees of the Jackson Trust dated July 1, 2002 (the "Jackson Trust"), are adult individuals residing in Mansfield, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of a 55.23607% undivided interest in and to all of the oil, gas and any and all hydrocarbons including those located within any minerals in and under and that may be produced from land situated in Wyalusing Township, Bradford County, Pennsylvania, described as Tax Parcel Number 61-101.00-171-000-000, consisting of approximately 106 acres (the "Jackson Trust

Property"). All of the beneficiaries of the Jackson Trust also reside in and are citizens of Pennsylvania.

80.     Plaintiff Theodore A. Johnson is an adult individual residing in Towanda, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of real property situated in Asylum Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 04-101.00-130-000 (consisting of approximately 48 acres), 04-101.00-145-000 (consisting of approximately 32.95 acres), and 04-101.00-146-000 (consisting of approximately 3.5 acres (collectively, the "Theodore Johnson Property").

81.     Little Fall R & R, Inc. ("Little Fall"), is a Pennsylvania corporation with its principal place of business in Albany Township, Bradford County, Pennsylvania, and the owner of real property situated in Albany Township, Bradford County, Pennsylvania, described as Tax Parcel Number 02-124-87 (consisting of approximately 54 acres) (the "Little Fall Property").

82.     Plaintiff Bonnie C. Long is an adult individual residing in Pennsburg, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of an undivided one-third (1/3) interest in real property situated in Colley Township, Sullivan County, Pennsylvania (a portion of which also is located in Wilmot Township, Bradford County), described as Tax Parcel Numbers 02-094-0001,

consisting of approximately 104.08 acres, and 02-080-0003-001, consisting of approximately 2.5 acres (the "Long Property").

83. Plaintiffs Richard D. Marshall and Sandra L. Marshall are adult individuals residing in Wyalusing, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Terry Township, Bradford County, Pennsylvania, described as Tax Parcel Number 46-114-10.1, consisting of approximately 20.42 acres (the "Marshall Property").

84. Plaintiff Wilson F. Martin a/k/a Wilson F. Martin, Jr., and Mary Ellen Martin are adult individuals residing in Towanda, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Wysox Township, Bradford County, Pennsylvania, described as Tax Parcel Number 62-074.00-063, consisting of approximately 42.78 acres (the "Martin Property").

85. Plaintiff Neva S. Minarik is an adult individual residing in Muncy Valley, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of an undivided one-fifth (1/5) interest in real property situated in Colley Township, Sullivan County, Pennsylvania (a portion of which also is located in Wilmot Township, Bradford County), described as Tax Parcel Numbers 02-094-0001, consisting of approximately 104.08 acres, and 02-080-0003-001, consisting of approximately 2.5 acres (the "Minarik Property").

86.    Plaintiffs David W. Moon and Mary J. Moon trading as Moonhaven Family Limited Partnership ("Moonhaven FLP") are adult individuals residing in New Albany, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of Moonhaven FLP, a Pennsylvania limited partnership with its principal place of business in New Albany, Pennsylvania. Each of the limited partners of Moonhaven FLP also resides in and is a citizen of Pennsylvania. Moonhaven FLP is the owner of real property situated in Windham Township, Wyoming County, Pennsylvania, described as Tax Parcel Numbers 29-067.00-003-02-00-00, consisting of approximately 3.04 acres ("Moonhaven FLP Property 1"), and real property situated in Albany and Terry Townships, Bradford County, Pennsylvania, described as Tax Parcel Numbers 02-124-152 and 02-135-63 (Albany Township) and 46-136-10 (Terry Township), consisting of approximately 193.53 acres in the aggregate (originally described as 131.89 acres, but subsequently increased, following survey, by Amendment and Ratification of Oil and Gas Lease effective May 11, 2006 and recorded on April 12, 2013 ("Moonhaven FLP Property 2").

87.    Plaintiff MorChar, LLC ("MorChar") trading as M&C Fassett Family Limited Partnership ("M&C FLP"), is a Pennsylvania limited liability company with its principal place of business in Laceyville, Pennsylvania, and is the general partner of M&C FLP, a Pennsylvania limited partnership also with its principal

place of business in Laceyville, Pennsylvania. All of the members of MorChar, and all of the limited partners of M&C FLP, reside in and are citizens of the Commonwealth of Pennsylvania. M&C FLP is the owner of real property situated in Tuscarora Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers: 54-091.00-083-000-000; 54-091.00-083-001-000; 54-091-00-084-000-000; and 54-104.00-110-000-000; consisting of approximately 286.712 acres in the aggregate (collectively, the M&C FLP Property").

88.     Plaintiffs Kent L. Morgan and M. Patricia Nelson are adult individuals residing in Englewood, Florida, citizens of the State of Florida, and the owners of real property situated in Fox Township, Sullivan County, Pennsylvania, described as Tax Parcel Numbers 9-106-65 and 9-92-16, consisting of approximately 176.643 acres in the aggregate (collectively, the "Morgan/Nelson Property").

89.     Plaintiffs Wesley G. Mosier and Barbara E. Mosier, a/k/a Barbara E. Kissell are adult individuals residing in Towanda, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of three parcels of real property totaling approximately 313.32 acres, including: (a) a property situated in North Towanda Township, Bradford County, Pennsylvania, described as Tax Parcel Number 51-73-167 (consisting of approximately 296.66 acres); (b) a property situated in Asylum Township, Bradford County, Pennsylvania (consisting of approximately 12.07 acres); and (c) a property situated in Asylum Township,

Bradford County, Pennsylvania (consisting of approximately 4.59 acres) (collectively, the "Mosier Property").

90.    Plaintiff Mosier Real Estate Management Co., LLC ("Mosier LLC") is a Pennsylvania limited liability company with its principal place of business in Towanda, Pennsylvania, and is the general partner of Mosier Family Royalty Management, LP ("Mosier Family LP"), a Pennsylvania limited partnership also with its principal place of business in Towanda, Pennsylvania. All of the members of Mosier LLC, and all of the limited partners of Mosier Family LP, reside in and are citizens of the Commonwealth of Pennsylvania. Mosier Family LP is the owner by assignment from Wesley Mosier and Barbara Mosier of all right, title and interest in and to royalties under certain oil and gas leases of two parcels of real property totaling approximately 309 acres, including: (a) a property situated in North Towanda Township, Bradford County, Pennsylvania, described as Tax Parcel Number 51-73-167 (consisting of approximately 296.66 acres); and (b) a property situated in Asylum Township, Bradford County, Pennsylvania, described as Tax Parcel Number 4-101-53 (consisting of approximately 12.07 acres) (together, the "Mosier Family LP Property").

91.    MS & JC Doss, LLC ("Doss LLC") trading as M & J Doss, LP ("Doss LP"), is a Pennsylvania limited liability company with its principal place of business in Albany Township, Pennsylvania, and is the general partner of Doss LP,

a Pennsylvania limited partnership also with its principal place of business in Albany Township, Pennsylvania. Each of the members of MS & JC Doss, LLC, and each of the limited partners of Doss LP, resides in and is a citizen of the Commonwealth of Pennsylvania. Doss LP holds royalty interests in the oil, gas and other minerals produced from a real property situated in Albany and Monroe Townships, Bradford County, Pennsylvania, described as Tax Parcel Number 02-124-86 (consisting of approximately 91.6 acres) and Tax Parcel Number 25-123-32 (consisting of approximately 19.9 acres) (the "Doss LP Property"), pursuant to assignment of an oil and gas lease from Michael Doss and Joan Doss.

92.     Plaintiff Doris J. Newton is an adult individual residing in Wyalusing, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of real property situated in Asylum and Terry Townships, Bradford County, Pennsylvania, described as Tax Parcel Numbers: 04-113-132 (consisting of approximately 28.145 acres); 04-101-118 (consisting of approximately 90.55 acres); and 04-113-42 (consisting of approximately 8 acres), consisting of approximately 126.695 acres in the aggregate (collectively, the "Doris Newton Property").

93.     Plaintiffs H. Timothy Newton and Renee S. Newton are adult individuals residing in Wyalusing, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Terry Township,

Bradford County, Pennsylvania, described as Tax Parcel Number 46-113-105, consisting of approximately 21.75 acres (the "Timothy and Renee Newton Property").

94.     Plaintiffs Shawn Patrick Newton and Nicole D. Newton are adult individuals residing in Wyalusing, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Terry Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 46-125-55.1 (consisting of approximately 45.42 acres) and 46-125-56 (consisting of approximately 10.41 acres), consisting of approximately 55.83 acres in the aggregate (collectively, the "Shawn and Nicole Newton Property").

95.     Plaintiffs Walter E. Newton, III and Darlene R. Newton are adult individuals residing in Wyalusing, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Terry Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers: 46-125-50 (consisting of approximately 1.5 acres); 46-125-51 (consisting of approximately 26.95 acres); 46-125-62 (consisting of approximately 2 acres); 46-125-63 (consisting of approximately 7 acres); 46-125-49 (consisting of approximately 10 acres); and 46-125-55 (consisting of approximately 48.81 acres); consisting of approximately 96.29 acres in the aggregate (collectively, the "Walter and Darlene Newton Property").

96.     Plaintiffs Walter E. Newton, III and Shawn Newton trading as Newton Family Limited Partnership ("Newton FLP") are adult individuals residing in New Albany, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of Newton FLP, a Pennsylvania limited partnership with its principal place of business in New Albany, Pennsylvania. Each of the limited partners of Newton FLP also resides in and is a citizen of Pennsylvania.  Newton FLP is the owner of real property located in Terry Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers: 46-124-160; 46-124-171; 46-125-25; 46-124-164; and 46-125-128; consisting of approximately 366.93 acres (collectively, the Newton FLP Property").

97.     Plaintiff Outdoor Investment, LLC ("Outdoor LLC") trading as White Tail Mountain Well, L.P. ("White Tail LP") is a Pennsylvania limited liability company with its registered office in Newtown, Bucks County, Pennsylvania, and is the general partner of White Tail LP, a Pennsylvania limited partnership also with its principal place of business in New Albany, Pennsylvania. Each of the members of Outdoor LLC and each of the limited partners of White Tail LP resides in and is a citizen of the State of New Jersey. White Tail LP is the owner by assignment of all of the rights and privileges of the lessor under an oil and gas lease dated May 2, 2006 with Anadarko, relating to a real property situated in Wysox Township, Bradford County Pennsylvania, described as Tax Parcel

Number 02-123-116, consisting of approximately 150.02 acres (the "White Tail LP Property").

98.    Plaintiff James B. Owen is an adult individual residing in Wyalusing, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of real property situated in Terry Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 46-114-56, consisting of approximately 128.29 acres (the "Owen Property").

99.    Plaintiff Lacinda Lou Peterman is an adult individual residing in Pen Argyl, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and is the owner of an undivided one-fifth (1/5) interest in real property situated in Colley Township, Sullivan County, Pennsylvania (a portion of which also is located in Wilmot Township, Bradford County), described as Tax Parcel Numbers 02-094-0001, consisting of approximately 104.08 acres, and 02-080-0003-001, consisting of approximately 2.5 acres (the "Peterman Property").

100.    Plaintiff Jacqueline T. Place a/k/a Jacqueline J. Place is an adult individual residing in Wyalusing, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of real property situated in Terry Township, Bradford County, Pennsylvania, described as Tax Parcel Number 46-113-103.2, consisting of approximately 35.3 acres (the "Place Property").

101.   Plaintiffs Jerry L. Price and Claudia C. Price are adult individuals residing in Wyalusing, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of real property situated in Terry Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers: 46-113-117 and 46-114-14.1 (together consisting of approximately 184.31 acres); and 46-124-187.1 (consisting of approximately 1 acre); consisting of approximately 185.3 acres in the aggregate (the "Price Property").

102.   Plaintiffs Milton Repsher a/k/a Milton H. Repsher, Sr., and Neta Repsher a/k/a Neta V. Repsher trading as M&N Repsher Partners Limited Partnership ("Repsher LP") are adult individuals residing in Laceyville, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of Repsher LP, a Pennsylvania limited partnership with its principal place of business in Laceyville, Pennsylvania. Each of the limited partners of Repsher LP also resides in and is a citizen of the Commonwealth of Pennsylvania. Repsher LP is the owner of real property situated in Tuscarora and Wilmot Townships, Bradford County, Pennsylvania, described as Tax Parcel Numbers: 54-104-106.2 (consisting of approximately 47.2 acres); 54-104-105 (consisting of approximately 50 acres); 54-104-106 (consisting of approximately 14.71 acres); and 58-127-82 (consisting of approximately 24.55 acres); consisting of approximately 136.46 acres in the aggregate (collectively, the "Repsher LP Property").

103.   Plaintiffs David L. Sandt a/k/a David Leo Sandt, and Maryanne Sandt are adult individuals residing in Wyalusing, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the owners of an undivided interest in real property situated in Herrick Township, Bradford County, Pennsylvania, described as Tax Parcel Number 20-090.00-124-000-000, consisting of approximately 179 acres (the "Sandt Property"). Plaintiff David L. Sandt also is the owner of a one-third interest as a joint tenant in a separate real property situated in Herrick Township, Pennsylvania, described as Tax Parcel Number 20-090.00-112-000-000, consisting of approximately 43.00 acres (the "David Sandt Property").

104.   Plaintiff Rexford Schoonover is an adult individual residing in Wysox, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of real property situated in Standing Stone and Wysox Townships, Bradford County, Pennsylvania, described as Tax Parcel Number 42-88-111, consisting of approximately 163 acres (the "Schoonover Property").

105.   Plaintiffs Paul R. Sites and Sue A. Sites trading as Sites Family Limited Partnership ("Sites FLP") are adult individuals residing in Monroeton, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of Sites FLP, a Pennsylvania limited partnership with its principal place of business in Monroeton, Pennsylvania. Each of the limited partners of Sites FLP also resides in and is a citizen of the Commonwealth of Pennsylvania. Sites FLP is

the owner of real properties situated in Monroe Township, Bradford County, Pennsylvania, the first designated as Tax Parcel Numbers 25-99-40.1 and 25-99-29.2, consisting of a total of 21.175001 acres (initially 23.59 acres, prior to the sale of 2.411 acres in February 2010) in the aggregate (collectively, the "Sites FLP Property 1"), and the second designated as Tax Parcel Number 25-99-29, consisting of approximately 23.7800 acres (initially 24.41 acres) ("Sites FLP Property 2").

106.   Plaintiff SL Allen LLC trading as Shirley L. Allen Family Limited Partnership ("Shirley Allen FLP") is a Pennsylvania limited liability company with its principal place of business in Wysox, Pennsylvania, and is the general partner of Shirley Allen FLP, a Pennsylvania limited partnership also with its principal place of business in Wysox, Pennsylvania. Each of the members of SL Allen LLC, and each of the limited partners of Shirley Allen FLP, also resides in and is a citizen of the Commonwealth of Pennsylvania. Shirley Allen FLP is the owner of real property situated in Wysox Township, Bradford County Pennsylvania, described as Tax Parcel Numbers: 62-75-40 (consisting of approximately 2.67 acres); 62-75-49 (consisting of approximately 224.16 acres); 62-75-81 (consisting of approximately 134.8 acres); 62-75-24 (consisting of approximately 1.15 acres); 62-75-64 (consisting of approximately 16.7 acres); and 62-75-56 (consisting of

approximately 29.94 acres); together consisting of approximately 409.42 acres in the aggregate (collectively, the Shirley Allen FLP Property").

