## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**A&B CAMPBELL FAMILY LLC,**
**et al.,**

               **Plaintiffs,**

               **vs.**

**CHESAPEAKE ENERGY**
**CORPORATION, et al.,**

               **Defendants.**

:

:

:    **Case No. 3:15-cv-00340**

:    **(Mehalchick, J.)**

:

:


## ANADARKO E&P ONSHORE LLC'S SUPPLEMENTAL BRIEF
## IN SUPPORT OF MOTION TO DISMISS
## PLAINTIFFS' AMENDED COMPLAINT
## <u>PURSUANT TO RULE 12(b)(6)</u>

DECHERT LLP
Steven E. Bizar
Michael Doluisio
Elisa Beneze
David Costigan
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Tel: 215-994-2205
Steven.bizar@dechert.com
Michael.doluisio@dechert.com
Elisa.beneze@dechert.com
David.costigan@dechert.com

Attorneys for Defendant
Anadarko E&P Onshore LLC

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................1

ARGUMENT ......................................................................................1

    I.     Plaintiffs Fail To State A Sherman Act Claim.....................................1

         A.    Plaintiffs Fail to Allege the Existence of an Anticompetitive Agreement.........................................2

             1.    Plaintiffs Fail to Allege an Anticompetitive Agreement Under Section 1. ...........................2

             2.    Plaintiffs Fail to Allege the Existence of a Conspiracy to Monopolize the Market for Gathering Services............................4

         B.    Plaintiffs Lack Standing to Assert Antitrust Claims..................6

         C.    The Plaintiffs Have Failed to Allege the Existence of a Proper Geographic Market.....................................11

    II.    The Plaintiffs Have Not Stated A Claim Under Rico. .......................15

         A.    The Plaintiffs Have Not Alleged the Existence of a Cognizable RICO Enterprise. ..................................15

         B.    The Plaintiffs Have Failed to Allege a Pattern of Racketeering Activity in Compliance with Rule 9(b). ...........17

         C.    The Plaintiffs' RICO Conspiracy Claim Should Also be Dismissed. ...............................................19

    III.    The Plaintiffs' State Law Claims Should Be Dismissed....................20

         A.    The Plaintiffs' Breach Of Contract Claim Fails To State A Claim For Relief............................................20

         B.    Plaintiffs' Claim For A Legal Accounting Fails For The Same Reasons As Their Breach Of Contract Claim...............25

         C.    Plaintiffs Fail To State A Claim For Conversion. ..................25

         D.    Plaintiffs Fail To State A Claim For Civil Conspiracy. ..........27

CONCLUSION.................................................................................28

CERTIFICATE OF COMPLIANCE....................................................30

CERTIFICATE OF SERVICE ............................................................31

## <u>TABLE OF AUTHORITIES</u>

*Aker v. Keeton Grp., LLC*,
No. 3:2009-101, 2011 WL 13235036 (W.D. Pa. Mar. 15, 2011).......................22

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544, 549 (2007)........................................................................6

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
429 U.S. 477 (1977)............................................................................6, 8

*Cable Line, Inc. v. Comcast Cable Commc'ns of Pennsylvania, Inc.*,
No. 3:16-CV-1000, 2017 WL 4685359 (M.D. Pa. Oct. 18, 2017).......................7

*Canfield v. Statoil USA Onshore Properties Inc.*,
No. CV 3:16-0085, 2017 WL 1078184 (M.D. Pa. Mar. 22, 2017) ...................27

*Camaisa v. Pharm. Rsch. Assocs.*, Inc.,
No. 21-CV-00775-EJW, 2022 WL 843653 (D. Del. Mar. 22, 2022)..................9

*Coastal Forest Res. Co. v. Chevron U.S.A., Inc.*,
No. 2:20-CV-1119, 2021 WL 1894596 (W.D. Pa. May 11, 2021) ........22, 23, 25

*Concord Assocs., L.P. v. Ent. Props. Tr.*,
No. 12 Civ. 1667 ER, 2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014) ...................5

*Concord Assocs., LP v Entm't Props. Trust*,
817 F.3d 46 (2d Cir. 2016) ....................................................................12

*Dressler Fam., LP v. PennEnergy Res., LLC*,
276 A.3d 729 (Pa. Super. Ct. 2022)..........................................................24

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
806 F.3d 162 (3d Cir. 2015) ...................................................................10

*Hausknecht v. John Hancock Life Ins. Co. of New York*,
334 F. Supp. 3d 665 (E.D. Pa. 2018).........................................................19

*Helicopter Helmet, LLC v. Gentex Corp.*,
774 F. App'x 96 (3d Cir. 2019) .................................................................7

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*,
32 F.4th 242 (3d Cir. 2022) .....................................................................9

*Int'l Constr. Prod. LLC v. Caterpillar Inc.*,
No. CV 15-108-RGA, 2016 WL 264909 (D. Del. Jan. 21, 2016)........................5

*Kerwin v. Casino*,
802 F. App'x 723 (3d Cir. 2020) ....................................................................3, 4

*Kilmer v. Elexco Land Servs., Inc.*,
990 A.2d 1147 (Pa. 2010)............................................................................*passim*

*Kovarik v. S. Annville Twp.*,
No. 1:17-CV-00097, 2018 WL 1428293 (M.D. Pa. Mar. 22, 2018).................18

*Leeder v. Feinstein*,
No. 318CV12384BRMDEA, 2019 WL 2710794 (D.N.J. June 28,
2019) ..........................................................................................................16, 17

*Levins v. Healthcare Revenue Recovery Grp. LLC*,
902 F.3d 274 (3d Cir. 2018) ..............................................................................21

*Marburger v. XTO Energy Inc.*
No. CV 15-910, 2016 WL 11659184 (W.D. Pa. Jan. 26, 2016) ........................23

*McLaughlin v. Int'l Bhd. of Teamsters, Loc.*
249, 641 F. Supp. 3d 177 (W.D. Pa. 2022) ......................................................19

*In re Mexican Gov't Bonds Antitrust Litig.*,
412 F. Supp. 3d 380 (S.D.N.Y. 2019) ................................................................5

*Mun. Auth. of Westmoreland Cnty. v. CNX Gas Co., L.L.C.*
380 F. Supp. 3d 464 (W.D. Pa. 2019)................................................................26

