# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **A&B CAMPBELL FAMILY LLC,** *et al.*, | : | |
| | : | |
| **Plaintiffs,** | : | **No. 3:15-cv-0340-KM** |
| | : | |
| **v.** | : | **(Mehalchick, J.)** |
| | : | |
| **CHESAPEAKE ENERGY** | : | |
| **CORPORATION,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

## PLAINTIFFS' CONSOLIDATED SUPPLEMENTAL BRIEF
## IN OPPOSITION TO DEFENDANTS'
## <u>MOTIONS TO DISMISS AMENDED COMPLAINT</u>

Christopher D. Jones
GRIFFIN, DAWSEY,
DePAOLA & JONES, P.C.
101 Main Street
Towanda, PA 18848
(570) 265-2175

Thomas S. McNamara
INDIK & McNAMARA, P.C.
123 South Broad Street, Suite 1200
Philadelphia, PA 19109
(215) 567-7125

Taunya M. Knolles Rosenbloom
LAW OFFICES OF TAUNYA M.
KNOLLES ROSENBLOOM
332 South Main Street, P.O. Box 309
Athens, PA 18810
(570) 888-0660

Attorneys for Plaintiffs

Date: April 22, 2024

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION…………………………………………………………… 1

SUPPLEMENTAL STATEMENT OF LEGAL STANDARD…………………. 3

ARGUMENT……………………………………………………………  6

I.    Plaintiffs State Legally Cognizable and Sufficient Antitrust Claims…….  6

      A.    Plaintiffs Sufficient Allege the Existence of Anti-Competitive
          Agreements …………………………………………………………  6

      B.    Plaintiffs Sufficiently Allege Harm to Competition……………… 10

      C.    Plaintiffs Sufficiently Allege Antitrust Injury and  Antitrust
          Standing……………………………………..……………………… 12

      D.    Plaintiffs Sufficiently Allege Harm From a Reduction in
          Competition in the Market for Gathering Services……………… 21

      E.    Plaintiffs Plead Horizontal Agreements to Allocate
          Territories in Order to Minimize Competition, Which
          Constitute *Per Se* Violations of the Sherman Act and
          Do Not Require Allegation of Geographic Markets……………… 23

      F.    If and to the Extent Required, Plaintiffs Plead Plausible and
          Legally Sufficient Geographic Markets…………………………  24

II.    The Particularity Requirements of Rule 9(b) Should Be Relaxed
    In Light of Plaintiffs' Detailed Allegations That Necessary Information
    Is Within Defendants' Control…………………………………………  24

III.    Plaintiffs Sufficiently Plead a Claim for Breach of Contract
    Against the Lessee Defendants……………………………………….. 24

CONCLUSION…………………………………………………………… 29

CERTIFICATE OF COMPLIANCE……………………………………… 30

## TABLE OF AUTHORITIES

**CASES**                                                             **Page**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)……………………………………………………… 3

*Baraka v. McGreevey*,
    481 F.3d 187, 195 (3d Cir.2007)…………………………………… 4

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)…………………………………………… 3, 4, 5

*Blue Shield of Virginia v. McCready*,
    457 U.S. 465 (1982)…………………………………………… 17

*Broadcom Corp. v. Qualcomm, Inc.*,
    501 F.3d 297 (3d Cir. 2007)…………………………………………17

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir.2011)………………………………………... 4

*Cole v. Philadelphia Co.*,
    345 Pa. 315 (Pa.1942)………………………………………… 27

*Connelly v. Lane Constr. Corp.*,
    809 F.3d 780 (3d Cir. 2016)………………………………… 4

*D.B. Van Campen Corp. v. Building and Constr. Trades Council*,
    195 A.2d 134 (1963)………………………………………… 27

*Deslandes v. McDonald's USA, LLC*,
    81 F.4th 699 (7th Cir. 2023)……………………………… 23, 24

*Ethypharm S.A. France v. Abbott Laboratories*,
    707 F.3d 223 (3d Cir. 2013)………………………………... 7

*Francis v. LCP N. Third, LLC*,
    293 A.3d 273 (Pa. Super. 2023), *reargument denied*
(May 22, 2023), *appeal denied*, 309 A.3d 698 (Pa. 2023)……………… 26, 27

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,
    806 F.3d 162 (3d Cir. 2015)………………………………….... 16, 17, 18

*Hayes v. Gross*,
    982 F.2d 104 (3d Cir.1992)………………………………………… 3

*Holocheck v. Luzerne County Head Start, Inc.*,
    385 F.Supp.2d 491 (M.D.Pa.2005)………………………………...... 4

*In re Railway Industry Employee No-Poach Antitrust Litig.*,
    395 F.Supp.3d 464 (W.D.Pa. 2019)……………………………….... 19

*In re Rockefeller Ctr. Props., Inc. Securities*,
    311 F.3d 198 (3d Cir.2002)………………………………………… 3

*Interwave Tech. Inc. v. Rockwell Automation, Inc.*,
    2005 WL 3605272 (E.D.Pa. Dec. 30, 2005)……………………… 28

*Jacobs v. CNG Transmission Corp.*,
    332 F.Supp.2d 759 (W.D.Pa.2004)………………………………… 26

*Johnsrud v. Carter*,
    620 F.2d 29 (3d Cir.1980)………………………………………… 4

*Kamuck v. Shell Energy Holdings GP, LLC*,
    2012 WL 1463594 (M.D.Pa. Mar.19, 2012),
    *adopted in relevant part by* 2012 WL 1466490
    (M.D.Pa. Apr.27, 2012)……………………………………………… 27

*Khan v. State Oil Co.*,
    93 F.3d 1358 (C.A.7 1996),
    *vacated and remanded on other grounds*, 522 U.S. 3 (1997)…………… 12

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
    926 F.2d 1406 (3d Cir.1991)………………………………………… 4

*LifeWatch Services, Inc. v. Highmark Inc.*,
   902 F.3d 323 (3d Cir. 2018)……………………………………………...   18

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*,
   334 U.S. 219 (1948)………………………………………………......   15

*Masciantonio v. SWEPI LP*,
   2014 WL 4441214 (M.D.Pa. Sept. 9, 2014)…………………   4, 26, 27, 28

*Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir.2013)………………………   4

*National Collegiate Athletic Association v. Alston*,
   594  U.S. 69 (2021)………………………………………………...   19

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*,
   267 F.3d 340 (3d Cir.2001)………………………………………………   3

*Omnicare, Inv. v. UnitedHealth Group, Inc.*,
   524 F.Supp.2d 1031 (N.D.Ill. 2007)…………………………………   20

*Palmer v. BRG of Georgia, Inc.*, 499 U.S. 46 (1990)………………………   23

*Presque Isle Colon and Rectal Surgery v. Highmark Health*,
   391 F.Supp.3d 485 (W.D.Pa. 2019)…………………………………   18, 19

*Shaev v. Saper*,
   320 F.3d 373 (3d Cir.2003)………………………………………………   3

*Sitts v. Dairy Farmers of America, Inc.*,
   276 F.Supp.3d 195 (D.Vt. 2017)…………………………………………   20

*Smith v. Arrington Oil & Gas, Inc.*,
   664 F.3d 1208, 1216–18 (8th Cir.2012)…………………………………   27

*Somers v. Somers*,
   613 A.2d 1211 (Pa. Super. 1992)…………………………………   26, 27

*Stewart v. SWEPI, LP*,
   918 F.Supp.2d 333 (M.D.Pa. 2013…………………………………………   26

*Turner v. McDonald's USA, LLC*,
   No. 19 C 5524, 2020 WL 3044086 (N.D. Ill. 2020)……………………   20

*T.W. Phillips Gas and Oil Co. v. Jedlicka*,
   42 A.3d 261 (Pa. 2012)……………………………………………………   26

*United States v. Topco Associates, Inc.*,
   405 U.S. 596 (1972)………………………………………………………   23, 26

*Vogel v. American Soc. of Appraisers*,
   744 F.2d 598 (7th Cir. 1984)……………………………………………   12

*Warren Gen. Hosp. v. Amgen Inc*.,
   643 F.3d 77 (3d Cir.2011)………………………………………………   4

*Weyerhaeuser* Co. *v. Ross-Simmons Hardwood Lumber Co*.,
   549 U.S. 312 (2007)……………………………………………………...   12

*W. Penn Allegheny Health Syst. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010)………………………………………………13, 14, 15

*Zaloga v. Provident Life & Accident Ins. Co. of Am.*,
   671 F.Supp.2d 623 (M.D.Pa. 2009)…………………………………………   27

## STATUTES, RULES & REGULATIONS

15 U.S.C. § 1……………………………………………………   13, 18, 19, 20

15 U.S.C. § 2……………………………………………………   13, 18, 19, 20

Fed. R. Civ. P. 9(b)………………………………………………………   24

Fed. R. Civ. P. 12(b)(6)…………………………………………………… 3, 4

## OTHER AUTHORITIES

Kirkwood, *Buyer Power and Exclusionary Conduct*,
   72 Antitrust L.J. 625, 653 (2005)…………………………………………   12

Noll, *''Buyer Power'' and Economic Policy*, 7
2 Antitrust L.J. 589, 591 (2005)............................................... 13

## INTRODUCTION

Plaintiffs A&B Campbell Family LLC, *et al.*, respectfully submit this consolidated supplemental brief in opposition to the separate motions to dismiss filed by defendants Anadarko E&P Onshore LLC, as successor by conversion to and f/k/a Anadarko E&P Company LP ("Anadarko") [Doc. 111], Mitsui E&P USA LLC ("Mitsui") [Doc. 113], and Williams Partners, LP f/k/a Access Midstream Partners, L.P. ("Access Midstream"), and its affiliates Access MLP Operating, L.P., n/k/a Williams MLP Operating, L.L.C. ("AMLP Operating"), and Appalachia Midstream Services, L.L.C. ("Appalachia Midstream") [Doc. 115], in accordance with the Court's March 14, 2024 Order [Dkt. 191] permitting the parties to file supplemental briefs on all pending motions. Plaintiffs continue to rely on all arguments, references to the Amended Complaint [Dkt. 94], and authorities set forth in their initial Plaintiffs' Consolidated Brief in Opposition to Defendants' Motions to Dismiss, which was dated and filed on October 25, 2015 (Dkt. 122).

On September 15, 2023, Plaintiffs filed a Notice of Dismissal Pursuant to Federal Rule of Civil Procedure 41(a)(1) by All Plaintiffs as to Certain But Not All Defendants [Dkt. 182], dismissing this action with respect to defendants Chesapeake Energy Corporation ("Chesapeake"), Chesapeake Appalachia, L.L.C. ("Chesapeake Appalachia"), Chesapeake Energy Marketing, Inc. ("CEMI") and Chesapeake Operating, Inc. ("Chesapeake Operating" and, together with Chesapeake,

Chesapeake Appalachia and CEMI, the "Chesapeake Defendants"), in light of the entry of an Order on January 16, 2021 (the "Confirmation Order"), by the United States Bankruptcy Court for the Southern District of Texas, Houston Division, in the jointly administered Chapter 11 case captioned *In re Chesapeake Energy Corporation, et al.*, Debtors, Case No. 20-33233 (currently administered jointly under *In re Chesapeake Exploration, L.L.C.*, 20-33239), approving the Fifth Amended Joint Chapter 11 Plan of Reorganization of Chesapeake Energy Corporation and Its Debtor Affiliates (the "Plan"), the effective date of which occurred on February 9, 2021 (the "Effective Date").

## SUPPLEMENTAL STATEMENT OF LEGAL STANDARD

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting and citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

For purposes of a motion to dismiss, the Court must accept as true the allegations in Plaintiffs' complaint, and make all reasonable inferences in their favor. *Shaev v. Saper*, 320 F.3d 373, 375 (3d Cir.2003) (citing *Hayes v. Gross*, 982 F.2d 104, 105–06 (3d Cir.1992)). "Dismissal under Rule 12(b)(6) is not appropriate unless it appears beyond doubt that [the] plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *In re Rockefeller Ctr. Props., Inc. Securities*, 311 F.3d 198, 215 (3d Cir.2002) (citing *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 346 (3d Cir.2001)).

"Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial

plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir.2011) (citing *Twombly*, 550 U.S. at 555–56). Although the Court must accept the allegations in the complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir.2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir.2007)).

Under Rule 12(b)(6), the defendant has the burden of showing that no claim has been stated. *Masciantonio v. SWEPI LP*, No. 4:13-CV-0797, 2014 WL 4441214, at *5 (M.D. Pa. Sept. 9, 2014) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir.1991); *Johnsrud v. Carter*, 620 F.2d 29, 32–33 (3d Cir.1980); *Holocheck v. Luzerne County Head Start, Inc.*, 385 F.Supp.2d 491, 495 (M.D.Pa.2005).

The Third Circuit has instructed that "under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016):

> First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Iqbal,* 556 U.S. at 675, 129 S.Ct. 1937. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679, 129 S.Ct. 1937. *See also Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir.2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth." (citation and editorial marks

> omitted)). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937.

*Id.*

# **ARGUMENT**

## I. **PLAINTIFFS STATE LEGALLY COGNIZABLE AND SUFFICIENT ANTITRUST CLAIMS.**

In arguing that Plaintiffs fail to state legally cognizable and sufficient antitrust claims, Defendants rely on a combination of: (i) disregard of extensive factual allegations in the Amended Complaint which contradict their arguments; and (ii) impermissible attempts to dispute, recharacterize or reframe problematic factual allegations which they are unable to ignore. A fair reading of the actual factual allegations made by Plaintiffs in the Amended Complaint, viewed in the light most favorable to Plaintiffs, with all inferences drawn in favor of Plaintiffs, shows that Plaintiffs have alleged facts which, taken as true, are sufficient to state legally cognizable and sufficient antitrust claims.

### A. **Plaintiffs Sufficiently Allege the Existence of Anti-Competitive Agreements Among the Defendants.**

Despite Defendants' assertions to the contrary, Plaintiffs have squarely alleged that all of the Defendants were party to multiple, inter-related, anti-competitive agreements, some described generally, and others described specifically by date, parties, and title or type. The allegations of anti-competitive agreements include, for example, the following:

- "The Lessee Defendants implemented their scheme [the scheme described in ¶ 8 of the Amended Complaint, to reduce, retrain or eliminate

competition in the geographic markets for Gas Mineral Rights, Operating Rights, and Gathering Services] by, among other things, entering things,  entering  into  a variety  of  contracts  and  establishing  a  variety of relationships,  including joint venture  agreements,  joint  exploration  agreements, assignments  and  partial assignments  of  oil  and  gas  leases,  and  agreements  to exchange  oil  and  gas assets,  including  the  establishment  of  contractually designated "areas  of mutual  interest"  ("AMI") … located  in  Bradford  County,  Pennsylvania,  in adjacent  portions  of  Sullivan,  Susquehanna  and  Wyoming  Counties, Pennsylvania.") (Dkt. 94 at ¶ 9);

- On information and belief, Anadarko E&P entered into a 50/50 Joint Exploration Agreement dated September 1, 2006 with Chesapeake Energy and/or CALLC [Chesapeake Appalachia, L.L.C.] (and/or  its  affiliates)  (the  "Joint Exploration  Agreement"),  covering portions of Bradford, Sullivan, Susquehanna and  Wyoming  Counties  within  an area of mutual  interest that the parties to the agreement  as  "Area  A"  (previously  defined  as  the  "AMI"),  and  agreed  that CALLC would serve as the operator of the leases within the AMI. Pursuant to the agreement,  Anadarko  E&P  also  assigned,  subject  to  certain  reservations  and exceptions, fifty percent (50%) of its right, title and interest in and to the Leases under  which  Plaintiffs  hold  royalty  interests  to CALLC, pursuant to a series of Partial Assignments of Oil and Gas Leases." (*Id.* at ¶ 136);

- "On information and belief, the Joint Exploration Agreement, or contemporaneous or subsequent agreements, also provided that Chesapeake or one or more of its affiliates would be an owner and the operator of gathering systems to be constructed to service the anticipated wells to be drilled by or on behalf of CALLC, and that Anadarko E&P or its affiliates would receive a proportionate ownership interest in the anticipate gathering systems and pipelines.") (*Id.* at ¶ 138);

- "Anadarko E&P subsequently entered into an Appalachian Area Participation Agreement, dated effective January 1, 2010, with Mitsui E&P, and also assigned, subject to certain reservations and exceptions, undivided interests in its right, title and interest in and to the Leases under which Plaintiffs hold royalty interests to Mitsui E&P, pursuant to a series of Partial Assignments of Oil and Gas.") (*Id.* at ¶ 140);

- As of December 29, 2011, when CHKM acquired Appalachia Midstream from CMD, Appalachia Midstream operated 100 percent of, and owned approximately a 47 percent interest in, 10 integrated gas gathering systems that consisted of approximately 549 miles of gas gathering pipeline in the Marcellus Shael, which serviced (and continue to service) approximately 250 natural gas wells. The remaining 53% interest in the assets was owned, directly or indirectly, primarily by Statoil ASA, Anadarko Petroleum Corporation and Mitsui & Co., Ltd.,

which were and are, respectively, the corporate parents of defendants Anadarko and

Mitsui (*Id.* at ¶¶ 183-184);

•  "Appalachia Midstream was and is party to long-term (15-year) gas

gathering agreements with certain subsidiaries and affiliates of Chesapeake, and

also with Statoil, Anadarko, Mitsui, Epsilon Energy Ltd., and Chief Oil & Gas LLC

("Chief"). Pursuant to these gas gathering agreements, which are not publicly

available, and the terms of which Chesapeake maintains as confidential,

Chesapeake and some or all of the other producer-parties to the agreements granted

Appalachia Midstream what CHKM has publicly characterized as "extensive

acreage dedications" (*i.e.,* exclusivity) in the areas within which it operated in the

Marcellus Shale region.") [footnote omitted]. (*Id.* at ¶ 185);

In addition, Plaintiffs describe in extensive detail the chronology (to the

extent publicly known) of the initial scheme and transactions by which Chesapeake

