**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| A&B CAMPBELL FAMILY LLC., et al., | |
| Plaintiffs, | CIVIL ACTION NO. 3:15-CV-00340 |
| v. | (MEHALCHICK, J.) |
| CHESAPEAKE ENERGY CORP, et al., | |
| Defendants. | |

## MEMORANDUM

Before the Court are four motions to dismiss filed by Defendants Anadarko E&P Onshore LLC, as successor by conversion to and f/k/a Anadarko E&P Company LP ("Anadarko"), Mitsui E&P USA LLC ("MEPUSA"), Access MLP Operating, L.L.C., Appalachia Midstream Services, L.L.C., Williams Partners, LP ("Access"), and Chesapeake Appalachia, L.L.C. ("Chesapeake"), as well as a motion to intervene filed by Appalachian Basic Minerals LP, McCrow Energy Partners, II, LLC, PennMarc Resources II, LP, and Wildes Mineral Interests, LLC. (Doc. 111; Doc. 113; Doc. 115; Doc. 117; Doc. 149). This action was originally filed by Plaintiffs, who consist of a group of oil and gas lessors, on February 17, 2025.[1] (Doc. 1). The operative amended complaint was filed on July 18, 2015.

---

[1] The named Plaintiffs in this case are as follows: David J Bride, John M Barrett, Richard D Marshall, Rexford Schoonover, F & M Robinson, LLC, Robert H Stoudt, Jr, SL Allen LLC, MS & JC Doss, LLC, F. Robert Hauss, Ronald L Campbell, James E Canfield, John R Snell, Jerry L. Price, DP Investments, LLC, David W Moon, DJH and WGH, LLC, Charles L Emerson, Little Fall R & R Inc., Barbara E Mosier, Erven W Crawford, Paul DeNault, Barbara P Grimes, Kendra P Solowiej, E. Larry Franklin, Clark H Beebe, Freda L Canfield, Sandra L Marshall, Theodore B Gatto, Wesley G Mosier, Darlene R Newton,

(Doc. 94). For the following reasons, Anadarko, MEPUSA, and Access's motions to dismiss will be **GRANTED**. (Doc. 111; Doc. 113; Doc. 115). Chesapeake's motion to dismiss will be **DENIED** as **MOOT**. (Doc. 117). The motion to intervene will also be **DENIED** as **MOOT**. (Doc. 149).

## I.   PROCEDURAL AND FACTUAL BACKGROUND

This case arises from fracking activity in the Marcellus Shale area in Pennsylvania.[2] (Doc. 94). Plaintiffs are a group of individuals who hold royalty interests under oil and gas

---

Valarie DeNault, Michael R Bride, James E Grimes, June Crawford, Carol Franklin, Cheryl A Henry, Tor Tamarack, LLC, Peter P Solowiej, Mosier Real Estate Co., LLC, Shirley Bride, Candy S Card, Robert L Dibble, Jr, David L Sandt, Doris J Newton, James P Snell, Neta Repsher, Carol Hauss, H. Timothy Newton, Foster Family LLC, Cindy E Barrett, A & B Campbell Family, Thomas R Frederick, Barto Family LLC, Patti L Stoudt, Jacqueline T Place, Sue A Sites, Shawn Patrick Newton, Richard A Card, Jr, Deborah S Frederick, Russell E Bulick, Richard W Jackson, Milton Repsher, Cathy Ann Brady, Dolores B Jackson, M. Patricia Nelson, Renee S Newton, Epler Family LLC, Claudia C Price, Outdoor Investment, LLC, Mary J Moon, Shawn Newton(trading as Newton Family Limited Partnership), James T Barrett, Walter E Newton, III, Lynn Dibble, Paul A Sites, DJH & PAH, LLC, Theodore A Johnson, Kent L Morgan, Nicole D Newton, Lori R Barrett, Morchar LLC, Michelle S Snell, Walter E Newton, III(trading as Newton Family Limited Partnership), Diane V Bride, Walter G Henry, Jr, Pamela L Emerson, Eugene J Barrett, Jr.

[2] The following relevant background about fracking in Pennsylvania is taken from this case's counterpart *Suessenbach Fam. Ltd. P'ship v. Access Midstream Partners, L.P.*:

> Fracking enables the production of natural gas and oil from rock formations below the earth's surface, generally 5,000 to 20,000 feet. At such depth, there may not be sufficient permeability or reservoir pressure to allow natural gas and oil to flow from the rock into the wellbore at economic rates. Given the extremely low natural permeability of shale, creating fractures in the rock is critical to extract gas from shale reservoirs.

> Large deposits of natural gas have been discovered in various shale deposits throughout the United States, including in Pennsylvania, and several oil and gas exploration and development companies have been actively accessing these deposits due to the development of fracking technology that allows the deposits

leases in properties generally located above the Marcellus Shale. (Doc. 94, ¶ 1). In the aggregate, Plaintiffs hold royalty interests in the natural gas produced from over 12,000 acres of leasehold land. (Doc. 94, ¶ 1 n.1). The named Defendants in this case, Chesapeake, USA Onshore Properties, Inc. ("Statoil"), Anadarko, and MEPUSA (together with Anadarko, "Lessee Defendants") also hold rights in Plaintiffs' leases, either as the original lessee party

---

to be exploited. The Marcellus Shale formation located in and beyond Pennsylvania is one of the largest natural gas reserves in the world. Plaintiffs' lands are located in the Marcellus Shale.

Gaining access to the deposits in the shale regions, including the Marcellus Shale, typically involves purchasing or leasing land or mineral rights in the vicinity of suspected deposits and attempting to develop profitable wells. Once a natural gas deposit is reached, a wellhead is placed on the deposit. After a wellhead is in place, natural gas can be moved from the well through gathering pipes and ultimately transported through an intrastate transmission pipeline. Intrastate transmission pipelines connect to major interstate transmission pipelines which transport natural gas throughout the United States. The transport and processing steps which follow removal of natural gas from the wellhead, but precede entry of the gas into an interstate transmission pipeline, are sometimes referred to as "gathering." Access Midstream operates between the lessors at the wellhead and the interstate pipeline system.

Processing can also include certain services to make gas suitable for entry into the interstate pipeline system, such as dehydration when the natural gas has a high water content. Access Midstream as indicated, however, "[i]n general, the natural gas in the northern Marcellus Shale is lean and typically requires little to no treatment to remove contaminants."

While federal rules limit fees that can be charged on the interstate pipelines to prevent gouging, drilling companies levy fees on local pipelines, known as gathering lines. However, even where such fees are deducted, they must be reasonable and actual.

No. CIV.A. 3:14-1197, 2015 WL 1470863, at *2-3 (M.D. Pa. Mar. 31, 2015).

or as assignees of all or part of the right, title, and interest of the original lessee party.[3] (Doc. 94, ¶ 2).

Broadly, Plaintiffs allege that Defendants engaged in "separate but related unlawful schemes" to deprive Plaintiffs of royalties and royalty interests for gas produced on their leaseholds. (Doc. 94, ¶ 7). Further, Plaintiffs allege that through an agreement among Defendants to jointly develop natural gas wells and gathering systems in and around the Marcellus Shale, Defendants have engaged in an unlawful, anti-competitive scheme. (Doc. 94, at 8). This scheme is allegedly intended to "allocate geographic markets for the acquisition of gas mineral rights and operating working interests in oil and gas leases through the establishment and abuse of restrictive areas of mutual interest." (Doc. 94, at 8). The scheme also allegedly permits Defendants, particular Chesapeake, to charge "supra competitive" fees for gathering services at the wells on property leased by Plaintiffs. (Doc. 94, ¶ 17). In effect, the scheme allegedly allows Defendants to defraud Plaintiffs of their royalties "by the misrepresentation of unauthorized or artificially inflated deductions." (Doc. 94, at 13).

