**IT UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA**

A&B CAMPBELL FAMILY LLC, *et al.*,

         Plaintiffs,

    v.

CHESAPEAKE ENERGY CORPORATION, *et al.*,

         Defendants.

ELECTRONICALLY FILED

Civil Action No. 3:15-cv-00340-KM

(MEHALCHICK, J.)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
MITSUI E&P USA LLC'S MOTION TO DISMISS
<u>PLAINTIFFS' SECOND AMENDED COMPLAINT</u>**

John K. Gisleson (PA62511)
john.gisleson@morganlewis.com
Matthew H. Sepp (PA85406)
matthew.sepp@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
One Oxford Centre
Thirty-Second Floor
Pittsburgh, PA  15219-6401
Telephone: +1.412.560.3300
Facsimile: +1.412.560.7001

# TABLE OF CONTENTS

**Pages**

I.    INTRODUCTION ..................................................................1

II.   PROCEDURAL HISTORY ....................................................2

III.  STATEMENT OF FACTS ......................................................3

IV.   QUESTIONS INVOLVED......................................................5

V.    ARGUMENT.........................................................................6

    A.    Plaintiffs' Antitrust Claims Fail as a Matter of Law.............................6

        1.    Plaintiffs Do Not Have Standing to Bring an Antitrust Claim.......7

        2.    Plaintiffs Fail to Allege Facts Supporting an Anti-Competitive Agreement. ..................................................................14

    B.    Plaintiffs' RICO Claims Fail as a Matter of Law. ...............................18

        1.    Plaintiffs Fail to Allege an Association-in-Fact Enterprise..........19

        2.    Plaintiffs Fail to Allege a RICO Conspiracy. ...............................23

        3.    Plaintiffs Fail to Plead Fraud with Particularity. ..........................25

    C.    Plaintiffs' Breach of Contract Claim Fails As A Matter of Law. ........27

        1.    MEPUSA May Deduct Post-Production Costs. ...........................28

        2.    Plaintiffs Failed to Plead a Plausible Claim That the Amount of MEPUSA's Deductions Was Somehow Improper. ...................29

VI.   CONCLUSION.............................................................30

CERTIFICATE OF WORD COUNT.....................................................31

CERTIFICATE OF SERVICE ...............................................................32

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate N.J. Ins. Co. v. Summit Pharm., Inc.*,
No. 13-5809, 2014 WL 1767528 (D.N.J. May 2, 2014) ........................20, 22, 24

*AlphaCard Sys. LLC v. Fery LLC*,
Civil Action No 19-20110 (ZNQ) (TJB), 2023 WL 3506414
(D.N.J. May 17, 2023) ............................................................................................8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................6

*Assoc. Gen. Contractors of Cal., Inc. v. Carpenters*,
459 U.S. 519 (1983)................................................................................................7

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)................................................................................................7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................*passim*

*Blue Shield v. McCready*,
457 U.S. 465 (1982)..............................................................................................13

*Boyle v. United States*,
556 U.S. 938 (2009)..................................................................................20, 22, 23

*Branta, LLC v. Newfield Production Co.*,
310 F. Supp. 3d 1166 (D. Col. 2018)...................................................................19

*Bret Binder v. Weststar Mortg., Inc.*,
No. CV 14-7073, 2016 WL 3762710 (E.D. Pa. July 13, 2016) ..........................15

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*,
429 U.S. 477 (1977)................................................................................................7

*Brunswick Corp. v. Riegel Textile Corp.*,
752 F.2d 261 (7th Cir. 1984) .................................................................................9

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011) .............................................................17

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986).........................................................................7

*Coastal Forest Res. Co. v. Chevron U.S.A., Inc.*,
  Civ. A. No. 2:20-cv-1119, 2021 WL 1894596 (W.D. Pa. May 10,
  2021) ................................................................................................28

*Columbia River People's Util. Dist. v. Portland Gen. Elec. Co.*,
  217 F.3d 1187 (9th Cir. 2000) ..........................................................9

*Domico v. Kontas*,
  No. 3:12cv1449, 2013 WL 1248638 (M.D. Pa. Mar. 26, 2013) ........24

*Donachy v. Intrawest U.S. Holdings, Inc.*,
  No. 10-4038, 2012 WL 869007 (D.N.J. Mar. 14, 2012) ....................27

*Eichorn v. AT&T Corp.*,
  248 F.3d 131 (3d Cir. 2001) ..............................................................8

*Elliott Indus. v. BO Am. Prod. Co.*,
  407 F.3d 1091 (10th Cir. 2005) .......................................................13

*Ethypharm S.A. Fr. v. Abbott Labs.*,
  707 F.3d 223 (3d Cir. 2013) .......................................................10, 13

*Ferguson v. Moeller*,
  No. 2:16-CV-41, 2016 WL 1106609 (W.D. Pa. Mar. 22, 2016).........20

*In re Baby Food Antitrust Litig.*,
  166 F. 3d 112 (3d Cir. 1999) ............................................................17

*In re Flat Glass Antitrust Litig.*,
  385 F.3d 350 (3d Cir. 2004) .............................................................14

*In re: Generic Pharm. Pricing Antitrust Litig.*,
  MDL 2724, 2025 WL 388813 (E.D. Pa. Feb. 3, 2025) .....................17

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) .................................................21, 23, 24

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
  2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015) ......................................................10

*Kerwin v. Casino*,
  802 F. App'x 723 (3d Cir. 2020) ........................................................................16

*Kilmer v. Elexco Land Services, Inc.*
  990 A.2d 1147 (Pa. 2010) ...........................................................................28, 29

*Kingfly Spirits, LLC v. Ragghianti*,
  No. CV 22-50E, 2023 WL 6214262 (W.D. Pa. Sept. 25, 2023) ........................22

*Lightning Lube v. Witco Corp.*,
  4 F.3d 1153 (3d Cir. 1993) ...............................................................................24

*Lum v. Bank of America*,
  361 F.3d 217 (3d Cir. 2004) .......................................................................25, 26

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ..........................................................................................17

*McCullough v. Zimmer, Inc.*,
  382 F. App'x 225 (3d Cir. 2010) .......................................................................11

*McLaughlin v. Int'l Bhd. Of Teamsters, Loc. 249*,
  641 F. Supp. 3d 177 (W.D. Pa. 2022) ...............................................................24

*PennEnergy Resources, LLC v. Winfield Resources, LLC*,
  301 A.3d 439 (Pa. Super. Ct. 2023) ..................................................................19

*Premier Comp Sols. LLC v. UPMC*,
  377 F. Supp. 3d 506 (W.D. Pa. 2019) ...............................................................13