107.   Plaintiff James P. Snell is an adult individual residing in Towanda, Pennsylvania, a citizen of the Commonwealth of Pennsylvania, and the owner of real property situated in Towanda Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 50-86-86002 (consisting of approximately 14.93 acres), 50-86-132 (consisting of approximately 70.0 acres), and 50-86-133 (consisting of approximately 26.18 acres), together comprising approximately 111.11 acres (the "James Snell Property").

108.   Plaintiffs John R. Snell and Michele S. Snell trading as Outback Family Limited Partnership ("Outback FLP") are adult individuals residing in Towanda, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of Outback FLP, a Pennsylvania limited partnership with its principal place of business in Towanda, Pennsylvania. Each of the limited partners of Outback FLP also resides in and is a citizen of the Commonwealth of Pennsylvania. Outback FLP is the owner of real property situated in Asylum Township, Bradford County, Pennsylvania, descried as Tax Parcel Number 04-101-33, consisting of approximately 61.37 acres (the "Outback FLP Property").

109.   Plaintiffs Peter P. Solowiej and Kendra D. Solowiej are adult individuals residing in Bradford County, Pennsylvania, citizens of the

Commonwealth of Pennsylvania, and the owners of real property situated in Wyalusing Township, Bradford County, Pennsylvania, described as Tax Parcel Number 61-102-64, consisting of approximately 65.57 acres (the "Solowiej Property").

110.   Plaintiffs Robert H. Stoudt, Jr. and Patti L. Stoudt trading as Stoudt Farm Limited Partnership ("Stoudt Farm LP") are adult individuals residing in New Albany, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of Stoudt Farm LP, a Pennsylvania limited partnership with its principal place of business in New Albany, Pennsylvania. Each of the limited partners of Stoudt Farm LP also resides in and is a citizen of the Commonwealth of Pennsylvania. Stoudt Farm LP is the owner of real property situated in Overton and Albany Townships, Bradford County, Pennsylvania, descried as Tax Parcel Numbers 28-134-18, 28-134-20, 28-134-20.1 and 28-134-21, consisting of a total of approximately 176.66 acres (the "Stoudt Farm LP Property").

111.   Plaintiffs John L. Sullivan a/k/a John M. Sullivan and Christine L. Sullivan a/k/a Christine Sullivan, individually and trading as 3 Borders FLP, are adult individuals residing in Towanda, Pennsylvania, citizens of the Commonwealth of Pennsylvania, and the general partners of 3 Borders FLP, a Pennsylvania limited partnership with its principal place of business in Towanda, Pennsylvania. Each of the limited partners of 3 Borders FLP also resides in and is a

citizen of the Commonwealth of Pennsylvania. 3 Borders FLP is the owner of interests in real property situated in Asylum Townships, Bradford County, Pennsylvania, described as Tax Parcel Numbers 04-087.00-051, 04-087.00-077, 04-087.00-079, 04-087.00-090 and 04-087.00-091, consisting of a total of approximately 168.97 acres (the "3 Borders FLP Property"). John and Christine Sullivan, his wife, also are the owners of real property consisting of four other tracts of land in Asylum Township, Bradford County, described as Tax Parcel Numbers 04-087.00-050.001, 04-087.00-050.002, and 04-087.00-081, consisting of approximately a total of approximately 14.5 acres (the "John and Christine Sullivan Property").

112.   Plaintiffs Mary Alice Sullivan and Katherine S. Barrett, as Trustees of the Sullivan Family Irrevocable Trust and Individually, as JTWROS, are adult individuals who respectively reside in Towanda and Athens, Pennsylvania, and are citizens of the Commonwealth of Pennsylvania. The Sullivan Family Irrevocable Trust is the owner of an undivided one-third (1/3) interests in and to a fifty-percent (50%) interest in real property situated in Township, Bradford County, Pennsylvania, described as Tax Parcel Numbers 04-087.00-051, 04-087.00-077, 04-087.00-079, 04-087.00-090 and 04-087.00-091, consisting of a total of approximately 317.94 acres (the "Sullivan Family Trust Property"). Mary Alice Sullivan and Katherine S. Barrett, Individually as JTWROS, also each own an

undivided one-sixth (1/6) interest in and to a fifty-percent (50%) interest in each of the same parcels with the exception of Tax Parcel Number 04-087.00-091, as to which they own the same interest in mineral rights only. The parcels in which they hold undivided interests will be referred to as the "Sullivan/Barrett Property", and the parcel in which they hold interests in the mineral rights will be referred to as the "Sullivan/Barrett Mineral Interest".

113.   Plaintiff Tor Tamarack, LLC trading as Thomson Business Ventures, L.P. f/k/a Thomson Family Limited Partnership ("Thomson LP") is a Pennsylvania limited liability company with its principal place of business in Wysox, Pennsylvania, and is the general partner of Thomson LP, a Pennsylvania limited partnership also with its principal place of business in Wysox, Pennsylvania. Each of the limited partners of Thomson LP also resides in and is a citizen of the Commonwealth of Pennsylvania. Thomson LP is the owner of real property situated in Standing Stone Township, Bradford County, Pennsylvania, designated as Tax Parcel Numbers: 43-088.00-112.000 (consisting of approximately 22.90000 acres); 43-088.00-113.000 (consisting of approximately 382.275000 acres); 43-089.00-138.000 (consisting of approximately 56.06400 acres); 43-089.00-138.002 (consisting of approximately 16.0000 acres); 43-088.00-112.000 (consisting of approximately 20.495308 acres); and 43-088.00-113.000 (consisting of

approximately 118.797787 acres); together consisting of a total of approximately 477.190 acres in the aggregate (collectively, the "Thomson LP Property").

**B.**   **Defendants**

114.   Defendant Chesapeake Energy Corporation ("Chesapeake Energy") is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma. Chesapeake Energy is a publicly traded oil and gas company which, through its subsidiaries, including but not limited to Chesapeake Appalachia, is one of the largest producers of natural gas in the United States.

115.   Chesapeake Energy provides the following summary of its business on its corporate website:

> Founded in 1989, Chesapeake's operations are focused on discovering and developing onshore, unconventional oil and natural gas fields in the U.S. We currently hold leading positions in the Eagle Ford, Utica, Granite Wash, Cleveland, Tonkawa, Mississippi Lime and Niobrara unconventional liquids plays and the Marcellus, Haynesville/Bossier and Barnett unconventional natural gas shale plays. The company also owns substantial marketing and compression businesses.
>
> As one of the first to recognize the vast potential of shale resources unlocked by advances in horizontal drilling techniques, Chesapeake has grown to become the second-largest producer of natural gas, 11th largest producer of oil and natural gas liquids, and the most active driller of onshore wells in the country.[3]

---

[3]   http://www.chk.com/About/Pages/Default.aspx (last visited December 8, 2014)

116.   Defendant Chesapeake Appalachia is an Oklahoma limited liability company with its principal place of business in Oklahoma City, Oklahoma. Defendant Chesapeake Energy is the sole member of Chesapeake Appalachia.

117.   Defendant Chesapeake Energy Marketing, Inc. ("CEMI"), is am Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma. CEMI is a wholly-owned subsidiary of defendant Chesapeake Energy.

118.   CEMI provides natural gas, oil and NGL marketing services, commodity price structuring, contract administration and nomination services, for Chesapeake, other interest owners in Chesapeake-operated wells and other producers. Among its other activities, CEMI aggregates volumes of gas produced from multiple wells, including wells located on separately owned properties pursuant to multiple different mineral leases, which are then sold to various intermediary markets, end markets and pipelines.

119.    Defendant Chesapeake Operating, Inc. ("COI"), is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma. COI is a wholly-owned subsidiary of defendant Chesapeake Energy.

120.   COI is responsible for the production of gas from leases in which Chesapeake entities hold the operating interest.

121.   Defendant   Chesapeake   Exploration,   L.L.C.   ("Chesapeake Exploration"), is an Oklahoma limited liability company with its principal place of business in Oklahoma City, Oklahoma. Chesapeake Exploration is the successor in interest to Chesapeake Exploration, L.P. Chesapeake Exploration, is comprised of three members: defendant COI (discussed above), Chesapeake E&P Holding Corporation (a corporation organized under Oklahoma law with its principal place of business in Oklahoma City, Oklahoma), and defendant Chesapeake Appalachia (discussed above).

122.   Defendant Williams Partners, LP, f/k/a Access Midstream Partners, L.P. ("Access Midstream"), is a publicly-traded Delaware limited partnership with its principal place of business in Tulsa, Oklahoma. Chesapeake Energy formed Access Midstream (formerly known as Chesapeake Midstream Partners, L.P.) in 2010 to own, operate, develop and acquire natural gas, natural gas liquids and oil gathering systems and other midstream energy assets.  On information and belief, the general and limited partners of Access Midstream reside or have their principal places of business in, and are citizens of, states other than Pennsylvania, New Jersey and New York. The business of Access Midstream is principally focused on natural gas and NGL gathering, the first segment of midstream energy infrastructure that connects natural gas and NGLs produced at the wellhead to third-party takeaway pipelines.

123. Defendant Access MLP Operating, L.P. ("Access Operating"), is a Delaware limited partnership with its principal place of business in Oklahoma City, Oklahoma. On information and belief, Access Operating is a direct or indirect subsidiary of Access Midstream, and serves as the operating entity for the natural gas gathering and transportation business of Access Midstream, and all of the general and limited partners of Access Operating reside or have their principal places of business in, and are citizens of, states other than Pennsylvania, New Jersey and New York.

124. Defendant Appalachia Midstream Services, L.L.C. ("Appalachia Midstream"), is an Oklahoma limited liability company with its principal place of business in Oklahoma. On information and belief, Appalachia Midstream was a direct or indirect subsidiary of Chesapeake Energy

125. Defendant Anadarko E&P Onshore LLC, successor by conversion to and f/k/a Anadarko E&P Company, L.P. ("Anadarko E&P"), is a Delaware limited liability company with its registered address in Delaware and its principal place of business in Houston, Texas. It is a wholly-owned by Anadarko USH1 Corporation, a Delaware corporation with its principal place of business in Houston, Texas.

126. Defendant Statoil USA Onshore Properties, Inc. ("Statoil USA") is a Delaware corporation with its principal place of business in Houston, Texas.

127.   Defendant Mitsui E&P USA LLC ("Mitsui USA"), is a Delaware limited liability company with its principal place of business in Houston, Texas. On information and belief, it is a wholly-owned direct or indirect subsidiary of Mitsui & Co., Ltd. ("Mitsui"), a public company organized and existing under the laws of Japan, with its principal place of business in Japan.

## IV.   FACTUAL ALLEGATIONS

### A.   The Production, Gathering, Processing and Transportation of Natural Gas

128.    After natural gas is extracted from the ground at the wellhead, and before it enters interstate transmission pipelines, which are governed by regulations established by the  Federal Energy Regulatory Commission ("FERC") that limit the rates that can be charged for the interstate transmission of natural gas, the gas is first moved through a system of "gathering" pipelines, which consist of relatively low pressure and small diameter (in comparison to interstate transmission pipelines) *intrastate* pipelines that transport raw natural gas from the wellhead, either to a processing plant, for subsequent delivery either to intrastate transportation pipelines (which are typically larger diameter, and some of which are subject to FERC jurisdiction, while others or not), or to major interstate transmission pipelines, or directly to such intrastate or interstate pipelines. As illustrated in defendant Access Midstream's 2013 Annual Report filed with the Securities and Exchange Commission ("SEC") on Form 10-K on February 21, 2013, Access Midstream's business focuses on the gathering and processing of natural gas between the wellhead and the major transportation pipelines:



129.   Although FERC regulations limit the rates that can be charged for the transmission of natural gas through *interstate* pipelines, to prevent price gouging, such regulations generally do not apply to limit the rates that can be charged for the transmission of natural gas through gathering systems and *intrastate* pipelines.

## B.   The Vertically Integrated, Highly Leveraged Business Models of Chesapeake and Anadarko

130.   Once the potential returns from horizontal drilling and fracking became clear, many oil and gas production companies, including Anadarko and Chesapeake Energy, embarked on aggressive programs to acquire oil and gas leases to properties located above multiple shale formations throughout the United States, including the Marcellus Shale, which is located in Pennsylvania. As Chesapeake Energy explained in its 2010 Annual Report on Form 10-K, filed on March 1, 2011:

> … [W]e embarked on an aggressive lease acquisition program, which we have referred to as the "gas shale land grab" of 2006 through 2008 and the "unconventional oil land grab" of 2009 and 2010. We believed that the winner of these land grabs would enjoy competitive advantages for decades to come as other

> companies would be locked out of the best new
> unconventional resource plays in the U.S.

Chesapeake Energy Corporation Annual Report on Form 10-K, filed March 1,

2011,

at 4.

131.  At the same time, both Chesapeake and Anadarko pursued vertically

integrated business models that included not only the production of natural gas, but

also related interlocking business opportunities in midstream gathering pipelines

and services, and, in the case of Chesapeake, in compression, drilling, marketing

and trucking services.

132.  To fund its gas shale land grab, and the related aggressive growth and

development of its interlocking vertical businesses, Chesapeake Energy borrowed

increasingly greater amounts of money, resulting in it having a highly leverage

balance sheet, including current liabilities of  $7 billion, and long term liabilities of

almost $17 billion, by the end of 2011.

## C.  Anadarko and Chesapeake Acquire Oil and Gas Leases In and Around Bradford County

133.  The Marcellus Shale formation, located in and beyond Pennsylvania,

soon was determined to contain one of the largest natural gas reserves in the world.

134.  Both Anadarko Petroleum Corporation ("Anadarko") (the ultimate

corporate parent of Anadarko E&P) and Chesapeake targeted Bradford County,

Pennsylvania for an aggressive lease acquisition program, and for development of the natural gas gathering systems that would be necessary to support its drilling and production business.

135.   Beginning in or about 2006, Anadarko E&P acquired hundreds of oil and gas leases to properties in Bradford County, Pennsylvania, and in surrounding counties, both by entering into such leases itself and through T.S. Calkins & Associates, Inc. ("T.S. Calkins").

### D.   Anadarko and Chesapeake Enter Into a Joint Exploration Agreement and Establish the AMI

136.   On information and belief, Anadarko E&P entered into a 50/50 Joint Exploration Agreement dated September 1, 2006 with Chesapeake Energy and/or CALLC (and/or its affiliates) (the "Joint Exploration Agreement"), covering portions of Bradford, Sullivan, Susquehanna and Wyoming Counties within an area of mutual interest that the parties to the agreement as "Area A" (previously defined as the "AMI"), and agreed that CALLC would serve as the operator of the leases within the AMI. Pursuant to the agreement, Anadarko E&P also assigned, subject to certain reservations and exceptions, fifty percent (50%) of its right, title and interest in and to the Leases under which Plaintiffs hold royalty interests to CALLC, pursuant to a series of Partial Assignments of Oil and Gas Leases.

137.   Anadarko E&P and the Chesapeake Defendants have peculiar knowledge of the terms of the Joint Exploration Agreement, and any

contemporaneous related agreements, which have not been publicly filed or disclosed by any of them.

138.   On information and belief, the Joint Exploration Agreement, or contemporaneous or subsequent agreements, also provided that Chesapeake or one or more of its affiliates would be an owner and the operator of gathering systems to be constructed to service the anticipated wells to be drilled by or on behalf of CALLC, and that Anadarko E&P or its affiliates would receive a proportionate ownership interest in the anticipate gathering systems and pipelines.