*Nahas v. Shore Medical Ctr.*,
828 Fed. Appx. 89 (3d Cir. 2020).......................................................................8

*Neurosurgical Care, LLC v. Doc Sols. LLC*,
No. CV 19-5751, 2022 WL 2974716 (E.D. Pa. July 26, 2022) ........................18

*Newman v. Universal Pictures*,
813 F.2d 1519 (9th Cir. 1987) ............................................................................8

*Otsuka Pharm. Co. v. Torrent Pharms. Ltd., Inc.*,
187 F. Supp. 3d 483 (D.N.J. 2016)..................................................................7, 9

*Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.*,
  886 F.3d 332 (3d Cir. 2018) .......................................................................7, 8, 9

*In re Processed Egg Prods. Antitrust Litig.*,
  821 F. Supp. 2d 709 (E.D. Pa. 2011) ...............................................................5, 6

*Ragner Tech. Corp. v. Berardi*,
  324 F. Supp. 3d 491 (D.N.J. 2018) ....................................................................13

*Satnam Distributors, LLC v. Commonwealth-Altadis, Inc.*,
  140 F. Supp. 3d 405 (E.D. P.a. 2015)..................................................................12

*SEI Glob. Servs., Inc. v. SS&C Advent*,
  496 F. Supp. 3d 883 (E.D. Pa. 2020), aff'd, No. 20-3386, 2022 WL
  2356730 (3d Cir. June 30, 2022) .........................................................................7

*Slamon v. Carrizo (Marcellus) LLC*,
  654 F. Supp. 3d 405, 434–35, 443 (M.D. Pa. 2023)..............................22, 23, 25

*Synthes, Inc. v. Emerge Med., Inc.*,
  No. CIV.A. 11-1566, 2012 WL 4473228 (E.D. Pa. Sept. 28, 2012)..................14

*The Knit With v. Knitting Fever, Inc.*,
  625 F. App'x 27 (3d Cir. 2015) ..........................................................................19

*Tunis Bros. Co. v. Ford Motor Co.*,
  952 F.2d 715 (3d Cir. 1991) ...............................................................................12

*Ulmer v. Chesapeake Appalachia, LLC*,
  No. 4:08-cv-2062, 2011 WL 1344596 (M.D. Pa Apr. 8, 2011) .........................22

*Zakheim v. Curb Mobility LLC*,
  No. CV 22-4594, 2023 WL 5339606 (E.D. Pa. Aug. 18, 2023) ..................15, 17

*Zamias v. Fifth Third Bank*,
  No. 3:17-CV-153, 2018 WL 355462 (W.D. Pa. Jan. 9, 2018) ..........................25

*In re Zinc Antitrust Litig.*,
  155 F. Supp. 3d 337 (S.D.N.Y. 2016) ..................................................................6

iv

**INTRODUCTION**

Plaintiffs' Amended Complaint attempts to manufacture federal jurisdiction with respect to Anadarko by taking federal antitrust and RICO claims previously brought only against Chesapeake, Access Midstream Partners, and their affiliates, and asserting those claims against Anadarko.  As explained in Anadarko's original motion to dismiss briefing (Dkt. 112; 128) and supported by the recent case law discussed below, Plaintiffs have failed to plead antitrust or RICO claims against Anadarko.  Indeed, Plaintiffs largely try to shoehorn Anadarko into these claims without providing any supporting factual details whatsoever, relying only on conclusory allegations and impermissible group pleading regarding all "Defendants."  Likewise, the recent case law discussed below undermines Plaintiffs' state law claims.  Accordingly, Plaintiffs' Amended Complaint should be dismissed with prejudice as to Anadarko.

**ARGUMENT**

**I.      PLAINTIFFS FAIL TO STATE A SHERMAN ACT CLAIM.**

In their Amended Complaint, Plaintiffs attempt to turn a basic contract dispute over royalty payments into an antitrust scheme.  Specifically, Plaintiffs allege that the Defendants agreed to restrain competition in the markets for Gas Mineral Rights, Gathering Services, and Operating Rights.  Plaintiffs further claim that Defendants

1

conspired to allow Access Midstream to monopolize the market for Gathering Services.  As a result of the alleged anticompetitive activity, Plaintiffs claim they suffered harm in the form of lower royalty payments.

Plaintiffs' antitrust claims as to Anadarko fail for multiple reasons.  Namely, Plaintiffs fail to plead *facts* – rather than mere conclusions – showing that: (1) Anadarko participated in an anticompetitive agreement to restrain trade or a conspiracy to monopolize; (2) Plaintiffs have standing to bring antitrust claims or suffered an antitrust injury; and (3) Plaintiffs have defined a proper geographic market.  For the reasons explained in Anadarko's original briefing and below, Plaintiffs' antitrust claims should be dismissed.

### A. Plaintiffs Fail to Allege the Existence of an Anticompetitive Agreement.

#### 1. Plaintiffs Fail to Allege an Anticompetitive Agreement Under Section 1.

Plaintiffs purport to bring a Sherman Act Section 1 claim based on unrelated, legitimate business agreements entered into between various Defendants. Notably missing from Plaintiffs' Amended Complaint are factual allegations regarding the existence of an agreement among all Defendants to restrain trade.  Plaintiffs' failure to plead these facts is fatal to their Section 1 claim.

Recent case law makes plain that a plaintiff fails to state a Section 1 claim when it fails to allege essential facts showing that defendants acted with "a unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme." *Kerwin v. Casino*, 802 F. App'x 723, 725-26 (3d Cir. 2020) (dismissing claim where, among other things, plaintiff failed to plead facts "specify[ing] a time or place that any actual agreement . . . occurred" or identifying the "particular individuals or organizations [that] made such an agreement") (*quoting Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) (cleaned up). Here, Plaintiffs allege no facts establishing an agreement among Defendants to restrain trade. Rather, as to Anadarko, Plaintiffs merely allege that Anadarko entered into a Joint Exploration Agreement with Chesapeake and later assigned lease interests to Mitsui. As discussed in Anadarko's prior briefing, these allegations are a far cry from factual allegations showing that there was an agreement among all Defendants to restrain trade. (Dkt. 112 at 10-11).