Energy Corporation ("Chesapeake") and Anadarko, through their respective

affiliates and subsidiaries, developed, financed, structured, owned and operated

gathering systems and intrastate pipelines (owned in part by defendant Mitsui), to

gather, treat and process the natural gas that they produced, and by which they

agreed, combined and conspired to restrain competition, and ultimately created a

monopoly, in the market for Gas Gathering Services in the relevant geographic

market. *See* Dkt. 94 at ¶¶ 16-17, 128, 155-159, and 170-177. Plaintiffs also describe

in in extensive detail the chronology (again, to the extent publicly known) of the subsequent scheme and transactions by which Chesapeake then used the gas gathering and related agreements to further leverage the Lessee Defendants effective monopoly power over Gas Mineral Rights, Operating Rights (in the case of Chesapeake), and Gathering Service to enable Chesapeake to address a severe liquidity crisis, and ultimately to enable the Access Defendants to generate supra-competitive profits at the expense of Plaintiffs and other royalty interest owners in the relevant geographic market. *See* Dkt. 94 at ¶¶ 18, 28, and 179-222.

### B.    Plaintiffs Sufficiently Allege Harm to Competition.

Despite Defendants' assertions to the contrary, in addition to alleging harm to their own economic interest, Plaintiff have also alleged harm to competition in markets in which they are participants, and which otherwise affect their interests. By way of example, *see*, *e.g.*, Dkt. 94 at ¶¶ 8-10 (alleging scheme by Lessee Defendants to divide and allocate market for Gas Mineral Rights, Operating Rights and Gathering Services by means including contractual establishment of geographic areas of mutual interest ("AMI") "with the intent and effect of reducing, restraining or eliminating competition."); *Id.* at ¶ 11 ("The Lessee Defendants involved in allocating the market for Gas Mineral Rights intended to and did (i) reduce, restrain or eliminate competition for Gas Mineral Rights…. within the defined AMI; (ii) fix, lower or maintain the price that they had to pay to acquire Gas Mineral Rights (in

the form of both initial bonus payments and ongoing royalties) to landowners within the defined AMI; and (iii) enable themselves to then reduce, restrain or eliminate competition in the markets for Operating Rights and Gathering Services in and around the defined AMI."); *Id.* at ¶ 199 ("By engaging in the CMO Acquisition and related transactions, Access Midstream effectively acquired a monopoly in the market for gathering, compression, dehydration and treating services within the "Dedication Areas" specified in its existing and new gathering agreement…."); and *Id.* at ¶ 253 ("Plaintiffs have suffered antitrust injury as of result of Defendants' conduct because the economic harm they have suffered … reflects either (a) the anticompetitive impact of the antitrust violations by Defendants with respect to the market for Operating Rights and/or Gathering Services, or (b) the effect of anticompetitive acts in the markets for Operating Costs and/or Gathering Services which were made possible by, and reflect a further consequence and effect of, their earlier successful efforts to foreclose or eliminate competition in the market for Gas Mineral Rights.")

### C.     Plaintiffs Sufficiently Allege Antitrust Injury and Antitrust Standing.

In arguing that Plaintiffs have failed to allege facts sufficient to demonstrate that they sustained antitrust injury, Defendants misconstrue or fail to acknowledge the import of Plaintiff's allegations that they were buyers from a seller with monopsony power. *See* Dkt. 94 at ¶¶ 244-245.

Monopsony power is market power on the buy-side of the market. *See Weyerhaeuser* Co. *v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007) ("… [A] monopsony is to the buy side of the market what a monopoly is to the sell side, and is sometimes colloquially called a 'buyer's monopoly.' "). In *Weyerhaeuser,* the Supreme Court recognized "… the close theoretical connection between monopoly and monopsony," citing: Kirkwood, *Buyer Power and Exclusionary Conduct*, 72 Antitrust L.J. 625, 653 (2005) (describing monopsony as the "mirror image" of monopoly); *Khan v. State Oil Co.*, 93 F.3d 1358, 1361 (C.A.7 1996) ("[M]onopsony pricing ... is analytically the same as monopoly or cartel pricing and [is] so treated by the law"), *vacated and remanded on other grounds*, 522 U.S. 3 (1997); and *Vogel v. American Soc. of Appraisers*, 744 F.2d 598, 601 (7th Cir. 1984) ("[M]onopoly and monopsony are symmetrical distortions of competition from an economic standpoint"). *Weyerhaeuser*, 549 U.S. at 321-22. As a result, the Court concluded that "the kinship between monopoly and monopsony suggests that similar legal standards should apply to claims of monopolization and to claims of

monopsonization. Cf. Noll, ''Buyer Power'' and Economic Policy, 72 Antitrust L.J.

589, 591 (2005) ("[A]symmetric treatment of monopoly and monopsony has no

basis in economic analysis")." *Id.* at 322.

In *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir.

2010), which is discussed in Plaintiff's initial brief (Dkt. 122 at 17-19), the Third

Circuit addressed claims brought by a seller of health care services to a firm alleged

to have exercised monopsony power as a buyer of health care services in the relevant

market pursuant to a conspiracy. The plaintiff seller, the second largest hospital

system in Pittsburgh (West Penn), sued the area's largest hospital system (UPMC)

and dominant health insurer (Highmark), under the Sherman Action and state law,

asserting that the defendants had violated Sections 1 and 2 of the Sherman Act by

conspiring to protect one another from competition, and in furtherance of the

conspiracy causing Highmark to pay West Penn artificially reduced reimbursement

rates. The District Court dismissed the complaint in its entirety on the grounds that

it failed to sufficiently allege that West Penn sustained any antitrust injury as a

consequence of a conspiracy. The Third Circuit reversed in part and vacated in part

the District Court's judgment, holding the complaint contained non-conclusory

allegations of an agreement that unreasonably restrained trade sufficient to survive

a motion to dismiss on the agreement element, and also holding that the complaint

sufficiently alleged that West Penn had sustained antitrust injury in the form of

artificially depressed reimbursement rates from Highmark. *See UPMC*, *supra*, 627 F.3d at 99-105.

In addressing the issue of antitrust injury in *UPMC*, the Third Circuit stated that:

> *As a general matter*, the class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and competitors in the restrained market, and to those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends.