On February 17, 2015, Plaintiffs first filed this lawsuit in this Court. (Doc. 1). On July 18, 2015, Plaintiffs filed the instant amended complaint. (Doc. 94). Therein, they alleged the following causes of action: First Cause of Action–Agreement to Restrain Competition in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; Second Cause of Action–Combination or Conspiracy to Monopolize Trade or Commerce in Violation of Section 2 of

―――――――――――――――――――――

[3] By the date of this filing, Statoil and Chesapeake have been dismissed from this action. (Doc. 110; Doc. 182).

the Sherman Act, 15 U.S.C. § 2; Third Cause of Action–Violation of RICO, 18 U.S.C. §§ 1961-1968; Fourth Cause of Action–Conspiracy to Violate RICO, 18 U.S.C. § 1962(d); Fifth Cause of Action–Breach of Contract – Express and/or Implied Covenants; Sixth Cause of Action–Action for Accounting; Seventh Cause of Action–Conversion; and Eighth Cause of Action–Civil Conspiracy. (Doc. 94, ¶¶ 236-56; 257-67; 268-88; 289-98; 299-310; 311-15; 316-326; 327-32). As relief, Plaintiffs seek monetary, compensatory, and punitive damages. (Doc. 94, at 139-141).

On September 18, 2015, Anadarko, MEPUSA, Access, and Chesapeake each filed a motion to dismiss Plaintiffs' amended complaint as well as a brief in support of their respective motions.[4] (Doc. 111; Doc. 112; Doc. 113; Doc. 114; Doc. 115; Doc. 116; Doc. 117; Doc. 118). On October 25, 2015, Plaintiffs filed a consolidated brief in opposition addressing each of Defendants' motions to dismiss. (Doc. 122). On November 20, 2015, MEPUSA, Anadarko, Access, and Chesapeake each filed a reply brief. (Doc. 127; Doc. 128; Doc. 129; Doc. 130).

On December 19, 2016, Appalachian Basic Minerals LP, McCrow Energy Partners, II, LLC, PennMarc Resources II, LP, and Wildes Mineral Interests, LLC filed a motion to

---

[4] As Chesapeake has been dismissed from this action, its motion to dismiss is **DENIED** as **MOOT**. (Doc. 117).

intervene in this action and a brief in support of their motion. (Doc. 149; Doc. 150). No brief in opposition was ever filed in response.[5]

Without a ruling on any of the pending motions, this action was stayed pending mediation on March 22, 2017. (Doc. 151). On June 28, 2020, resolution of this case was further delayed by bankruptcy proceedings implicating Chesapeake. (Doc. 167). Upon the resolution of these proceedings, Plaintiffs filed a notice of voluntary dismissal, dismissing Chesapeake as a Defendant from this action. (Doc. 182).

On February 23, 2024, the undersigned was assigned to this case. On March 14, 2024, after a conference call with the parties, this Court lifted the stay on this litigation and scheduled oral argument on the pending motions to dismiss. (Doc. 191). The Court also directed the parties to submit supplemental briefing addressing updates in the law since the parties initially filed their briefs in 2015. On April 19, 2024, Anadarko, MEPUSA, and Access filed their supplemental briefing.[6] (Doc. 196; Doc. 197; Doc. 198). On April 23, 2024, Plaintiffs filed their supplemental opposition brief. (Doc. 202). Oral argument subsequently took place on May 21, 2024. Accordingly, the outstanding motions are ripe and ready for disposition. (Doc. 111; Doc. 113; Doc. 115).

---

[5] Because Plaintiffs' complaint is to be dismissed, the motion to intervene will be **DENIED** as **MOOT**. (Doc. 149). The motion may be reasserted once a second amended complaint has been filed.

[6] Access incorrectly filed their supplemental briefing as a motion to supplement. (Doc. 196).

## II. LEGAL STANDARD

Rule 12(b)(6) authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To assess the sufficiency of a complaint on a Rule 12(b)(6) motion, a court must first take note of the elements a plaintiff must plead to state a claim, then identify mere conclusions which are not entitled to the assumption of truth, and finally determine whether the complaint's factual allegations, taken as true, could plausibly satisfy the elements of the legal claim. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). In deciding a Rule 12(b)(6) motion, the court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

After recognizing the required elements which make up the legal claim, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The plaintiff must provide some factual ground for relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Thus, courts "need not credit a complaint's 'bald assertions' or 'legal conclusions…'" *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997)). The court also

need not assume that a plaintiff can prove facts that the plaintiff has not alleged. *Associated Gen. Contractors of Cal. v. Cal. St. Council of Carpenters*, 459 U.S. 519, 526 (1983).

A court must then determine whether the well-pleaded factual allegations give rise to a plausible claim for relief. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Palakovic v. Wetzel*, 854 F.3d 209, 219-20 (3d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted); *see also Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010). The court must accept as true all allegations in the complaint, and any reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). This "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt* v. *President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted). The plausibility determination is context-specific and does not impose a heightened pleading requirement. *Schuchardt*, 839 F.3d at 347.

### III.   DISCUSSION

#### A.   ANTITRUST CLAIMS ASSERTED UNDER THE SHERMAN ACT

Plaintiffs allege that Defendants have violated the Sherman Act by engaging in a conspiracy to monopolize trade and restrain competition. (Doc. 94, at 106, 115). "The purpose of the Sherman Act is to protect buyers and sellers from the effects of seller or buyer 'market power' unless obtained by competition on the merits." *Abrams v. Chesapeake Energy Corp.*, No. 4:16-CV-1343, 2017 WL 6541511, at *6 (M.D. Pa. Dec. 21, 2017). Plaintiffs bring

claims under both Section 1 and Section 2 of the Sherman Act, which "prohibit agreements that unreasonably restrain competition, and prohibit monopolization, attempted monopolization, and conspiracies to monopolize, respectively." *Abrams*, 2017 WL 6541511, at *6. All Defendants argue that Plaintiffs lack standing to bring their Sherman Act claims and that Plaintiffs have failed to sufficiently plead the necessary elements under Section 1 and Section 2 of the Sherman Act. (Doc. 112, at 17-31; Doc. 114, at 16-28; Doc. 116, at 21-37). The Court will address each contention in turn.

> 1. **Plaintiffs have failed to allege they suffered an antitrust injury and thus do not have standing to bring their antitrust claims.**

This Court must first address whether Plaintiffs have standing to bring their Sherman Act claims. All Defendants argue that Plaintiffs lack standing to bring their antitrust claims because they were not injured in a manner consistent with the protections of the Act. (Doc. 112, at 23-24; Doc. 114, at 19; Doc. 116, at 21-22). In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, the United States Supreme Court detailed factors to be considered when determining whether a plaintiff has antitrust standing. 459 U.S. 519 (1983). These factors, as organized by the Third Circuit, are as follows:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

> *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165–66 (3d Cir. 1993); *see also Ethypharm S.A. France v. Abbott Lab'ys*, 707 F.3d 223 (3d Cir. 2013).