*Rolo v. City Investing Co. Liquidating Trust*,
  155 F.3d 644 (3d Cir. 1998) ..............................................................................27

*Salinas v. United States*,
  522 U.S. 52 (1997) ............................................................................................24

*SEI Glob. Servs., Inc. v. SS&C Advent*,
  No. 20-3386, 2022 WL 2356730 (3d Cir. June 30, 2022) ............................7, 13

iv

*Suessenbach Family Ltd. P'ship v. Access Midstream Partners, L.P.*,
   Civ.A.No. 3:14-1197, 2015 WL 1470863 (M.D. Pa. Mar. 31, 2015) ...............18

*Tredennick v. Bone*,
   647 F. Supp. 2d 495 (W.D. Pa. 2007), *aff'd*, 323 F. App'x 103 (3d
   Cir. 2008) ...........................................................................................................27

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
   873 F.3d 185 (3d Cir. 2017) ..............................................................................16

*W. Penn Allegheny Health Sys. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010) .....................................................................11, 13, 14

*Warren v. Chesapeake Exploration, L.L.C.*,
   759 F.3d 413 (5th Cir. 2014) ..............................................................................28

*Wood v. Wood*,
   No. CV 16-995, 2017 WL 57186 (W.D. Pa. Jan. 5, 2017) .................................26

*Zakheim v. Curb Mobility LLC*,
   No. CV 22-4594, 2023 WL 5339606 (E.D. Pa. Aug. 18, 2023) ............19, 20, 21

**Statutes**

58 P.S. § 35.2 (2013)....................................................................................................30

15 U.S.C. § 1 ................................................................................................................14

RICO .................................................................................................................*passim*

Sherman Act.............................................................................................6, 7, 10, 14

**Other Authorities**

Local Rule 7.1 ................................................................................................................7

Rule 8(a)......................................................................................................................16

Rule 9(b).................................................................................................................2, 25

Rule 12(b)(6).............................................................................................................5, 6

## I.    <u>INTRODUCTION</u>

On August 30, 2024, this Court dismissed without prejudice the entirety of Plaintiffs' First Amended Complaint for failure to state a claim upon which relief could be granted.  (Doc. 213).  While finding the "amended complaint . . . [did] not clearly set forth any sufficiently pled claims," the Court granted Plaintiffs leave to file a second amended complaint.  (Doc. 212, at 35).  Plaintiffs' Second Amended Complaint ("Complaint" or "SAC"), however, wholly fails to cure the multiple, independent deficiencies identified in the Court's August 30, 2024 Memorandum ("Memorandum") that accompanied its dismissal of the prior complaint.  (Docs. 212, 213).  While omitting certain of the failed claims from its First Amended Complaint, Plaintiffs failed to allege any new substantive supporting facts for their remaining claims.[1]  Plaintiffs' amendment therefore did not cure the specific deficiencies identified by the Court, requiring dismissal of the Complaint with prejudice.

Plaintiffs attempt to rely on an inference of wrongdoing, yet Plaintiffs again failed to allege facts plausibly showing *how or why* MEPUSA purportedly participated in or supported a corporate conspiracy to repay a loan transaction solely between MEPUSA's co-defendants but without financial benefit to MEPUSA itself.

---

[1] Plaintiffs' SAC omits claims for Accounting, Conversion, Civil Conspiracy, and Declaratory Judgment that were previously dismissed (prior Counts 6-9, respectively).

To the contrary, as pled, this arrangement financially harmed MEPUSA by causing it to pay higher gathering fees to co-defendant Access Midstream. The Complaint's recurring deficiencies do not stop there. Plaintiffs have taken the black-and-white rulings of this Court and wholesale ignored them—pleading the exact same facts and legal theories that were dismissed back in August 2024. As just one example, Plaintiffs repeat their allegation that MEPUSA did not have the contractual right to deduct post-production costs when calculating royalty payments to Plaintiff leaseholders, despite this Court's express holding to the contrary in its Memorandum. (*Compare* ¶¶ 25-26[2] with Doc. 212, at 27-30). Plaintiffs' Complaint is riddled with such deficiencies that fly in the face of this Court's Memorandum and settled law. Moreover, Plaintiffs' fraud-based allegations fall well short of the particularity required by Rule 9(b)–especially as to MEPUSA. This well-aged litigation should end with prejudice.[3]

## II.    **PROCEDURAL HISTORY**

On February 17, 2015, Plaintiffs filed their initial complaint. (Doc. 1). MEPUSA filed a Motion to Dismiss on May 22, 2015. (Doc. 68). Plaintiffs

---

[2] All paragraph citations are to the SAC, unless indicated otherwise.

[3] While MEPUSA limits this memorandum of law to its primary arguments for dismissal and discussion of the Complaint's deficiencies, it incorporates by reference the relevant arguments MEPUSA made in its previous motions to dismiss. (Docs. 114, 127, 198).

responded by amending their complaint. (Doc. 94). Following a stay in proceedings and additional briefing, this Court dismissed, in its entirety, Plaintiffs' First Amended Complaint. (Doc. 213). After granting leave to amend, Plaintiffs filed their Second Amended Complaint, which was deemed filed on May 1, 2025. (Docs. 216, 230).

## III.   <u>STATEMENT OF FACTS</u>

Plaintiffs are owners/lessors of royalty interests in Bradford, Sullivan, and Wyoming Counties. ¶ 1. At all times relevant to this litigation, MEPUSA and Anadarko E&P Onshore LLC ("Anadarko") (each a "Lessee," collectively, "Lessee Defendants") and non-parties Chesapeake Appalachia, L.L.C. ("Chesapeake") and Statoil USA Onshore Properties, Inc. ("Statoil") (each a "Lessee," collectively, "Non-Party Lessees") "held working interests in each of the oil and gas leases in which Plaintiffs hold royalty interests, either as the original lessee party to the lease" or as assignees thereof. ¶ 2. MEPUSA obtained its interest in the oil and gas leases (the "Leases") through a partial assignment from Anadarko. ¶ 142. Chesapeake operated the wells. ¶ 3.

Plaintiffs again admit that each Lessee *separately* calculated royalties based on its particular fractional interest in the Leases. "*Each* of the Lessees was responsible for accounting for and distributing *its share* of the royalties due and owing to royalty interest owners . . . ." ¶ 4 (emphasis added). The royalty provision in the Leases states:

> LESSEE . . . shall pay the LESSOR on gas . . . produced from the premises and used off the premises or lands pooled therewith or in the manufacture of gasoline, or other products therefrom, or sold (whether to an affiliated or non-affiliated purchaser) *the market value at the well of one-eighth (1/8th) of the gas so used or sold* . . . . and *market value at the well* shall not exceed *the amount realized* by LESSEE for such production *computed at the well*."