139.   Initial construction of gathering and midstream assets within the AMI commenced in or about May 2008.

140.   Anadarko E&P subsequently entered into an Appalachian Area Participation Agreement, dated effective January 1, 2010, with Mitsui E&P, and also assigned, subject to certain reservations and exceptions, undivided interests in its right, title and interest in and to the Leases under which Plaintiffs hold royalty interests to Mitsui E&P, pursuant to a series of Partial Assignments of Oil and Gas.

### E.   The Joint Venture Between Chesapeake and Statoil

141.   In November 2008, Chesapeake and/or CALLC entered into an industry participation agreement (commonly referred to as a joint venture) with Statoil ASA ("Statoil"), pursuant to which Chesapeake sold Statoil or affiliates a minority interest in CALLC's leaseholds, producing properties and other assets

located in the Marcellus Shale play (including working interests in the leases in which Plaintiffs hold royalty interests, as well as ownerships interest in certain gathering systems) in consideration for an upfront cash payment of $1.250 billion plus a commitment by Statoil to pay 75% of Chesapeake's drilling and completion costs in the play until $2.125 billion has been paid. Chesapeake serves as the operator, and conducts all leasing, drilling, completion, operations and marketing activities in connection with the Statoil joint venture.

F.   **Plaintiffs' Royalty Interests**

142.   Each of the following Plaintiffs or their respective predecessors in interest entered into a fully paid up oil and gas lease with Anadarko E&P, pursuant to which the respective Plaintiffs hold royalty interests in the natural gas produced and marketed from the leases premises:

| PLAINTIFF(S) | LEASED PREMISES | ORIGINAL LESSOR(S) | LEASE DATE |
|---|---|---|---|
| A&B Campbell Family LLC | Campbell Property | Andy Campbell | 08/07/2006 |
| Amber A. Adams | Amber Adams Property 1 | Burton R. Adams | 3/27/2006 |
| Amber A. Adams | Amber Adams Property 2 | Burton R. Adams | 3/27/2006 |
| Burton R. Adams | Burton Adams Property | Burton R. Adams | 3/27/2006 |
| Adams' Tyler Mountain Limited Partnership, | Adams' Tyler Mountain LP Property | Burton R. Adams & Joanne M. Adams | 3/27/2006 |
| Libbie A. Adams | Libbie Adams | Plaintiff | 3/27/2006 |

| | Property | | |
|---|---|---|---|
| Sherwood G. Adams | Sherwood Adams Property | Plaintiff | 3/27/2006 |
| Toby L. Adams | Toby Adams Property | Plaintiff | 3/27/2006 |
| James P. Ahern | Ahern Property | Plaintiff | 8/4/2006 |
| Barto Family LLC | Barto FLLC Property | George E. & Dolores Barto | 3/4/2006 |
| Paula A. Bruyn | Bruyn Property | Plaintiff | 3/27/2006 |
| Russell E. Bulick & Cathy Ann Brady | Bulick/Brady Property | Plaintiffs | 7/18/2006 |
| Ronald L. Campbell | Ronald Campbell Property | Plaintiff | 8/1/2006 |
| James E. Canfield & Freda L. Canfield | Canfield Property | Plaintiffs | 7/20/2006 |
| Richard A. Card, Jr. & Candy S. Card | Card Property | Plaintiffs | 6/7/2006 |
| Erven E. Crawford & June Crawford | Crawford Property | Plaintiffs | 5/17/2006 |
| DJH & PAH, LLC t/a WGH & HBH, LP | WGH & HBH, LP Property | Donald J. Henry & Patricia A. Henry | 5/2/2006 |
| DJH & WGH, LLC t/a Henry Brothers, L.P. | Henry Brothers, L.P. Property | Donald J. Henry Patricia A. Henry, Walter G, Henry & Cheryl A. Henry | 5/2/2006 |
| Paul DeNault & Valarie DeNault | DeNault Property | Plaintiffs | 5/11/2006 |
| Robert L. Dibble, Jr. | Dibble Property | Plaintiff | 5/22/2006 |
| DP Investments, LLC | DP Investments Property | Gustaves's Seven Bucks Club | 5/2/2006 |
| Brian Driscoll | Driscoll Property 1 | Carl S. Driscoll, Marvin S. Driscoll, et al. | 3/5/2006 |
| Brian Driscoll | Driscoll Property 2 | Carl S. Driscoll, Marvin S. | 3/10/2006 |

| | | Driscoll & Jule Driscoll | |
|---|---|---|---|
| Brian Driscoll | Driscoll Property 3 | Carl S. Driscoll, Marvin S. Driscoll & Jule Driscoll | 2/24/2006 |
| Charles & Pamela Emerson | Emerson Property | Plaintiffs | 6/28/2006 |
| Foster Family Farm LLC | Foster FLLC Property | Rosemarie Foster and Gregory Foster | 4/6/2006 |
| E. Larry Franklin and Carol Franklin | Franklin Property 2 | Plaintiffs | 5/23/2006 |
| Thomas R. Frederick & Deborah Frederick t/a FH Ranch Family Limited Partnership | FH Ranch FLP Property | Thomas R. Frederick & Deborah Frederick | 5/20/2006 |
| Theodore B. Gatto, Individually and as Admin. of the Estate of Penny June Gatto, Deceased | Gatto Property | Penny Gatto | 5/17/2006 |
| Walter G. Henry, Jr. and Cheryl A. Henry a/k/a Cheryl R. Henry | Walter and Cheryl Henry Property | Plaintiffs | 5/2/2006 |
| Richard W. Jackson and Dolores B. Jackson, Trustees of the Jackson Trust dated July 1, 2002 | Jackson Trust Property | Shirley L. Jackson, widow, by William W. Them, Attorney in Fact | 7/12/2006 |
| Theodore A. Johnson | Theodore Johnson Property | Plaintiff | 6/24/2006 |
| Little Fall R & R Inc. | Little Fall Property | Plaintiff | 6/29/2006 |
| Bonnie C. Long | Long Property | Plaintiff | 3/27/2006 |
| Richard D. & Sandra L. Marshall | Marshall Property | Plaintiffs | 4/18/2006 |
| Wilson F. Martin & Mary Ellen Martin | Martin Property | Plaintiffs | 6/30/2006 |
| Neva S. Minarik | Minarik Property | Plaintiff | 3/27/2006 |

| David W. Moon & Mary J. Moon t/a Moonhaven Family LP | Moonhaven FLP Property 2 | David W. Moon & Mary J. Moon | 5/11/2006 |
|---|---|---|---|
| MorChar , LLC t/a M&C Fassett Family LP | M&C FLP Property | Morris P. Fassett & Charlotte Fassett | 6/5/2006 |
| Kent L. Morgan & M. Patricia Nelson | Morgan/Nelson Property | Plaintiffs | 4/26/2006 |
| Wesley G. Mosier & Barbara E. Mosier, a/k/a Barbara E. Kissell | Mosier Family LP Property | Plaintiffs | 5/8/2006 |
| Mosier Real Estate Co., LLC t/a Mosier Family Royalty Management, LP | Mosier Family LP Property | Wesley G. Mosier and Barbara E. Mosier | 5/8/2006 |
| MS & JC Doss, LLC t/a M & J Doss, LP | Doss LP Property | Michael S. Doss & Joan C. Doss | 6/29/2006 |
| Doris J. Newton | Doris Newton Property | Plaintiff | 3/30/2006 |
| H. Timothy Newton & Renee S. Newton | Timothy and Renee Newton Property | Plaintiffs | 3/30/2006 |
| Shawn Patrick Newton and Nicole D. Newton | Shawn and Nicole Newton Property | Plaintiffs | 3/20/2006 |
| Walter E. Newton, III and Darlene R. Newton | Walter and Darlene Newton Property | Plaintiffs | 3/20/2006 |
| Walter E. Newton, III and Shawn Newton t/a Newton Family LP | Newton FLP Property | WAJA Farms, Inc. | 3/30/2006 |
| Outdoor Investment, LLC t/a White Tail Mountain Well, L.P. | White Tail LP Property | Gustave's Seven Bucks Club, Inc. | 5/2/2006 |
| Lacinda L. Peterman | Peterman Property | Plaintiff | 3/27/2006 |
| Jacqueline T. Place a/k/a Jacqueline J. Place | Place Property | Plaintiff | 8/14/2006 |
| Jerry L. Price & Claudia C. Price | Price Property | Plaintiffs | 7/14/2006 |
| R&E Gowan FLP | R&E Gowan FLP Property | Elaine Gowan | 7/10/2006 |

| Milton Repsher a/k/a Milton H. Repsher, Sr. and Neta Repsher a/k/a Neta V. Repsher t/a M&N Repsher Partners Limited Partnership | Repsher LP Property | Milton Repsher & Neta Repsher | 6/7/2006 |
|---|---|---|---|
| David Leo Sandt | David Sandt Property | David Leo Sandt, Susan Sandt and Nancy Sandt | 3/7/2006 |
| Rexford Schoonover | Schoonover Property | Plaintiff | 4/11/2006 |
| Paul R. Sites and Sue A. Sites t/a Sites Family Limited Partnership | Sites FLP Property 1 | Paul R. & Sue A. Sites | 7/14/2006 |
| Paul R. Sites and Sue A. Sites t/a Sites Family Limited Partnership | Sites FLP Property 2 | Paul R. & Sue A. Sites | 7/14/2006 |
| James P. Snell | James Snell Property | Plaintiff | 6/13/2006 |
| Peter P. Solowiej and Kendra D. Solowiej | Solowiej Property | Plaintiffs | 8/11/2006 |
| Robert H. Stoudt, Jr. and Patti L. Stoudt t/a Stoudt Family Limited Partnership | Stoudt Farm LP | Plaintiffs | 5/8/2006 |
| Mary Alice Sullivan and Katherine S. Barrett, Tr of Sullivan Family Irrev. Trust | Sullivan Trust Property | Anne J. Sullivan | 7/22/2006 |
| Mary Alice Sullivan and Katherine S. Barrett, JTWROS | Sullivan/Barrett Property | Anne J. Sullivan | 7/22/2006 |
| Mary Alice Sullivan and Katherine S. Barrett, JTWROS | Sullivan/Barrett Mineral Interest | Anne J. Sullivan | 7/22/2006 |
| 3 Borders FLP | 3 Borders FLP Property | John L. Sullivan and Christine L. Sullivan | 7/22/2006 |

| Tor Tamarack , LLC t/a Thomson Business Ventures, L.P. | Thomson LP Property | Thomson Family Limited Partnership d/b/a Tor Tamarack Farms | 5/4/2006 |

143.   Each of the following Plaintiffs or their respective predecessors in interest entered into a fully paid up oil and gas lease with T.S. Calkins, to which Anadarko E&P is the successor in interest, pursuant to which the respective Plaintiffs hold royalty interests in the natural gas produced and marketed from the leases premises:

| PLAINTIFF(S) | LEASED PREMISES | ORIGINAL LESSOR(S) | LEASE DATE |
|---|---|---|---|
| Eugene J. Barrett, Jr. & Lori R. Barrett | Eugene Barrett Property | Plaintiffs | 2/2/2006 |
| James Barrett & Cindy Barrett | James Barrett Property | Plaintiffs | 2/9/2006 |
| John M. Barrett t/a John M. Barrett Family Limited Partnership | John Barrett FLP Property | John M. Barrett | 2/9/2006 |
| Clark A. Beebe | Beebe Property | Plaintiffs | 2/18/2006 |
| Clark A. Beebe & Donna L. Beebe, Trustees of the Beebe Living Trust dated June 21, 2010 | Beebe Trust Property | Clark A. Beebe | 2/18/2006 |
| David J. Bride and Diane V. Bride, t/a Bride Family Limited Partnership | Bride FLP Property | David J. Bride & Diane V. Bride | 1/20/2006 |
| Michael R. Bride & Shirley Bride t/a | Marshview FLP Property | Michael R. & Shirley A. Bride | 12/29/2005 |

| Marshview Family Limited Partnership | | | |
|---|---|---|---|
| Cahill Realty Business Trust | Cahill Realty Property | Plaintiff | 2/4/2006 |
| Epler Family LLC | Epler Property | Robert Harry & Larry R. Epler | 2/2/2006 |
| F&M Robinson, LLC t/a Francis & Maxine Robinson Family Limited Partnership | Robinson FLP Property | Francis E. Robinson & Maxine P. Robinson | 1/11/2006 |
| James E. Grimes & Barbara P. Grimes | Grimes Property | Plaintiffs | 2/22/2006 |
| F. Robert Hauss & Carol Hauss t/a Hauss Family Limited Partnership | Hauss FLP Property | F. Robert Hauss & Carol Hauss | 2/10/2006 |
| James B. Owen | Owen Property | Plaintiff | 2/25/2006 |
| David L. Sandt a/k/a David Leo Sandt & Maryanne Sandt | Sandt Property | Jane M. Pratt, Trustee of Eva Mae Sandt Irrevocable Residential/ Income Only Trust dated August 5, 2004 | 3/3/2006 |
| SL Allen LLC t/a Shirley L. Allen Family Limited Partnership | Shirley Allan FLP Property | Shirley L. Allen | 2/18/2006 |
| John R. Snell & Michelle S. Snell t/a Outback Family Limited Partnership | Outback FLP Property | John R. Snell & Michelle S. Snell | 2/28/2006 |

144.   The Oil and Gas Leases described in which the respective Plaintiffs hold royalty interests above are sometimes referred to below collectively as "Plaintiffs' Leases" or the "Leases."

### G.    The Royalty Provisions in Plaintiffs' Leases

145.    Anadarko E&P and T.S. Calkins each used substantially the same preprinted form of Lease in connection with each Lease that it entered into with one of the Plaintiffs, or with his, her or its predecessor in interest, each of which contains the following provisions regarding royalties:

> A.    The LESSEE covenants and agrees as follows:
>
> 1st – LESSEE … shall pay the LESSOR on gas … produced from the premises and used off the premises or lands pooled therewith or in the manufacture of gasoline, or other products therefrom, or sold (whether to an affiliated or non-affiliated purchaser) the market value at the well of one-eighth (1/8th) of the gas so used or sold. In no event shall the gas royalty payable hereunder be computed on the basis of a price the collection of which by LESSEE is unlawful or prohibited by order or regulation of any governmental authority having jurisdiction, and market value at the well shall not exceed the amount realized by LESSEE for such production computed at the well…. LESSEE may pay all taxes and fees levied upon LESSOR's royalty share of production of oil and gas and deduct the amount so paid from any monies payable to LESSOR hereunder….
>
> *            *            *            *
>
> B.    It is mutually agreed by and between LESSOR and LESSEE as follows:
>
> 6th – LESSEE is hereby granted the right to pool or unitize all or any part of the premises with any other leases, lands, oil or gas estates, or any of them whether owned by the LESSEE or others, so as to create one or more drilling or production units. Such units shall not

exceed 640 acres in extent provided, however, that if any Federal or State law, Executive order, rule or regulation shall prescribe a spacing pattern for the development of the field or allocate a producing allowable on acreage per well, then such units may embrace as much additional acreage as may be prescribed or as may be use in such allocation or allowable. LESSEE shall record a copy of the unit operation designation in the county in which the premises are located…. As to each such unit, LESSOR agrees to accept, in lieu of the royalty herein described, such proportion of such royalty as the acreage in the premises in such unit bears to the total acreage included in such unit….

146. Certain of Plaintiffs' Leases include addenda or exhibits which contain language increasing the royalty rate specified in the body of the preprinted form of Lease to a higher specified rate.