Moreover, recent case law makes plain that Plaintiffs cannot adequately allege an illegal agreement among all Defendants by merely claiming that the so-called Lessee Defendants deducted certain post-production costs when calculating Plaintiffs' royalties. Rather, these are the exact type of "parallel conduct" allegations that, without more, fail to support the inference of an agreement, particularly where

3

"independent self-interest is an obvious alternative explanation for defendants' common behavior." *Kerwin*, 802 F. App'x at 726 (*quoting In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010)).  Indeed, in 2010, the Pennsylvania Supreme Court held that post-production costs could be deducted when royalties are being calculated.  *Kilmer v. Elexco Land Servs., Inc.*, 990 A.2d 1147, 1149 (Pa. 2010).  As such, it was neither surprising nor illegal for individual Defendants to make such deductions after *Kilmer*.  (Dkt. 94 at ¶¶ 163-169) (alleging that the Lessee Defendants began deducting post-production costs after *Kilmer* was decided).  Because Plaintiffs allege nothing more than non-actionable "parallel conduct" readily explained by independent self-interest, their Section 1 claim fails.

  2. <u>Plaintiffs Fail to Allege the Existence of a Conspiracy to Monopolize the Market for Gathering Services.</u>

  Plaintiffs purport to allege a violation of Section 2 of the Sherman Act based on a claimed conspiracy among the Defendants to grant Access Midstream a monopoly in the Gathering Services market.  As detailed in Anadarko's prior briefing, there is not a single factual allegation regarding Anadarko's alleged involvement in this purported conspiracy.  (Dkt. 112 at 12).  Among other deficiencies, Plaintiffs make no allegations regarding: (1) Anadarko's purported agreement to conspire with the other Defendants; (2) any action taken by Anadarko in furtherance of the conspiracy; or (3) Anadarko's intent to install Access as a

4

monopolist.  Notably, Plaintiffs' Complaint contains a list of alleged "overt acts" that were undertaken in furtherance of the purported conspiracy.  (*See* Dkt. 94 at ¶ 261).  But not a single one of these alleged acts involves Anadarko.  In fact – and unlike other Defendants – Anadarko is not even mentioned by name in Plaintiff's Section 2 Cause of Action.  (Dkt. 94 ¶¶ 257-267).  Instead, Anadarko is swept up via Plaintiffs' conclusory allegations regarding "Defendants."  (*See*, *e.g.*, Dkt. 94 at ¶ 260).  But as Anadarko's prior briefing established and recent case law confirms, this type of unspecific group pleading is insufficient.  *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 387 (S.D.N.Y. 2019) (granting motion to dismiss where complaint "impermissibly relies on 'group pleading' by failing to differentiate among Defendants); *Int'l Constr. Prod. LLC v. Caterpillar Inc.*, No. CV 15-108-RGA, 2016 WL 264909, at \*10 (D. Del. Jan. 21, 2016) (dismissing conspiracy to monopolize claims where "[q]uite simply, there are no factual allegations concerning an agreement to create a single dominant firm.").  Indeed, an antitrust claim "is simply insufficient to withstand review on a motion to dismiss" if it relies on "[g]roup pleading."  *Concord Assocs., L.P. v. Ent. Props. Tr.*, No. 12 Civ. 1667 ER, 2014 WL 1396524, at \*24 (S.D.N.Y. Apr. 9, 2014), *aff'd*, 817 F.3d 46 (2d Cir. 2016) (internal citation omitted); *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011) (collecting cases).  The rule springs from

5

*Bell Atlantic Corp. v. Twombly,* which holds that courts should not expose defendants to the litigation expense and disruption accompanying antitrust litigation [and by logical extension, RICO litigation] unless the allegations make defendants reasonably aware of what they have done or failed to do. 550 U.S. 544, 549 (2007). To satisfy *Twombly* and survive a motion to dismiss, a complaint therefore must make "specific allegations that would tie each particular defendant to the conspiracy." *In re Processed Egg Prods. Antitrust Litig.,* 821 F. Supp. 2d at 720 (internal citation omitted).  Any allegation couched in "[c]onclusory, collective language is too convenient, too undisciplined, and too unfocused" to do that.  *Id.; see also In re Zinc Antitrust Litig.,* 155 F. Supp. 3d 337, 383-84 (S.D.N.Y. 2016) (citing *Twombly,* 550 U.S. at 557-58) ("Rule 8 provides that a defendant is entitled to notice of the claims brought against him; *Twombly* makes clear that at the pleading stage in this antitrust case, that means that each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose.").

**B.    Plaintiffs Lack Standing to Assert Antitrust Claims.**

Recent case law also bolsters Anadarko's argument that Plaintiffs lack antitrust standing.  To have standing, Plaintiffs must allege facts showing that they suffered an injury "of the type that the antitrust laws were intended to prevent and . . . that flows from that which makes the defendants' acts unlawful." *Brunswick*

6

*Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477 (1977); *Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 343 (3d Cir. 2018) ("Of the requirements for antitrust standing, antitrust injury is 'a necessary but insufficient condition.'") (quoting *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997). As this Court has explained, granting a motion to dismiss for lack of standing is proper "if the allegations do not support the inference that plaintiff suffered an injury proximately caused by conduct intended to harm competition." *Cable Line, Inc. v. Comcast Cable Commc'ns of Pennsylvania, Inc.*, No. 3:16-CV-1000, 2017 WL 4685359, at *3 (M.D. Pa. Oct. 18, 2017); *see*, *e.g.*, *Helicopter Helmet, LLC v. Gentex Corp.*, 774 F. App'x 96, 97 (3d Cir. 2019); *Otsuka Pharm. Co. v. Torrent Pharms. Ltd., Inc.*, 187 F. Supp. 3d 483, 486 (D.N.J. 2016); *SEI Glob. Servs., Inc. v. SS&C Advent*, 496 F. Supp. 3d 883, 899 (E.D. Pa. 2020), aff'd, No. 20-3386, 2022 WL 2356730 (3d Cir. June 30, 2022) (all dismissing complaints).