*Id.*, 627 F.3d at 102 (citations omitted) (emphasis added). Significantly, the Third Circuit did *not* state that the class of plaintiffs capable of satisfying the antitrust-injury requirement is categorically limited to consumers and competitors in *all* instances. To the contrary, in rejecting the defendants' argument that West Penn (a *seller* of healthcare services) had failed to allege antitrust injury, the Third Circuit found that the plaintiff, West Penn, had plausibly alleged antitrust injury by alleging that Highmark (the buyer of its health care services) had substantial monopsony power and had paid West Penn depressed reimbursement rates pursuant to a conspiracy with UPMC:

> Here, the complaint suggests that Highmark has substantial monopsony power. * * * The complaint also alleges that Highmark paid West Penn depressed reimbursement rates, not as a result of independent decisionmaking, but pursuant to a conspiracy with UPMC, under which UPMC insulated Highmark from competition in return for Highmark's taking steps to hobble West Penn. In these circumstances, it is certainly plausible that paying West Penn depressed reimbursement rates unreasonably restrained trade. Such shortchanging poses competitive threats similar to those posed by conspiracies among buyers to fix

prices, *see Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948), and other restraints that result in artificially depressed payments to suppliers—namely, suboptimal output, reduced quality, allocative inefficiencies, and (given the reductions in output) higher prices for consumers in the long run.

627 F.3d at 103-104 (other citations omitted). In other words, the Third Circuit recognized that, in the context of markets restrained as a result of the exercise of monopsony power pursuant to a conspiracy, the class of plaintiffs capable of satisfying the antitrust requirement can include sellers of products or services in the restrained market – particularly when the buyer is the monopsonist.

Because Plaintiffs, in their roles as lessees of Gas Mineral Rights to Chesapeake, were effectively direct sellers or suppliers to buyers with substantial monopsony or oligopsony power, which they are alleged to have exercised as a result of a conspiracy among themselves and with the Access Defendants to underpay royalties by, among other things, overcharging for Gathering Services, it is certainly plausible that the alleged conduct of the Lessee Defendants in paying Plaintiffs depressed royalties as a result of supra-competitive gathering fees (like the conduct of Highmark in paying West Penn depressed reimbursement rates) unreasonably restrained trade. In both cases, "[s]uch shortchanging poses competitive threats similar to those posed by conspiracies among buyers to fix prices … and other restraints that result in artificially depressed payments to suppliers…." *UPMC*, 627 F.3d at 104. As a result, Plaintiffs, like West Penn in the *UPMC* case, fall directly

within "the class of plaintiffs capable of satisfying the antitrust injury requirement," whether as a result of their being, as sellers to buyers with monopsony or oligopsony power, the mirror-image of buyers from sellers with monopoly or oligopy power, or as "the means by which the defendants seek to achieve their anticompetitive ends." *Id.* at 102. In any event Plaintiffs also have plausibly alleged, in the alternative, that the economic injury they have sustained are integral to and "inextricably intertwined" with Defendants' wrongdoing. *See* Dkt. 94 at ¶¶ 252-253.

The fact that Plaintiffs were direct "sellers" to Chesapeake, which is alleged to have and to have exercised monopsony power, in combination and conspiracy with the other Lessee Defendants and the Access Defendants, distinguishes Plaintiffs in this case from the plaintiff in *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162 (3d Cir. 2015), a property developer who asserted antitrust claims against an operator of full-service supermarkets. The plaintiff in *Village Supermarkets* admitted that it was neither a competitor nor a consumer in the market for full-service supermarkets, and instead argued that its injuries from the defendant's efforts to block plaintiff from obtaining permits and approvals that it needed to proceed with a lease to a competing operator, were "inextricably intertwined" with the Defendant's alleged attempt to monopolize the market for full-service supermarkets in the relevant geographic market. The Third Circuit agreed, and held the plaintiff property developer had sufficiently alleged antitrust injury

because it was the immediate target, and bore the costs, of the defendants' scheme to keep a competing operator out of the market. *Id.* at 176.

Despite the material differences between the market roles of the plaintiff in *Village Supermarkets* and of Plaintiffs in the present case, *Village Supermarkets* offers an important perspective on the Third Circuit's view of the "inextricably intertwined" exception. In holding that the plaintiff had antitrust standing, the Third Circuit cautioned against an overly narrow reading of its statements in prior cases, including *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 225-26, 237 (3d Cir. 2013), and *Broadcom Corp. v. Qualcomm, Inc.,* 501 F.3d 297, 319-21 (3d Cir. 2007), regarding the scope of the "inextricably intertwined" exception, and reiterated that . As the Court stated:

> Defendants read too much into these statements. As an initial matter, just because we have not extended the exception beyond parties that sell goods or services in the same market by no means suggests we shouldn't (or can't) do so. In fact, *McCready* [*Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982)] suggests the opposite conclusion. McCready did not sell goods or services in the psychotherapy market— she was a subscriber to a health insurance plan. Nor was the hypothetical bank in McCready even a participant in the psychotherapy market. Nonetheless, both sustained harm that was inextricably intertwined with the defendants' misconduct. *Because § 4 [of the Clayton Act] "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers" we must avoid placing artificial limits on who may bring suit under the antitrust laws. McCready, 457 U.S. at 472 (citations omitted).* Moreover, our comments in *Ethypharm* and *Broadcom* must be read in context. As we discussed, the alleged injuries to the plaintiffs in those cases were *byproducts* of anticompetitive restraints in separate markets. In contrast, although Hanover Realty and ShopRite operate in separate

17

markets, the very *essence* of Defendants' scheme was to impose
expense and delay on Hanover Realty as a means of keeping Wegmans
out of the relevant market.

*Village Supermarkets*, *supra.,* 806 F.3d at 174-75 (emphasis added).

More recently, in *LifeWatch Services, Inc. v. Highmark Inc.*, 902 F.3d 323 (3d

Cir. 2018), the Third Circuit held that the plaintiff – a seller of telemetry monitors -

- plausibly alleged antitrust injury and standing, and otherwise plausibly stated a

claim under Section 1 of the Sherman Act against Blue Cross Blue Shield

Association and five of its member insurance plans, based on the plaintiff's claim

that the defendant insurers denied coverage for the plaintiff's telemetry monitors as

a means to depress demand for telemetry monitors in the outpatient cardiac monitor

market. *Id.* at 342-343.