9

The threshold element of antitrust standing is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). This requirement ensures that antitrust laws are enforced "for the protection of competition, not competitors." *Brunswick Corp.*, 429 U.S. at 488. Accordingly, antitrust standing is limited to consumers and competitors in the relevant market, and to those whose injuries are "inextricably intertwined" with the alleged antitrust agreement or conspiracy. *Ethypharm*, 707 F.3d at 233. Per the Third Circuit, the "inextricably intertwined" exception requires the alleged injury to be the means by which a defendant achieves anti-competitive ends and may be extended only to entities that are in the business of selling goods and services in the same market. *See Ethypharm*, 707 F.3d at 237 (citing *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 320-21 (3d Cir. 2007)). Furthermore, "[a]n antitrust plaintiff must allege not only personal harm, but also that the defendant's conduct affected the 'prices, quantity or quality of goods or services' in the relevant market." *Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 531 (W.D. Pa. 2019*); Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996) (citing *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d at 728); *see also Eichorn v. AT & T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001) ("[T]he antitrust laws were designed to protect market-wide anticompetitive activities"). The ensuing injury must result from the competition-reducing effect of the defendant's behavior.

According to Anadarko, Plaintiffs have not alleged they suffered an antitrust injury because "the harm alleged by Plaintiffs is not harm to market-wide competition." (Doc. 112, at 25). MEPUSA argues that, according to the amended complaint, Chesapeake, which has

been dismissed from this action, is alleged to have merely transferred an existing monopoly to another entity, which "has no antitrust effect." (Doc. 114, at 20); *See Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 266 (7th Cir. 1984) (An act that "creates no monopoly power[, but] merely shifts a lawful monopoly into different hands . . . has no antitrust significance."); *see also Columbia River People's Utility Dist. v. Portland General Elec. Co.*, 217 F.3d 1187, 1190-91 (9th Cir. 2000) (holding that determining which party would be a state-approved monopolist for an electrical plant had no antitrust significance because the monopoly would exist either way). Access avers that Plaintiffs' antitrust claims fail because "Plaintiffs allege no reduction in competition" from the relevant agreements at issue in this case, and thus no cognizable injury. (Doc. 116, at 22).

Plaintiffs respond to these arguments by citing Third Circuit precedent which stands for the proposition that the existence of antitrust injury is not typically resolved through motions to dismiss. (Doc. 122, at 28). *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997) (citing *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995)). Plaintiffs also contend that they "remained prospective participants in the market for Gas Mineral Rights, and therefore subject to potential injury in the market for such rights by the anticompetitive activity of the defendants, due to the unique characteristics of oil and gas leases." (Doc. 122, at 23). Plaintiffs further recognize themselves as "sellers" in a buyers' market for gas mineral rights however, such an allegation is absent from their amended complaint. (Doc. 94; Doc. 122, at 30).

Antitrust injury is an essential element to antitrust standing. *See SEI Glob. Servs., Inc. v. SS&C Advent,* No. 20-3386, 2022 WL 2356730, at *2 (3d Cir. June 30, 2022) (recognizing

11

antitrust injury the "threshold" for antitrust standing). But, as Plaintiffs point out, "[t]he existence of antitrust injury is not typically resolved through motions to dismiss." (Doc. 122, at 28); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 684 (E.D. Pa. 2014); *see also Ethypharm*, 707 F.3d at 232 n.15 (antitrust standing is a "merits issue"); *see also CarePoint Health Sys. Inc. v. RWJ Barnabas Health, Inc.*, No. 22CV5421 (EP) (CLW), 2023 WL 7986429, at *5 (D.N.J. Nov. 17, 2023). "An antitrust plaintiff is only required to 'allege facts capable of supporting a finding or inference that the purported anticompetitive conduct produced'" the purported harm. *RWJ Barnabas Health, Inc.*, 2023 WL 7986429, at *5 (quoting *In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566, 577 (E.D. Pa. 2018)). However, even considering this liberal demand, Plaintiffs have failed to meet their burden to established they suffered an antitrust injury.

First, Plaintiffs do not allege any facts supporting there was a reduction in competition stemming from their alleged injury. *See SS&C Advent*, 2022 WL 2356730, at *2 (stating an antitrust injury must flow from "anti-competitive effect on the competitive market" in the relevant market). Instead, Plaintiffs only allege harm to themselves through the underpayment of royalties. (Doc. 94, ¶ 253); *see AlphaCard Sys. LLC v. Fery LLC*, No. CV1920110ZNQTJB, 2023 WL 3506414, at *4 (D.N.J. May 17, 2023) (dismissing antitrust claims because plaintiff failed to allege harm to competition, alleging only harm unto itself); *see also Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1125 (10th Cir. 2005) (finding the alleged injury of underpayment of royalties to be insufficient to confer antitrust standing). Also, Plaintiffs fail to allege that the market for Gathering Services became less competitive as a result of the complaint of activities, alleging instead that Chesapeake merely

transferred its monopoly power and that competitive fees were already charged in the market for Gathering Services before the complained of agreements. (Doc. 94, ¶¶ 17, 211, 246-47). A shift in a monopoly does not automatically establish a change in the market, especially whereas here Plaintiffs fail to allege specific ways in which Defendants "bolstered and extended" their monopoly power beyond their conclusory allegation stating as much. (Doc. 94, ¶ 248); *see, e.g., Columbia River People's Util. Dist. v. Portland Gen. Elec. Co.*, 217 F.3d 1187, 1190-91 (9th Cir. 2000) (recognizing that the same permissible constraints will exist whether the monopoly is held by one party or another); *see also, e.g., Hasu Shah v. Harristown Dev. Corp.*, No. 1:12-CV-2196, 2013 WL 6567764, at *8 (M.D. Pa. Dec. 13, 2013) ("The court agrees with defendants [] that an existing monopoly's change of ownership is not, by itself, an antitrust violation."). Furthermore, because Plaintiffs allege that Defendants "enabled themselves" to "cause Plaintiffs to receive below- market royalties as a result of the deduction of unauthorized and/or artificially inflated costs from their royalties." (Doc. 94, ¶ 253). Thus, the Court cannot surmise that Plaintiffs' alleged injury of decreased royalties was caused by the unlawful exercise of market power by Defendants. *See SS&C Advent*, 2022 WL 2356730, at *2 (affirming the dismissal of antitrust claims where plaintiff had "not alleged that harm flows from any purported anticompetitive conduct by" defendants).

Next, Plaintiffs are not the proper parties to bring an antitrust action because they are neither consumers nor competitors in the alleged relevant markets. *W. Penn Allegheny Health Sys., Inc. v. UPMC,* 627 F.3d 85 (3d Cir. 2010) (Antitrust injury is limited to "consumers and competitors in the restrained market."). Whereas Plaintiffs may play an upstream role in the market for gas minerals rights, their tangential relationship to the relevant market is

13

insufficient to confer standing. *SigmaPharm, Inc. v. Mut. Pharm.* Co., 454 F. App'x 64, 69 (3d Cir. 2011) (concluding that even though plaintiff provided a crucial input in the relevant market, it was not within the class of parties with antitrust standing). Plaintiffs attempt to plead around this conclusion by alleging in a conclusory fashion that their injury is "inexplicably intertwined" with Defendants' alleged wrongdoing. (Doc. 94, ¶¶ 252-253). The Third Circuit has extended antitrust standing to instances where "'both plaintiffs and defendants are in the business of selling goods or services in the same relevant market,' though they may not directly compete against each other." *Ethypharm*, 707 F.3d at 237; *see also Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162 (3d Cir. 2015) ("suppliers and other non-market participants generally do not have antitrust standing unless their injuries were the very means by which the defendants carried out their illegal ends"). Standing exists under the inextricably intertwined exception where the alleged injury is a "necessary step in effecting the ends of the alleged illegal conspiracy." *Blue Shield v. McCready*, 457 U.S. 465, 476-79, 484 (1982) (emphasis added). Here, however, based on the allegations in the amended complaint, that is not the case. Plaintiffs' allegations do not support their conclusion that they and Defendants are buyers and sellers in the same market and Plaintiffs have failed to direct the Court to any caselaw that suggests otherwise. *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 321 (3d Cir. 2007). Even more damaging to their claim for standing is Plaintiffs' inability to point to non-conclusory, factual allegations in the complaint demonstrating how reducing their royalties was a necessary means for Defendants to reduce competition in the relevant market for Gas Mineral Rights. The Court is not convinced that Plaintiffs' complained of injury is inextricably intertwined with Defendants' alleged anticompetitive

scheme. The Court therefore finds that Plaintiffs have failed to sufficiently allege antitrust standing at this juncture.[7] Accordingly, Defendants' motions to dismiss are **GRANTED** as to Plaintiffs' antitrust claims, the First and Second Causes of Action, which are hereby **DISMISSED without prejudice**. (Doc. 94, ¶¶ 236-56, 257-67; Doc. 111; Doc. 113; Doc. 115).