¶ 151 (emphasis added). As Plaintiffs recognize, gas is no longer sold at the well. Instead, producers transport their gas through pipelines for eventual sale to third parties. ¶¶ 126–127. The key phrases for interpreting the royalty provision are "market value at the well … of the gas … sold" and "market value at the well shall not exceed the amount realized by Lessee for such production computed at the well."

Plaintiffs assert that MEPUSA was not "entitled to deduct post-production costs from the proceeds received by it at the point of sale in calculating the royalties payable to Plaintiffs," and underpaid royalties by deducting those costs. ¶¶ 340-41. Alternatively, if such deductions are permitted by law (as this Court determined they were in its Memorandum), MEPUSA supposedly still breached the Leases by passing along "artificially inflated, grossly excessive, improper and unreasonable charges for purported post-production costs." ¶ 345.

Plaintiffs' antitrust and RICO claims, pled in the SAC with minimal alteration from their previous complaint, are a re-hash of Plaintiffs' core breach of contract claim. Defendants allegedly conspired to deduct—and each separately deducted—

4

from Plaintiffs' royalties excessive post-production costs for gathering and transportation of the gas:

> The *overcharges for gathering and transportation fees*, and resulting underpayment in royalties, to Plaintiffs was an integral and necessary part of the scheme, as they enabled Defendants to profit from their respective interests in Access Midstream and Appalachia Midstream Service (in the case of Chesapeake), and in the shared ownership of the gathering pipelines (in the case of other Defendants), and *later enabled Chesapeake to fulfill the payment obligations that it incurred to Access Midstream* in connection with the CMO Transaction, and the other Defendants to acquiesce in and profit from such payments (through their continued common ownership interests in the gathering pipelines).

¶ 324 (as to RICO claims) (emphasis added); *see also* ¶¶ 20, 279, 294 (as to antitrust claims). Because MEPUSA deducts 1/8th of those fees from Plaintiffs' royalties, MEPUSA itself pays 7/8th of the "supra-competitive" fees. *See, e.g.*, ¶ 20, ¶ 234 (noting that "a lessor's post-production deductions cannot exceed 12.5% of the total post-production costs"); ¶ 279 ("deducting a *proportionate share* of the charges from the royalties") (emphasis added); ¶ 294. Other than the fact that Defendants each purportedly passed along a portion of their post-production costs to Plaintiffs (a pre-existing allegation), which is permitted by law and not itself evidence of collusion, Plaintiff still asserts nothing more than conclusory allegations that Defendants formed an agreement to do so.

## IV.    QUESTIONS INVOLVED

1.    Whether each of the Counts asserted against MEPUSA in the Complaint fails under Rule 12(b)(6).

## V.    ARGUMENT

Plaintiffs failed to cure the numerous pleading deficiencies identified by the Court in its Memorandum.  The Complaint, just as the complaint before it, fails to meet the applicable pleading standards and is factually deficient.  To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs must state "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do."  *Id.* at 555 (internal quotations omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A.    Plaintiffs' Antitrust Claims Fail as a Matter of Law.

In its Memorandum, the Court dismissed Plaintiffs' claims under Sections 1 and 2 of the Sherman Act for two reasons: (1) Plaintiffs lacked standing because they failed to plead antitrust injury (Doc. 212, at 9–14); and (2) Plaintiffs failed to allege facts supporting an anti-competitive agreement (Doc. 212, at 15–18).  Nothing materially changed in the SAC, requiring dismissal for the same reasons in the Memorandum.  (Doc. 212, at 8-18).

### 1.    Plaintiffs Do Not Have Standing to Bring an Antitrust Claim.

To state a claim under Sections 1 and 2 of the Sherman Act, Plaintiffs must make a threshold showing of antitrust standing.  *Assoc. Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 535 (1983).  The first step in the standing analysis is determining whether the plaintiff suffered antitrust *injury*, and while "[a] showing of antitrust injury is necessary, [it is] not always sufficient to establish standing." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986).  The requirement that Plaintiffs suffer "injury of the type the antitrust laws were intended to prevent" ensures that antitrust laws are enforced "for the protection of competition, not competitors."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*, 429 U.S. 477, 488–89 (1977).  Plaintiffs again not only fail to allege antitrust injury, but the injury they do allege is too remote to confer antitrust standing.  The Court should dismiss the antitrust claim for the same reasons as before.  (Doc. 212, at 11-15).

"The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior."  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990); *SEI Glob. Servs., Inc. v. SS&C Advent*, No. 20-3386, 2022 WL 2356730, at \*2–3 (3d Cir.

June 20, 2022[4]) (affirming dismissal because "antitrust injury must have an 'anti-competitive effect on the competitive market' and because plaintiff failed to allege 'that harm flows from any purported anticompetitive conduct'"); *see also Eichorn v. AT&T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001) (noting that the allegedly anticompetitive conduct must have "a wider impact on the [overall] competitive market."). Here, Plaintiffs' alleged injury does not stem from any competition-reducing aspect or effect of the Defendants' alleged behavior, least of all MEPUSA's, because—despite Plaintiffs' conclusory allegations—they have not sufficiently pled a reduction in market-wide competition. Instead, Plaintiffs mostly allege harm to themselves, with tacked-on conclusory allegations about harm to the market at-large. (Doc. 212, at 12); *AlphaCard Sys. LLC v. Fery LLC*, Civil Action No 19-20110 (ZNQ) (TJB), 2023 WL 3506414, at *4 (D.N.J. May 17, 2023) (holding that plaintiff did not state an antitrust injury simply "because it pled an injury to itself").

Plaintiffs rehash their previously-rejected claim that Defendants conspired to assist Access in obtaining a monopoly in the alleged Gathering Services market through the transfer of Chesapeake's monopoly power to Access. (Doc. 212, at 12-13). They claim to be harmed by the price Chesapeake agreed to pay Access for

---

[4] Pursuant to Local Rule 7.1, copies of this and all other unpublished opinions are attached for the Court's convenience at Attachment 1.

those services, a portion of which is passed along to them in the form of reduced royalty payments. *See, e.g.*, ¶¶ 194, 219–220, 279, 294. Plaintiffs' purported injury, however, is not the result of any reduction in competition in the alleged market for Gathering Services. Just as before, following Chesapeake's transfer of its midstream business to Access, there remained only one provider of the gathering services, with no effect on the competitive conditions in the alleged Gas Gathering market at all. At most, Chesapeake merely "transferred" a lawful, "existing" monopoly from itself to another entity, a fact that Plaintiffs concede. ¶¶ 208, 219, 280. The transfer of an existing lawful monopoly has no antitrust significance. (Doc. 212, at 13); *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 266 (7th Cir. 1984) (An act that "creates no monopoly power[, but] merely shifts a lawful monopoly into different hands . . . has no antitrust significance."); *see also Columbia River People's Util. Dist. v. Portland Gen. Elec. Co.*, 217 F.3d 1187, 1190–91 (9th Cir. 2000) (same)).