## H.   The Pooling and Unitization of the Leases and Commencement of Production of Natural Gas.

147. Following the execution of the Leases of the respective Plaintiffs, or their predecessors in interest, the Lessee Defendants pooled, unitized and combined each of the respective Leases, along with the lands covered by the Lease and the oil and gas estates therein, with other properties, into one or more production units, and commenced the drilling of one or more wells in each unit and the production of gas from such wells, on dates that varied by Lease and by well.

148. Following the commencement of production of gas from the wells drilled in each unit into which all or any portion of each Lease was combined, the

Lessee Defendants began accounting for and paying royalties to those Plaintiffs who had acreage covered by a Lease under which they held royalty interests included in the unit.

I. **The Lessee Defendants Have Taken or Allowed for Deductions of Post-Production Costs Which Are Impermissible, or Otherwise Arbitrary, Excessive and Unreasonable, in Calculating the Royalties Payable to Plaintiffs, Resulting in the Material Underpayment of Royalties Due and Owing to Plaintiffs.**

149. Each of the Lessee Defendants, directly or indirectly, has taken, allowed for or otherwise imposed upon Plaintiffs who have royalty interests in Leases in which the respective Lessee Defendants hold royalty interests, deductions for purported post-production costs, including, but not limited to, purported costs of  gas gathering and transportation, in calculating the royalties payable to Plaintiffs, even though such costs: (i) are not expressly permitted by the terms of the respective Leases under which Plaintiffs hold royalty interests; (ii) were not charged at arms-length by or on behalf of entities unaffiliated with the respective defendants, but were instead charged by entities which were initially owned by Chesapeake Energy, for the gathering and transportation of gas through intrastate pipelines owned by some or all of the Lessee Defendants, or their affiliates; and (iii) were arbitrary, excessive and unreasonable in amount.

150. The imposition of such charges on the royalties payable to Plaintiffs breaches the express terms of the relevant Leases and assignments or, in the

alternative, the covenant of good faith and fair dealing by the Lessee Defendants that is implied in each of the Leases.

**J.     Plaintiffs Have Satisfied, or Should Be Equitably Excused from Satisfying, the Condition Precedent to the Breach of Contract Claim Asserted in this Action, If and to the Extent it is Applicable**

151.   The Anadarko E&P and T.S. Calkins forms of Lease contain the following provision conditioning the liability of the Lessee for any failure to perform its obligations or covenants under the Lease, and the right of the Lessor to commence a judicial action for damages for breach of the Lease, on the failure of the Lessee to satisfy or perform its obligation, covenant or condition for a period of one year following express and specific written demand by Lessor:

> C.     It is mutually agreed by and between LESSOR and LESSEE as follows:
>
> 7th – . . . This Lease shall not be terminated, in whole or in part, nor Lessee held liable for any failure to perform unless such obligation, covenant or condition remains unsatisfied and unperformed for a period of one year following the express and specific written demand upon Lessee by Lessor for such satisfaction and performance.... No judicial action may be commenced by Lessor for forfeiture of this Lease or for damages until after said period.

152.   By its terms, the foregoing condition does not apply to any of the claims asserted in this action against the defendants other than the Lessee Defendants, and does not apply to any of the claims asserted against the Lessee

Defendants other than the claim for breach of contract asserted in the Fifth Cause of Action.

153.   If and to the extent the foregoing condition applies to the breach of contract claims asserted against the Lessee Defendants in the Fifth Cause of Action, a majority of the Plaintiffs satisfied the foregoing condition by causing one of their undersigned counsel, Christopher D. Jones, Esquire, to submit written demands upon each of the Lessee Defendants, by letters dated November 21, 2012, that they cure their respective breach of the respective Plaintiffs' Leases arising out of their "improperly taking deductions for post-production costs" from their royalty payments to the clients identified in the letters, and by the subsequent failure and refusal of Chesapeake Appalachia, Anadarko and Mitsui to satisfy or perform their respective obligations for a period of over one year following the demands.

154.   Because the Lessee Defendants have failed and refused to satisfy or perform their respective obligations to pay royalties without improperly taking deductions for post-production costs following written demand by or on behalf of a majority of the Plaintiffs, it would be futile to require any further demand by the remaining Plaintiffs, and all Plaintiffs should be deemed to have satisfied, or to be equitably excused from satisfying, the condition, if and to the extent it is applicable.

**K.**     **Chesapeake Engaged in Self-Dealing, Including the Use of Non-Arms'-Length Contracts and Artificial "Prices" Based on Comingled Gas and Transactions With Its Own Subsidiaries and Affiliates, to Determine The Royalties Payable to Plaintiffs**

155.   Chesapeake has used, and continues to use, non-arms'-length contracts and transactions with its own subsidiaries and affiliates to produce, process and market the gas in which Plaintiffs' own royalty interests, and artificially constructed "prices," to determine the royalties payable to Plaintiffs in connection with such gas.

156.   After gas is produced from a well, Chesapeake Appalachia purportedly sells the gas to its affiliate, CEMI, in a transaction which is not at arms'-length. At that point, CEMI takes title to and possession of the gas at the wellhead. Access Midstream (formerly known as Chesapeake Midstream Partners, L.P.), aggregates, commingles and gathers the gas with gas produced from multiple other wells subject to other leases into a downstream pool and transports it to a central point. CEMI then delivers the gas to one of several "points of delivery," which are physical locations where Access Midstream's system connects to larger interstate pipelines owned and operated by unaffiliated third party interstate pipeline companies. The gas is then transported downstream from these points of delivery to various "points of sale." It is only at these points of sale that title to the gas passes from CEMI to third-party purchasers.

157.   According to written statements previously made by Chesapeake Energy in correspondence to royalty interest owners, CEMI determines a weighted average sales price (sometimes referred to by the acronym "WASP") for the gas sold from the pool on a monthly basis. CEMI purportedly calculates the WASP by averaging the price received by CEMI from individual sales from the pool across the entire volume contained in the pool. CEMI then purportedly pays Chesapeake Appalachia 97% of the sales price that CEMI receives in third-party sales, retaining a 3% "marketing fee, which is purportedly borne solely by Chesapeake Appalachia, and not passed-along to Plaintiffs, *less* the costs CEMI incurs between the initial point of sale (the wellhead) and what it characterizes as the "value-added downstream points of sale," which include a compression fee, a gathering fee and a transportation fee.

158.   Chesapeake makes royalty payments to owners of royalty interests, including Plaintiffs, based on a weighted average sales price calculated on these sales to various third party purchasers.

159.   In reality, Chesapeake receives a much higher "effective" price for gas produced under Leases in which Plaintiffs hold royalty interests than the WASP it uses to calculate the royalties payable to Plaintiffs.

160.   On information and belief, Chesapeake purports to sell certain of the gas produced under Plaintiffs' Leases pursuant to forward future contracts, called

prompt month contracts (with smaller amounts sold each month at spot prices, or pursuant to same-day contracts).

161.   Because Chesapeake knows that prompt month futures contracts typically bring lower prices than longer-term contracts, and because of the high volatility of the market for prompt month future contracts, Chesapeake also bought and sold derivatives (puts, calls, collars, options) of farther forward sales of gas to lock-in significantly higher prices for gas produced in the Marcellus Shale region, including gas produced under Plaintiffs' Leases.

162.   Chesapeake does not, however, calculate or pay royalties based on the substantially higher "effective" price it receives for its physical production of gas, but instead uses the substantially lower, artificial WASP.

**L.   After Initially Taking No Deductions for Post-Production Costs, CALLC and Other Lessee Defendants Unilaterally and <u>Retroactively Changes the Method by Which They Calculate and</u>**

163.   When CALLC initially began paying royalties to Plaintiffs, it did not deduct post-production costs in calculating, accounting for and paying royalties to Plaintiffs. In or about January 2012, however, CALLC sent letters to Plaintiffs notifying them that, based on the Pennsylvania Supreme Court's decision in *Kilmer v. Elexco Land Services, Inc.*, 605 Pa. 413, 990 A.2d 1147 (2010), Chesapeake would be retroactively changing the manner in which it calculated and paid the royalties due and owing to Plaintiffs in connection with their respective

Leases, by deducting post-production costs from the proceeds received by CALLC at the point of sale in calculating the royalties payable to the respective Plaintiffs.

164.   In its opinion in *Kilmer*, the Pennsylvania Supreme Court held that oil and gas leases which expressly provide for a royalty in the amount of one-eighth of the proceeds actually received by the lessee from sales of production, *less a proportionate share of post-production costs*, does not violate the Pennsylvania Guaranteed Minimum Royalty Act, 58 P.S. § 33, which invalidates oil or gas leases which do not "guarantee the lessor at least one-eighth royalty on all oil, natural gas or gas of other designation removed or recovered from the subject real property."

165.   Subsequent to the *Kilmer* decision, despite the fact that Plaintiffs' Leases, unlike the oil and gas leases at issue in *Kilmer*, do *not* expressly permit the deduction of post-production costs, CALLC sent letters notifying Plaintiffs that, based on the *Kilmer* decision, CALLC would be retroactively changing the manner in which it calculated and paid the royalties due and owing to Plaintiffs in connection with their respective Leases, effective as of the date of the *Kilmer* decision, by deducting post-production costs from the purported proceeds received by CALLC at the point of sale in calculating the royalties payable to the respective Plaintiffs on gas produced from their respective properties.

166.   CALLC then unilaterally and impermissibly: (a) re-calculated the royalties it had previously accounted for and paid to Plaintiffs, arbitrarily and unilaterally applying the new method of calculating royalties retroactively; (b) determined, based on the new methodology, that it had overpaid Plaintiffs; and (c) unilaterally and wrongfully sought to and did recoup the purported overpayments from and after the date of the *Kilmer* decision by, suspending royalty payments to Plaintiffs and/or by offsetting current royalties due and owing to Plaintiffs against its purported prior overpayments to Plaintiffs (both calculated using the new methodology), resulting in CALLC suspending the payment of any royalties to Plaintiffs until it fully recovered the amounts of its purported overpayments, by offset.

167.   From the time that CALLC resumed making royalty payments to the respective Plaintiffs, and continuing to the present, CALLC, acting without any authority to do so, has wrongfully deducted post-production costs from the proceeds purportedly received by Chesapeake Appalachia at the point of sale in calculating the royalties payable to the respective Plaintiffs on gas produced from their respective properties. Each of the other Lessee Defendants likewise commenced wrongfully deducting post-production costs from Plaintiffs' royalties.

168.   The Lessee Defendants provide little to no explanation to royalty interest holders, including Plaintiffs, of the nature or basis of the purported post-

production costs that they deducts from their pro rata shares of the purported proceeds that they receives from the sale of gas produced from their respective properties in calculating the royalties paid to them. The checks are accompanied only by a short-form, cursory check-stub type summary listing of the deductions, with cryptic descriptions that provide no detail as to the nature of the services provided, the basis for the fees, or the identity of the payees.

169.   Statoil USA and Anadarko E&P have likewise made similar impermissible retroactive adjustments to royalties paid to certain of the Plaintiffs.

**M.     The Lessee Defendants Deduct Excessive and Unwarranted Charges for Gathering Services and Related Post-Production Services**

170.    In addition to acquiring oil and gas leases and producing natural gas in the Marcellus Shale region, Anadarko and Chesapeake Energy, through their respective subsidiaries and affiliates, also invested in, developed and operated gathering systems and processing facilities to gather, treat and process the natural gas that it produced.

171.   On February 29, 2008, Chesapeake Energy formed Chesapeake Midstream Development, L.P. ("CMD"), to own, operate and develop midstream energy assets.

172.   In September 2009, Chesapeake Energy and Global Infrastructure Partners-A, L.P, and affiliated funds managed by Global Infrastructure

Management, LLC, and certain of their respective subsidiaries and affiliates (collectively, "GIP"), formed a joint venture to own and operate natural gas midstream assets. As part of the transaction, CMD contributed certain natural gas gathering systems (which, on information and belief, did not include Marcellus Shale midstream assets) to the newly formed joint venture entity, and GIP purchased an interest for $588 million in cash.

173.   In 2010, Chesapeake Energy and GIP formed Chesapeake Midstream Partners, L.P. ("CHKM"), a master limited partnership, to own, operate, develop and acquire gathering systems and other midstream energy assets.

174.   CHKM completed its initial public offering of common units on August 3, 2010. In connection with the closing of the public offering, Chesapeake Energy and GIP contributed the interests of the midstream joint venture's operating subsidiary to CHKM.

175.   Prior to the end of 2011, Chesapeake Energy provided gas gathering and related post-production services in the Marcellus Shale region through its own subsidiaries and affiliates, initially including, but not limited to, CMD and one of CMD's subsidiaries, Appalachia Midstream.

176.   The post-production costs which CALLC began to deduct from proceeds received by it at the point of sale in calculating the royalties payable

Plaintiffs were based entirely on purported post-production services by Chesapeake affiliates and subsidiaries, in self-dealing, related party transactions.

177.   Although the royalty statements that CALLC issued to Plaintiffs provided only cursory, cryptic and confusing descriptions of the deductions taken from the proceeds received by CALLC at the point of sale in calculating the royalties payable to the respective Plaintiffs on gas produced from their respective properties, Plaintiffs believe and aver, based on comparisons of the their respective statements from Chesapeake, and on comparisons of the statements they received from Chesapeake with statements from other oil and gas companies which had interests in the same wells, that, even if Chesapeake was otherwise authorized to take such deductions (which Plaintiffs dispute), many of the deductions taken by Chesapeake in connection with the underlying self-dealing, related party transactions were arbitrary, excessive and unreasonable.

**N.     Chesapeake's Joint Venture Partner Statoil's Treatment of Post-Production Costs.**

178.   As a joint venture partners of Chesapeake, Statoil USA sells, and accounts to royalty interest owners, including Plaintiffs, for its share of the gas produced by the joint venture separately from Chesapeake. Until relatively recently, in calculating the royalties payable to royalty interest owners, including Plaintiffs, Statoil USA, unlike CALLC and the other Lessee Defendants, did not

expressly itemize or disclosed on its check stubs or royalty statements that it was taking any deductions for gathering costs from the revenues that it derives from the sale of its share of the gas produced by the joint venture in calculating royalties, even though it is the same gas, produced from the same wells, subject to the same leases, as to which Chesapeake takes substantial cost deductions from the revenues derived from its share of the gas in calculating the royalties payable to royalty interest holders. At the same time, Statoil reported substantially lower unit price for the gas produced from the same wells, for the same months. As a result, Plaintiffs infer and believe, and based thereon allege, that Statoil USA was actually taking deductions for post-production costs without disclosing them, and then simply paying royalties on the resulting lower unit price.

## O.    Chesapeake's Liquidity Crisis

179.   Chesapeake financed its aggressive campaign to acquire leases in the Marcellus Shale region and in other parts of the country by incurring massive amounts of debt, resulting in it having an unusually highly leveraged balance sheet, and increasingly onerous and ongoing debt servicing and repayment obligations. By the end of 2011, Chesapeake owed approximately $10 billion in debt.

180.   As long as the price of natural gas increased or at least remained stable, Chesapeake was able to service and refinance its growing debt obligations.