Here, Plaintiffs lack standing because they have failed to allege facts establishing antitrust injury. Plaintiffs' injury relates solely to royalty payments that they received under lease agreements. Those lease agreements were signed before the alleged anticompetitive conduct began, and the ability to deduct post-production costs when calculating royalties under the leases was later authorized by *Kilmer*. As such, Plaintiffs fail to plead that their alleged injury "reflects the anticompetitive

effect either of the violation or of anticompetitive acts made possible by the violation." *Nahas v. Shore Medical Ctr.*, 828 Fed. Appx. 89, 91 (3d Cir. 2020) (cleaned up) (quoting *Brunswick*, 429 U.S. at 489); *see, e.g., Newman v. Universal Pictures*, 813 F.2d 1519, 1522 (9th Cir. 1987) (plaintiff lacks standing where the harm they claim flowed from conduct occurring before the alleged anticompetitive harm took place).  By Plaintiffs' own allegations, Anadarko "secured and was [the] sole initial party to all of the oil and gas leases that are at issue in this action" prior to the alleged anticompetitive conduct.  (Dkt. 94 at ¶ 13).  As such, Plaintiffs' Amended Complaint fails to establish the necessary causal relationship between the alleged anticompetitive conduct and the Plaintiffs' alleged harm.  *Philadelphia Taxi Ass'n*, 886 F.3d at 343 ("[T]here must be a causal link between the alleged injury and an antitrust violation's anticompetitive effects.").

Moreover, as established in Anadarko's prior briefing (Dkt. 112 at 16) and reinforced by recent case law, Plaintiffs fail to state a claim because they do not allege facts showing that the alleged anticompetitive conduct harmed *competition*. Plaintiffs allege injury based upon royalty deductions under leases that they signed. However, Plaintiffs allege no facts showing that all landowners in the purported geographic market who sought to lease their land suffered this injury as a result of

the purported antitrust violation.[1]  As such, Plaintiffs allege at best harm only to themselves – not to competition.  *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 250-51 (3d Cir. 2022) (affirming motion to dismiss for lack of antitrust injury where the plaintiff "seeks remedy for its injury alone," which was based on "an objectionable term in a commercial agreement"); *Philadelphia Taxi Ass'n,* 886 F.3d at 344 (dismissing complaint where plaintiffs alleged "their own injury, namely, financial hardship," but "fail[ed] to aver an antitrust injury, such as a negative impact on consumers or to competition in general"); *Camaisa v. Pharm. Rsch. Assocs.*, Inc., No. 21-CV-00775-EJW, 2022 WL 843653, at *4 (D. Del. Mar. 22, 2022) (granting a motion to dismiss where the "alleged injury flows not from an alleged antitrust violation, but rather, it flows from an alleged breach of contract"); *Otsuka Pharm. Co.,* 187 F. Supp. 3d at 486  (granting motion to dismiss and noting that "the hallmark for evaluating the plausibility of an allegation of antitrust injury hinges upon whether the allegedly anticompetitive conduct bears consequence for the overall market, rather than only for the individual competitor.") (cleaned up).

Plaintiffs have an additional standing problem when it comes to their Section 2 claim.  Plaintiffs' Section 2 theory is that Defendants conspired to allow Access

---

[1] As discussed below, Anadarko disputes Plaintiffs' purported geographic market as too narrow, which further undermines the existence of antitrust injury.

Midstream to become a monopoly in the market for Gathering Services. Because Plaintiffs do not claim to be participants in that market—either as consumers, competitors, or suppliers—they can establish standing only if "their injuries were the very means by which the defendants carried out their illegal ends." *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 173 (3d Cir. 2015). By contrast, "harm that is secondary to the anticompetitive conduct cannot support antitrust injury." *Id.* Such harms "are merely byproducts of the anticompetitive effects of the restraint, and do not qualify as antitrust injury." *Id.* (citation omitted). Here, Plaintiffs' theory under Section 2 appears to be that increased gathering costs were passed along to Lessee Defendants, who then passed these costs along by making larger deductions when calculating Plaintiffs' royalties.[2] While this alleged harm to Plaintiffs' royalties might be an "incidental" effect of the purported monopolization in the Gathering Services Market, it was certainly not "essential[] to the restraint on trade." *Id.* Plaintiffs have not alleged facts showing that the purported conspiracy to monopolize the Gathering Services Market depended on the deduction of costs when calculating Plaintiffs' royalties. Because they are not

---

[2] To be clear, Plaintiffs assert this theory as to Chesapeake, but never allege any facts to support a similar theory of harm as to Anadarko. Rather, they only make vague and insufficient allegations regarding "Defendants" generally. (*See* Dkt. 94 at ¶¶ 264-65).

10

market participants and their claimed injury was not "essential" to the alleged conspiracy, Plaintiffs lack standing to bring their Section 2 claim. *Id*.

### C.   The Plaintiffs Have Failed to Allege the Existence of a Proper Geographic Market.

As argued in Anadarko's original briefing, another fatal flaw in Plaintiffs' Amended Complaint is Plaintiffs' failure to allege a proper antitrust market. (Dkt. 112 at 20-22). For their Sherman Act Section 1 claim, Plaintiffs allege three potential geographic markets: (1) Bradford County, Pennsylvania and adjoining portions of Sullivan, Susquehanna and Wyoming Counties; (2) the AMI designated in the 2006 Joint Exploration Agreement between Chesapeake and Anadarko; and/or (3) the portion of the "Dedicated Area" located within Bradford, Sullivan, Susquehanna, or Wyoming Counties. (Dkt. 94 at ¶ 237). For the Section 2 claim, Plaintiffs allege the market is either the first or the third markets alleged under Section 1.

As discussed in Anadarko's prior briefing, Plaintiffs' attempt to allege a geographic market fails because they do not allege facts showing that their narrowly drawn markets reflect commercial realities. (Dkt. 112 at 20-22). For instance, Plaintiffs do not allege facts showing that purchasers in the market for Gas Mineral Rights would limit their search to a narrow geographical area in a few counties in Pennsylvania. Nor do they allege why it would be plausible for operators of natural gas wells (participants in the market for Operating Rights) or operators of gathering

systems (participants in the market for Gathering Services) to limit their areas of service to those same few Pennsylvania counties.