Similarly, in *Presque Isle Colon and Rectal Surgery v. Highmark Health*, 391

F.Supp.3d 485 (W.D.Pa. 2019), the District Court granted in part and denied in part

a motion by the Highmark insurer defendants to dismiss a complaint brought against

them by the operator of an independent, physician-run medical practice alleging

violations of Sections 1 and 2 of the Sherman Act, including the allegation that

Highmark "maintained and abused monopsony power" by combining

reimbursement rate cuts with an "all products" clause, as part of an anticompetitive

scheme. *Id.* at 493-94. The court denied defendant Highmark's motion to dismiss as

to Counts I and III of the complaint, in which the plaintiff medical practice asserted

claims for unlawful monopsonization and attempted monopsonization of in violation of Section 2 of the Sherman Act. The court found that the plaintiff had alleged "plausible harm to competition" based on its allegations that Highmark dominated the relevant market and used its dominance on the "buy side" of the market, including among other things predatorily low reimbursement rates, to lower the income of independent physicians and allow it to unfairly compete in the physicians' services market by not subjecting its own facilities to such treatment. *Id.*, 391 F.Supp.3d at 498-501.

Other courts in Pennsylvania and throughout the country have likewise recognized that, in the context of markets restrained as a result of the exercise of monopsony power pursuant to a conspiracy, the class of plaintiffs capable of satisfying the antitrust injury requirement includes sellers of products or services in the restrained market. *See*, *e.g.*, *National Collegiate Athletic Association v. Alston*, 594  U.S. 69 (2021) (class action by current and former collegiate student athletes alleging that NCAA violated Section 1 of the Sherman Act by issuing and enforcing rules limiting compensation they could receive in exchange for their athletic services); *In re Railway Industry Employee No-Poach Antitrust Litig.*, 395 F.Supp.3d 464 (W.D.Pa. 2019) (class action by employees against employers, who were railroad equipment suppliers, and their subsidiaries, alleging violation of the Section 1 of the Sherman Act through conspiracy to enter into no-poach agreement);

*Turner v. McDonald's USA, LLC*, No. 19 C 5524, 2020 WL 3044086, at *2-3 (N.D. Ill. 2020) (action by employee of McDonald's alleging that it had violated Section 1 of the Sherman Act by agreements with entering into agreements with franchisees pursuant to which they agreed not to hire each other's employees or former employees, resulting in the depression of prices (wages) to sellers (employees) due to anticompetitive behavior of buyers (employers) with monopsony power; motion to dismiss denied); *Sitts v. Dairy Farmers of America, Inc.*, 276 F.Supp.3d 195 (D.Vt. 2017) (action by dairy farmers against dairy marketing cooperative and milk marketing agency for violation of Section 2 of the Sherman Act by exercising monopsony power in Grade A milk market to depress prices paid to dairy farmers; finding that plaintiffs sufficiently alleged antitrust injury and denying motion to dismiss); *Omnicare, Inv. v. UnitedHealth Group, Inc*., 524 F.Supp.2d 1031, 1040 (N.D.Ill. 2007) (institutional pharmacy's allegations that manager care companies were member of unlawful buyer's conspiracy, and that pharmacy received significantly below-market reimbursement rates from the buyers' cartel as of result of the conspiracy, sufficiently alleged antitrust injury; motion to dismiss denied).[1]

---

[1] After denying the defendants' motion to dismiss the complaint, and completion of discovery, the District Court granted a motion for summary judgment in favor of the defendants, and the Seventh Circuit affirmed. *See Omnicare, Inc. v. UnitedHealth Group, Inc.*, 594 F.Supp.2d 945 (N.D.Ill. 2009), *aff'd*, 692 F.3d 697 (7th Cir. 2011).

For the foregoing reasons, Plaintiffs sufficiently allege antitrust injury and antitrust standing.

### D. Plaintiffs Sufficiently Allege Harm From a Reduction in Competition in the Market for Gathering Services.

The Access Defendants argue that Plaintiffs fail to allege that their alleged injury results from any reduction in competition in the market for gas gathering services. *See* Dkt. 129 at 9-10. According to the Access Defendants, Plaintiffs do not allege any change in the competitive landscape. The Access Defendants are mistaken. Relying on a partial quote and incomplete paraphrase of paragraph 247 of the Amended Complaint, the Access Defend first contend that Plaintiffs allege that "'Chesapeake … not only transferred its existing, unlawfully acquired monopoly power to Access … but also effectively bolstered and extended that monopoly power.' through new contracts." Dkt. 129 at 10 (partially quoting Dkt. 94 at ¶ 247). The Access Defendants then dismiss their own incomplete and inaccurate characterization of Plaintiffs' allegation as "a legal conclusion – a rhetorical averment' – that is not entitled to a presumption of truth." Dkt. 129 at 10 (citation omitted). Next, the Access Defendants suggest (without any citation to the Amended Complaint) that Plaintiffs "specifically allege that that market simply switched from one supplier with 100% market share to a different supplier with 100% market share." *Id.* Finally, the Access Defendants argue that there is neither a

reduction in competition nor antitrust injury where one exclusive provider is substituted for another. *Id.*

The Access Defendants misconstrue and mischaracterize Plaintiffs' allegations regarding the injury to competition caused by their conduct, in several ways. First, the Access Defendants ignore language in paragraph 247 alleging that the Access Defendants bolstered and extended their market power in the market for gas gathering services in the Exclusive Dedicated acreage not only through new gathering agreements executed in connection with the CMO Acquisition, but also through the CMO Acquisition itself. *See* Dkt. 94 at ¶ 247. Second, the Access Defendants ignore the extensive factual allegations earlier in the Amended Complaint which (i) detail key aspects of the structure and terms of the CMO Acquisition, (ii) give meaning and weight to the allegation that the transaction bolstered and extended the prior monopoly power of Chesapeake in gas gathering in the relevant geographic market, (iii) demonstrate that the transaction involved far more than merely substituting one exclusive provider for another, and (iv) show that the transaction resulted in further antitrust injury to Plaintiffs. *See* Dkt. 94 at ¶¶ 28, 170-177, 179-196 and 197-222 (especially ¶¶ 207-211).