   **2. Plaintiffs have failed to allege an anti-competitive agreement among all Defendants.**

   Even if Plaintiffs did have standing to assert their Sherman Act claims against Defendants, their claims would fail as insufficiently pled. Turning first to the Section 2 claim, Plaintiffs do not explicitly refute Anadarko and MEPUSA's claim that they have failed to allege an antitrust conspiracy. (Doc. 112, at 17; Doc. 114, at 17; Doc. 122). Plaintiffs do, however, defend their Section 1 claim. (Doc. 122, at 35). According to Defendants, Plaintiffs' amended complaint does not sufficiently establish that Defendants came to the requisite agreement to satisfy this claim. (Doc. 112, at 17-21; Doc. 114, at 17-19; Doc. 116, at 21-22). To assert a claim under Section 1 of the Sherman Act, Plaintiffs must allege Defendants engaged in a "contract, combination. . . or conspiracy, in restraint of trade or commerce." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 548 (2007). This requires a showing of that Defendants made a conscious commitment to a common scheme. *Burch v. Milberg Factors, Inc.*, 662 F.3d

---

[7] Plaintiffs allege "the economic injury suffered by Plaintiffs was a necessary step in, integral to, or part of the essential means by which defendants Chesapeake and Access Midstream sought to achieve their illegal and anticompetitive ends. As a result, the economic injury suffered by Plaintiffs is inextricably intertwined with Defendants' wrongdoing." (Doc. 94, ¶ 252). This allegation is not only conclusory, but also fails to implicate all remaining Defendants in this case.

212, 220 (3d Cir. 2011). Here, each Defendant argues that Plaintiffs have failed to allege that all the Defendants named in the amended complaint together were engaged in "act actual illicit agreement." (Doc. 112, at 18; Doc. 114, at 17; Doc. 116, at 36). According to Defendants, Plaintiffs' claims are "conclusory" and "devoid of fact." (Doc. 112, at 18; Doc. 114, at 17; Doc. 116, at 36). Plaintiffs maintain that "the amended complaint contains far more than bare allegations of joint venture." (Doc. 122, at 20).

The Court is tasked with determining whether the alleged anticompetitive conduct was the result of an agreement among Defendants or each of their independent choices. *Twombly*, 550 U.S. at 553; *see Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 254 (3d Cir. 2010) ("Section 1 claims are limited to combinations, contracts, and conspiracies, and thus always require the existence of an agreement."). Conduct that is "entirely consistent" with the defendant pursuing its own economic interests does not support an inference of conspiracy. *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 368 (M.D. Pa. 2008); *see also Twombly*, 550 U.S. at 567 (allegations of conspiracy are deficient if there are "obvious alternative explanation[s]" for the facts alleged). "While a showing of parallel 'business behavior is admissible circumstantial evidence from which the fact finder may infer agreement,' it [also] falls short of 'conclusively establish[ing] agreement or ... itself constitut[ing] a Sherman Act offense.'" *Twombly*, 550 U.S. at 553 (citing *Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (2007)); *see also See Valspar Corp. v. E.I. Du Pont De Nemours and Company*, 873 F.3d 185, 190-91 (3d Cir. 2017) ("single firm's independent action...does not implicate § 1"). Even conscious parallelism falls short of what is required to establish a Sherman Act violation. *Twombly*, 550 U.S. at 553. To establish an

16

unlawful anticompetitive conspiracy, Plaintiffs must demonstrate that an "actual, manifest agreement" exists between Defendants. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004); *see also Kerwin v. Casino*, 802 F. App'x 723, 725-26 (3d Cir. 2020) (dismissing claim where, among other things, plaintiff failed to plead facts "specify[ing] a time or place that any actual agreement . . . occurred" or identifying the "particular individuals or organizations [that] made such an agreement") (quoting *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) (cleaned up). Plaintiffs' "agreement" claim must include factual allegations with respect to each defendant named in the complaint. *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 719 (E.D. Pa. 2011).

In their amended complaint, Plaintiffs point to several agreements made by various groupings of Defendants over a five-year period to support a larger conspiracy containing all Defendants. (Doc. 94, ¶¶ 136, 140, 141). Plaintiffs offer no factual allegations supporting their conclusion that all Defendants, acting in concert, had an agreement to restrain trade in violation of the Sherman Act. Without citing to any caselaw, Plaintiffs argue their Section 1 claim should not be dismissed because they "aver detailed factual allegations of overlapping schemes among the defendants which are sufficient to create a plausible inference that the defendants entered into an agreement to unreasonably restrain trade in the relevant markets." (Doc. 122, at 36). However, this is not so. To meet their burden, Plaintiffs must allege facts that support Defendants shared "a unity of purpose." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004). The amended complaint does not support that each Defendant was even aware of each other's conduct, never mind had a unity purpose. Instead, at most Plaintiffs have alleged parallel conduct "entirely consistent" with each Defendant pursuing

17

its own interests by underpaying Plaintiffs' royalties by deducting post-production costs. *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363 (M.D. Pa. 2008). Furthermore, this parallel conduct of deducting post-production costs has been upheld as permissible by the Pennsylvania Supreme Court. *Kilmer v. Elexco Land Servs., Inc.*, 990 A.2d 1147, 1149 (Pa. 2010). Accordingly, because Plaintiffs have failed to allege Defendants participated in an anticompetitive agreement, Defendants' motions to dismiss are to be **GRANTED** on this basis. (Doc. 111; Doc. 113; Doc. 115). Even "under the most liberal notice pleading requirements of Rule 8(a), a plaintiff must differentiate between defendants. . . An allegation against multiple defendants that is bereft of specific wrongdoing by those proposed defendants is insufficient to state a claim." *Bret Binder v. Weststar Mortg., Inc.*, No. CV 14-7073, 2016 WL 3762710, at *3 (E.D. Pa. July 13, 2016) (citation omitted). Accordingly, Plaintiffs' First and Second Causes of Action are **DISMISSED without prejudice**. *See Ellison v. Am. Bd. of Orthopaedic Surgery, Inc.*, No. CV168441KMJBC, 2018 WL 6629764, at *5 (D.N.J. Oct. 30, 2018) (dismissing Section 1 claims because plaintiff failed to allege an unlawful agreement).

3. **Whether Plaintiffs have designated a proper geographic market is a question best answered after discovery.**

To state a claim under the Sherman Act, a plaintiff must also allege the existence of a valid geographic market. *Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 524 (W.D. Pa. 2019). The relevant geographic market is the "area in which a potential buyer may rationally look for the goods or services he or she seeks." *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 726-27 (3d Cir. 1991). Typically, defining the appropriate geographic market involves questions of material fact and requires expert testimony. *Premier Comp Sols.*, 377 F. Supp. 3d at 526. Still, Defendants argue that Plaintiffs' proposed geographic market is

deficient, even considering their lack of discovery at this time. (Doc. 112, at 29-31; Doc. 114, at 28 n.5; Doc. 116, at 26-28). Plaintiffs refute this. As they see it, they "cannot reasonably be expected or required to define the proposed markets with any further precision until after they have had the opportunity to conduct factual inquiries into the commercial realities faced by natural gas exploration and production companies in discovery." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482; (Doc. 122, at 35). The Court is inclined to agree, especially given Plaintiffs' argument that they based their proposed geographic markets on the information that was publicly available to them at the time of filing the amended complaint. (Doc. 202, at 17). However, having determined that Plaintiffs' lack standing to bring their antitrust claims, the Court will not further opine on this element of their claim.