In its Memorandum, this Court indicated that Plaintiffs had failed "to allege specific ways in which Defendants 'bolstered and extended' their monopoly power beyond their conclusory allegations stating as much." (Doc. 212, at 13). Yet, Plaintiffs have again used the "bolstered and extended" language, ¶¶ 257, 280, without adding substantive factual allegations to establish plausibility. Instead, they repeat their conclusory allegations that the transfer of an existing monopoly from one entity to another supposedly bolstered an already-existing, lawful monopoly.

9

MEPUSA cannot be liable based on those allegations. ¶¶ 192–198, 207–220. This is not antitrust injury. *See In re LIBOR-Based Financial Instruments Antitrust Litig.*, 2015 WL 4634541, at *82 (S.D.N.Y. Aug. 4, 2015) (noting that "[a] conspiracy to commit fraud may resemble an antitrust conspiracy [but] is not thereby transmuted into a violation of the Sherman Act," and concluding that "plaintiffs' injuries were not antitrust injuries because they 'resulted from defendants' misrepresentation, not from harm to competition.'").

Equally as important, Plaintiffs have again failed to plead *any* competition-reducing aspect or effect of MEPUSA's behavior.  Despite name-dropping MEPUSA on a few more occasions than in the previous complaint, Plaintiffs have not materially altered the same failed allegations.  Plaintiffs do not allege any specific details about MEPUSA's gas gathering contract with Access, or how Access's pricing to MEPUSA did, or even could have, harmed competition. Plaintiffs' vague and conclusory reference to the new gathering agreement "augment[ing]" Access' monopoly power (¶ 219) is insufficient as Plaintiffs fail to explain how it did so, how it involved MEPUSA, or what that even means. *See Twombly*, 550 U.S. at 555.

Nor are Plaintiffs the "proper part[ies] to bring an antitrust action because they are neither consumers nor competitors in the alleged relevant markets." (Doc. 212, at 13); *Ethypharm S.A. Fr. v. Abbott Labs.*, 707 F.3d 223, 232 n.17, 233 (3d Cir.

2013).  Plaintiffs claim to be participants in three different markets: (1) Gas Mineral Rights; (2) Gathering Services; and (3) Operating Rights.  (¶ 245)  But they aren't consumers or competitors in any of those markets.  *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010) (Antitrust injury is limited to "consumers and competitors in the restrained market."); *McCullough v. Zimmer, Inc.*, 382 F. App'x 225, 229 (3d Cir. 2010) (no antitrust standing where plaintiffs were "commission-based sales representatives who did business with competitors and consumers in the market for surgical orthopedic devices, [but] not as competitors or consumers themselves").

As to Gas Mineral Rights, Plaintiffs attempt to paper over this material deficiency by alleging that they "were in substance sellers in the market for Gas Mineral Rights," ¶ 252, an allegation that was absent from their previous complaint. Yet this is a mischaracterization of Plaintiffs' role in the purported Gas Mineral Rights market.  Plaintiffs are no longer market participants because they *already sold* their Gas Mineral rights when they entered leases with Anadarko E&P or its predecessor in interest, T.S. Calkins, in 2006—four years before MEPUSA acquired an interest in the Anadarko leases.  ¶¶ 16, 140, 145.  Moreover, their leases are producing gas (as evidenced by their receipt of royalties), so they do not currently have any contractual right to lease their gas rights to another producer. ¶ 153 ("…this Lease shall remain in full force and effect until midnight on the 5th anniversary of

11

the date hereof (the primary term) and as long thereafter as…oil and gas or either of them is produced or withdrawn from any portion of the premises or any land pooled or unitized therewith…")   Their suggestion that they are participants in that market—a consumer or competitor—is contradicted by their own allegations. Plaintiffs fail to show how they have more than a "tangential relationship to the relevant market" (Doc. 212, at 13-14), one that is sufficient to put them within the ambit of proper antitrust plaintiffs.

Plaintiffs' allegations concerning the other two markets equally fail.  As to Gathering Services, the Complaint does not include any new factual allegations that Plaintiffs are gas shippers or pipeline operators.  ¶ 255 (alleging that Chesapeake, Anadarko and MEPUSA obtained gathering services); ¶ 255 (alleging that Chesapeake and/or Access charged "supra-competitive prices for such services").  As to Operating Rights, they are lessors, not well pad operators.  ¶ 16 (alleging that Chesapeake "became the sole operator of all of the wells drilled and units established")  Rather, Plaintiffs assert only that, "[a]s holders of royalty interests in oil and gas leases with respect to Gas Mineral Rights in the Exclusive Dedicated acreage, Plaintiffs were and are within the area of the economy endangered by the breakdown in competitive conditions in the markets for Gas Mineral Rights, Operating Rights, and Gas Gathering Services."  ¶ 262.  Such allegations are insufficient to establish standing and, thus, Plaintiffs lack standing to sue for any

injury sustained as a result of alleged harm in those markets. *W. Penn*, 627 F.3d at 102; *see also Elliott Indus. v. BO Am. Prod. Co.*, 407 F.3d 1091, 1125 (10th Cir. 2005) (no antitrust standing for a party entitled to royalties on oil and gas leases because he was neither a consumer nor a competitor in the market for defendant's products).

Plaintiffs further attempt to plead around their clear lack of standing by repeating the vague and conclusory allegation that their injury is "inextricably intertwined" with Defendants' alleged wrongdoing. *See* ¶¶ 263, 286-287. This narrow exception to the general rule, however, confers standing only where the plaintiff's injury is a "*necessary step* in effecting the ends of the alleged illegal conspiracy." *Blue Shield v. McCready*, 457 U.S. 465, 476-79, 484 (1982) (emphasis added). The Third Circuit has limited this exception to instances where "'*both plaintiffs and defendants are in the business of selling goods or services in the same relevant market*,' though they may not directly compete against each other." *Ethypharm,* 707 F.3d at 237; *SEI Glob. Servs., Inc.*, 2022 WL 2356730, at \*2 (affirming dismissal) (emphasis added); *Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 531 (W.D. Pa. 2019) ("An antitrust plaintiff must allege not only personal harm, but also that the defendant's conduct affected the 'prices, quantity or quality of goods or services' in the relevant market"). That is not the case here.