181.   By the end of 2011, however, Chesapeake found itself faced with a liquidity crisis, precipitated by an unexpected decline in the market price for natural gas, which threatened Chesapeake's ability to continue to service and refinance or pay the massive debt obligations on its highly-leveraged balance sheet. As described by a journalist writing for Forbes:

> Chesapeake Energy is in a bind. It's the second-biggest natural gas producer in the country after ExxonMobil. But with natgas prices having fallen to their lowest levels in a decade ($2.40 per thousand cubic feet), Chesapeake isn't generating enough cash.
>
> Chesapeake has curtailed its drilling in some plays, and in January said it would shut in production of marginal gas fields. But the company has $10 billion in debt to service and is obligated to keep drilling wells on newer oil and gas leases in order to hold the land. Over the course of 2012, if gas prices were to stay where they are now, Chesapeake would face a cash shortfall of several billion dollars.[4]

**P.     Chesapeake's Scheme to Use Gas Gathering and Related Agreements to Solve Its Liquidity Crisis**

182.   As part of its efforts to address its impending liquidity crisis, Chesapeake decided to "sell" certain of its midstream assets, including its natural gas gathering system and intrastate pipeline operations in the Marcellus Shale

---

[4]     Christopher Helman, *Chesapeake Energy's New Plan: Desperate Measures for Desperate Times*, (Forbes Feb. 13, 2012) (the "Forbes Article"). http://forbes.com/sites/christopherhelman/2012/02/13/chesapeake-energys-new-plan-desperate-measures-for-desparate-times/

region, through a series of complex and unusual transactions with Access Midstream.

183.   On December 29, 2011, CHKM acquired from CMD all of the issued and outstanding equity interests in Appalachia Midstream, for total consideration of $879.3 million, consisting of 9,791,605 common units and $600.0 million in cash.

184.   As of its acquisition by CHKM, Appalachia Midstream operated 100 percent of, and owned an approximate average 47 percent interest in, 10 integrated gas gathering systems that consisted of approximately 549 miles of gas gathering pipeline in the Marcellus Shale, which serviced (and continue to service) approximately 250 natural gas wells. The remaining 53 percent interest in the assets was owned, directly or through subsidiaries and affiliates, primarily by Statoil ASA, Anadarko Petroleum Corporation, and Mitsui & Co., Ltd., which were and are, respectively, the corporate parents of defendants Statoil, Anadarko and Mitsui.

185.   Appalachia Midstream was and is party to long-term (15-year) gas gathering agreements with certain subsidiaries and affiliates of Chesapeake, and also with Statoil, Anadarko, Mitsui, Epsilon Energy Ltd., and Chief Oil & Gas LLC ("Chief"). Pursuant to these gas gathering agreements, which are not publicly available, and the terms of which Chesapeake maintains as confidential,

Chesapeake and some or all of the other producer-parties to the agreements granted Appalachia Midstream what CHKM has publicly characterized as "extensive acreage dedications" (i.e., exclusivity) in the areas within which it operated in the Marcellus Shale region.[5]

186.  Although the terms of the gas gathering agreements were and are largely confidential, not publicly available, and within the peculiar knowledge of the Defendants who are party to such agreements, CHKM has publicly disclosed that its gas gathering agreements generally contain certain terms, including the following:

- opportunity to connect natural gas drilling pads and wells of the counterparties of these agreements within our acreage dedications to our gathering systems in all of our regions; [and]

- fee redetermination mechanisms, which are designed to support a return on invested capital and allow our gathering rates to be adjusted, subject to specified caps in certain cases, to account for variability in revenues, capital, expenditures and compression and certain other expenses....[6]

---

[5]    *See* Chesapeake Midstream Partners, L.P., SEC Form 8-K, filed February 1, 2012, Ex. No. 99.1, at 1-2.
https://www.sec.gov/Archives/edgar/data/1483096/000119312512034455/d292771d8k.htm
https://www.sec.gov/Archives/edgar/data/1483096/000119312512034455/d292771dex991.htm
Chesapeake Midstream Partners, L.P. SEC Form 10-K, filed February 29, 2011, at 1-3.
https://www.sec.gov/Archives/edgar/data/1483096/000119312512089268/d283045d10k.htm

[6]  Chesapeake Midstream Partners, L.P., SEC Form 10-K, filed February 29, 2011, at 2.

187.   The long-term gas gathering agreements functioned to limit (if not to entirely eliminate) any direct exposure and risk to Appalachia Midstream and CHKM from changes in the market price of natural gas.

188.   Effective July 24, 2012, CHKM changed its names to Access Midstream Partners, L.P.

189.   On December 20, 2012, Access Midstream acquired from CMD and certain of CMD's affiliates one hundred percent (100%) of the issued and outstanding equity interests in Chesapeake Midstream Operating, L.L.C. ("CMO") for total consideration of $2.16 billion (the "CMO Acquisition"). Through the CMO Acquisition, Access Midstream acquired certain midstream assets in the Eagle Ford, Utica and Niobrara regions, and also extended its existing assets and operations in the Marcellus and other regions. Access Midstream also assumed various gas gathering and processing agreements associated with the assets that have terms ranging from 10 to 20 years and that, in certain cases, include cost of service or fee redetermination mechanisms.

190.   When Chesapeake sought to spin-off its gathering assets, it turned to J. Michael Stice – who then served as Chief Executive Officer of Chesapeake Midstream GP, L.L.C (the general partner of CHKM), as  Senior Vice President— Natural Gas Projects of Chesapeake Energy, and as President and Chief Operating Officer of Chesapeake's primary midstream subsidiaries – to run the operation.

Stice became the Chief Executive Officer of Access Midstream upon its acquisition of the CMO midstream assets.

191.   Dominic J. Dell'Osso, Jr. – who then served as the Executive Vice President of Chesapeake, and who had served as the Chief Financial Officer of Chesapeake Midstream from August 2008 to November 2010 – also was fully familiar with and intimately involved in the scheme.

192.   Stice and Dell'Osso also served as directors of Access Midstream's general partner, Access Midstream Partners GP, L.L.C., since July 2012 and July 2011, respectively.

193.   According to the *ProPublica* Report, post-spinoff agreements between Chesapeake and Access Midstream also guarantee that Chesapeake and certain of its subsidiaries and affiliates will receive a rebate of some of the monies that they pay out to Access Midstream, in the form of payments for services and additional assets.[7]

194.   As part of the transaction, Chesapeake agreed that certain of its personnel and employees would be made available to Access Midstream during a

---

[7]   *See ProPublica* Report.

transitional period, and that it would provide certain services to Access Midstream (for which it would be paid) going forward.[8]

195.   As a result, Access Midstream has been and continues to be managed and directed by former or current Chesapeake officer, has made extensive use of other Chesapeake employees in conducting its operations, and continues to pay Chesapeake and certain of its affiliates and subsidiaries for a variety of services.

196.   In connection with the CMO Acquisition, Access Midstream not only acquired existing gas gathering agreements, but also entered into certain new gas gathering agreements (the "New Gas Gathering Agreements") with certain Chesapeake Energy subsidiaries, including Chesapeake Appalachia.[9]

### Q.   Defendants Leverage Their Monopoly Power Over Gas Mineral Rights, Gathering and Intrastate Transportation Pipeline Systems In Contractually Dedicated Areas to Enable Chesapeake to Address Its Liquidity Crisis, and to Enable Access Midstream to Generate Supra-Competitive Profits, at the Expense of Plaintiffs and Other Royalty Interest Owners.

197.   Chesapeake and Access Midstream sought and received from the SEC confidential treatment of the New Gas Gathering Agreements, and have not otherwise made the agreements public. As a result, Plaintiffs do not presently have

---

[8]      Access Midstream Partners, L.P., Form 10-K, filed Feb. 25, 2013; *see also* Access Midstream Partners, L.P., Form 8-K, Exhibit 10.2, filed Dec. 19, 2012; Access Midstream Partners, L.P., Form 8-K, Exhibit 10.2, filed June 20, 2012

[9]      *See* Access Midstream SEC Form 8-K, filed December 19, 2012, at 2-5. http://www.sec.gov/Archives/edgar/daa/1483096/00119312514085/d457818d8k.htm

access to or knowledge of all of the terms and conditions of the New Gas Gathering Agreements, which are within the exclusive knowledge of Chesapeake, Access Midstream and the SEC (subject to confidentiality). As set forth below, however, certain terms of the New Gas Gathering Agreements have been described in public filings by Chesapeake Energy and Access Midstream, and in the *ProPublica* Report.

198.    Under both the existing gathering agreements acquired by Access Midstream from CMD and its affiliates, and the new gathering agreements established and entered into in connection with the CMO Acquisition, CMD and other affiliates of Chesapeake "agreed to procure gathering, compression, dehydration and treating services" for natural gas produced in the "Dedication Areas" specified in the respective gathering agreements, *exclusively* from Access Midstream.[10]

199.    By engaging in CMO Acquisition and related transactions, Access Midstream effectively acquired a monopoly in the market for gathering, compression, dehydration and treating services within the "Dedication Areas" specified in its existing and new gathering agreements, for at least the duration of the long-term gathering agreements.

---

[10]      *See* Access Midstream Partners, L.P., SEC Form 8-K (filed Dec. 26, 2012) https://www.sec.gov/Archives/edgar/data/1483096/000119312512514085/d457818d8k.htm Exhibit 10.1 (Non-Solicitation Agreement , dated as of Dec. 20, 2012), at 1-2 https://www.sec.gov/Archives/edgar/data/1483096/000119312512514085/d457818dex101.htm

200.   Although Plaintiffs do not have access to the gathering agreements that cover the natural gas produced from their properties by Chesapeake, Plaintiffs believe and aver that much of Bradford County, including all of Plaintiffs' properties that are subject to Leases with Chesapeake, falls within Dedication Areas specified in one or more of the gathering agreements transferred or established as part of the CMO Acquisition.

201.   In its public filings with the SEC, Access Midstream acknowledges that, because it has long-term gathering agreements with its producer customers, including Chesapeake, which have provided it with "long term acreage dedications," it faces no competition within such acreage dedications:

> Given that substantially all of the natural gas gathered and transported through our gathering systems and processing facilities is owned by producer customers with whom we have long-term gathering contracts, we do not currently face significant competition for our natural gas volumes…. Chesapeake and other producers have provided long-term acreage dedications in the Marcellus Shale region….
>
> We face competition for production drilled outside of our acreage dedications and in attracting third-party volumes to our systems.[11]

---

[11]   Access Midstream Partners, L.P. Form 10-K (filed Feb. 21, 2014), at 8. https://www.sec.gov/Archives/edgar/data/1483096/000156459014000295/acmp-10k_20131231.htm

202.   In other words, by virtue of its long-term exclusive contracts with Chesapeake and other producers in the Marcellus Shale region, **Access Midstream effectively has a one hundred percent (100%) share of the market for gas gathering and related post-production services in the relevant geographic market.**

203.   There were and are no economically practicable or reasonable means for a prospective competitor to enter into the market to compete with Access Midstream in the delivery of gas gathering and related post-production services in the relevant geographic market. The barriers to entry into the market include: (a) the substantial capital costs and regulatory barriers associated with the construction and operation of the necessary gathering pipelines; and (b) Access Midstream's long-term exclusive contracts with Chesapeake, the dominant producer in the relevant geographic market, and other producers in the market. As a result, Access Midstream acquired in the CMO Acquisition, and continues to possess, effective monopoly power in the market for gas gathering and related post-production services in the relevant geographic market, as defined by the exclusive dedicated acreage granted in its long-term gathering agreements.

204.   The New Gas Gathering Agreements included agreements between Access Midstream and Chesapeake Appalachia for the gathering of natural gas produced by Chesapeake Appalachia from its operations the Marcellus Shale

Region (the "Marcellus Gas Gathering Agreements").[12] Under the Marcellus Shale Gas Gathering Agreements, Chesapeake Appalachia's payments to Access Midstream for gas gathering and transportation services were referred to as the "Marcellus fee." *Id.*

205.  Access Midstream attempts to characterize of the amounts that Chesapeake Appalachia has been required to pay for gas gathering and transportation services (which Access Midstream sometimes refers to as the "Marcellus fee") as a "cost-of-service based fee." This characterization, however, is false and misleading.

206.  As the *ProPublica* Report details, the fees charged to Chesapeake Appalachia by Access Midstream for purported post-production services were not and are not "cost-of service based," but instead were and are based on a transaction structured to provide Access Midstream with a long-term, guaranteed, above-market return on its investment, as an incentive and as consideration for the payments it made to Chesapeake. As explained by *ProPublica*, "[a]n executive at a rival company who reviewed the deal at ProPublica's request said it looked like **Chesapeake had found a way to make the landowners pay the principal and**

---

[12]    *See* Access Midstream SEC Form 8-K, filed December 19, 2012, at 5

interest on what amounts to a multi-billion dollar loan to the company from Access Midstream."[13]

207.   Access Midstream's own public disclosures show that the fees paid to it in connection with the Marcellus Gathering Agreement are not based on the cost of the gathering services provided under the agreement. To the contrary, according to Access Midstream, the agreement is a long-term agreement that guarantees it a specified rate of return on its investment:

> Effective on January 1, 2014 and January 1st of each year thereafter for a period of 15 years from July 1, 2012, the Marcellus fee will be redetermined based on a cost-of-service calculation that provides a specified pre-income tax rate of return on invested capital.[14]

208.   Although neither Chesapeake nor Access Midstream filed the Marcellus Gathering Agreement with the SEC, *ProPublica* has reported that the rate of return guaranteed to Access Midstream is 15% per year: "Chesapeake has pledged to pay Access enough in fees to **repay the $5 billion plus a 15 percent return** on its pipelines."[15]

209.   Both Chesapeake and Access Midstream acted with full knowledge that the rate of return being guaranteed to Access Midstream was well in excess of

---

[13]      *See ProPublica* Report.

[14]      Access Midstream SEC Form 8-K, filed Dec. 19, 2012, at 5
http://www.sec.gov/Archives/edgar/data/1483096/000119312512514085/d457818d8k.htm

[15]      *See ProPublica* Report

the rate of return that would have been available in a competitive market.   Both Chesapeake and Access Midstream also acted with full knowledge that, in the absence of sudden and unanticipated increases in the market price of natural gas, and in light of the condition of Chesapeake's cash flow and balance sheet, Chesapeake's ability to deliver on its promise to provide Access Midstream with an above-market rate of return would require Chesapeake to treat the payments that it would be making to Access Midstream as purported post-production costs, and to then deduct and pass-on the artificial purported post-production costs in calculating royalty payments to Chesapeake's lessors, including Plaintiffs, thereby reducing the royalties payable to them.

210.   Both Chesapeake and Access Midstream further acted with full knowledge that the resulting purported post-production costs that Chesapeake inevitably would have to pass-on to its lessors, including Plaintiffs, would be artificially inflated, and in excess of the true market rates of such services.

211.   The structure and terms of the CMO Acquisition and related agreements, including the ability to fund the commitments undertaken by Chesapeake at the expense of its royalty interest owners, including Plaintiffs, depended and relied on the existence and abuse by Access Midstream of the monopoly power already possessed by Chesapeake Energy and its subsidiaries in the market for gathering services in the Dedicated Areas, which was effectively

conveyed to Access Midstream in connection with the CMO Acquisition, and which was augmented by the new gathering agreement entered into by Defendants and their affiliates as part of the transaction.

212.   Defendants acted with the intent of using the artificial reduction of the royalties due and owing to Plaintiffs (and other royalty interest owners) to finance their scheme.