Recent case law makes plain that antitrust claims should be dismissed when a plaintiff fails to allege a plausible market. *Satnam Distributors, LLC v. Commonwealth-Altadis, Inc.*, 140 F. Supp. 3d 405, 418 (E.D. P.a. 2015); *Concord Assocs., LP v Entm't Props. Trust*, 817 F.3d 46, 53 (2d Cir. 2016) (noting that dismissal is appropriate "where the plaintiff has failed to articulate a plausible explanation as to why a market should be limited in a particular way"). Among other things, Plaintiffs are not permitted to define a market based solely on the area or product that they believe was monopolized. *Satnam,* 140 F. Supp. 3d at 420. Instead, the market definition must be based on the commercial realities of where consumers actually purchase goods and suppliers actually compete. *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 727 (3d Cir. 1991) ("The mere delineation of a geographical area, without reference to a market as perceived by consumers and suppliers, fails to meet the legal standard necessary for the relevant geographic market.").

In *Satnam*, for instance, the plaintiffs attempted to define the market narrowly to encompass a specific product that had been monopolized, even though the realities of the market provided for a much a broader market. *Satnam*, 140 F. Supp. 3d at

12

420.   Analogously, Plaintiffs here have defined a narrow geographic area that is contrary to commercial realities.  The Marcellus Shale covers approximately 90,000 square miles in four states.  But as Exhibit A to Plaintiffs' own Amended Complaint makes clear, Plaintiffs have defined the market based solely on where Chesapeake had the most wells, *i.e.*, one county (and adjoining parts of a few others) out of a natural gas play that covers significant portions of at least four states. (Dkt. 94, Ex. A).   There is no reason to restrict the market in this way.  *Ragner Tech. Corp. v. Berardi*, 324 F. Supp. 3d 491, 510 (D.N.J. 2018) ("Simply pleading where Defendants are engaged in commerce is completely insufficient to establish the relevant geographic market, even at the pleading stage").  Indeed, even looking only at Pennsylvania, there were at least seven counties that saw high levels of drilling activity in the relevant time period:  Bradford, Tioga, Susquehanna, Lycoming, Washington, Greene, and Fayette; another twelve counties were "core" counties with lower levels of drilling activity. (*See The Marcellus Shale Impacts Study: Chronicling Social and Economic Change in North Central and Southwest Pennsylvania*, attached as Ex. A.)



Figure 1. Marcellus Shale Typology

*Case Study County

Typology based on the number of unconventional wells drilled through September 2012

Plaintiffs provide no rationale for defining the geographic market to exclude numerous core drilling areas, either within Pennsylvania or beyond. *See Synthes, Inc. v. Emerge Med., Inc.*, No. CIV.A. 11-1566, 2012 WL 4473228, at *7 (E.D. Pa. Sept. 28, 2012) ("The law is clear that the relevant geographic market is not defined by the market in which the defendant conducts its business, or even where the injury is felt"). While Plaintiffs attempt to support the proposed geographic market by alleging that "there are known to be rich deposits of natural gas in the Marcellus Shale located beneath the surface of the land in and around Bradford County" (Dkt. 94 at ¶ 237), that rationale would justify the inclusion of a far broader area than what Plaintiffs propose. Because Plaintiffs' own market definition is unsupported by commercial realities and contrary to their own explanation for it, Plaintiffs' antitrust claims should be dismissed.

14

**II.    THE PLAINTIFFS HAVE NOT STATED A CLAIM UNDER RICO.**

As with their antitrust claims, Plaintiffs attempt to use impermissibly vague group pleading and conclusory allegations to implicate Anadarko in RICO claims that they previously alleged only against Chesapeake and Access.  Plaintiffs allege that Chesapeake "organized [a] fraudulent scheme and procured the involvement of the other Defendants" in order to defraud leaseholders by overcharging them for post-production costs, thereby reducing the royalties paid to Plaintiffs.  (Dkt. 94 at ¶¶ 270-288).  They further allege that Defendants participated in a conspiracy to violate RICO.  (Dkt. 94 at ¶¶ 289-298).  For the reasons discussed in Anadarko's original briefing and below, Plaintiffs' RICO claims against Anadarko should be dismissed.

**A.    The Plaintiffs Have Not Alleged the Existence of a Cognizable RICO Enterprise.**

As an initial matter, Plaintiffs plead no facts showing that Anadarko was part of any alleged RICO enterprise.  At most, Plaintiffs allege that Anadarko may have been charged inflated costs by Access Midstream, and that those costs were later deducted when Plaintiffs' royalties were calculated.  These allegations, however, prove nothing more than a normal business relationship between Anadarko and Access, not a RICO enterprise.  *Zakheim v. Curb Mobility LLC*, No. CV 22-4594, 2023 WL 5339606, at *3 (E.D. Pa. Aug. 18, 2023) ("The Third Circuit has made

clear that normal business relationships, without more, are insufficient to support an association-in-fact enterprise") (citing *Brittingham v. Mobil Corp.*, 943 F.2d 297, 301 (3d Cir. 1991)).

Plaintiffs fare no better by relying on their conclusory allegation that the Defendants had a common purpose to "defraud[] the leaseholders . . .by [] overcharging them for post-production costs associated with the gathering, transportation and marketing of natural gas produced from the leasehold properties in which such leaseholders, including Plaintiffs, hold royalty interests . . . with the intended effect of reducing the royalties otherwise payable to such leaseholders." (Dkt. 94 at ¶ 272).   Indeed, while Plaintiffs allege that Anadarko improperly deducted production costs when calculating royalties, nowhere in the Amended Complaint do Plaintiffs allege that Anadarko defrauded Plaintiffs by *overcharging* for those production costs, *i.e.*, Plaintiffs nowhere allege that Anadarko's deductions did not reflect Anadarko's actual costs.   As such, Plaintiffs fail to allege that Anadarko took part in the alleged "common purpose" of the enterprise.   *See Leeder v. Feinstein*, No. 318CV12384BRMDEA, 2019 WL 2710794, at *8 (D.N.J. June 28, 2019) (holding that plaintiff failed to allege a RICO enterprise, because "a valid RICO enterprise requires defendants to conduct or participate in the conduct of the enterprise's affairs, not just their own affairs'") (cleaned up).