**E.    Plaintiffs Plead Horizontal Agreements to Allocate
        Territories in Order to Minimize Competition, Which
        Constitute *Per Se* Violations of the Sherman Act and
        Do Not Require Allegation of Geographic Markets.**

Plaintiffs plead horizontal agreements to allocate geographic territories to minimize competition. *See* Dkt. 94 at ¶¶ 8-17, and 130-140. Agreements among competitors at the same level of the market structure to allocate territories in order to minimize competition are naked restraints of trade and constitute *per se* violations of the Sherman Act, without any need to establish market power, unless they are ancillary to the success of a cooperative venture. *See Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 702-703 (7th Cir. 2023) (citing *Palmer v. BRG of Georgia, Inc.*, 499 U.S. 46 (1990)). *See also United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972). Plaintiffs specifically plead that that their claim for violation of Section 1 of the Sherman Act is founded on agreements among horizontal competitors to divide and allocate markets, which constitute naked restraints of trade and therefore should be evaluated under the *per se* rule.   See Dkt. 94 at ¶ 241. Plaintiffs also plead, in the alternative, that if Defendants are able to convince the Court, based on the evidence developed after discovery, that the division and allocation of markets by Chesapeake and defendant Anadarko was ancillary to some legitimate, pro-competitive business purpose, then the claim can and should be evaluated under the rule of reason. *Id.* Whether the division and allocation of markets by Chesapeake and defendant Anadarko was ancillary to some legitimate, pro-competitive business purpose

involves "potentially complex questions, which cannot be answered by looking at the language of the complaint. They require careful economic analysis. More than that: the classification of a restraint as ancillary is defense, and complaints need not anticipate and plead around defenses." *Deslandes*, *supra.*, 81 F.4[th] at 705. As a result, it is premature to "jettison[] the *per se* rule." *Id.* at 703.

### F.   If and to the Extent Required, Plaintiffs Plead Plausible and Legally Sufficient Geographic Markets.

In any event, despite Defendants assertions to the contrary, Plaintiffs in the alternative plead plausible and legally sufficient geographic markets, in light of the applicable product or services market alleged (which Defendants do not challenge), and the nature of the anticompetitive conduct alleged. *See* Dkt. 94 at ¶¶ 8-12, 237-239, 240, 242-251, 257-262.

## II.   THE PARTICULARITY REQUIREMENTS OF RULE 9(b) SHOULD BE RELATED IN LIGHT OF PLAINTIFFS' DETAILED ALLEGATIONS THAT NECESSARY INFORMATION IS WITHIN DEFENDANTS' CONTROL.

The particularity requirements of Rule 9(b) are relaxed when pleaders sufficiently allege that necessary information is within the other parties' control. As the Third Circuit has stated:

> Because, in cases alleging corporate fraud, "plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs," we have relaxed the particularity rule "when factual information is peculiarly within the defendant's knowledge or control." Nevertheless, "even under a non-restrictive application of the rule, pleaders must allege that the necessary information lies within

> defendants' control, and their allegations must be accompanied by a
> statement of the facts upon which the allegations are based.

*Weiner v. Quaker Oats Co*., 129 F.3d 310, 319 (3d Cir. 1997) (quoting *Craftmatic*

*Securities Litigation v. Kraftsow*, 890 F.2d 628, 645 (3d Cir.1989).

Here, Plaintiffs have alleged that necessary information is within Defendants'

control, and have accompanied their allegations with the detailed statements of the

facts on which the allegations are based. *See* Am. Compl., Dkt. 94 at ¶¶ 19, 26-28,

137, 155, 168, 177, 185-186, 197, 200, 222, 225. Accordingly, the particularity

requirements of Rule 9(b) should be relaxed in the evaluation of Plaintiffs' RICO

claims.

## III.   PLAINTIFFS SUFFICENTLY PLEAD A CLAIM FOR BREACH OF CONTRACT.

Plaintiffs' Fifth Cause of Action for breach of contract includes claims for

breach by the Lessee Defendants of their respective express and implied in fact

obligations under Plaintiffs' respective Leases, as well as a claim for breach of the

implied covenant of good faith and fair dealing inherent in their respective Leases.

*See* Dkt. 94 at ¶¶ 299-310.

### A.   Breach of Express Contract.

Plaintiffs rely upon the arguments set forth in their original brief (Plaintiffs'

Consolidated Brief in Opposition to Defendants' Motions to Dismiss) in opposition

to their claim from breach by the respective Lessee Defendants of the express provisions of Plaintiffs' Leases. *See* Dkt. 122 at 39-49.

### B. Breach of Implied Contract (Including Breach of the Implied Covenant of Good Faith and Fair Dealing)

As this Court recognized in *Masciantonio v. SWEPI LP*, No. 4:13-CV-0797, 2014 WL 4441214, at *5 (M.D. Pa. Sept. 9, 2014), "[u]nder Pennsylvania law, an oil and gas lease 'is in the nature of a contract and is controlled by principles of contract law.' " *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012); *see also Stewart v. SWEPI, LP*, 918 F.Supp.2d 333, 339 (M.D.Pa.2013) (Conner, J.); *Jacobs v. CNG Transmission Corp.*, 332 F.Supp.2d 759, 772 (W.D.Pa.2004).

Pennsylvania courts impose an implied duty of good faith in the performance of contracts, sometimes termed the "doctrine of necessary implication." *See Francis v. LCP N. Third, LLC*, 293 A.3d 273, 279–80 (Pa. Super. 2023), *reargument denied* (May 22, 2023), *appeal denied*, 309 A.3d 698 (Pa. 2023) (citing *Somers v. Somers*, 613 A.2d 1211, 1214 (Pa. Super. 1992)).

> In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.

*Id.*, quoting *D.B. Van Campen Corp. v. Building and Constr. Trades Council*, 195 A.2d 134, 136-37 (1963).