B. RICO CLAIMS

Plaintiffs also allege that Defendants violated RICO. (Doc. 94, at 119). Specifically, Plaintiffs claim that Defendants were part of a RICO enterprise designed to defraud Plaintiffs by overcharging them for post-production costs associated with the gathering, transportation, and marketing of natural gas. (Doc. 94, ¶ 272). Pursuant RICO, it is unlawful "for any person employed by or associated with any enterprise engage in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962; *see Dongelewicz v. PNC Bank Nat'l. Ass'n*, 104 Fed. Appx. 811, 816–817 (3d Cir. 2004) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). To state a claim for a RICO violation, Plaintiffs must allege that Defendants are (1) a person (2) who is associated with an enterprise

19

engaged in interstate commerce (3) who conducted the affairs of said enterprise (4) through a pattern (5) of racketeering activity. *Dongelewicz*, 104 Fed. Appx. at 816–817.

Here, Plaintiffs allege the predicate racketeering activity is mail and wire fraud. (Doc. 94, ¶¶ 231-32). "Racketeering activity" includes mail and wire fraud as defined by 18 U.S.C. §§ 1341 and 1343. *See* 18 U.S.C. § 1961(1). To establish a claim for mail or wire fraud, a plaintiff must allege: "(1) a scheme to defraud; (2) the use of the mails or wires for the purpose of executing the scheme; and (3) fraudulent intent." *Rapid Circuits, Inc. v. Sun Nat. Bank*, No. 10-6401, 2011 WL 1666919, at *23 (E.D. Pa. May 3, 2011) (citing *United States v. Pharis*, 298 F.3d 228, 234 (3d Cir. 2002)); *see also Katz v. DeLuca*, No. CV 23-1188, 2024 WL 2188905, at *5 (E.D. Pa. May 15, 2024). "When mail and wire fraud are the alleged predicate acts of a RICO violation, 'they must be pled with particularity to satisfy Federal Rule of Civil Procedure 9(b); in particular, blanket allegations of mail and wire fraud lacking information of who sent or received the fraudulent representations are insufficient to satisfy Rule 9(b).'" *DeLuca*, 2024 WL 2188905, at *5 (quoting *Rapid Circuits, Inc.* 2011 WL 1666919, at *23). Additionally, RICO makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962. Pursuant this section, Plaintiffs have also asserted a RICO conspiracy claim against Defendants. (Doc. 94, at 126).

Defendants argue that Plaintiffs' RICO claims should be dismissed because they have failed to allege that they suffered a RICO injury, failed to allege Defendants engaged in a RICO enterprise, failed to allege a pattern of racketeering activity, and failed to allege RICO conspiracy. (Doc. 112, at 32-37; Doc. 114, at 29; Doc. 116, at 42). The Court will address each argument in turn.

20

### 1. Plaintiffs have alleged a RICO injury.

The parties dispute whether Plaintiff have standing to assert their RICO claims.[8] (Doc. 112, at 35-36; Doc. 114, at 36-37; Doc. 122, at 46). The RICO statute "provides a private right of action to a person who is injured in his 'business or property by reason of' a RICO violation." *Hausknecht v. John Hancock Life Ins. Co. of New York*, 334 F. Supp. 3d 665, 679 (E.D. Pa. 2018)*; see* 18 U.S.C. § 1964. To have standing to assert their RICO claim, Plaintiffs must allege that Defendants' racketeering activities were the proximate cause of their injuries. *In re Sunrise Sec. Litig.*, 916 F.2d 874, 883 (3d Cir. 1990); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to plaintiffs' injuries."); *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010) (To state a claim under RICO, a plaintiff "is required to show that a RICO predicate offense 'not only was a "but for" cause of his injury, but was the proximate cause as well.'" (citation omitted)). Proximate cause requires a showing that there is "some direct relation between the injury asserted and the injurious conduct alleged." *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 804 F.3d 633 (3d Cir. 2015) (citation omitted). Courts in the Third Circuit consider three factors when determining the proximate cause of a RICO injury: "(1) whether the plaintiff was directly harmed by the defendant's predicate acts, (2) whether damages are speculative or concrete,

---

[8] Access does argue whether Plaintiffs have alleged a RICO injury in its brief in support of its motion to dismiss. (Doc. 116).

and (3) whether alternative potential plaintiffs exist who could better redress the harm alleged." *Lester v. Percudani*, 556 F. Supp. 2d 473, 483 n.16 (M.D. Pa. 2008).

Plaintiffs' alleged RICO injury is loss of royalties. (Doc. 94, ¶ 286). Plaintiffs allege their injury was caused by "deduction of unauthorized or artificially inflated and unreasonable post-production gathering and transportation costs in the calculation and payment of such royalties to Plaintiffs" as part of Defendants' scheme to overpay Access for gathering services and then recover some of that overpayment. (Doc. 94, ¶ 286). Plaintiffs further allege that their injury stems from their reliance on Defendants' predicate acts in issuing misleading monthly royalty statements that either "(a) fraudulently represented that deductions shown for gas gathering and transportation costs were legitimately incurred and permissible under the terms of the respective Plaintiffs' leases; or (b) fraudulently concealed, omitted or otherwise failed to disclose that such deductions had in fact been taken in calculating the royalties paid to the respective Plaintiffs." (Doc. 94, ¶¶ 233, 277-81, 283-84, 286; Doc. 122, at 47). As stated by Plaintiffs, "[i]n essence, [they] allege that they were initially lulled into a false sense of security by the royalty statements." (Doc. 122, at 48).

Plaintiffs aver that "[t]he Third Circuit has held that mailings 'designed to lull victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place' are sufficient to support a claim for mail fraud." (Doc. 122, at 48) (citing *U.S. v. Lebovitz*, 669 F.2d 894, 896 (3d Cir.1982) (quoting *U.S. v. Maze*, 414 U.S. 395, 403 (1974))). In *Suessenbach Family Ltd. Partnership v. Access Midstream Partners, L.P.*, this Court found this argument persuasive and held a similar injury to the one at bar to be sufficient to establish

standing for the purpose of a motion to dismiss. No. CIV.A. 3:14-1197, 2015 WL 1470863, at *11-13 (M.D. Pa. Mar. 31, 2015). Remaining consistent with this previous finding, the Court here too finds Plaintiffs' RICO allegations are sufficient at the motion to dismiss stage to sustain their burden as to their RICO injury. Thus, the Court will not grant Defendants' motions to dismiss on this basis. (Doc. 111; Doc. 113; Doc. 115).

**2. Plaintiffs have failed to allege an association-in-fact RICO enterprise.**

The parties dispute whether Plaintiffs have sufficiently alleged the existence of a RICO enterprise. (Doc. 112, at 32; Doc. 114, at 33-34; Doc. 116, at 38; Doc. 122, at 38; Doc. 197, at 20-21). For RICO purposes, "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[T]he 'enterprise' cannot be the pattern of racketeering activity alone and must be 'an entity separate and apart from the pattern of activity in which it engages.'" *Zakheim v. Curb Mobility LLC*, No. CV 22-4594, 2023 WL 5339606, at *2 (E.D. Pa. Aug. 18, 2023) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). There are two categories of associations that constitute a RICO enterprise: (1) legal entities such as corporations and partnerships, and (2) associations-in-fact. *See Ins. Brokerage Litig.*, 618 F.3d at 364 (citing *United States v. Turkette,* 452 U.S. 576, 581-52 (1981)).