In its Memorandum, the Court explicitly identified "Plaintiffs' inability to point to non-conclusory, factual allegations . . . demonstrating how reducing their royalties was a necessary means for Defendants to reduce competition in the relevant market for Gas Mineral Rights." (Doc. 212, at 14). Nothing changed in the SAC. Plaintiffs repeat their already-rejected assertion that their purported economic injury was the "essential means" by which Defendants sought to achieve "illegal and anticompetitive ends." (Doc. 212, at 14-15); ¶¶ 263, 286. Such labels and legal conclusions are insufficient to allege antitrust standing. *Twombly*, 550 U.S. at 555.

### 2. Plaintiffs Fail to Allege Facts Supporting an Anti-Competitive Agreement.

"Even if Plaintiffs did have standing to assert their Sherman Act claims…, their claims would fail as insufficiently pled." (Doc. 212, at 15). To state a Section 1 claim, Plaintiffs must allege facts showing that MEPUSA was party to a "contract, combination . . . or conspiracy," (15 U.S.C. § 1), which had a "unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004) (internal quotation marks omitted). A claim for conspiracy to monopolize under Section 2 likewise requires this essential element. *See W. Penn*, 627 F.3d at 100. Plaintiffs have not met that standard.

The core of Plaintiffs' theory is that Defendants conspired to pay Access a "supra-competitive" rate for gas gathering services and then to pass on to Plaintiffs

14

a fraction of the artificially inflated prices they paid through allegedly improper royalty deductions for post-production costs. *See* ¶¶ 20, 279, 294. That is, Plaintiffs allege the existence of a vague agreement to overpay Access--for the benefit of Access and Chesapeake--the effect of which was for MEPUSA itself to overpay Access (i.e., pay 7/8th of the supposedly improper costs). As an attempt to support this theory, Plaintiffs allege that MEPUSA entered into a joint venture agreement with Anadarko "with full knowledge of the terms of Anadarko's anticompetitive joint venture with Chesapeake." ¶ 144. While Plaintiffs claim to plead this allegation solely "[o]n information and belief," they fail to present any facts supporting such a blunt and conclusory allegation, such as when or how MEPUSA entered this agreement or how MEPUSA knew "the terms of" the supposedly "anticompetitive joint venture." Accordingly, Plaintiffs' conclusory allegation of a conspiracy is insufficient to state a Section 1 or 2 antitrust conspiracy claim, particularly as to MEPUSA. *Twombly*, 550 U.S. at 555. Plaintiffs fail to allege any facts showing that MEPUSA engaged in collusive behavior regarding the specific terms of a gas gathering contract with Access or that MEPUSA conspired with anyone to pay Access supra-competitive prices. Just as in their last complaint, allegations specific to MEPUSA are few and far between, a failure to sufficiently plead that is fatal to their claims. *See Bret Binder v. Weststar Mortg., Inc.*, No. CV 14-7073, 2016 WL 3762710, at *3 (E.D. Pa. July 13, 2016) ("[E]ven under the most

15

liberal notice pleading requirements of Rule 8(a), a plaintiff must differentiate between defendants . . . . An allegation against multiple defendants that is bereft of specific wrongdoing by those proposed defendants is insufficient to state a claim.") (citation omitted).

Plaintiffs likewise cannot allege specific facts to support their claim that MEPUSA conspired to underpay royalties to Plaintiffs in order to fund a purported conspiracy to overpay Access. The decision to deduct a portion of its gas gathering costs, as MEPUSA was permitted to do by law (*infra*), was entirely consistent with its independent economic interests. *See Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 190–91 (3d Cir. 2017) ("single firm's independent action . . . does not implicate § 1"). The fact that other Defendants also made such deductions cannot support an inference that there was an agreement to do so. *Id.* at 193 ("evidence of conscious parallelism cannot alone create a reasonable inference of a conspiracy") (citation omitted); *Kerwin v. Casino*, 802 F. App'x 723, 726 (3d Cir. 2020) ("without more, parallel conduct does not suggest conspiracy") (citation omitted) (affirming dismissal).

Moreover, Plaintiffs fail to make any well-pled factual allegations that would establish the existence of an agreement. To plead an antitrust conspiracy case, Plaintiffs must "specify a time or place that [an] actual agreement… occurred, [and] indicate [the] particular individuals or [defendants that] made such an agreement."

16

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225-26 (3d Cir. 2011) (quoting *Twombly,* 550 U.S. at 565 n.10) (alteration in original)). Even upon amendment, the vast majority of Plaintiffs' allegations that are specific to any Defendant do not have anything to do with MEPUSA. Much less do they specify the time and place of actual conspiratorial agreements. Plaintiffs *still* do not make any factual allegations concerning: (1) whether and how MEPUSA and the other Lessee Defendants aligned the amount of their royalty deductions; and (2) knowledge by MEPUSA of how any other Defendant calculated its royalty payments or made deductions (which would not establish anything more than conscious parallelism in any event). Plaintiffs actually allege the opposite. ¶ 4 ("*Each* of Lessees was responsible for accounting for and distributing *its share* of the royalties due and owing to royalty interest owners…") (emphasis added). Plaintiffs' allegations of conspiracy are thus both deficient and impermissibly speculative. *See In re Baby Food Antitrust Litig.*, 166 F. 3d 112, 132 (3d Cir. 1999) (no antitrust conspiracy where "defendants' prices were neither uniform nor within any agreed upon range of each other").

Finally, the Court must "take account of the absence of a plausible motive to enter into the alleged … conspiracy." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 595 (1986); *In re: Generic Pharm. Pricing Antitrust Litig.*, MDL 2724, 2025 WL 388813, at 3 (E.D. Pa. Feb. 3, 2025) (desire for profit alone does not imply conspiratorial motive). There is no allegation that MEPUSA

17

received consideration in addition to or different from the working interest for which it paid for its working interest in the Anadarko lease or in connection with the gathering system. At most, Plaintiffs attempt to explain why MEPUSA would conspire to raise the price that MEPUSA itself pays for gathering services by alleging collectively that "Lessee Defendants" have shared ownership interests in the gathering systems. ¶ 21. That generalized, group-pleading allegation fails.

Accordingly, Plaintiffs antitrust claims against MEPUSA must be dismissed with prejudice as a matter of law.