213.   In Chesapeake Energy's 2013 Annual Report on Form 10-K, filed with the SEC on February 27, 2014, Chesapeake for the first time publicly disclosed the financial magnitude of the gathering and transportation commitments that it made to Access Midstream in connection with the CMO Acquisition, as well as fact that its royalty interest owners would be bearing a portion of those costs:

> We have contractual commitments with midstream service companies and pipeline carriers for future gathering, processing and transportation of natural gas and liquids to move certain of our production to market. Working interest owners and *royalty interest owners, where appropriate, will be responsible for their proportionate share of these costs.*[16]

(emphasis added). According to Chesapeake Energy, its aggregate undiscounted commitments under gathering, processing and transportation agreements,

---

[16]     Chesapeake Energy Corporation SEC Form 10-K (filed Feb. 27, 2014), Item 8, Note 4, at 93.(available at https://www.sec.gov/Archives/edgar/data/895126/000089512614000104/chk-20131231_10xk.htm) (last accessed Sept. 11, 2014).

"excluding any reimbursement from working interest and royalty interest owners," amounts to a staggering $17 Billion.[17]

214.   Although Plaintiffs believe and aver that Chesapeake was impermissibly deducting inflated and improper post-production costs in calculating their royalties, resulting in the underpayment of royalties, even *before* the CMO Acquisition closed, the problem grew dramatically worse and more evident following the closing of the CMO Acquisition.

215.   As part of the CMO Acquisition, Chesapeake not only agreed to guaranty Access Midstream an above-market rate of return on its investment, but also agreed to pay Access Midstream supra-competitive prices for natural gas gathering services going forward that are many multiples of Access Midstream's actual costs, and far more than the costs previously deducted by Chesapeake Appalachia when Chesapeake's own subsidiaries and affiliates owned the gathering system.

216.   The *ProPublica* Report details how Chesapeake has charged and deducted amounts far in excess of not only the market rate, but also far in excess of its own and Access Midstream's actual costs for gathering services. In one example reported by *ProPublica*, the markup was in excess of 3,000%.[18]

---

[17]      *Id.*

[18]      *See ProPublica* Report.



217. As one of Chesapeake's competitors stated, "[t]hey were trying to figure out a way to raise money and keep their company alive [and] they looked at it as a way to get disguised financing … that is going to be repaid at a premium."[19]

218. Notably, as also mentioned in the *ProPublica* Report, and as reflected in the royalty statements received by many of the Plaintiffs from other oil and gas companies who hold interests in the gas produced from the same wells, Chesapeake reports lower sales prices, and also deducts vastly more for gathering services, than other oil companies which hold participating interests in the same wells, despite the fact that they share the same contractual royalty payment obligation, and the same entitlement (or lack of entitlement) to take such deductions.

219. Notably, Chesapeake reported to investors in September 2013 that its expenses related to pipeline and marketing business had roughly doubled in the

---

[19]    *Id.*

months after it sold certain pipelines, and that its revenues for that part of its business also had increased accordingly, covering the new costs.[20]

220.   Industry analysts could not explain the change in revenue and expenses. As reported by *ProPublica*:

- Fadel Gheit, a seasoned industry analyst for the investment firm Oppenheimer, who initially estimated the figure was off by a decimal point before later confirming that it matched the numbers Chesapeake had reported to the SEC, stated "[s]omething is wrong with this calculation …. It can't be."

- Kevin Kaiser, a financial analyst with Hedgeye, a private equity group in New York, stated, "[t]he change in marketing, gathering, compression revenue and expense is staggering."

- None of the financial analysts who cover Chesapeake that *ProPublica* spoke with could explain the explosion in Chesapeake's marketing and transportation revenue and expenses using oil sales alone.[21]

221.   It was not until Chesapeake's filing with the SEC of its 2013 Annual Report on Form 10-K at the end of February, 2014 that Chesapeake disclosed in a note – two sentenced in  299 page report - that its contracts with Access and other companies played into the rising figures, without specifying how much.[22]

---

[20]     *See ProPublica* Report.

[21]     *See ProPublica* Report.

[22]     *See ProPublica* Report.

222.    The benefits that Access Midstream derived from the scheme are clear. Access Midstream's predominant source of revenue is gathering fees, and Chesapeake accounts for approximately 84% of Access Midstream's business.[23] Due in large part to Stice's positive descriptions of, and other disclosures about, the guaranteed revenue stream that Access Midstream would enjoy as a result of the CMO Acquisition, the broader market also plainly understands and appreciates the benefits of the transaction to Access Midstream. As of June 16, 2014, Access Midstream's publicly traded common units (NYSE: ACMP) were trading at $66.57 per share, more than double the price at which they were trading on December 14, 2012, the week before the CMO Acquisition closed.

**R.     The Lessee Defendants Have Charged, and Are Continuing to Charge, Artificially Inflated and Unreasonable Deductions From the Royalties Payable to Plaintiffs.**

223.    The oil and gas leases executed by Plaintiffs do not expressly allow for the deduction of post-production costs of gathering, transportation or marketing from Plaintiffs' royalties, and by implication prohibit such deductions.

224.    Although the Lessee Defendants are not entitled to deduct any amounts from Plaintiffs' royalties in connection with post-production costs of gathering, transportation or marketing, they have nonetheless taken such deductions in calculating and paying Plaintiffs' royalties, in amounts which were

---

[23]     *Id.*

and are artificially inflated, improper, and unrelated to any legitimate market "cost of services."

225.  CALLC was not the only one of the Lessee Defendants that took impermissible or artificially inflated and unreasonable deductions for gathering, transportation and other post-production costs. Each of the Lessee Defendants has taken such deductions in calculating the royalties that it accounted for and paid to those of the Plaintiffs in whose leases the respective Lessee Defendants hold working interests, resulting in underpayment of royalties.

226.  Pursuant to Pennsylvania's Guaranteed Minimum Royalty Act ("GMRA"), a natural gas lease is not valid if it does not "guarantee the lessor at least one-eighth royalty of all oil, natural gas or gas of other designations removed or recovered from the subject real property." 55 P.S. § 33.3. As a result, royalty deductions, even if and to the extent permissible at all under the terms of a particular oil and gas lease, not only must be reasonable and reflect actual costs, but also must be proportionate to the lessor's minimum guaranteed royalty under the GMRA  (*i.e.*, a lessor's post-production deductions cannot exceed 12.5% of total post-production costs).[24]

---

[24]     In this action, Plaintiffs contend their leases did not permit the Lessee Defendants to deduct post-production gathering, transportation or marketing costs in any amount, or, in the alternative, that any such deductions must be reasonable and based on bona fide, actual costs.

227.   Notwithstanding these limitations, and the absence of any language in Plaintiffs' respective leases allowing for the deduction of post-production costs, each of the Lessee Defendants, acting under the guise of such leases, has taken artificially inflated and unreasonable deductions in calculating and paying royalties to Plaintiffs that far exceeded their *pro rata* share of 12.5% of total post-production costs, in order to effectively and improperly shift a material portion of the financial obligation undertaken by Chesapeake to ensure its financial survival to its lessors, including Plaintiffs.

228.   Each of the Plaintiffs has received, and continues to receive, periodic royalty payments from each of the Lessee Defendants that holds a working interest in the respective Plaintiff's lease(s). The Lessee Defendants generally account for and pay royalties on a monthly basis, although the frequency and regularity of the payments and accountings from the respective Lessee Defendants sometimes vary over time.

229.   Each of the royalty payments received by each of the respective Plaintiffs was and is accompanied by a statement, in the form of a check-stub or otherwise, purporting to summarize the basis on which the payment was calculated.

230.   The formats of the royalty statements provided by the respective Lessee Defendants, and the categories of information provided in such statements,

are similar, but not identical. Moreover, certain of the Lessee Defendants have modified the categories of information provided in their respective royalty statements over time.

## V.   THE USE OF INTERSTATE MAILS AND WIRES TO CAUSE INJURY TO PLAINTIFFS

231.   The scheme alleged herein constituted mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

232.   The conduct of Defendants and their co-conspirator, CALLC, as described in this amended complaint, constituted the execution of a scheme and artifice to defraud and deprive Plaintiffs and other oil and gas lessors in Pennsylvania of royalties properly due to them by means of fraudulent pretenses and representations through the use of the United States mails, in violation of 18 U.S.C. § 1341.

233.   The use of the mails formed a central feature of the scheme and included, by way of example and as described above, the conduct of the Defendants in causing and permitting the Lessee Defendants to send to Plaintiffs, and the conduct of the Lessee Defendants in sending to Plaintiffs, their periodic (typically, but not always, monthly) royalty statements and royalty payments. Each of the Lessee Defendants sent royalty statements to Plaintiffs that either (a) fraudulently represented that deductions shown for gas gathering and transportation costs were legitimately incurred and permissible under the terms of

the respective Plaintiffs' leases; or (b) fraudulently concealed, omitted or otherwise failed to disclose that such deductions had in fact been taken in calculating the royalties paid to the respective Plaintiffs.

234.   The conduct described above constituted multiple instances of mail fraud, in violation of 18 U.S.C. § 1341, which is a predicate offense for purposes of 18 U.S.C. § 1962(c).

235.   In addition, Defendants have, on a regular monthly or other periodic basis, transferred payments between themselves by wire, pursuant to and in furtherance of the conspiratorial agreement among them described herein.   This conduct constituted multiple instances of wire fraud, in violation of 18 U.S.C. § 1343, which also is a predicate offense for purposes of 18 U.S.C. § 1962(c).

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (Agreement to Restrain Competition in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

236.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

237.   The relevant geographic market for purposes of this claim is, in the alternative: (a) Bradford County, Pennsylvania, and adjoining portions of Sullivan, Susquehanna and Wyoming Counties, Pennsylvania; (b) the AMI designated in the that Joint Exploration Agreement between Chesapeake and Anadarko E&P; and/or (c) that portion of the aggregate Dedicated Area, together with any other dedicated acreage defined in any and all gathering agreements to which Chesapeake Energy or any of its affiliates or subsidiaries, including but not limited to CMD, is a party, in which they contractually agreed to procure gathering, compression, dehydration or treating services with respect to natural gas exclusively from another entity, and which is located within Bradford, Sullivan, Susquehanna, or Wyoming County, Pennsylvania, including, if and to the extent they fall within the foregoing definition, the Dedicated Areas specified in the following Gathering Agreements listed on Schedule A to the Non-Solicitation Agreement entered into on December 20, 2012, among Access Midstream, CMD, Chesapeake Operating, Inc., Chesapeake Energy Marketing, Inc., and Chesapeake Energy, filed as Exhibit 10.1

to the SEC Form 8-K filed by Access Midstream Partners, L.P., on December 26, 2012:

- The contracts designed as "5. Marcellus" with a date TBD, with Mid-Atlantic Gas Services, L.L.C., or its successors or assigns;

- The contract designated as "8. Anchor Shipper Gas Gathering Agreement for Marcellus" with an Effective Date of January 1, 2012, with Appalachia Midstream Gas Services, L.L.C., or its successors or assigns; and

- The contract designated as "9. Anchor Shipper Gas Gathering Agreement for Northern Pennsylvania" with an Effective Date of January 1, 2012, with Appalachia Midstream Gas Services, L.L.C., or its successors or assigns; and

The geographic market defined above is referred to below as the "Exclusive Dedicated Acreage." Because there are known to be rich deposits of natural gas in the Marcellus Shale located beneath the surface of the land in and around Bradford County, the relevant geographic market, as alternately defined above, is not reasonably interchangeable with other geographic markets.

238.   The relevant product or service market for purposes of this claim is, in the alternative: (a) the market for the lease of subsurface natural gas underlying specific land, together with the rights to explore for, develop, produce, measure and market gas from the leased premises ("Gas Mineral Rights"); (b) the market for the right to operate working interests in oil and gas leases to explore for, produce and market natural gas ("Operating Rights"); or (c) the market for natural gas gathering and midstream transportation services ("Gathering Services").

239.   Because natural gas is not readily and reasonably interchangeable with other fossil fuels, such as coal or petroleum, due to various economic, technological and regulatory restrictions, as well as constraints associated with capacity and local transmission and transportation, all of which limit the ability and responsiveness of end-users including electricity generators, and end-users of gas for heating, to respond in the short-term to changes in prices, Gas Mineral Rights likewise are not reasonably interchangeable with similar rights to other forms of fuel, and Operating Rights and Gathering Services are not reasonably interchangeable with other conceivable methods of exploring for, producing and marketing natural gas, or transporting gas from wells to interstate pipelines. As a result, the estimated cross-elasticities of demand, supply and substitution for the alternative products or services are relatively low.

240.   Beginning in 2006, at or about the time of the negotiation of the Joint Exploration Agreement between Chesapeake and Anadarko E&P, and continuing through at least 2012, defendants Chesapeake and Anadarko E&P and its affiliates, who otherwise had been, were and are horizontal competitors in the markets for Gas Mineral Rights, Operating Rights and Gathering Services, by and through their respective conduct set forth above, willfully, knowingly and intentionally combined or conspired, initially among themselves, and later with other oil and gas companies that competed in, or sought to enter, those markets, to reduce, restrain

or eliminate competition in the markets for such rights and services by dividing and allocating between themselves separate relevant geographic markets in Northern Pennsylvania, including but not limited to the geographic market in and around Bradford County, between and among themselves, with the specific intent to reduce, restrain or eliminate competition in the markets for such rights and services in the relevant geographic area.

241.  Because the claim set forth in this cause of action is founded on agreements among horizontal competitors to divide and allocate markets, which constitute naked restraints of trade, Plaintiffs respectfully submit that Defendants' conduct described herein constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and therefore should be evaluated under the "per se" rule. Alternatively, if Defendants are able to convince the Court, based on the evidence developed after discovery, that the division and allocation of markets by defendants Chesapeake and Anadarko E&P in connection with their establishment of the AMI referred to as "Area A" was ancillary to some legitimate, pro-competitive business purpose, enhanced overall efficiency, and made markets more competitive, then the claim can and should be analyzed under the rule of reason, which was violated by the conduct in questions. Because an observer with even a rudimentary understanding of economics could readily conclude that the arrangement in question could have an anticompetitive effect on customers and

markets, however, Plaintiffs submit that the conduct at issue can and should appropriately be analyzed under the intermediate "quick look" rule. Under the "quick look rule", the conduct in question constitutes a violations Section 1 of the Sherman Act, 15 U.S.C. § 1.

242.   Chesapeake and Anadarko began by establishing the AMI known as "Area A", which appears to have been intended, and to have operated, to restrict competition between them in the markets for such products and services in the relevant geographic market.

243.   Statoil USA and Mitsui E&P later joined in and provided critical financial support for the conspiracy, acting with knowledge of and with the intent to enable Chesapeake and Anadarko to fully exploit, the anticompetitive and restrictive AMI established pursuant to the 2006 Joint Exploration Agreement. In return for their financial commitments, Statoil USA and Mitsui E&P received working interests in the wells and units developed by CALLC as the operator, and ownership interests in the gathering systems developed by Chesapeake, AMS and later to facilitate the production and marketing of natural gas from such wells.

244.   As a result of the agreement, combination and conspiracy among the Lessee Defendants and their respective affiliates, which Plaintiffs infer and allege (based on the apparent ability of CALLC to exclude other competitors from the relevant geographic market) later came to include other competing oil and gas

companies, competition in the markets for Gas Mineral Rights, Operating Rights and Gathering Services Chesapeake in the relevant geographic market was substantially foreclosed or eliminated, leaving Chesapeake with an effective monopoly or, more accurately a monopsony, given that it was effectively the sole buyer of the relevant rights and services in the relevant geographic market.