16

Finally, Plaintiffs' enterprise allegations fail as to Anadarko because Plaintiffs allege no facts showing that Anadarko was aware that the costs it was being charged were inflated as a result of the alleged racketeering activity.  As noted above, Plaintiffs allege that Anadarko was charged supra-competitive post-production costs and that Anadarko then passed along a portion of those costs through reductions to Plaintiffs' royalties.  But Plaintiffs nowhere plead facts showing that Anadarko was aware that the costs it was being charged were artificially inflated or resulted from the purported RICO scheme.  As such, Plaintiffs fail to plead that Anadarko was a participant in the alleged enterprise.  *Zakheim*, 2023 WL 5339606 at *3 (rejecting enterprise allegations where plaintiffs failed to allege facts showing that purported members of the enterprise were aware of the illicit racketeering activity for which other enterprise members were using them).[3]

### B.   The Plaintiffs Have Failed to Allege a Pattern of Racketeering Activity in Compliance with Rule 9(b).

Plaintiffs' RICO claims against Anadarko also fail because Plaintiffs do not plead facts satisfying the heightened pleading standard for predicate acts of mail and/or wire fraud.  Rather than identifying the time, place, speaker or content of the

---

[3] Even if the Court accepts Plaintiffs' allegations of mail and wire fraud, that alone would not be sufficient to establish a RICO enterprise.  Where the "[c]omplaint alleges no structure of an enterprise outside of the group's conspiracy to perform the underlying criminal offenses" the claims must be dismissed because that "is insufficient to plead the existence of an enterprise." *Leeder*, 2019 WL 2710794, at *9.

alleged misrepresentations, Plaintiffs allege only that they received "periodic royalty statements and payments."  (Dkt. 94 at ¶ 279).  As discussed in Anadarko's prior briefing, Plaintiffs' allegations do not satisfy Rule 9(b). (Dkt. 112 at 25-26); *see also Kovarik v. S. Annville Twp*., No. 1:17-CV-00097, 2018 WL 1428293, at *11-12 (M.D. Pa. Mar. 22, 2018) (dismissing RICO claim where the alleged predicate act was the "regular mailing of purportedly fraudulent invoices" and noting "plaintiffs' failure to plead with particularity the circumstances of the alleged mail fraud as required by Rule 9(b)") (cleaned up).

In addition to failing to comply with Rule 9(b), Plaintiffs fail to plead the elements of mail or wire fraud as to Anadarko.  Mail and wire fraud both require "proof of specific intent."  *Neurosurgical Care, LLC v. Doc Sols. LLC*, No. CV 19-5751, 2022 WL 2974716, at *5 (E.D. Pa. July 26, 2022).  As such, Plaintiffs were required to "specifically allege that Defendants actually knew about or participated in the fraudulent activity underpinning Plaintiff's racketeering accusations." *Id*. at *6-7 (dismissing RICO claims where plaintiff "sets forth little information substantiating any accusation of wrongdoing on behalf of [a specific Defendant], and thus cannot meet the high standard needed to support a claim based on fraudulent dealings").  Here, however, Plaintiffs do not allege that Anadarko was a participant

in or aware of the alleged scheme between Chesapeake and Access to inflate post-production costs.  As such, Plaintiffs' RICO claims fail.[4]

**C.     The Plaintiffs' RICO Conspiracy Claim Should Also be Dismissed.**

As Anadarko argued in its prior briefing, Plaintiffs' RICO conspiracy claim fails as a matter of law because they have failed to plead a substantive RICO claim. (Dkt. 112 at 28-29); *McLaughlin v. Int'l Bhd. of Teamsters, Loc.* 249, 641 F. Supp. 3d 177, 203 (W.D. Pa. 2022) ("[T]he Court has concluded that [plaintiff] failed to plead a substantive RICO claim under section 1962(c). This is fatal to the RICO conspiracy claim under section 1962(d).").

Moreover, Plaintiffs' conspiracy claim fails because Plaintiffs plead no facts showing that Anadarko "objectively manifested an agreement to participate, directly or indirectly, in the affairs of a RICO enterprise through the commission of two or more predicate acts." *The Knit With v. Knitting Fever, Inc.*, 625 F. App'x 27, 36 (3d Cir. 2015) (affirming dismissal of RICO conspiracy claim where Plaintiff failed to plead facts sufficient to "show that each Defendant objectively manifested an

---

[4]  As Anadarko argued in its original briefing, Plaintiffs' RICO claims should also be dismissed because Plaintiffs do not allege that Defendants' actions were the proximate cause of their injuries. (Dkt. 112 at 26-28).   Here, the alleged acts of mail and wire fraud – the mailing of statements or payments -- did not themselves cause the injury.  Rather, the injury was caused by the purported agreement to inflate post-production costs and pass those costs along to Plaintiffs through reduced royalty payments.  As such, Plaintiffs fail to allege proximate cause.  *Hausknecht v. John Hancock Life Ins. Co. of New York*, 334 F. Supp. 3d 665, 680 (E.D. Pa. 2018) (noting that RICO requires a plaintiff to plead "not simply whether Plaintiffs would not have been injured 'but for' the alleged RICO violation, but whether Defendant proximately caused Plaintiffs' injuries.").

19

agreement to participate") (citation omitted).  As the Third Circuit has explained, "it is not enough for a complaint to simply make 'conclusory allegations of concerted action but be devoid of facts actually reflecting joint action.'"  *Id.* (quoting *Abbott v. Latshaw*, 164 F.3d 141, 148 (3d Cir. 1998)) (cleaned up).  Here, Plaintiffs have not specified *any* acts taken by Anadarko in support of their RICO conspiracy claim.  As such, their RICO conspiracy claim should be dismissed.

## III.   THE PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED.

### A.   The Plaintiffs' Breach Of Contract Claim Fails To State A Claim For Relief.

Plaintiffs allege that Anadarko breached its contracts with landowners by impermissibly deducting post-production costs when calculating the royalty payments it made to landowners.  (Dkt. 94 ¶ 303).  For the reasons stated in Anadarko's earlier briefing, Plaintiffs' threadbare allegations that Anadarko's deductions were somehow "wrongful" are conclusory and fail to state a breach of contract claim.  (Dkt. 112 at 30-35; Dkt. 128 at 15-18).  In fact, the contracts *explicitly allowed* Anadarko to make the deductions that are the subject of Plaintiffs' breach of contract claim.  Specifically, the leases require Anadarko to pay royalties to landowners based on the "market value at the well."  (Dkt. 94 at ¶ 145, *see also*

Dkt. 112-1) (representative lease agreement).[5]  As Anadarko established in its earlier briefing – and as recent case law confirms – the "at the well" language permits Anadarko to use the "netback" method when calculating royalties.  (Dkt. 112 at 30-33; Dkt. 128 at 15-17).  Under that method, Anadarko can deduct post-production costs.