As the Pennsylvania Superior Court has further explained:

The obligation to act in good faith in the performance of contractual duties varies somewhat with the context, and a complete catalogue of types of bad faith is impossible, but it is possible to recognize certain strains of bad faith which include: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of power to specify terms, and interference with or failure to cooperate in the other party's performance.

*Francis*, *supra.*, 293 A.3d at 279-280 (quoting *Somers*, 613 A.2d at 1213) (citations omitted).

As the plaintiffs argued, and as this Court recognized, in *Masciantonio*, *supra*, parties to oil and gas leases, like parties to any other commercial contract, may be subject to the implied duty of good faith and fair dealing. In support of this proposition, the Court cited multiple cases from Pennsylvania and other jurisdictions, including:

*Smith v. Arrington Oil & Gas, Inc.,* 664 F.3d 1208, 1216–18 (8th Cir.2012) (applying Arkansas law); *Zaloga v. Provident Life & Accident Ins. Co. of Am.,* 671 F.Supp.2d 623, 629–30 (M.D.Pa.2009) (predicting that the Supreme Court of Pennsylvania would recognize an implied covenant of good faith and fair dealing in all contracts); *Kamuck v. Shell Energy Holdings GP, LLC,* No. 4:11–CV–1425, 2012 WL 1463594, at *6 (M.D.Pa. Mar.19, 2012) (magistrate judge's report) (relying on *Zaloga* in the context of oil and gas leases), *adopted in relevant part by* 2012 WL 1466490 (M.D.Pa. Apr.27, 2012) (Conner, J.); *Cole v. Philadelphia* Co., 345 Pa. 315, 26 A.2d 920, 922–23 (Pa.1942) (holding that oil and gas lease provision permitting surrender at any time lessee deemed lease unprofitable did not permit arbitrary

surrender); *see also Interwave Tech. Inc. v. Rockwell Automation, Inc.,* No. Civ. A. 05–398, 2005 WL 3605272, at *9, * 12 (E.D.Pa. Dec.30, 2005) (finding, in a non-UCC context, that an implied duty to act in good faith "applied to limit the possibility of self-dealing conduct such as 'where a contract grants one party discretion over some aspect of performance, for in these cases the party accorded discretionary power can opportunistically subvert the legitimate expectations of the other party' ").

*Masciantonio*, 2014 WL 4441214, at *11.[2]

In the Amended Complaint in the present case, in addition (and in the alternative) to alleging that the Lessee Defendants breached their express obligations under their respective Leases by deducting post-production costs in calculating royalties, Plaintiffs allege that the Lessee Defendants breached their implied in fact obligations, as well as their implied covenants of good faith and fair dealing inherent in the Leases, by "selling gas produced pursuant to Leases in which Plaintiffs hold royalty interests to affiliates, in non-arms'-length transactions, at artificial, self-serving and unreasonably low prices," and by "unilaterally and retroactively recouping and recovering artificially inflated, grossly excessive, improper and unreasonable charges for purported post-production costs, and by self-interestedly using such costs to improperly reduce the royalties payable and actually paid to

---

[2] In response to defendant SWEPI LP's assertion that the plaintiffs had waived any implied covenant of good faith and fair dealing by general waiver of implied covenant language in their leases, the Court (while recognizing that Pennsylvania courts have not yet addressed the issue) also suggested that the implied covenant of good faith and fair dealing was not subject to waiver. *Masciantonio*, 2014 WL 4441214, at *14.

Plaintiffs under their Leases." (Dkt. 94 at ¶ 308).  In alleging that the post-production costs deducted by the respective Lessees are excessive, improper, and unreasonable, Plaintiffs incorporate and rely on their earlier allegations of anti-competitive agreements among the Lessee Defendants, and common ownership of gathering pipelines, and the Court can and should reasonably infer that Plaintiffs are alleging that the excessive, improper and unreasonable post-production costs are result of such earlier self-dealing transactions. *See, e.g.* Dkt. 94 at ¶¶ 6-17, 25, 136-140, 149-150, 299, 306-308.

As a result, Plaintiffs sufficiently plead a claim for breach of contract.

## **CONCLUSION**

For the reasons stated above and in Plaintiffs' original brief (Dkt. 122), Plaintiffs respectfully request the Court to deny the motions to dismiss filed by each of the Defendants. In the alternative, if for any reason the Court finds that Plaintiffs have not sufficiently stated any of their claims, Plaintiffs respectfully request leave to amend.

Dated: April 23, 2024          Respectfully submitted,

/s/ Thomas S. McNamara
Thomas S. McNamara
Attorney ID #38479
INDIK & McNAMARA, P.C.
123 South Broad Street, Suite 1200
Philadelphia, PA  19109
Tel:  (215) 567-7125

-and-

Taunya M. Knolles Rosenbloom
Attorney ID # 200635
LAW OFFICES OF TAUNYA M.
KNOLLES ROSENBLOOM
332 South Main Street, P.O. Box 309
Athens, PA  18810
Tel: (570) 888-0660

-and-

Christopher D. Jones
Attorney I.D. # 84049
GRIFFIN, DAWSEY, DePAOLA &
JONES, P.C.
101 Main Street
Towanda, PA  18848

Tel: (570) 265-2175

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.8(b)(2)</u>

I Thomas S. McNamara hereby certify that the text of the foregoing Plaintiffs'
Consolidated Supplemental Brief in Opposition to Defendants' Motions to Dismiss,
excluding the caption, Table of Contents, Table of Authorities, and signature block,
contains 6,517 words, as calculated by the word-count feature of Microsoft Word,
which is within the 7,500 word limit requested in Plaintiffs' Unopposed Motion for
Leave to Enlarge Length of Brief being filed contemporaneously with this brief.


Dated:  April 23, 2024                            <u>/s/ Thomas S. McNamara</u>
                                                  Thomas S. McNamara

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 23, 2024, I caused a copy of the foregoing Plaintiffs' Supplemental Consolidated Brief in Opposition to Defendants' Motions to Dismiss to be filed using the Court's electronic filing system, and that the filing is available to counsel for all parties for downloading and viewing from the electronic filing system.

<u>/s/ Thomas S. McNamara</u>
Thomas S. McNamara