Here, Plaintiffs assert that Defendants, along with their respective officers, directors, employees and agents, formed an association-in-fact enterprise. (Doc. 94, ¶¶ 270-72). In an association-in-fact enterprise, entities act together "for a common purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Therefore, an association-in-fact must share "(1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to

permit these associates to pursue the enterprise's purpose." *Boyle,* 556 U.S. at 946; *see also Fleetwood Servs., LLC v. Complete Bus. Sols. Grp., Inc.*, 374 F. Supp. 3d 361, 373 (E.D. Pa. 2019).

"The Third Circuit has made clear that normal business relationships, without more, are insufficient to support an association-in-fact enterprise." *Zakheim,* 2023 WL 5339606, at *3. Plaintiffs must allege that Defendants are "an entity separate and apart from the pattern of activity in which it engages." *Turkette,* 452 U.S. at 583. Here, Plaintiffs have not directed the Court to any allegations containing "descriptive details about the relationships between members of the enterprise." *Zakheim,* 2023 WL 5339606, at *1, 3 (discussing the dismissal of RICO claims because plaintiff had failed to allege a common purpose among defendants and stating "requires pleading some descriptive details about the relationships between members of the enterprise."). Specifically, Plaintiffs have not alleged that each Defendant knowingly agreed to participate together in an enterprise intended to defraud Plaintiffs. Instead, Plaintiffs rely on conclusory allegations that each Defendant "agreed to, and did, participate in the conduct of the Enterprise, and carried out its role using broad and independent discretion." (Doc. 94, ¶ 271); *Zakheim,* 2023 WL 5339606, at *3. This is especially true for MEPUSA and Anadarko. (Doc. 94). Thus, Plaintiffs have failed to allege a RICO enterprise. (Doc. 94).

Similarly, Plaintiffs also fail to satisfy the predicates set out in *Boyle v. United States.* 556 U.S. at 946. While Plaintiffs allege the enterprise's purpose was to defraud plaintiffs and overcharge them for post-production costs, again, Plaintiffs fail to allege a relationship among all Defendants to perpetuate this purpose. (Doc. 94, ¶ 272); *Boyle,* 556 U.S. at 946. The amended complaint alleges independent and varied conduct by each Defendant, there are no factual allegations supporting global, coordinated, and unified activity among all the

24

Defendants beyond Plaintiffs conclusory allegation that such activity occurred. *See Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 307 (S.D.N.Y. 2010) (dismissing RICO claim where plaintiffs failed to allege how the members of the association-in-fact "came to an agreement to act together"). Plaintiffs' allegations of Defendants' individual conduct is insufficient to establish all Defendants acted in concert. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 374 (3d Cir. 2010).

The amended complaint does not contain allegations that demonstrate Defendants "understood the essential nature of the plan and knowingly agreed to participate in the plan." *Schwartz v. Lawyers Title Ins. Co.*, 970 F. Supp. 2d 395, 405 (E.D. Pa. 2013). "Simply identifying the allegedly associated components does not serve to put defendants on notice of the RICO claim." *In re Ins. Brokerage*, 618 F.3d at 369. Defendants' motions to dismiss are thereby **GRANTED** as to Plaintiffs' RICO claim. (Doc. 111; Doc. 113; Doc. 115). Accordingly, Plaintiffs have failed to allege the enterprise factor of their Third Cause of Action, their RICO claim, which is to be **DISMISSED without prejudice** on this basis.[9] (Doc. 94, ¶¶ 268-88); *see*

---

[9] Plaintiffs allege mail and wire fraud to be the predicate racketeering activity. (Doc. 94, ¶ 277). Specifically, Plaintiffs allege "Defendants engaged in an intentional scheme or artifice to defraud Plaintiffs and other owners of royalty interests under oil and gas leases with the Lessee Defendants, in order to obtain their money or property through false or fraudulent pretenses, representations or promises." (Doc. 94, ¶ 277). Anadarko and MEPUSA argue that Plaintiffs' RICO claim fails also because they do not state their predicate claims with particularity, as required under Rule 9. (Doc. 112, at 35; Doc. 114, at 30-31). Access does not argue this element of Plaintiffs' RICO claim, stating instead, "[a]lthough Access and its affiliates do not believe that Plaintiffs have adequately pled (or will be able to prove) any of the elements set forth above, they recognize that this Court found allegations similar to those set forth in the Amended Complaint sufficient to allege a pattern of racketeering activity in *Suessenbach Family Ltd. P'ship v. Access Midstream*, Case No. 14-cv-2297. Access will not

*Kingfly Spirits, LLC v. Ragghianti*, No. CV 22-50E, 2023 WL 6214262, at *3 (W.D. Pa. Sept. 25, 2023) (dismissing RICO claim where it was "bereft of connective tissue plausibly establishing an 'enterprise structure' tying together the various actors").

### 3. Plaintiffs' RICO Conspiracy Claim fails.

Plaintiffs also assert a RICO conspiracy claim against Defendants. (Doc. 94, at 126). RICO provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c)." 18 U.S.C. §1962(d). To plead a conspiracy to violate § 1962(c), a plaintiff must allege "(1) knowledge of the corrupt enterprise's activities and (2) agreement to facilitate those activities." *Smith v. Berg*, 247 F.3d 532, 535 (3d Cir. 2001) (citing *Salinas v. United States*, 522 U.S. 52, 66 (1997)). Liability for a RICO conspiracy "will arise only from services which were purposefully and knowingly directed at facilitating a criminal pattern of racketeering activity." *Berg*, 247 F.3d at 538. RICO conspiracy claims are subject to Fed. R. Civ. P. 8(a)'s pleading standards, not the heightened standard of Rule 9(b). *See Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989).

"Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993). Accordingly, because Plaintiffs' underlying RICO claim is to be dismissed, the Court is compelled to

---

address the same arguments here." (Doc. 116, at 37). Having found other grounds for Plaintiffs' RICO claims to be dismissed, the Court will not address these arguments.

**GRANT** Defendants' motions as to Plaintiffs' RICO conspiracy claim. (Doc. 111; Doc. 113;
Doc. 115); *see Lightning Lube, Inc.,* 4 F.3d at 1191; *see also McLaughlin v. Int'l Bhd. Of Teamsters,
Loc. 249,* 641 F. Supp. 3d 177, 201 (W.D. Pa. 2022). Plaintiffs' RICO conspiracy claim, their
Fourth Cause of Action, is therefore **DISMISSED without prejudice**. (Doc. 94, ¶¶ 289-98);
see *Zakheim,* 2023 WL 5339606, at *4 ("Because I find that Plaintiffs have sufficiently pleaded
a claim under Section 1962(c), I will also deny Defendant's Motion as to Plaintiffs' conspiracy
claim under Section 1964(d).").

C. STATE LAW CLAIMS

Plaintiffs assert state law claims against Defendants for breach of contract, conversion,
civil conspiracy, and accounting. (Doc. 94 at 128, 132, 133, 135). Plaintiffs' state law claims
are premised on their allegation that the Anadarko and MEPUSA (collectively, "Lessee
Defendants") improperly deducted post-production costs when calculating the amount of
royalties that were to be paid to the Plaintiffs or, alternatively, that the Lessee Defendants
charged Plaintiffs with "arbitrary, excessive and unreasonable" deductions." (Doc. 94, at
135). Lessee Defendants argue that each of Plaintiffs' state law claims should be dismissed for
failure to state a claim. (Doc. 112, at 39; Doc. 114, at 40). For the following reasons, the Court
agrees.