### B.    Plaintiffs' RICO Claims Fail as a Matter of Law.

Plaintiffs' RICO claims (Counts Four and Five) are insufficient to state a claim because: (1) there still are no facts to support an association-in-fact enterprise; (2) Plaintiffs still fail to allege a RICO conspiracy; and (3) Plaintiffs have still failed to plead their fraud-based claims with particularity. For these reasons, Counts Four and Five should be dismissed.[5]

---

[5] The Court's decision in *Suessenbach Family Ltd. P'ship v. Access Midstream Partners, L.P.*, 2015 WL 1470863, at *1 (M.D. Pa. Mar. 31, 2015) is inapposite, as that complaint alleged a bilateral RICO enterprise between Chesapeake and Access based on a single gas gathering agreement. Here, Plaintiffs have alleged a much longer and larger RICO enterprise involving at least 10 parties, "together with their respective officers, directors, employees and agents," ¶¶ 113-26, 305, but, as explained herein, Plaintiffs have not alleged facts to adequately support their claims against these different entities and individuals, much less with any of the requisite specificity.

### 1.    Plaintiffs Fail to Allege an Association-in-Fact Enterprise.

The Court previously determined that Plaintiffs "failed to allege the enterprise factor" because they did not plead "any allegations containing 'descriptive details about the relationships between members of the enterprise,'" (citing *Zakheim*, 2023 WL 5339606, at *1, 3), especially as it related to MEPUSA and Anadarko.  (Doc. 212, at 24-25).  Plaintiffs now attempt to cure this deficiency by including a few paragraphs regarding the relationship between MEPUSA and Anadarko (¶¶ 140-44), and then broadly asserting—just as before--that MEPUSA "entered into its joint venture with Anadarko with full knowledge of the term of Anadarko's anticompetitive joint venture with Chesapeake."  ¶ 144.  Plaintiff's addition is woefully inadequate since Plaintiffs still failed to plead any *facts* supporting that conclusory assertion, which by itself is insufficient.  The RICO claim therefore fails for the same reasons previously determined by the Court.[6]  (Doc. 212, at 23-25).

---

[6] Courts have consistently held that joint venture and AMI agreements are common in the oil and gas industry, and not anticompetitive.  *See e.g., Branta, LLC v. Newfield Production Co.*, 310 F. Supp. 3d 1166, 1207–08 (D. Col. 2018) ("The evidence is undisputed that it is the custom and practice in the industry that parties to an AMI agreement do not bid against each other for assets covered by an AMI because doing so would be economically irrational.") (*id.*) ("evidence presented at trial cannot exclude the possibility of independent action in conformity with the well-accepted practices of AMI partners, and thus cannot support the existence of a bid-rigging agreement"); *PennEnergy Resources, LLC v. Winfield Resources, LLC*, 301 A.3d 439, 445 (Pa. Super. Ct. 2023) (parties entered into common asset purchase and sale agreement (APSA) to buy gas leaseholds and rights, and thereafter, as required by

An association-in-fact enterprise is a "group of persons associated together for a common purpose of engaging in a course of conduct" and "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." (Doc. 212, at 23); *Boyle v. United States*, 556 U.S. 938, 946 (2009). This requires a showing that the association is an "ongoing organization" and that the various associates "function as a continuing unit." *Id.* at 944-45; *Ferguson v. Moeller*, No. 2:16-CV-41, 2016 WL 1106609, at *7 (W.D. Pa. Mar. 22, 2016) (dismissing RICO claim where "no allegations regarding ongoing organization or decision-making, an actual role for each Defendant in a functional unit, or the existence of any activities beyond the alleged racketeering"). "While an association-in-fact enterprise 'need not have a hierarchical structure or a "chain of command,"' there must be some decision-making: 'decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc.'" *Allstate N.J. Ins. Co. v. Summit Pharm., Inc.*, No. 13-5809, 2014 WL 1767528, at *10 (D.N.J. May 2, 2014) (quoting *Boyle*, 556 U.S. at 948). "[N]ormal business relationships, without more, are insufficient to support an association-in-fact enterprise." (Doc. 212, at 24) (quoting *Zakheim*, 2023 WL 5339606).

---

the APSA, entered into a joint development agreement to develop the leases within an AMI).

Here, Plaintiffs claim that Defendants are allegedly associated for the "common purpose and goal of defrauding royalty interest owners, including Plaintiffs, to accept royalties in amounts less than that to which they were entitled…" ¶ 321; *see also* ¶ 306 ("The purpose of the Enterprise was to maximize the revenues and profits to its members from the anticompetitive contracts, combinations, and conspiracies among them…"). But Plaintiffs still have not provided factual allegations demonstrating that Defendants ever functioned or are currently functioning as a continuing unit. (Doc. 212, at 24); *Zakheim v. Curb Mobility LLC*, No. CV 22-4594, 2023 WL 5339606, at *2 (E.D. Pa. Aug. 18, 2023) ("The 'enterprise' cannot be the pattern of racketeering activity alone and must be an entity separate and apart from the pattern of activity in which it engaged.") (citation omitted). As explained above, fact-based allegations concerning a functioning unit and of an overarching agreement among all Defendants to defraud Plaintiffs or mail fraudulent royalty statements are simply absent from the Complaint. Plaintiffs' allegations—such as ¶ 4 concerning separate calculation of royalties—reveal nothing other than unilateral, independent decision-making by each individual Defendant, which is insufficient to allege a RICO enterprise. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 374 (3d Cir. 2010) ("'[S]everal individuals' who 'engaged in a pattern of crimes listed as RICO predicates' 'independently and without coordination' 'would not establish the existence of an enterprise.'" (quoting

*Boyle*, 556 U.S. at 47 n.4)); *see also Kingfly Spirits, LLC v. Ragghianti*, No. CV 22-50E, 2023 WL 6214262, at *3 (W.D. Pa. Sept. 25, 2023) (dismissing RICO claim where it was "bereft of connective tissue plausibly establishing an 'enterprise structure' tying together the various actors"). Plaintiffs make no allegation of any decision-making by the purported enterprise, but instead merely allege that the enterprise was "primarily managed" and "organized" by Chesapeake, and that "[e]ach of the members of the Enterprise … also conducted or participated … in the conduct of the affairs of the Enterprise … by means of the fraudulent overcharges for, and deductions of, gathering and related costs from the royalties paid to owners of royalty interests …" ¶ 307.

Not only are the allegations pled by Plaintiffs deficient under *Twombly*, but they are also insufficient to *plausibly* suggest an enterprise structure under *Boyle*. *See Allstate,* 2014 WL 1767528, at *10. Plaintiffs' claim that Defendants "[e]xpressly or implicitly agree[d]" that the challenged post-production costs would be passed on to royalty interest holders is likewise conclusory and unsupported by factual allegations. ¶ 312(c); *Twombly*, 550 U.S. at 555.