245.   Chesapeake's effective monopsony placed it in a position to exercise, and it did exercise, market power over payment of the price of Gas Mineral Rights, including but not limited to royalties. Specifically,

246.   Prior to the end of 2011, in furtherance of the agreement, combination and conspiracy among Defendants, CALLC obtained Gathering Services from other affiliates of Chesapeake, including CMD and/or AMS. By virtue of their unlawfully acquired effective monopoly on Gathering Services in the relevant geographic market, CMD and/or AMS were able to and did charge supra-competitive prices for such services. CALLC and the other Lessee Defendants befitted from such above-market prices by virtue of their shared ownership of the gathering systems, and by being able to effectively recover material portion of such charges by deducting a proportionate share of the charges from the royalties payable to Plaintiffs, causing injury to Plaintiffs.

247.   Prior to the CMO Acquisition, Chesapeake Energy, directly and through its controlled subsidiaries, possessed monopoly power in the market for

natural gas gathering and midstream transportation services in the Exclusive Dedicated Acreage. Through the CMO Acquisition, and the new gathering agreements executed in connection with the transaction, Chesapeake Energy and its affiliates not only transferred its existing, unlawfully-acquired monopoly power to Access Midstream and its affiliates, but also effectively bolstered and extended that monopoly power.

248.   By entering into and closing the CMO Acquisition, and the various contracts involved in that transaction, including the Marcellus Gathering Agreement, Defendants contracted, combined or conspired to further restrain competition in the relevant markets.Defendants took steps in furtherance of their contract, combination or conspiracy by, among other things, closing the CMO Acquisition, and by Access Midstream and its affiliates paying, and  Chesapeake Energy and its affiliates accepting and receiving, the agreed consideration, and by Access Midstream thereafter providing natural gas gathering systems and services, and related natural gas post-production services, to Chesapeake Energy and its affiliates, with respect to natural gas produced in the Exclusive Dedicated Acreage, at supra-competitive prices.

249.   In negotiating and entering into the CMO Acquisition, Chesapeake and Access Midstream acted with knowledge that the gathering and transportation costs that Chesapeake was committing to pay to Access Midstream or its affiliates were excessive, and that Chesapeake Energy and its affiliates intended to fund a material portion the ongoing supra-competitive cost of gathering and transportation services which they were committing to pay by effectively passing along a substantial portion of such costs to the owners of royalty interests in natural gas wells operated by Chesapeake within the Exclusive Dedicated Acreage, including Plaintiffs, by deducting a portion of such costs in calculating the royalties payable to such royalty interest owners, and thereby reducing the amount of the royalties.

250.   Chesapeake has in fact effectively passed along to Plaintiffs and other royalty interest owners a significant portion of the supra-competitive costs of gathering and transportation services that Chesapeake committed to pay in connection with the CMO Acquisition by deducting a portion of such costs in calculating the royalties payable Plaintiffs, thereby reducing the amount of the royalties paid to Plaintiffs.

251.   As lessors of natural gas rights and holders of royalty interests in natural gas produced and marketed within the Exclusive Dedicated acreage through the commercial exploitation of such rights, Plaintiffs were and are within the area of the economy endangered by the breakdown in competitive conditions

resulting from the contracts or conspiracy between Chesapeake and Access Midstream in restraint of trade.

252.    The economic injury suffered by Plaintiffs was a necessary step in, integral to, or part of the essential means by which defendants Chesapeake and Access Midstream sought to achieve their illegal and anticompetitive ends. As a result, the economic injury suffered by Plaintiffs is inextricably intertwined with Defendants' wrongdoing.

253.  Plaintiffs have suffered antitrust injury as a result of Defendants' conduct because the economic harm they have suffered – the loss of royalties due to deductions by the Lessee Defendants of unauthorized or artificially inflated costs for gathering, transportation and other post-production costs – reflects either (a) the anticompetitive impact of the antitrust violations by Defendants with respect to the market for Operating Rights and/or Gathering Services, or (b) the effect of anticompetitive acts in the markets for Operating Rights and/or Gathering Services which were made possible by, and reflect a further consequence and effect of, their earlier successful efforts to foreclose or eliminate competition in the market for Gas Mineral Rights. By engaging in market allocation in the market for Gas Mineral Rights, defendants Chesapeake and Anadarko E&P, which were horizontal competitors, enabled themselves to cause Plaintiffs to receive below-

market royalties as a result of the deduction of unauthorized and/or artificially inflated costs from their royalties.

254.   As a direct and proximate result of Defendants' past and continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered injury and damages in amounts to be proven at trial.

255.   Plaintiffs seek money damages from Defendants, jointly and severally, for these violations.

256.   The actual damages sustained by Plaintiffs should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

## SECOND CAUSE OF ACTION

### (Combination or Conspiracy to Monopolize Trade or Commerce in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

257.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

258.    The relevant geographic market for purposes of this claim is, in the alternative: (a) Bradford County, Pennsylvania, and adjoining portions of Sullivan, Susquehanna and Wyoming Counties, Pennsylvania; and/or (b) the Exclusive Dedicated Acreage.

259.   The relevant product or service market for purposes of this claim is the market for Gathering Services. Gathering services are not reasonably interchangeable with other conceivable methods of transporting natural gas from

wells to interstate pipelines. As a result, the estimated cross-elasticities of demand, supply and substitution for potential alternative services is low.

260.  By their respective conduct set forth above, Defendants willfully, knowingly and intentionally combined or conspired among themselves and with others with the specific intent to: allocate the market for cause and permit Access Midstream to acquire, maintain, possesses and exercise monopoly power in the market for natural gas gathering systems and services, and for related natural gas post-production services, in the geographic market consisting of the Exclusive Dedicated Acreage, and to abuse that power to maintain and enhance its market dominance by knowingly causing, inducing and permitting Chesapeake to deliberately underpay royalties properly due and payable to owners of royalty interests, including Plaintiffs, on the proceeds received by Chesapeake at the point of sale from the sale of natural gas produced from the properties of such royalty owners, by the improper deduction of excessive, unwarranted and unreasonable costs before calculating the royalties payable on such proceeds, to enable Chesapeake to return to Access Midstream, and pay supra-competitive returns to Access Midstream on, the monies that it paid to Chesapeake.

261.  In furtherance of the combination or conspiracy, Defendants have committed one or more overt acts, including, but not limited to: defendants

Chesapeake and Access Midstream closed the CMO Acquisition; Access Midstream and its affiliates paid, and Chesapeake Energy and its affiliates accepted and received, the agreed cash consideration for the CMO Acquisition; Access Midstream, directly or through its subsidiaries and affiliates, has provided natural gas gathering systems and services, and related natural gas post-production services, to Chesapeake Energy and its affiliates, with respect to natural gas produced in the Exclusive Dedicated Acreage; and Chesapeake has paid Access Midstream or its affiliates the supra-competitive fees specified in the existing contracts transferred and the new contracts entered into as part of the CMO Acquisition for gas gathering and transportation services.

262.   By charging and accepting supra-competitive fees for gathering services pursuant to its combination or conspiracy with Chesapeake, Access Midstream has abused its monopoly power for gathering and midstream transportation services in the Exclusive Dedicated Acreage.

263.   Defendants' conduct described herein constitutes a per se violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. In the alternative, the conduct violates Section 2 of the Sherman act by virtue of the rule of reason. Alternatively, because an observer with even a rudimentary understanding of economics could readily conclude that the arrangement in question could have an anticompetitive effect on customers and markets, the conduct at issue can and should appropriately

be analyzed under the intermediate "quick look" rule. Under the "quick look rule", the conduct in question constitutes a violations Section 1 of the Sherman Act, 15 U.S.C. § 1.

264.   As a direct and proximate result of Defendants' past and continuing violation of Section 2 of the Sherman Act, as well as Defendants' other unlawful conduct, Plaintiffs have suffered injury and damages in amounts to be proven at trial. The injury and damages sustained by Plaintiffs include being deprived of the royalties properly due and payable to them on the proceeds received by Chesapeake at the point of sale from the sale of natural gas produced from Plaintiffs' respective properties, as a result of Chesapeake's improper deduction of excessive, unwarranted and unreasonable costs before calculating the royalties payable to Plaintiffs on such revenues, which resulted in Plaintiffs receiving royalties in amounts substantially less than they would have been in the absence of the violations alleged.

265.   Plaintiffs have suffered antitrust injury as a result of Defendants' conduct because the economic harm they have suffered – the loss of royalties due to deductions by the Lessee Defendants of unauthorized or artificially inflated costs for gathering, transportation and other post-production costs – reflects the anticompetitive impact of the antitrust violations by Defendants with respect to the market for Gathering Services,

266.   Plaintiffs seek money damages from Defendants, jointly and severally, for these violations.

267.   The actual damages sustained by Plaintiffs should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

## THIRD CAUSE OF ACTION

## (Violation of RICO, 18 U.S.C. §§ 1961-1968)

268.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

269.   Plaintiffs and each of the Defendants are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

### A.     The Enterprise

270.   For purposes of this claim, the RICO "enterprise" is an association in fact, as that term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of Defendants, together with their respective officers, directors, employees and agents (the "Enterprise"). As such, the Enterprise is separate and distinct from the Persons that constituted the Enterprise.

271.   The Enterprise was primarily managed by Chesapeake, which organized the fraudulent scheme and procured the involvement of the other Defendants. Each of the Defendants, however, agreed to, and did, participate in the

conduct of the Enterprise, and carried out its role using broad and independent discretion.

272.  The companies and individuals that comprise the Enterprise were associated for the common purpose of defrauding the leaseholders of the Lessee Defendants, including Plaintiffs, by: (a) overcharging them for post-production costs associated with the gathering, transportation and marketing of natural gas produced from the leasehold properties in which such leaseholders, including Plaintiffs, hold royalty interests, which the co-conspirators knowingly and improperly deemed and treated to be permitted by the terms of the leases of such leaseholders, including Plaintiffs, with the intended effect of reducing the royalties otherwise payable to such leaseholders, including Plaintiffs.

273.  At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce in that their gas gathering and transportation charges and deductions have reduced oil and gas royalty payments to lessors throughout the United States, and have been directed against lessors throughout the Commonwealth of Pennsylvania and other states. Further, the Gas Gathering Agreements and other non-arm's length agreements entered into by Chesapeake Appalachia and its co-conspirators, govern assets and employees located throughout the United States, and prescribe payments to be sent throughout the United States.

274.   The Enterprise has operated since at least 2010, and its operation is ongoing.

275.   The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engage.

## B.     The Pattern of Racketeering Activity

276.   At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendants conducted the affairs of the Enterprise, and participated in the operation and management thereof, through a "pattern of racketeering activity" as that phrase is defined in 18 U.S.C. §§ 1961(1) and (5), through conduct including but not limited to the following:

a.     Defendants caused and permitted the Lessee Defendants to pass-on and charge to Plaintiffs and other leaseholders, and the Lessee Defendants charged and deducted from the royalties payable to Plaintiffs and other leaseholders, artificially inflated gathering fees, which thereby improperly reduced the royalties otherwise payable to Plaintiffs and such other leaseholders, despite their knowledge that the underlying gathering and transportation fees charged by Access Midstream, including under the Marcellus Gathering Agreements, were far in excess of the fair market rates of such fees;

b.     Defendant Access Midstream agreed, and the other Defendants knew that Access Midstream had agreed, to rebate a portion of the artificially inflated

fees to Chesapeake and/or its subsidiaries and affiliates, ostensibly for the use of other equipment and services;

 c. Defendants also knew and expressly or implicitly agreed, that such artificially inflated gathering and transportation fees would be passed-on to holders of royalty interests in leases with the Lessee Defendants, including Plaintiffs, in the form of deductions from the royalties payable to them;

 d. The unlawful conduct by Defendants through the association-in-fact Enterprise, was intended to and did operate to deprive holders of royalty interests in leases with the Lessee Defendants, including Plaintiffs, of their proper royalty payments, was continuous and open-ended, was intended to continue, and continues today;

 e. Plaintiffs were among the intended targets of the scheme that was facilitated by the knowing and purposeful involvement of the Defendants, and suffered financial harm as the direct and intended consequence and result of such conduct.

## C. The Predicate Acts of Mail Fraud and Wire Fraud

277. The pattern of racketeering activity in which Defendants engaged consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. Specifically, Defendants engaged in an intentional scheme or artifice to defraud Plaintiffs and other owners of royalty interests under oil and gas leases with the

Lessee Defendants, in order to obtain their money or property through false or fraudulent pretenses, representations or promises.

278.  It was reasonably foreseeable to the Defendants that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme.

279.  The nature, pervasiveness and duration of the Enterprise necessarily entailed frequent mail and/or wire transmissions. The specific dates and contents of such transmissions are within the peculiar knowledge of Defendants, and connect be alleged by Plaintiffs without access to the books and records of the Defendants. Plaintiffs nonetheless can and do allege such transmission generally, and specifically with reference to their own periodic royalty statements and payments.

280.  For the purpose of executing and furthering the scheme, the Defendants regularly transmitted and caused to be transmitted by means of wire communications in interstate commerce writings, electronic date, and funds, to and among themselves, Plaintiffs and others, and also regularly caused matters and things to be placed in post offices or authorized depositories, or caused to be deposited matters or things to be sent or delivered by private or commercial interstate carrier. By so doing, Defendants utilized the mails and/or wires for purposes of furthering and executing the scheme.

281. Each royalty statement issued to each of the Plaintiffs, and the other electronic and postal transmissions alleged above, was incident to an essential part of the scheme. As detailed above, Defendants engaged in similar activities with respect to each Plaintiff.

282. In addition, each such electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud, in that each transmission furthered and executed the scheme to defraud Plaintiffs and other royalty interest owners.

283. Defendants each participated in the scheme to defraud knowingly, willfully, and with the specific intent to defraud royalty interest owners, including Plaintiffs, to accept royalties in amounts less than that to which they were entitled, as a result of the deduction of unauthorized or falsely inflated post-production costs.

284. The foregoing predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5). The predicate acts were not isolated events, but were related and recurring acts aimed and the common purpose and goal of defrauding royalty interest owners, including Plaintiffs, to accept royalties in amounts less than that to which they were entitled, as a result of the deduction of unauthorized or falsely inflated post-production costs, and thereby enable Defendants to reap illicit profits.

285.   Defendants were common participants in the predicate acts. Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiffs and other royalty interest owners.

### D.   RICO Injury to Plaintiffs

286.   As a direct and proximate result of the foregoing violations of 18 U.S.C. § 1962(c) by Defendants, Plaintiffs have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c). Plaintiffs were injured by the loss of royalties to which they otherwise were entitled as a result of Defendants' deduction of unauthorized or artificially inflated and unreasonable post-production gathering and transportation costs in the calculation and payment of such royalties to Plaintiffs. The injuries that have been sustained by Plaintiffs are a direct, proximate and foreseeable result of the scheme alleged. Plaintiffs' continued acceptance of underpayment royalties as a result of the deduction of such unauthorized or artificially inflated and unreasonable costs in the calculation of their royalties evidences their reliance on Defendants' fraudulent misrepresentations and omissions.

287.   The overcharges for gathering and transportation fees, and resulting underpayment in royalties, to Plaintiffs was an integral and necessary part of the scheme, as they enabled Defendants to profit from their respective interests in Access Midstream and Appalachia Midstream Service (in the case of Chesapeake),

and in the shared ownership of the gathering pipelines (in the case of other Defendants, and later enabled Chesapeake to fulfill the payment obligations that it incurred to Access Midstream in connection with the CMO Transaction, and the other Defendants to acquiesce in and profit from such payments (through their continued common ownership interests in the gathering pipelines).

288.   Pursuant to 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiffs for three times the damages they have sustained, together with reasonable attorney's fees and costs.