The leading case, as noted, is *Kilmer v. Elexco Land Servs., Inc.*  There, the Pennsylvania Supreme Court held that Pennsylvania's Guaranteed Minimum Royalty Act ("GMRA") "permit[s] the calculation of royalties at the wellhead, as provided by the net-back method."  *Kilmer*, 990 A.2d at 1158.[6]  In 2015, Anadarko argued that, under *Kilmer*, leases using the phrase "at the well" – like the leases underlying Plaintiffs' breach of contract claim here – necessarily permit deducting post-production costs from royalties via the netback method.  (Dkt. 112 at 31-33). Plaintiffs argued that *Kilmer* should be construed narrowly as only interpreting

---

[5] The Court can consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  *Levins v. Healthcare Revenue Recovery Grp. LLC*, 902 F.3d 274, 279 (3d Cir. 2018) (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

[6] In *Kilmer*, leaseholders had argued that the defendants impermissibly made royalty payments below the GMRA's one-eighth royalty threshold by calculating royalties "at the wellhead" via the netback method (i.e., by deducting post-production costs from royalty payments).  *Kilmer*, 990 A.2d at 1153.  The Court rejected this argument.  *Id.* at 1158.

21

language in the GMRA, and not "the contractually agreed method for calculating royalties for purposes of the present case." (Dkt. 122 at 42-43).

Since 2015, multiple courts interpreting oil and gas leases under Pennsylvania law have rejected Plaintiffs' cramped reading of *Kilmer*. In *Coastal Forest Res. Co. v. Chevron U.S.A., Inc.*, the court addressed the exact question presented here: "[W]hether the Pennsylvania Supreme Court's decision in *Kilmer* can be read as providing an industry wide interpretation of the term 'at the wellhead' as permitting the use of the net-back method to recoup post-production expenses, or whether it is limited to the context of whether the method violates the GMRA." No. 2:20-CV-1119, 2021 WL 1894596, at *3 (W.D. Pa. May 11, 2021). [7] The court held that because "[t]he lease provisions in this case expressly and unequivocally call for the calculation of royalties 'at the wellhead' . . . the contract must be interpreted as permitting the net-back method." *Id.* at *6.[8] Similarly, in *Slamon v. Carrizo*

---

[7] Plaintiffs have not argued that there is any difference between the phrase "at the well" (used in the leases here) and "at the wellhead," and there is none. *See* Patrick H. Martin and Bruce M. Kramer, Williams & Meyers, Oil and Gas Law (2023) (defining "at the well" and collecting cases involving contracts that say both "at the well" and "at the wellhead," including *Coastal Forest*.

[8] In reaching its holding, the *Coastal Forest* court relied on *Ulmer v. Chesapeake Appalachia, LLC*, No. 4:08-cv-2062, 2011 WL 1344596 (M.D. Pa Apr. 8, 2011), which Anadarko cited in its earlier briefing. It also relied on *Aker v. Keeton Grp., LLC*, which held that "[i]n *Kilmer* the Pennsylvania Supreme Court expressly adopted an 'at the well head' definition of royalty and expressly adopted the 'netback' method for determining that royalty." No. 3:2009-101, 2011 WL 13235036, at *5 (W.D. Pa. Mar. 15, 2011).

*(Marcellus) LLC*, the court collected various cases where "courts have expressly interpreted [*Kilmer*] to have broad application" and held that, as a matter of law, the term "royalty" used in the oil and gas leases at issue unambiguously permitted the net-back method.  654 F. Supp. 3d 405, 434–35, 443 (M.D. Pa. 2023).  Because Anadarko's leases all use the phrase "at the well," they explicitly permit the netback method.  Accordingly, Plaintiffs' breach of claim based on Anadarko's use of this method should be dismissed.

The few cases holding that certain oil and gas leases do not permit a "netback" calculation turn on the specific language at issue in those leases and are readily distinguishable.  For example, in *Marburger v. XTO Energy Inc.*, the plaintiffs' leases entitled plaintiffs to an undefined "royalty."   *See* No. CV 15-910, 2016 WL 11659184, at *4 (W.D. Pa. Jan. 26, 2016).  Unlike the leases at issue here, the leases in *Marburger* did not include a phrase like "market value at the well" or "at the wellhead" when describing how that royalty would be calculated.  As the *Coastal Forest* court explained, "*Marburger* merely held that there is nothing in *Kilmer* that *requires* parties to a gas lease to use the net-back method in calculating royalties," but "*Kilmer* cannot be read so narrowly as to ignore the fact that it interpreted 'at the wellhead' language in leases as providing for the use of the net-back method."  2021 WL 1894596, at *5.  Rather, leases providing for royalties based on the market value

23

at the well must, as a matter of law and "consistent with *Kilmer*, be read as calling for the use of the net-back method of calculating royalties." *Id.*

Likewise, *Dressler Fam., LP v. PennEnergy Res., LLC* turned on ambiguous language in certain leases that left open whether defendants could use a netback calculation. 276 A.3d 729, 735 (Pa. Super. Ct. 2022). The leases in *Dressler* had two contradictory terms: First, they said that royalties should be based on "*gross proceeds* received from the sale of . . . *gas sold at the well*" (emphasis added). As the court explained, the ordinary meaning of "gross" is "[e]xclusive of deductions." *Id.* at 740-41. Second, the leases provided that "royalties" would be based upon proceeds "at the well," *i.e.*, a term that has a specialized industry meaning permitting the deduction of post-production costs. In light of the contradictory language, the court held that the royalty provision as written was not sufficiently "plain and unambiguous with regard to whether Appellee may deduct post-production costs from royalties" and allowed plaintiffs' breach of contract claim to proceed. *Id.* at 742. Here, by contrast, the leases contain no contradictory language like "gross proceeds" that could be read to create any ambiguity. Rather, Anadarko's leases unambiguously call for royalties to be paid based on the "market value at the well," which – under *Kilmer* and the numerous cases interpreting it – means royalties paid based on the netback methodology.