**1. Plaintiffs' Breach of Contract claim fails as a matter of law.**

Lessee Defendants dispute the viability of Plaintiffs' breach of contract claims. (Doc.
112, at 39-40; Doc. 114, at 40-41). Plaintiffs allege that under the terms of their leases, the
Lessee Defendants are not entitled to deduct post-production costs in calculating the royalties
payable to Plaintiffs and thus breached their obligations under the leases by deducting such

costs. (Doc. 94, ¶ 304; Doc. 122, at 50). Lessee Defendants aver that, as a matter of law, Pennsylvania Supreme Court precedent provides there is no cause of action for these alleged post-production deductions. (Doc. 112, at 39-40; Doc. 114, at 40-41).

To state a breach of contract claim under Pennsylvania law, a plaintiff must allege: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages. *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 255 (3d Cir.2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)); *Gottselig v. Energy Corp. of Am.*, No. CIV.A. 15-971, 2015 WL 5820771, at *6 (W.D. Pa. Oct. 5, 2015). The general principles of contract interpretation govern oil and gas leases. *Smith v. Steckman Ridge, LP*, 2014 WL 1278120, at *4 (W.D. Pa. March 27, 2014); *Gottselig*, 2015 WL 5820771, at *6. Here, the parties dispute whether Lessee Defendants breached their obligations under the terms of Plaintiffs' leases by deducting post-production costs from royalties payable to Plaintiffs. In accordance with Pennsylvania Supreme Court precedent, the Court finds that, per the allegations in the amended complaint, Lessee Defendants have not breached their obligations in the applicable leases and Plaintiffs' breach of contract claim is to be dismissed.

The parties agree that *Kilmer v. Elexco Land Services* is instructive here. 990 A.2d 1147, 1149, 1157-58 (Pa. 2010). In *Kilmer*, the Pennsylvania Supreme Court found that lessee gas producers may deduct their post-production costs from royalty payments under an "at the wellhead" lease provision like the ones at bar, which permits the "net-back" method to determine deductions. 990 A.2d at 1149, 1157-58. Courts have interpreted this holding broadly. *Slamon v. Carrizo (Marcellus) LLC*, 654 F. Supp. 3d 405, 435 (M.D. Pa. 2023); *see also Ulmer v. Chesapeake Appalachia*, LLC, No. 4:08-CV-2062, 2011 WL 1344596, at *3 ("it is our

28

considered view that *Kilmer* was not meant to be read narrowly, and thus we find that the deduction of post-production costs contained in the lease sub judice is a permissible use of the net-back method under the GMRA"). Applying *Kilmer*, federal courts have dismissed breach of contract claims premised on producers deducting post-production costs from their royalty payouts. *See Ulmer,* 2011 WL 1344596, at *2 ("The holding of *Kilmer* is that the GMRA permits the calculation of the royalties at the wellhead utilizing the net-back method. That is exactly what the leases here provide, and as a result, we decline to void them"); *see also Pollock v. Energy Corp. of Am.*, No. CIV.A. 10-1553, 2011 WL 3667289, at *5 (W.D. Pa. June 27, 2011), *report and recommendation adopted*, No. CIV.A. 10-1553, 2011 WL 3667385 (W.D. Pa. Aug. 22, 2011) (adopting a Magistrate Judge's recommendation that defendants' motion to dismiss a breach of contract claim where the relevant oil and gas leases the leases contemplate calculation of royalties by the net-back method.).

Here, it is apparent from the allegations in the amended complaint the Plaintiffs' leases entitled them to royalties based on the market value of the gas at the well using the netback method. (Doc. 94, ¶145). Specifically, the applicable lease provision states:

> The LESSEE covenants and agrees as follows: 1st – LESSEE … shall pay the LESSOR on gas … produced from the premises and used off the premises or lands pooled therewith or in the manufacture of gasoline, or other products therefrom, or sold (whether to an affiliated or non-affiliated purchaser) the market value at the well of one-eighth (1/8th) of the gas so used or sold. In no event shall the gas royalty payable hereunder be computed on the basis of a price the collection of which by LESSEE is unlawful or prohibited by order or regulation of any governmental authority having jurisdiction, and market value at the well *shall not exceed the amount realized by LESSEE for such production computed at the well*…. LESSEE may pay all taxes and fees levied upon LESSOR's royalty share of production of oil and gas and deduct the amount so paid from any monies payable to LESSOR hereunder….

(Doc. 94, ¶ 145) (emphasis added).

29

Whereas Plaintiffs attempt to argue that this language is ambiguous, courts have recognized the "generally accepted industry-specific use of the term 'at the wellhead'" as an industry specific, technical term that should be construed as much." *Coastal Forest Res. Co. v. Chevron U.S.A., Inc.*, No. 2:20-CV-1119, 2021 WL 1894596, at *4 (W.D. Pa. May 11, 2021). The language at bar includes language that other courts, such as the Western District of Pennsylvania, have found "expressly and unequivocally call for the calculation of royalties 'at the wellhead.'" (Doc. 94, ¶ 145); *Coastal Forest*, 2021 WL 1894596, at *6. Courts have found that this language requires that contract "be interpreted as permitting the net-back method" and therefore as permissive of deducting post-production costs from royalty payments. *Coastal Forest*, 2021 WL 1894596, at *6. Because Plaintiffs' claims stem from alleged netback deductions of post-production costs, their breach of contract claims cannot be sustained, even given their allegations that such deductions were unjust, unreasonable, or wrongful. Pennsylvania law allows for such deductions and does not impose a "reasonableness" standard in deciding them. *See Kilmer*, 990 A.2d at 1149 & n.3, 1158 (citing 30 C.F.R. § 206.151). Accordingly, Plaintiffs' breach of contract claim cannot stand as a matter of law and is **DISMISSED without prejudice**.[10] *See Coastal Forest*, 2021 WL 1894596,

---

[10] Plaintiffs' allegation of an implied-in-fact lease obligation that deductions for post-production costs must not be "grossly excessive or otherwise unreasonable" fairs no better. *Kilmer* anticipated and rejected this argument, finding that lessors' and lessees' interests are typically aligned. 990 A.2d at 1158. Further, Plaintiffs have not provided any facts to support their conclusory allegation that the post-production costs they were charged were excessive, unreasonable, or artificially inflated. (Doc. 94, ¶ 307).

at * (dismissing a breach of contract claim where lease provisions expressly and unequivocally call for the calculation of royalties "at the wellhead.").

### 2.  Plaintiffs' Claims for Legal/Equitable Accounting are to be dismissed.[11]

The amended complaint asserts a claim for accounting. (Doc. 94, at 132). The parties agree that there is no viable claim for an equitable accounting in this case because Plaintiffs have adequate remedies at law for breach of contract and conversion. (Doc. 112, at 45; Doc. 114, at 48; Doc. 118, at 48; Doc. 122, at 60). The parties do dispute whether Plaintiffs are entitled to legal accounting. "In Pennsylvania, the right to an accounting at law is a form of relief that attaches only where the defendant has breached a valid contract with the plaintiff." *Lightman v. Marcus*, CIV.A. 12-97, 2012 WL 1344378, at *4 (E.D. Pa. Apr. 18, 2012) (citation and quotation omitted) (emphasis added). To establish entitlement to a legal accounting, Plaintiffs must allege a valid contract under which the defendant received monies in a capacity which imposed upon it a legal obligation to account to the plaintiffs for the monies received and a breach of defendant's duty under the contract. *Haft v. United States Steel Corp.*, 499 A.2d 676 (1985). "[A] legal accounting is not a separate claim but rather a form of relief that accompanies a formal breach of contract claim." *Zamias v. Fifth Third Bank*, No. 3:17-CV-153, 2018 WL 355462, at *17 (W.D. Pa. Jan. 9, 2018).