Further, there are no allegations that MEPUSA, in particular, entered into any agreement with the "Enterprise" with the goal of fraudulently overcharging deductions from royalties or had any intention to function as part of a continuing unit with other entities. There are no allegations that MEPUSA or any other

Defendant knew the amount of any post-production costs that were deducted from any Plaintiff's royalty payment by any other Defendant. There are no allegations that MEPUSA or any other Defendant knew how any other Defendant calculated any Plaintiff's royalty payment. Instead, Plaintiffs allege independent accounting and distribution by each Defendant of its respective royalty share. ¶ 4. Plaintiffs again failed to allege facts showing that Defendants function as a continuing unit dedicated to a common purpose. *Boyle*, 556 U.S. at 944; *Allstate*, 2014 WL 1767528, at *10–11. As with their antitrust claims, Plaintiffs do not plead an enterprise that is "plausible on its face." *Twombly*, 550 U.S. at 570; *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 370 ("The enterprise element of RICO claims is a close analogue of § 1's agreement element. Unless a plaintiff is required at the pleading stage to suggest plausibly the existence of an enterprise structure … the RICO statute's allowance for association-in-fact enterprises becomes an open gateway to the imposition of potentially massive costs on numerous defendants, regardless of whether there is even a hint of the collaboration necessary to trigger liability.").

### 2.    Plaintiffs Fail to Allege a RICO Conspiracy.

"To state a RICO conspiracy claim, plaintiff must allege (1) an agreement to commit the predicate act and (2) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate one of the substantive

provisions of the RICO statute." *Domico v. Kontas*, 2013 WL 1248638, at *9 (M.D. Pa. Mar. 26, 2013) (internal quotation marks omitted); *McLaughlin v. Int'l Bhd. Of Teamsters, Loc. 249*, 641 F. Supp. 3d 177, 201 (W.D. Pa. 2022) ("A plaintiff must thus plead facts showing that the object of the RICO conspiracy was to 'assist the enterprise's involvement in corrupt endeavors.'") (citation omitted). Plaintiffs' allegations fail to establish the basic elements of a RICO conspiracy claim.

This Court previously determined that the RICO conspiracy claim failed "because Plaintiffs' underlying RICO claim" failed. (Doc. 212, at 26-27); *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993). *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 373 (A "§ 1962(d) claim must be dismissed if the complaint does not adequately allege 'an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] offense.'" (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997))). Nothing changed, so the Court should dismiss the RICO claim for the same reason.

Even if considered, the Complaint remains devoid of allegations showing an agreement—or even communications that might suggest one—among Defendants to commit mail or wire fraud, much less an agreement that involves MEPUSA. Plaintiffs merely allege in conclusory fashion that "members of the Enterprise … conducted or participated, directly or indirectly, in the conduct of the affairs of the

Enterprise …" ¶ 307.  Such conclusory allegations are insufficient to state a claim. *Twombly*, 550 U.S. at 555.

The Complaint again omits factual allegations that MEPUSA knew that its independent mailing of royalty statements was part of a pattern of racketeering activity.  Plaintiffs allege that Defendants knew and expressly or implicitly agreed, that [inflated gathering fees] "would be passed-on to holders of royalty interests …" ¶ 312(c).  As explained above, there are no factual allegations supporting any such agreement or how Defendants aligned the amount of their royalty deductions, requiring dismissal.

### 3.    <u>Plaintiffs Fail to Plead Fraud with Particularity.</u>[7]

Because Plaintiffs' RICO claims are predicated on mail and wire fraud, they must be pled with specificity under Rule 9(b).  *Lum v. Bank of America*, 361 F.3d 217, 220 (3d Cir. 2004).  Plaintiffs are required to allege "the date, place or time of the fraud, or through alternative means, . . . inject[] precision and some measure of substantiation into their allegations of fraud."  *Id.* at 224 (internal quotation marks omitted).  Here too, Plaintiffs failed to meet their burden.

---

[7] In its Memorandum, the Court did not analyze Anadarko and MEPUSA's argument that Plaintiffs' RICO claim fails because they do not state their predicate claims with particularity because it dismissed Plaintiffs' RICO claims on separate, independent grounds.  (Doc. 212, at 25 n.9).

Plaintiffs allege that "Defendants" entered into a RICO scheme in order to deprive Plaintiffs of a portion of their royalties by mailing fraudulent royalty statements. *See* ¶ 23. Plaintiffs, however, do not provide the date, time, or place of any of the allegedly fraudulent mailings. Instead, they allege in vague and ambiguous language that "the Lessee Defendants" issued royalty statements to Plaintiffs on a "periodic" basis, which was "typically, but not always monthly." ¶¶ 23, 240. Plaintiffs themselves recognize the lack of specificity in their allegations, admitting that they are "unable to" "allege with particularity operative details," and "allege such transmissions *generally*." ¶¶ 31, 316. While Plaintiffs claim that "the specific dates and contents of such transmissions are within the peculiar knowledge" of the Defendants, (¶ 316), they admit that they are in possession of the documents that contain the information they fail to allege: the royalty statements. *See* ¶¶ 236-37, 240. Plaintiffs' failure to include such information does nothing to "substantiat[e] their allegations of fraud." *Lum*, 361 F.3d at 224. As a result, Plaintiffs did not allege that any particular Defendant made a misrepresentation to any particular Plaintiff or allege the specific content of any purported misrepresentation. *Lum*, 361 F.3d at 224 (allegations of mail fraud insufficient because they did not indicate the date, time, or place of any misrepresentation, or which defendant made misrepresentations to which plaintiff); *Wood v. Wood*, No. CV 16-995, 2017 WL 57186, at *6 n.5 (W.D. Pa. Jan. 5, 2017)

26

(same).  Plaintiffs' failure to "link their own injuries to the alleged RICO enterprise" by "alleg[ing] what happened to them" requires dismissal.  *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 659 (3d Cir. 1998).  Nor did Plaintiffs' group pleading excuse their burden of doing so.  *Donachy v. Intrawest U.S. Holdings, Inc.*, No. 10-4038 (RMB/KMW), 2012 WL 869007, at *2 (D.N.J. Mar. 14, 2012) ("Where allegations of fraud are brought against multiple defendants, the complaint must plead with particularity . . . the [specific] allegations of fraud applicable to each defendant.") (quoting *MDNet, Inc. v. Pharmacia Corp.*, 147 F. App'x 239, 245 (3d Cir. 2005)); *Tredennick v. Bone*, 647 F. Supp. 2d 495, 501 (W.D. Pa. 2007) ("'lump[ing]' together numerous defendants does not provide sufficient notice of which defendants" allegedly engaged in fraudulent conduct), *aff'd*, 323 F. App'x 103 (3d Cir. 2008).