## FOURTH CAUSE OF ACTION

### (Conspiracy to Violate RICO, 18 U.S.C. § 1962(d))

289.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

290.   RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section"

291.   The Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

292.   Defendants formed and conducted the affairs of the association-in-fact Enterprise for the common purpose of fraudulently deducting unauthorized or artificially inflated and unreasonable post-production gathering and transportation

costs in the calculation and payment of royalties to Plaintiffs and other royalty interest owners, and thereby fraudulently and improperly justifying the underpayment of royalties to Plaintiffs and such other royalty interest owners.

293.   The Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

294.   As set forth above, each of the Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), in violation of 18 U.S.C. § 1962(c).

295.   Each of the Defendants was associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate in the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

296.   Each of the Defendants committed or caused to be committed a series of overt acts in furtherance of the conspiracy and to accomplish the objects thereof, including but not limited to the acts set forth herein.

297.   As a direct and proximate result of the overt acts and predicate acts of the respective Defendants in furtherance of the violation of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs have been and are continuing to be injured in their business and property in amounts to be determined at trial.

Such injuries include, but are not limited to, the loss of royalties to which they otherwise were entitled as a result of Defendants' deduction of unauthorized or artificially inflated and unreasonable post-production gathering and transportation costs in the calculation and payment of such royalties to Plaintiffs.

298.   Pursuant to 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiffs for three times the damages they have sustained, together with reasonable attorney's fees and costs.

## FIFTH CAUSE OF ACTION

### (Breach of Contract – Express and/or Implied Covenants)

299.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

300.   Each of the Lessee Defendants holds its respective interests in and to, and its associated obligations under, the Leases in which such Lessee Defendant holds a working interest either as the original party Lessee to such Lease or as the successor by assignment or partial assignment of the right, title and interest and obligations of the original Lessee.  The relevant Leases and assignments were and are valid and enforceable contracts.

301.   Plaintiffs are the proper parties to sue to enforce the terms of their respective Leases, whether as the original party Lessors to such Leases or as

successors to the rights and interests of the original party Lessors, by deed or assignment.

302.   Plaintiffs have performed, or have substantially performed, any and all necessary conditions precedent, dependent obligations, and/or dependent covenants owed under their respective Leases and the related assignments. Plaintiffs are, and have been, entitled to performance by the Lessee Defendants of their obligations under their respective Leases and the related assignments.

303.   Under the terms of the oil and gas leases of those Plaintiffs who are parties, or the successors or assigns of parties, to leases with Anadarko or T.S. Calkins, the Lessee Defendants were not and are not entitled to deduct post-production costs from the proceeds received by it at the point of sale in calculating the royalties payable to Plaintiffs.

304.   In material breach of their obligations under the terms of Plaintiffs' Leases, each of the Lessee Defendants has deducted, and continues to deduct, post-production costs from the proceeds received by it at the point of sale in calculating the royalties payable to Plaintiffs, and based on such deductions has improperly reduced and failed to pay the royalties due and owing to Plaintiffs under the terms of their respective Leases.

305.   Acting without any right or authority to do so, and also in material breach of its obligations under the terms of Plaintiffs' Leases, the Lessee

Defendants  also have unilaterally and wrongfully applied their new method of calculating royalties retroactively, by offsetting royalties due and owing to Plaintiffs from current production against their purported prior overpayments to Plaintiffs (both calculated using the new methodology), and, as a result, suspending or reducing current royalty payments owed to Plaintiffs.  Even if the Lessee Defendants were entitled to deduct post-production costs in calculating current royalties, they were not and are not entitled to retroactively recoup purported prior overpayments based on their failure to have deducted post-production costs in the past, or otherwise having miscalculated the royalties paid to Plaintiffs.

306.   In the alternative, if the leases under which Plaintiffs hold royalty interests entitled Chesapeake to deduct post-production costs from the proceeds received by it at the point of sale in calculating the royalties payable under such Leases, such costs are implicitly limited to a pro rata share of the reasonable and actual charges actually paid by the Lessee Defendants for bona fide post-production services.

307.   The Lessee Defendants materially breached their express or implied in fact obligations under each of Plaintiffs' Leases: (a) by deducting post-production costs from the proceeds received by them at the point of sale in calculating the royalties payable to the respective Plaintiffs; or, in the alternative, (b) by deducting

amounts which were not bona fide post-production costs, or were otherwise in artificially inflated, grossly excessive or otherwise unreasonable in amount, derived from artificial and self-serving formulas established in the transactions which guaranteed excessive profits to Chesapeake and Access Midstream.

308.   In addition, or in the alternative, to breaching theirs express or implied in fact obligations under the respective Plaintiffs' Leases, the Lessee Defendants materially breached their respective implied covenant of good faith and fair dealing inherent in the Leases by selling the gas produced pursuant to the Leases in which Plaintiffs hold royalty interests to affiliate, in non-arms'-length transactions, at artificial, self-serving and unreasonably low prices, and by charging, deducting, imposing and passing-along such costs, and also by unilaterally and retroactively recouping and recovering, artificially inflated, grossly excessive, improper and unreasonable charges for purported post-production costs,  and by self-interestedly using such costs to improperly reduce the royalties payable and actually paid to Plaintiffs under their Leases.

309.   As a direct, proximate and foreseeable result of foregoing material breaches by the Lessee Defendants of their respective express and implied contractual obligations, Plaintiffs have suffered financial injuries for which Plaintiffs now seek all expectation-interest damages, consequential and incidental damages, lost profits, out-of-pocket losses, and future damages.

310.   Plaintiffs believe that the relevant terms of the leases and assignments at issue clearly and unambiguously provide the rights and obligations described in the preceding paragraphs. In the alternative, however, plaintiffs plead and allege both (a) that the relevant terms of the leases and assignments at issue are ambiguous as a matter of law and (b) that the interpretation of the relevant leases and assignments stated in the preceding paragraphs represents the correct and proper interpretation of the relevant leases and assignments.

## SIXTH CAUSE OF ACTION

### (Action for Accounting)

311.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

312.   Each of the Lessee Defendants has received, and continues to receive, monies in connection with sale of natural gas produced and marketed from the leased premises, in which Plaintiffs hold royalty interests under the terms of their respective leases.

313.   The relationships created by the leases to which the respective Plaintiffs are parties imposes a legal obligation upon each of the Lessee Defendants which holds a working interest in such leases to account to the respective Plaintiffs for the monies received by or on behalf of such Defendants from the sale of natural gas produced and marketed from the leased premises.

314.   As a matter of law, each of the Plaintiffs is entitled to an accounting from each of the Lessee Defendants that holds a working interest in the Plaintiff's lease for the monies received by such Defendants from the sale of natural gas produced and marketed from the leased premises.

315.   In the alternative, each of the Plaintiffs is entitled to an equitable accounting from Chesapeake Appalachia and from each of the other Lessee Defendants, because the accounts involved in the calculation of the royalties payable to Plaintiffs are inherently complicated, and because the Lessee Defendants have failed to account for the purported post-production gathering and transportation costs which they have deducted, or threatened to deduct, in calculating the royalties payable to Plaintiffs. As a result, each of the Plaintiffs is entitled to an equitable accounting.

## SEVENTH CAUSE OF ACTION

### (Conversion)

316.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

317.   Defendants wrongfully and intentionally caused unauthorized or artificially inflated and unreasonable deductions to be taken from royalties otherwise payable to Plaintiffs.

318.   Plaintiffs were entitled to receive the wrongfully deducted amounts pursuant to their leases.

319.   As alleged above, Defendants collected the amounts wrongfully deducted from Plaintiffs royalties through agreements between affiliates of Chesapeake and Access Midstream that resulted in the charges being assessed against Plaintiffs' royalties by the respective Lessee Defendants.

320.   Defendants have retained these funds unlawfully and without the consent of Plaintiffs, and have deprived Plaintiffs from exercising control over these funds, which belong to Plaintiffs.

321.   Defendants intend to permanently deprive Plaintiffs of these funds.

322.   The funds which have been taken and retained by Defendants are specific and readily identifiable pursuant to royalty statements largely in the control of the Lessee Defendants.

323.   The funds taken and retained by the Lessee Defendants were ultimately received and retained by their respective parent companies and other Defendants herein as part of the coordinated conduct alleged herein.

324.   As a direct and proximate result of Defendants' wrongful conversion, Plaintiffs have suffered and continue to suffer damages.

325.   Plaintiffs are entitled to recover from Defendants all damages and costs permitted, including all amounts wrongfully converted, which are specific and readily identifiable

326.   In wrongfully converting Plaintiffs' funds, Defendants and each of them have acted, and are continuing to act, intentionally, willfully, outrageously and in conscious disregard of the rights and interests of Plaintiffs, entitling Plaintiffs to recover, in addition to compensatory damages, punitive and exemplary damages, in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

### (Civil Conspiracy)

327.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

328.   By engaging in the actions set forth above, Defendants, and each of them, acting with the intent to injure Plaintiffs and other Lessor Royalty Owners, and without privilege or justification to do so, wrongfully agreed, combined and conspired with each other and with third parties to make wrongful deduction from Plaintiffs' royalties and to thereby deprive Plaintiffs of the royalties which they were and are entitled to receive under the respective Leases under which they hold royalty interests by causing, enabling, inducing and permitting the respective Lessee Defendants to take or give effect to impermissible, or otherwise arbitrary,

excessive and unreasonable, deductions for purported post-production costs in calculating the royalties payable to Plaintiffs, and have taken, and are continuing to take, actions in furtherance of such agreement, combination and conspiracy.

329.   Defendants have formed and operated a civil conspiracy with each other to convert Plaintiffs' property, performing as part of the conspiracy numerous overt act in furtherance of the common design, including one or more unlawful acts which were performed to accomplish a lawful goal, or, in the alternative, one or more lawful acts which were performed to accomplish an unlawful goal.

330.   Defendants intended to injure Plaintiffs, and succeeded in injuring Plaintiffs, to the extent of the wrongful deductions alleged herein, without legal justification.

331.   As a direct and proximate result of wrongful agreement, combination and conspiracy by and among the Defendants, and the actions taken by them in furtherance of the agreement, combination and conspiracy, Plaintiffs have been harmed, and continue to be harmed, by the loss and underpayment of royalties to which they were and are otherwise contractually entitled pursuant to their respective leases or assigned rights.

332.   In wrongfully agreeing, combining and conspiring to deprive Plaintiffs of the royalties to which they are contractually entitled, and in taking

actions in furtherance of such agreement, combination and conspiracy, as set forth above, Defendants and each of them have acted, and are continuing to act, intentionally, willfully, outrageously and in conscious disregard of the rights and interests of Plaintiffs, entitling Plaintiffs to recover, in addition to compensatory damages, punitive and exemplary damages, in an amount to be determined at trial.

## **NINTH CAUSE OF ACTION**

## **(Declaratory Judgment)**

333.   Plaintiffs restate and incorporate the facts alleged in the preceding paragraphs of this Complaint as if set forth in full.

334.   The Lessee Defendants have acted contrary to their obligations under the relevant leases and assignments. A substantial controversy of sufficient immediacy and reality exists between Plaintiffs and the Lessee Defendants so as to warrant this Court's declaration on the matters presented.

335.   Plaintiffs and the Lessee Defendants hold adverse legal interests.

336.   Plaintiffs seek a declaration as to the following rights and legal relations:

a.      That the Lessee Defendants cannot deduct, or allow for the deduction of, post-production costs and expenses in calculating the royalties to which Plaintiffs are and have been entitled; or, in the alternative,

b.      That the Lessee Defendants cannot deduct, or allow for the deduction, of post-production costs and expenses in calculating the royalties to which Plaintiffs are and have been entitled in any amounts in excess of the reasonable market price for the applicable service in a competitive market.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor, and against Defendants, on all of their respective causes of action, granting the following relief:

A.    As to the First Cause of Action, for Violation of Section 1 of the Sherman Act, an award of monetary damages to each of the Plaintiffs, as allowed by law, in favor of Plaintiffs and against the Defendants, jointly and severally, including compensatory damages in such amounts as are determined at trial to have been sustained by each of the respective Plaintiffs, and treble damages pursuant to 15 U.S.C. § 15(a), together with costs of suit, including reasonable attorneys' fees;

B.    As to the Second Cause of Action, for Violation of Section 2 of the Sherman Act, an award of monetary damages to each of the Plaintiffs, as allowed by law, in favor of Plaintiffs and against the Defendants, jointly and severally, including compensatory damages in such amounts as are determined at trial to have been sustained by each of the respective Plaintiffs, and treble damages pursuant to 15 U.S.C. § 15(a), together with costs of suit, including reasonable attorneys' fees;

C.    As to the Third and Fourth Causes of Action, for violation of RICO, an award of monetary damages to each of the Plaintiffs, as allowed by law, in favor

of Plaintiffs and against the Defendants, jointly and severally, including compensatory damages in such amounts as are determined at trial to have been sustained by each of the respective Plaintiffs, and treble damages pursuant to 18 U.S.C. § 1964(c), together with costs of suit, including reasonable attorneys' fees;

D.     As to the Fifth Cause of Action for breach of contract, an award of compensatory damages to each of the Plaintiffs, and against defendant Chesapeake Appalachia or Anadarko, as the case may be, in such amounts as may be determined at trial to have been sustained by each of the respective Plaintiffs, together with costs of suit;

E.     As to the Sixth Cause of Action, for an accounting, an accounting as described above;

F.     As to the Seventh Cause of Action, for conversion, an award of compensatory damages to each of the Plaintiffs, and against all Defendants, jointly and severally, or, in the alternative, against defendant Chesapeake Energy, as allowed by law, in such amounts as are determined at trial to have been sustained by each of the respective Plaintiffs, together with punitive damages, in an amount determined to be just and proper, and  costs of suit;

G.     As to the Eighth Cause of Action, for civil conspiracy, an award of compensatory damages to each of the Plaintiffs, and against each of the Defendants, jointly as severally, as allowed by law, in such amounts as are

determined at trial to have been sustained by each of the respective Plaintiffs, together with punitive damages, in an amount determined to be just and proper, and costs of suit;

H.     As to the Ninth Cause of Action, for declaratory judgment, a declaration of the rights of the respective parties, as described above;

I.      As to all monetary damages awarded, an award to Plaintiffs and against the applicable Defendants of pre- and post-judgment interest on the amount(s) of the monetary damages awarded; and

J.      Granting such other and further relief as may be deemed necessary or appropriate.

## VIII.  DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all of their respective claims and issues in this action that are triable of right by a jury.

Dated: July 17, 2015                     Respectfully submitted,

By: *Thomas S. McNamara*
Thomas S. McNamara (*pro hac vice*)
Attorney ID #38479
INDIK & McNAMARA, P.C.
100 South Broad Street, Suite 2230
Philadelphia, PA  19110
T:  (215) 567-7125
Email:  tmcnamara915@gmail.com

Christopher D. Jones
Attorney I.D. # 84049
GRIFFIN, DAWSEY, DePAOLA &
JONES, P.C.
101 Main Street
Towanda, PA  18848
Tel: (570) 265-2175
Email: chris@gddj-law.com

Taunya M. Knolles Rosenbloom
Attorney ID # 200635
LAW OFFICES OF TAUNYA M.
KNOLLES ROSENBLOOM
332 South Main Street, P.O. Box 309
Athens, PA  18810
Tel: (570) 888-0660
Email:  taunya@tkrlaw.com

*Attorneys for Plaintiffs*

# EXHIBIT A

# The Economic Impact of Marcellus Shale in Bradford and Tioga Counties, Pennsylvania

## By

## Representative Matt Baker

## 68th District

# Northern Tier Drilling



Chesapeake Energy is the red wells