24

B. **Plaintiffs' Claim For A Legal Accounting Fails For The Same Reasons As Their Breach Of Contract Claim.**

Plaintiffs' Amended Complaint sought either a legal or equitable accounting. (*See* Dkt. 94 at ¶¶ 314-315).   Plaintiffs have since abandoned their equitable accounting claim, leaving only their claim for a legal accounting.  (Dkt. 122 at 49). As Anadarko has already explained, and as more recent decisions have further confirmed, "a legal accounting is not a separate claim but rather a form of relief that accompanies a formal breach of contract claim."  *Zamias v. Fifth Third Bank*, No. 3:17-CV-153, 2018 WL 355462, at *17 (W.D. Pa. Jan. 9, 2018); *Coastal Forest*, 2021 WL 1894596, at *3 ("[B]ecause there is no breach of contract, accounting cannot be awarded as a remedy"); *Slamon*, 654 F. Supp. 3d at 439.  Thus, Plaintiffs' claim for legal accounting rises and falls with their breach of contract claim. Because Plaintiffs have failed to state a valid breach of contract claim, their claim for a legal accounting should also be dismissed.

C. **Plaintiffs Fail To State A Claim For Conversion.**

Anadarko's earlier briefing explained that the Plaintiffs' conversion claim fails because Plaintiffs have no property interest sufficient to state a conversion claim.  (Dkt. 112 at 36-37).  Anadarko also explained that Plaintiffs' conversion claim is barred by both the gist of the action doctrine and the economic loss doctrine. (*Id.* at 37-38).  In response, Plaintiffs conceded that "[t]he right of payment under a

contractual agreement does not constitute a property interest for purposes of conversion" and ignored the economic loss doctrine entirely. (Dkt. 122 at 51). Their only response was to cite inapposite case law standing for the proposition that, if a plaintiff has a property interest separate and apart from the contract, then the gist of the action doctrine does not bar the plaintiff from proceeding on both a breach of contract claim and a conversion claim. (*Id.* at 52). But Plaintiffs have made no allegations showing that they have a property interest in royalty payments, making their case law irrelevant. (Dkt. 128 at 18).

Regardless, recent case law confirms that landowners do not have a separate property interest in royalties owed to them under oil and gas leases. In *Mun. Auth. of Westmoreland Cnty. v. CNX Gas Co., L.L.C.*, plaintiffs tried to tack on a conversion claim to their breach of contract claim, just as Plaintiffs do here. 380 F. Supp. 3d 464, 478 (W.D. Pa. 2019). The court relied on the gist of the action doctrine to reject the conversion claim because the plaintiff's "entitlement to the withheld royalties, and thus its theory of conversion, depends entirely on the terms of the Lease." *Id*. "When entitlement to the property at issue is predicated solely on the terms of a contract, the gist of the action doctrine will bar a conversion claim for that property." *Id.* So too here.

### D.   Plaintiffs Fail To State A Claim For Civil Conspiracy.

For the reasons covered in Anadarko's earlier briefing, Plaintiffs' formulaic recitation of the elements of a civil conspiracy claim – without any specific allegations about how Anadarko supposedly conspired with other defendants to defraud anyone, and with no specific allegation of malice – are insufficient to withstand a motion to dismiss.  (Dkt. 112 at 38-40; Dkt. 128 at 20).

Further, Plaintiffs' civil conspiracy claim is linked to their conversion claim, because allegations of civil conspiracy must be premised on the existence of an underlying tort.  (Dkt. 112 at 40) (citing *Festa v. Jordan*, 803 F. Supp. 2d 319, 326 (M.D. Pa. 2011)).  As discussed above, Plaintiffs' conversion claim is barred by the gist of the action doctrine.  As such, its civil conspiracy claim premised on its conversion claim is also barred.  As the court in *Canfield v. Statoil USA Onshore Properties Inc.* recognized in the oil and gas context, when the plaintiff's claims "all relate to the alleged breach of the royalty provision in [an] oil and gas lease," the gist of the action doctrine bars the plaintiff from bringing a tort claim "based on those same allegations."  No. CV 3:16-0085, 2017 WL 1078184, at *26 (M.D. Pa. Mar. 22, 2017).  And "[i]t follows that [the plaintiff] cannot bring a civil conspiracy claim where that claim is entirely premised" on a tort barred by the gist of the action doctrine.  *Id*.  Plaintiffs' civil conspiracy claim fails for the same reason.

27

## **CONCLUSION**

For the reasons stated herein and in Anadarko's prior briefing (Dkt. 112 and 128), Anadarko respectfully requests that the Court grant its Motion to Dismiss each of the Plaintiffs' claims against Anadarko with prejudice.

Dated: April 19, 2024

By: /s/ Steven. E. Bizar

Steven E. Bizar (PA 68316)
Michael Doluisio (PA 75060)
Elisa Beneze (PA 333485)
David Costigan (PA 329496)

DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Tel: 215-994-2205
Fax: 215-655-2205
Steven.bizar@dechert.com
Michael.doluisio@dechert.com
Elisa.beneze@dechert.com
David.costigan@dechert.com

Attorneys for Defendant
Anadarko E&P Onshore LLC

## <u>CERTIFICATE OF COMPLIANCE</u>
## <u>With Local Rule 7.8(b)(3)</u>

I, Steven E. Bizar, attorney for Defendant Anadarko E&P Onshore LLC, hereby certify that Defendant Anadarko's Supplemental Brief in Support of Motion to Dismiss contains 6,837 words as calculated by the word-count function of Microsoft Word, which is within the limit of 7,500 as requested in Defendant Anadarko's Motion for Permission to File Brief Exceeding 15 Pages and 5,000 Words (Dkt. 192).


Dated: April 19, 2024


By: <u>/s/ Steven E. Bizar    </u>
Steven E. Bizar

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 19, 2024, I caused a copy of the foregoing document to be filed electronically using the Court's electronic filing system and served upon designated counsel of record for all parties in the above-captioned matter.

By: <u>/s/ Steven E. Bizar   </u>
Steven E. Bizar

31