---

[11] Access does not argue this issue because it is not a Lessee Defendant.

Because the Court has found that Plaintiffs' breach of contract claim is to be dismissed, their claim for legal accounting cannot stand. Accordingly, Plaintiffs' Sixth Cause of Action, their claim for accounting, is to be **DISMISSED without prejudice**. (Doc. 94, at 132).

### 3.  Plaintiffs' Conversion claim is to be dismissed.

Lessee Defendants request that this Court dismiss Plaintiffs' state law conversion claim. (Doc. 112, at 45-46; Doc. 114, at 49). Conversion is the "deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." *Rahemtulla v. Hassam*, 539 F. Supp. 2d 755, 776 (M.D. Pa. 2008) (quoting *Universal Premium Acceptance Corp. v. York Bank & Trust Co.*, 69 F.3d 695, 704 (3d Cir. 1995)); *see also Gottesfeld v. Mechanics and Traders Ins. Co.*, 173 A.2d 763, 766 (Pa. Super. Ct. 1961). "Money may be the subject of a conversion only where the plaintiff had a property interest in the money at the time of the alleged conversion." *It's Intoxicating, Inc. v. Maritim Hotelgesellschaft mbH*, No. 11-CV-2379, 2013 WL 3973975, at *21-22 (M.D. Pa. July 31, 2013).

Plaintiffs acknowledge that this Court has held "[t]he right to payment of money under a contractual agreement does not constitute a property interest for purposes of conversion." *It's Intoxicating, Inc.*, 2013 WL 3973975, at *21-22. Plaintiffs, however, go on to cite an exception detailed in *Shonberger v. Oswell*, where the Pennsylvania Superior Court held that the failure to remit proceeds as required in connection with a consignment agreement is sufficient to support an action for conversion. 365 Pa. Super. 481, 530 A.2d 112, 114 (1987); (Doc. 122, 62). Plaintiffs also note that several courts have held that a plaintiff may proceed on both a breach of contract and a conversion claim. *See Bernhardt, III, P.C. v. Needleman*, 705

A.2d 875 (Pa. Super. 1997) (in a dispute between lawyers over a referral fee, lawyer could proceed on theories of breach of contract and conversion); *see also* Fed. R. Civ. P. 8(d)(2) (a party may set forth two or more statements of a claim in the alternative; if one of them independently would be sufficient, the pleading is not insufficient). (Doc. 122, at 63).

"[A] plaintiff may not ordinarily recover for the tort of conversion for a breach of duty that simply restates a contractual obligation." *Figueroa v. Point Park Univ.*, 553 F. Supp. 3d 259, 277 (W.D. Pa. 2021). Further, "a claim for conversion cannot stand when there is a contract between the parties that governs the same disputed funds." *Scott v. PNC Bank, Nat'l Ass'n*, 785 F. App'x 916, 920 (3d Cir. 2019). Plaintiffs' conversion claim stems directly from their allegation that "Defendants wrongfully and intentionally caused unauthorized or artificially inflated and unreasonable deductions to be taken from royalties otherwise payable to Plaintiffs." (Doc. 94, ¶ 317). Plaintiffs' leases govern these disputed funds. (Doc. 94, ¶ 319). Thus, because the converted funds are directly related to the contracts at issue in this case, and because arguable plaintiffs never had a right in the monies at issue, Plaintiffs do not have a cause of action for conversion. Accordingly, Plaintiffs' Seventh Cause of Action, their claim for conversion, is **DISMISSED without prejudice**. (Doc. 94, at 133); *see Meyer v. Delaware Valley Lift Truck, Inc.*, 392 F. Supp. 3d 483, 495 (E.D. Pa. 2019) (dismissing conversion claim and stating: "[w]here 'the success of the conversion claim depend[s] entirely on the obligations as defined by the contract,' the conversion claim is barred" by the gist of the action doctrine.) (quoting *Pittsburgh Constr. Co. v. Griffith*, 834 A.2d 572, 584 (Pa. Super. Ct. 2003))).

33

### 4. Plaintiffs' State Law Civil Conspiracy claim fails.

The parties dispute whether Plaintiffs have stated a claim for civil conspiracy. (Doc. 112, at 47-48; Doc. 114, at 51; Doc. 116, at 47; Doc. 122, at 64). Under Pennsylvania common law, civil conspiracy requires that two or more conspirators reached an agreement to commit an unlawful act or perform a lawful act by unlawful means. *See Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979); *Burnside v. Abbott Laboratories*, 505 A.2d 973, 980 (Pa. Super. 1985). Additionally, a plaintiff must show an overt act and actual legal damage. *Phillips v. Selig*, 959 A.2d 420 (Pa. Super. 2008) (internal citations omitted). To allege a conspiracy claim, Plaintiffs must also allege malice, which requires a showing that the sole purpose of the conspiracy was to injure Plaintiffs without justification. *Doltz v. Harris & Assoc.*, 280 F. Supp. 2d 377, 389 (E.D. Pa. 2003)

Plaintiffs allege Defendants, acting with knowledge that artificially inflated gathering and transportation fees would be passed-on to Plaintiffs and deducted from their royalties, engaged in a scheme to defraud and deprive Plaintiffs of their duly owed royalty payments by manipulating and misrepresenting certain post-production costs incurred and charged. (Doc. 94, ¶¶ 327-332; Doc. 122, at 65). In other words, Plaintiffs allege Defendants engaged in a conspiracy to commit the tort of conversion. (Doc. 122, at 65). However, because Plaintiffs' conversion claim is to be dismissed as insufficiently pled, as discussed *supra*, Plaintiffs' civil conspiracy claim cannot survive. Plaintiffs' Eighth Cause of Action for civil conspiracy is therefore **DISMISSED without prejudice**. (Doc. 94, ¶¶ 327-332).

### IV.  LEAVE TO AMEND

The Third Circuit has instructed that if a complaint is vulnerable to dismissal for failure to state a claim, the district court must permit a curative amendment, unless an amendment

would be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). The amended complaint, in its current form, does not clearly set forth any sufficiently pled claims. (Doc. 94). Thus, as discussed *supra*, dismissal is warranted. However, it is not apparent to the Court that amendment would be futile or inequitable. *See Dennis v. Sheridan*, No. 1:18-CV-1131, 2019 WL 13328299 (M.D. Pa. May 31, 2019), *report and recommendation adopted*, No. 1:18-CV-01131, 2019 WL 13328298 (M.D. Pa. June 19, 2019) (recommending leave to amend be extended where it was not apparent from the pleadings that amendment would be inequitable or futile). Accordingly, the Court will grant Plaintiffs leave to file a second amended complaint**.**

**V.   CONCLUSION**

Based on the foregoing, Anadarko, MEPUSA, and Access's motions to dismiss are **GRANTED**. (Doc. 111; Doc. 113; Doc. 115). Plaintiffs' amended complaint is **DIMISSED without prejudice**. (Doc. 94). Chesapeake's motion to dismiss is **DENIED** as **MOOT**. (Doc. 117). The motion to intervene is also **DENIED** as **MOOT**. (Doc. 149). Plaintiffs are granted leave to file an amended complaint within twenty-eight days of this Memorandum and accompanying Order, on or before **Friday, September 27, 2024.**

An appropriate Order follows.

Dated: **August 30, 2024**                    **BY THE COURT:**

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States District Judge**