### C.    Plaintiffs' Breach of Contract Claim Fails As A Matter of Law.

Despite the Court's determination that Plaintiffs' breach of contract claim was barred by existing Pennsylvania law (Doc. 212, at 30), and the stasis in controlling law since the Memorandum, Plaintiffs have pled the same breach of contract theory, almost word-for-word, accompanied by the same failed factual averments. The Court should dismiss Count Six for the same reasons as before.  (Doc. 212, at 27-30).

### 1.    MEPUSA May Deduct Post-Production Costs.

The Pennsylvania Supreme Court held in *Kilmer v. Elexco Land Services, Inc.* that lessee gas producers may deduct their post-production costs from royalty payments under an "at the wellhead" lease provision (such as the ones at issue here), which permits the "net-back" method to deduct post-production costs.  990 A.2d 1147, 1149, 1157-58 (Pa. 2010).  *See also* Doc. 212, at 28-29.  "Because Plaintiffs' claims stem from alleged netback deductions of post-production costs, their breach of contract claims cannot be sustained…"  (Doc. 212, at 30).

Plaintiffs' Leases, by their plain terms, require the net-back method validated in *Kilmer*:  MEPUSA is to calculate the royalty based on the "market value at the well," which "*shall not exceed the amount realized* by LESSEE for such production *computed at the well*."  ¶ 151 (emphasis added).  The "amount realized" is equivalent to "profits realized," and is calculated using the net-back method—deducting post-production costs from the sale price.  *See, e.g., Warren v. Chesapeake Exploration, L.L.C.*, 759 F.3d 413, 417 (5th Cir. 2014) ("The phrase 'amount realized by Lessee, computed at the mouth of the well' means that the royalty is based on net proceeds, and the physical point to be used as the basis for calculating net proceeds is the mouth of the well. … 'the phrase net proceeds' contemplates deductions.'").  Indeed this Court agreed that Plaintiffs' leases entitled them to royalties based on the market value of the gas at the well using the netback method.  (Doc. 212, at 29); *Coastal*

*Forest Res. Co. v. Chevron U.S.A., Inc.,* Civ. A. No. 2:20-cv-1119, 2021 WL 1894596 (W.D. Pa. May 10, 2021).

> **2.    Plaintiffs Failed to Plead a Plausible Claim That the Amount of MEPUSA's Deductions Was Somehow Improper.**

Plaintiffs' alternative claim—that MEPUSA "violated the implied covenants of good faith and fair dealing inherent in each of the leases … by deducting, or giving effect to the deduction of, purported post-production costs which were arbitrary, artificially inflated, grossly excessive and unreasonable in amount" (¶ 27)—fails to meet the *Iqbal/Twombly* standard for the simple reason that Plaintiffs failed to plead *any* facts to support this theory.  *See* ¶¶ 344, 345.  This Court previously rejected this claim as barred by *Kilmer* and because "Plaintiffs have not provided any facts to support their conclusory allegations that the post-production costs they were charged were excessive, unreasonable, or artificially inflated."  (Doc. 212, at 30 n.10).

Plaintiffs' Complaint (again) lacks any differentiation among the Lessee Defendants and simply alleges in conclusory and threadbare fashion (again) that the Lessee Defendants "provide Plaintiffs with only cryptic, cursory, incomplete and misleading summaries of the deductions taken in calculating the royalties."  ¶¶ 30, 178–179.  Plaintiffs' failure is particularly glaring because Pennsylvania's Oil and Gas Lease Act specifies ten specific pieces of information a lessee/producer is to

provide the royalty owner.  58 P.S. § 35.2 (2013).  Plaintiffs, however, do not allege any facts showing that MEPUSA failed to provide that information.

Finally, this Court recognized that Pennsylvania law "does not impose a 'reasonableness' standard" in deciding whether deductions were purportedly "unjust, unreasonable, or wrongful." (Doc. 212, at 30).  Regardless, Plaintiffs still fail to allege any facts to support their conclusory assertion that MEPUSA charged post-production costs that were excessive, unreasonable, or artificially inflated.

## VI.    **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed as to MEPUSA with prejudice.

Dated:  June 18, 2025                    MORGAN, LEWIS & BOCKIUS LLP


By: */s/ John K. Gisleson*

John K. Gisleson (PA62511)
john.gisleson@morganlewis.com
Matthew H. Sepp (PA85406)
matthew.sepp@morganlewis.com

One Oxford Centre
Thirty-Second Floor
Pittsburgh, PA  15219-6401
Telephone: +1.412.560.3300
Facsimile: +1.412.560.7001

*Attorneys for Defendant*
*Mitsui E&P USA LLC*

## <u>CERTIFICATE OF WORD COUNT</u>

I, John K. Gisleson, hereby certify that this Brief contains 7,043 words and complies with Local Rule 7.8(b)(2), as modified by Doc. No. 234.

MORGAN, LEWIS & BOCKIUS LLP


By: <u>*/s/John K. Gisleson*</u>
John K. Gisleson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 18, 2025, true and correct copies of the foregoing

**Memorandum of Law in Support of Defendant Mitsui E&P USA LLC'S**

**Motion to Dismiss Plaintiffs' Second Amended Complaint** were served on all

counsel of record via the Court's CM/ECF Court Filing System as follows:

Christopher D. Jones, Esquire
Griffin, Dawsey, DePaola & Jones, P.C.
101 Main Street
Towanda, PA 18848

Taunya M. Rosenbloom, Esquire
Law Office of Taunya M. Knolles
Rosenbloom
P.O. Box 309
332 South Main Street
Athens, PA 18810

Thomas S. McNamara, Esquire
Indik & McNamara, P.C.
123 South Broad Street, Suite 1200
Philadelphia, PA 19109

*Counsel for Plaintiffs*

Steven E. Bizar, Esquire
Michael Doluisio, Esquire
Elisa Beneze, Esquire
David Costigan, Esquire
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

*Counsel for Anadarko E & P Onshore LLC*

Kayci Blair Hughes, Esquire
Alexander Sokolosky, Esquire
Crowe & Dunlevy, P.C.
222 N. Detroit Avel, Suite 600
Tulsa, OK 74120

John S. Summers, Esquire
Hangley Aronchick Segal Pudlin &
Schiller
One Logan Square
18th & Cherry Streets
27th Floor
Philadelphia, PA 19103

*Counsel for Access MLP Operating,
LLC, Appalachia Midstream Services,
LLC, and Williams Partners, LP f/k/a
Access Midstream Partners, LP*

MORGAN, LEWIS & BOCKIUS LLP


By:  */s/ John K. Gisleson*
      John K. Gisleson