**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| A&B CAMPBELL FAMILY LLC, et al., | |
| Plaintiffs, | CIVIL ACTION NO. 3:15-CV-00340 |
| v. | (MEHALCHICK, J.) |
| WILLIAMS PARTNERS, L.P., et al., | |
| Defendants. | |

<u>**MEMORANDUM**</u>

Before the Court are three motions to dismiss filed by Defendants Anadarko E&P

Onshore LLC, as successor by conversion to and f/k/a Anadarko E&P Company LP

("Anadarko"), Mitsui E&P USA LLC ("MEPUSA"), Williams MLP Operating, L.L.C.,

Appalachia Midstream Services, L.L.C., and Williams Partners, L.P. ("Access"). (Doc. 235;

Doc. 237; Doc. 239). This action was originally filed by Plaintiffs ("A&B"), who consist of a

group of oil and gas lessors, on February 17, 2015.[1] (Doc. 1). The operative second amended

---

[1] The named Plaintiffs in this case are as follows: David J. Bride, John M. Barrett, Richard D. Marshall, Rexford Schoonover, F & M Robinson, LLC, Robert H. Stoudt, Jr., SL Allen LLC, MS & JC Doss, LLC, F. Robert Hauss, Ronald L. Campbell, James E. Canfield, John R. Snell, Jerry L. Price, DP Investments, LLC, David W. Moon, DJH and WGH, LLC, Charles L. Emerson, Little Fall R & R Inc., Barbara E. Mosier, Erven W. Crawford, Paul DeNault, Barbara P. Grimes, Kendra P. Solowiej, E. Larry Franklin, Clark H. Beebe, Freda L. Canfield, Sandra L. Marshall, Theodore B. Gatto, Wesley G. Mosier, Darlene R. Newton, Valarie DeNault, Michael R. Bride, James E. Grimes, June Crawford, Carol Franklin, Cheryl A. Henry, Tor Tamarack, LLC, Peter P. Solowiej, Mosier Real Estate Co., LLC, Shirley Bride, Candy S. Card, Robert L. Dibble, Jr., David L. Sandt, Doris J. Newton, James P. Snell, Neta Repsher, Carol Hauss, H. Timothy Newton, Foster Family LLC, Cindy E. Barrett, A & B Campbell Family, Thomas R. Frederick, Barto Family LLC, Patti L. Stoudt, Jacqueline T. Place, Sue A. Sites, Shawn Patrick Newton, Richard A. Card, Jr., Deborah S. Frederick, Russell E. Bulick, Richard W. Jackson, Milton Repsher, Cathy Ann Brady,

complaint ("SAC") was filed on October 17, 2024. (Doc. 216). For the following reasons, the

motions to dismiss will be **GRANTED**. (Doc. 235, Doc. 237; Doc. 239).

## I. PROCEDURAL AND FACTUAL BACKGROUND

This case arises from fracking activity in the Marcellus Shale area in Pennsylvania.[2]

(Doc. 216). A&B is a group of individuals who hold royalty interests under oil and gas leases

---

Dolores B. Jackson, M. Patricia Nelson, Renee S. Newton, Epler Family LLC, Claudia C. Price, Outdoor Investment, LLC, Mary J. Moon, Shawn Newton(trading as Newton Family Limited Partnership), James T. Barrett, Walter E. Newton, III, Lynn Dibble, Paul A. Sites, DJH & PAH, LLC, Theodore A. Johnson, Kent L. Morgan, Nicole D. Newton, Lori R. Barrett, Morchar LLC, Michelle S. Snell, Walter E. Newton, III(trading as Newton Family Limited Partnership), Diane V. Bride, Walter G. Henry, Jr, Pamela L. Emerson, Eugene J. Barrett, Jr.

[2] The following relevant background about fracking in Pennsylvania is taken from this case's counterpart *Suessenbach Fam. Ltd. P'ship v. Access Midstream Partners, L.P.*:

> Fracking enables the production of natural gas and oil from rock formations below the earth's surface, generally 5,000 to 20,000 feet. At such depth, there may not be sufficient permeability or reservoir pressure to allow natural gas and oil to flow from the rock into the wellbore at economic rates. Given the extremely low natural permeability of shale, creating fractures in the rock is critical to extract gas from shale reservoirs.

> Large deposits of natural gas have been discovered in various shale deposits throughout the United States, including in Pennsylvania, and several oil and gas exploration and development companies have been actively accessing these deposits due to the development of fracking technology that allows the deposits to be exploited. The Marcellus Shale formation located in and beyond Pennsylvania is one of the largest natural gas reserves in the world. Plaintiffs' lands are located in the Marcellus Shale.

> Gaining access to the deposits in the shale regions, including the Marcellus Shale, typically involves purchasing or leasing land or mineral rights in the vicinity of suspected deposits and attempting to develop profitable wells. Once a natural gas deposit is reached, a wellhead is placed on the deposit. After a wellhead is in place, natural gas can be moved from the well through gathering pipes and ultimately transported through an intrastate transmission pipeline. Intrastate transmission pipelines connect to major interstate transmission pipelines which transport natural gas throughout the United States. The transport and processing steps which follow removal of natural gas from the

in properties generally located above the Marcellus Shale. (Doc. 216, ¶ 1). In the aggregate, A&B holds royalty interests in the natural gas produced from over 12,000 acres of leasehold land. (Doc. 216, ¶ 1 n.1). Two named Defendants in this case, Anadarko and MEPUSA (together, "Lessee Defendants"), and non-parties, Chesapeake Appalachia, L.L.C. ("CALLC") and Statoil USA Onshore Properties, Inc. ("Statoil USA"), also hold rights in A&B's leases, either as the original lessee party or as assignees of all or part of the right, title, and interest of the original lessee party.[3] (Doc. 216, ¶ 2).

A&B alleges that Defendants engaged in "separate but related unlawful schemes" to deprive A&B of royalties and royalty interests for gas produced on their leaseholds. (Doc. 216, ¶ 6). Further, A&B alleges that through an agreement among Defendants to jointly develop natural gas wells and gathering systems in and around the Marcellus Shale, Defendants have engaged in an unlawful, anti-competitive scheme. (Doc. 216, at 8). This scheme is allegedly intended to "allocate geographic markets for the acquisition of gas mineral

---

wellhead, but precede entry of the gas into an interstate transmission pipeline, are sometimes referred to as "gathering." Access Midstream operates between the lessors at the wellhead and the interstate pipeline system.

Processing can also include certain services to make gas suitable for entry into the interstate pipeline system, such as dehydration when the natural gas has a high water content. Access Midstream as indicated, however, "[i]n general, the natural gas in the northern Marcellus Shale is lean and typically requires little to no treatment to remove contaminants."

While federal rules limit fees that can be charged on the interstate pipelines to prevent gouging, drilling companies levy fees on local pipelines, known as gathering lines. However, even where such fees are deducted, they must be reasonable and actual.

No. CIV.A. 3:14-1197, 2015 WL 1470863, at *2-3 (M.D. Pa. Mar. 31, 2015).

[3] On September 17, 2015 and September 15, 2023, Statoil USA and CALLC were dismissed from this action, respectively. (Doc. 110; Doc. 182).

rights and operating working interests in oil and gas leases through the establishment and abuse of restrictive areas of mutual interest." (Doc. 216, at 8). The scheme also allegedly permits Defendants, particularly CALLC and Anadarko, to charge "supra competitive" fees for gathering services at the wells on property leased by A&B. (Doc. 216, ¶ 7). In effect, the scheme allegedly allows Defendants to defraud A&B of its royalties "by the misrepresentation of unauthorized or artificially inflated deductions." (Doc. 216, at 13).

On February 17, 2015, A&B commenced this action. (Doc. 1). On February 23, 2024, the matter was reassigned to the undersigned. On March 14, 2024, after a conference call with the parties, this Court lifted a stay on this litigation and scheduled oral argument on the pending motions to dismiss. (Doc. 191). The Court also directed the parties to submit supplemental briefing addressing developments in the law since they initially filed their briefs in 2015. On August 30, 2024, the Court granted Defendants' motions to dismiss A&B's amended complaint (Doc. 212), and on October 17, 2024, A&B filed the instant SAC. (Doc. 216). Therein, Plaintiffs allege the following causes of action: First Cause of Action–Agreement to Restrain Competition in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (against Anadarko); Second Cause of Action–Agreement to Restrain Competition in Violation of Section 1 of the Sherman Act, 15 U.S.C. 1 against all Defendants; Third Cause of Action–Combination or Conspiracy to Monopolize Trade or Commerce in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; Fourth Cause of Action–Violation of RICO, 18 U.S.C. §§ 1961-1968; Fifth Cause of Action–Conspiracy to Violate RICO, 18 U.S.C. § 1962(d); and Sixth Cause of Action–Breach of Contract – Express and/or Implied Covenants.

(Doc. 216, ¶¶ 243-68; 269-90; 291-302; 303-25; 326-35; 336-47).[4] As relief, A&B seeks monetary, compensatory, and punitive damages. (Doc. 216, at 137-38). On June 18, 2025, Anadarko, MEPUSA, and Access each filed a motion to dismiss A&B's SAC as well as a brief in support of their respective motions. (Doc. 235; Doc. 236; Doc. 237; Doc. 238; Doc. 239; Doc. 240).

## II. LEGAL STANDARD

Rule 12(b)(6) authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To assess the sufficiency of a complaint on a Rule 12(b)(6) motion, a court must first take note of the elements a plaintiff must plead to state a claim, then identify mere conclusions which are not entitled to the assumption of truth, and finally determine whether the complaint's factual allegations, taken as true, could plausibly satisfy the elements of the legal claim. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). In deciding a Rule 12(b)(6) motion, the court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

After recognizing the required elements that make up the legal claim, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009). The plaintiff

---

[4] Although A&B alleged the First Cause of Action and the Second Cause of Action separately, the Court will not address them separately because they allege the same Sherman Act violations.

must provide some factual ground for relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Thus, courts "need not credit a complaint's 'bald assertions' or 'legal conclusions…'" *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997)). The court also need not assume that a plaintiff can prove facts that the plaintiff has not alleged. *Associated Gen. Contractors of Cal. v. Cal. St. Council of Carpenters*, 459 U.S. 519, 526 (1983).

A court must then determine whether the well-pleaded factual allegations give rise to a plausible claim for relief. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Palakovic v. Wetzel*, 854 F.3d 209, 219-20 (3d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted); *see also Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010). The court must accept as true all allegations in the complaint, and any reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). This "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt* v. *President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted). The plausibility determination is context-specific and does not impose a heightened pleading requirement. *Schuchardt*, 839 F.3d at 347.

III.    DISCUSSION

A.    SHERMAN ACT ANTI-TRUST CLAIMS

A&B alleges that Defendants violated the Sherman Act by engaging in a conspiracy to restrain competition and monopolize trade. (Doc. 216, at 103, 113, 120). "The purpose of the Sherman Act is to protect buyers and sellers from the effects of seller or buyer 'market power' unless obtained by competition on the merits." *Abrams v. Chesapeake Energy Corp.*, No. 4:16-CV-1343, 2017 WL 6541511, at *6 (M.D. Pa. Dec. 21, 2017). A&B brings claims under both Section 1 and Section 2 of the Sherman Act, which "prohibit agreements that unreasonably restrain competition, and prohibit monopolization, attempted monopolization, and conspiracies to monopolize, respectively." *Abrams*, 2017 WL 6541511, at *6. Defendants argue that A&B lacks standing to bring its Sherman Act claims and that A&B fails to sufficiently plead the necessary elements under Section 1 and Section 2 of the Sherman Act. (Doc. 236, at 13-21; Doc. 238, at 12-24; Doc. 240, at 21-29).

**1.  A&B does not have standing to bring its antitrust claims.**

Defendants argue that A&B lacks standing to bring its antitrust claims because Plaintiffs were not injured in a manner consistent with the protections of the Sherman Act. (Doc. 236, at 14-15; Doc. 238, at 14; Doc. 240, at 21-22). In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983), the United States Supreme Court detailed factors to be considered when determining whether a plaintiff has antitrust standing. These factors are as follows:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct

victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165–66 (3d Cir. 1993); *see Ethypharm S.A. France v. Abbott Lab'ys*, 707 F.3d 223 (3d Cir. 2013).

The threshold element of antitrust standing is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). This requirement ensures that antitrust laws are enforced "for the protection of competition, not competitors." *Brunswick Corp.*, 429 U.S. at 488. Accordingly, antitrust standing is limited to consumers and competitors in the relevant market, and to those whose injuries are "inextricably intertwined" with the alleged antitrust agreement or conspiracy. *Ethypharm*, 707 F.3d at 233. Per the Third Circuit, the "inextricably intertwined" exception requires the alleged injury to be the means by which a defendant achieves anti-competitive ends and may be extended only to entities that are in the business of selling goods and services in the same market. *See Ethypharm*, 707 F.3d at 237 (citing *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 320-21 (3d Cir. 2007)). Furthermore, "[a]n antitrust plaintiff must allege not only personal harm, but also that the defendant's conduct affected the 'prices, quantity or quality of goods or services' in the relevant market." *Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 531 (W.D. Pa. 2019*); Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996) (citing *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d at 728); *see also Eichorn v. AT & T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001) ("[T]he antitrust laws were designed to protect market-wide anticompetitive activities"). The ensuing injury must result from the competition-reducing effect of the defendant's behavior.

According to Anadarko, A&B has not alleged facts supporting a reduction in competition and cannot identify themselves as consumers or competitors in the relevant markets. (Doc. 236, at 14-15). MEPUSA argues that, rather than pleading a reduction in competition, A&B "mostly allege[s] harm to themselves, with tacked-on conclusory allegations about harm to the market at-large." (Doc. 238, at 14). Access avers that A&B fail to establish "an injury stemming from a reduction in competition in the market[.]" (Doc. 240, at 21). A&B argues it has "repeated and modified their original factual allegations, added additional supporting factual allegations, and modified their claims, to clarify and further support their allegation of a market allocation scheme[.]" (Doc. 241, at 17). A&B contends that this alleged scheme resulted in the reduction of competition in the relevant markets. (Doc. 241, at 18). A&B also perceives itself as "in substance sellers in the market for Gas Mineral Rights[.]" (Doc. 216, ¶ 252; Doc. 241, at 19). Acknowledging the rule that courts find antitrust injury only where a plaintiff is a consumer or competitor, A&B avers that its falls within an exception. (Doc. 241, at 24-25).

Antitrust injury is an essential element to antitrust standing. *See SEI Glob. Servs., Inc. v. SS&C Advent,* No. 20-3386, 2022 WL 2356730, at *2 (3d Cir. June 30, 2022) (recognizing antitrust injury the "threshold" for antitrust standing). "An antitrust plaintiff is only required to 'allege facts capable of supporting a finding or inference that the purported anticompetitive conduct produced'" the purported harm. *CarePoint Health Sys. Inc. v. RWJ Barnabas Health, Inc.*, No. 22CV5421 (EP) (CLW), 2023 WL 7986429, at *5 (D.N.J. Nov. 17, 2023) (quoting *In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566, 577 (E.D. Pa. 2018)). However, even after amending the complaint for a second time, A&B fails plead an antitrust injury.

9

First, the SAC does not allege sufficient facts supporting that there was a reduction in competition stemming from A&B's alleged injury. *See SS&C Advent*, 2022 WL 2356730, at *2 (stating an antitrust injury must flow from "anti-competitive effect on the competitive market" in the relevant market). Instead, A&B only posits the existence of "a foundational market allocation scheme" which caused "the reduction in their royalty payments by excessive and unreasonable deductions." (Doc. 241, at 19); *see AlphaCard Sys. LLC v. Fery LLC*, No. CV1920110ZNQTJB, 2023 WL 3506414, at *4 (D.N.J. May 17, 2023) (dismissing antitrust claims because plaintiff failed to allege harm to competition, alleging only harm unto itself); *see also Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1125 (10th Cir. 2005) (finding the alleged injury of underpayment of royalties to be insufficient to confer antitrust standing). At best, the modified factual allegations in A&B's SAC are no more than textual changes to its original complaint with additional conclusory statements. (Doc. 94, ¶¶ 7, 8-15, 16-18, 237-47, 253; Doc. 216, ¶¶ 7, 11-18, 19-22, 244-56, 265). A&B's second amended complaint, like it's original complaint, pleads no reduction in competition stemming from A&B's alleged injury.

Further, A&B is still not the proper party to bring an antitrust action. *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010) (finding antitrust injury is limited to "consumers and competitors in the restrained market."). To allege an antitrust injury, A&B claims that it was "in substance sellers in the market for Gas Mineral Rights[.]" (Doc. 216, ¶ 252). This allegation mischaracterizes A&B's role in the purported market because A&B already sold its Gas Mineral Rights, and as a result, is no longer a market participant. (Doc. 216, ¶¶ 16, 145); *McCullough v. Zimmer, Inc.*, 382 F. App'x 225, 229 (3d Cir. 2010) (holding no antitrust standing existed where plaintiffs were "commission-based sales

representatives who did business with competitors and consumers in the market for surgical orthopedic devices, [but] not as competitors or consumers themselves").

The Third Circuit has extended antitrust standing to instances where "'both plaintiffs and defendants are in the business of selling goods or services in the same relevant market,' though they may not directly compete against each other." *Ethypharm*, 707 F.3d at 237; *see also Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162 (3d Cir. 2015) ("suppliers and other non-market participants generally do not have antitrust standing unless their injuries were the very means by which the defendants carried out their illegal ends"). Standing exists under the inextricably intertwined exception where the alleged injury is a "necessary step in effecting the ends of the alleged illegal conspiracy." *Blue Shield v. McCready*, 457 U.S. 465, 476-79, 484 (1982) (emphasis added). Here, A&B continue to allege in a conclusory fashion that its injury is "inextricably intertwined with Defendants' wrongdoing." (Doc 216, ¶ 263). A&B also argues that, in *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 174-75 (3d Cir. 2015), the Third Circuit cautioned against an overly narrow reading of its statements in prior cases" relating "to the scope of the 'inextricably intertwined' exception[.]" (Doc. 241, at 26). The Court finds A&B's argument unpersuasive. Although Hanover Reality was neither a competitor nor a consumer in the market for full-service markets, the Third Circuit held that it had sufficiently alleged antitrust injury because "its harm was the essential component of [Village Supermarkets'] anticompetitive scheme as opposed to an ancillary byproduct of it[.]"[5] *Hanover*, 806 F.3d at 173. Here, A&B asserts that

---

[5] In *Hanover*, the Third Circuit explained:

the antitrust injury is its loss of royalties due to the alleged unlawful deduction of "supra-competitive" gathering fees. (Doc. 216, ¶¶ 255-256). A&B, however, does not identify a competitor in the relevant market that was the actual target of the purported conspiracy and fails to articulate how its economic injury was capable of inflicting injury on a competitor in the relevant market. Rather than an "essential component" of the anticompetitive scheme, A&B's injury was "an ancillary byproduct." *Hanover*, 806 F.3d at 173. A&B's complained of injury is not inextricably intertwined with Defendants' alleged anticompetitive scheme. The Court, therefore, finds that A&B fails to sufficiently allege antitrust standing.[6]

Accordingly, Defendants' motions to dismiss are **GRANTED** as to A&B's antitrust claims, its First, Second, and Third Causes of Action, which are hereby **DISMISSED with prejudice**. (Doc. 216, ¶¶ 243-68, 269-90, 291-302; Doc. 235; Doc. 237; Doc. 239).

**2. A&B fails to allege an anti-competitive agreement among all Defendants.**

---

The end goal of Defendants' alleged anticompetitive conduct was to injure Wegmans, a prospective competitor. To keep Wegmans out of the market, Defendants sought to impose costs no on their competitor, but on Hanover Realty, the party tasked with obtaining the necessary permits before construction could begin. Absent this relationship between Hanover Realty and Wegmans, Defendants' conduct "would have been without purpose or effect."

806 F.3d at 174.

[6] A&B alleges "the economic injury suffered by Plaintiffs was a necessary step in, integral to, or part of the essential means by which Chesapeake, Anadarko, Anadarko E&P, Mitsui E&P, and Access Midstream sought to achieve their respective illegal and anticompetitive ends. As a result, the economic injury suffered by Plaintiffs is inextricably intertwined with Defendants' wrongdoing." (Doc. 216, ¶ 263). Although A&B amended this allegation in the SAC, it remains conclusory.

Even if A&B had standing to assert its Sherman Act claims against Defendants, its Section 1 and Section 2 claims fail as insufficiently pled. According to Defendants, A&B's SAC does not sufficiently establish that Defendants came to the requisite agreement to satisfy these claims. (Doc. 236, at 17-21; Doc. 238, at 20-24; Doc. 240, at 24-29). A&B argues that the SAC "squarely allege[s]" anti-competitive agreements and contains "extensive additional allegations[.]" (Doc. 241, at 34-35). To prevail on a claim under Section 1 or Section 2 of the Sherman Act, "a plaintiff must establish the existence of an agreement, sometimes also referred to as a 'conspiracy' or 'concerted action.'" *W. Penn,* 627 F.3d at 99 (citations omitted). "An agreement exists when there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." *W. Penn,* 627 F.3d at 99 (citations omitted). A plaintiff may plead an agreement by using direct evidence, circumstantial evidence, or both. *W. Penn,* 627 F.3d at 99; *see Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 219 & n.10 (3d Cir. 2008).

The Court must determine whether the alleged anticompetitive conduct was the result of an agreement among Defendants or each of their independent choices. *Twombly*, 550 U.S. at 553; *see Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 254 (3d Cir. 2010) ("Section 1 claims are limited to combinations, contracts, and conspiracies, and thus always require the existence of an agreement."). Conduct that is "entirely consistent" with the defendant pursuing its own economic interests does not support an inference of conspiracy. *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 368 (M.D. Pa. 2008); *see Twombly*, 550 U.S. at 567 (finding allegations of conspiracy are deficient if there are "obvious alternative explanation[s]" for the facts alleged). If antitrust defendants lack a rational economic motive to conspire, and "if their conduct is consistent with other, equally plausible

explanations, the conduct does not give rise to an inference of conspiracy." *Toledo Mack Sales*, 530 F.3d at 219 (quoting *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 466 (3d Cir. 1998)). "While a showing of parallel 'business behavior is admissible circumstantial evidence from which the fact finder may infer agreement,' it [also] falls short of 'conclusively establish[ing] agreement or ... itself constitut[ing] a Sherman Act offense.'" *Twombly*, 550 U.S. at 553 (citing *Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (2007)); *See Valspar Corp. v. E.I. Du Pont De Nemours and Company*, 873 F.3d 185, 190-91 (3d Cir. 2017) ("single firm's independent action…does not implicate § 1"). Even conscious parallelism falls short of what is required to establish a Sherman Act violation. *Twombly*, 550 U.S. at 553.

To establish an unlawful anticompetitive conspiracy, A&B must demonstrate that an "actual, manifest agreement" exists between Defendants. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004); *see Kerwin v. Casino*, 802 F. App'x 723, 725-26 (3d Cir. 2020) (quoting *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) (dismissing claim where, among other things, plaintiff failed to plead facts "specify[ing] a time or place that any actual agreement . . . occurred" or identifying the "particular individuals or organizations [that] made such an agreement"). A&B's "agreement" claim must include factual allegations with respect to each defendant named in the complaint. *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 719 (E.D. Pa. 2011).

A&B mentions several agreements made by various groupings of Defendants over a five-year period to support a larger conspiracy containing all Defendants. (Doc. 216, ¶¶ 134, 139, 140). In the SAC, however, A&B adds no factual allegations supporting their conclusion that all Defendants, conspiring or acting in concert, had an agreement to restrain trade in violation of the Sherman Act. A&B argues that the SAC includes "non-conclusory allegations

of both evidence… and of circumstantial evidence" of anti-competitive agreements. (Doc. 241, at 36). This is not the case. A&B merely repeats conclusory allegations of anti-competitive agreements and made implications that do not constitute to Sherman Act violations. (Doc. 216, ¶¶ 140-144, 217). Without factual allegations, A&B suggests that circumstantial evidence exists. (Doc. 241, at 36). Certain evidentiary restrictions are necessary in antitrust cases since "'mistaken inferences… are especially costly because they chill the very conduct the antitrust laws are designed to protect.'" *Toledo Mack Sales*, 530 F.3d at 219 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)). "For circumstantial evidence of an agreement, … a plaintiff must allege both parallel conduct and something 'more' … This 'more' could include evidence (1) 'that the defendant had a motive to enter into a … conspiracy,' (2) 'that the defendant acted contrary to its interests,' or (3) 'implying a traditional conspiracy.'" *In re Generic Pharms. Pricing Antitrust Litig.*, 386 F. Supp. 3d 477, 483-84 (E.D. Pa. 2019) (citation omitted). Here, the SAC does not establish anything "more" than purported parallel conduct. Similarly, in the first amended complaint, A&B alleged parallel conduct "entirely consistent" with each Defendant its own interests by underpaying Plaintiffs' royalties by deducting post-production costs. *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363 (M.D. Pa. 2008). This parallel conduct of deducting post-production costs has been upheld as permissible by the Pennsylvania Supreme Court. (Doc. 212, at 18); *Kilmer v. Elexco Land Servs., Inc.*, 990 A.2d 1147, 1149 (Pa. 2010).

As A&B fails to allege Defendants participated in an anticompetitive agreement, Defendants' motions to dismiss are **GRANTED**. (Doc. 235; Doc. 237; Doc. 239). Accordingly, Plaintiffs' First, Second, and Third Causes of Action are **DISMISSED with prejudice**. *See Ellison v. Am. Bd. of Orthopaedic Surgery, Inc.*, No. CV168441KMJBC, 2018 WL

6629764, at *5 (D.N.J. Oct. 30, 2018) (dismissing Sherman Act claims because plaintiff failed to allege an unlawful agreement).

B. RICO CLAIMS

A&B claims that Defendants "conducted or participated, directly or indirectly, in the conduct of the affairs" of a RICO enterprise "by means of the joint ventures, contracts and transactions[.]" (Doc. 216, ¶ 307). Pursuant to RICO, it is unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962; *see Dongelewicz v. PNC Bank Nat'l. Ass'n*, 104 Fed. Appx. 811, 816–17 (3d Cir. 2004) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). To state a claim for a RICO violation, A&B must allege that Defendants are (1) a person (2) who is associated with an enterprise engaged in interstate commerce (3) who conducted the affairs of said enterprise (4) through a pattern (5) of racketeering activity. *Dongelewicz*, 104 Fed. Appx. at 816–17.

Here, A&B alleges the predicate racketeering activity is mail and wire fraud. (Doc. 216, ¶¶ 238-39). "Racketeering activity" includes mail and wire fraud as defined by 18 U.S.C. §§ 1341 and 1343. *See* 18 U.S.C. § 1961(1). To establish a claim for mail or wire fraud, a plaintiff must allege: "(1) a scheme to defraud; (2) the use of the mails or wires for the purpose of executing the scheme; and (3) fraudulent intent." *Rapid Circuits, Inc. v. Sun Nat. Bank*, No. 10-6401, 2011 WL 1666919, at *23 (E.D. Pa. May 3, 2011) (citing *United States v. Pharis*, 298 F.3d 228, 234 (3d Cir. 2002)); *see also Katz v. DeLuca*, No. CV 23-1188, 2024 WL 2188905, at *5 (E.D. Pa. May 15, 2024). "When mail and wire fraud are the alleged predicate acts of a RICO violation, 'they must be pled with particularity to satisfy Federal Rule of Civil

Procedure 9(b); in particular, blanket allegations of mail and wire fraud lacking information of who sent or received the fraudulent representations are insufficient to satisfy Rule 9(b).'" *DeLuca*, 2024 WL 2188905, at *5 (quoting *Rapid Circuits, Inc.* 2011 WL 1666919, at *23). Additionally, RICO makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962. Pursuant to this section, A&B has also asserted a RICO conspiracy claim against Defendants. (Doc. 216, at 131). Defendants argue that A&B's RICO claims should be dismissed because they have failed to allege an association-in-fact RICO enterprise and failed to allege RICO conspiracy. (Doc. 236, at 21-26; Doc. 238, at 24; Doc. 240, at 29, 33).[7]

### 1. A&B fails to allege an association-in-fact RICO enterprise.

For RICO purposes, "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[T]he 'enterprise' cannot be the pattern of racketeering activity alone and must be 'an entity separate and apart from the pattern of activity in which it engages.'" *Zakheim v. Curb Mobility LLC*, No. CV 22-4594, 2023 WL 5339606, at *2 (E.D. Pa. Aug. 18, 2023) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). There are two categories of associations that constitute a RICO enterprise:

---

[7] A&B does not address any of Defendants' arguments in favor of dismissing their RICO claims. (Doc. 241). "[T]he filing of a brief in opposition to a motion to dismiss that fails to respond to a substantive argument to dismiss a particular claim results in the waiver or abandonment of that claim." *Lykens v. Peters*, No. 4:24-CV-01385, 2025 WL 383803, at *6 (M.D. Pa. Feb. 4, 2025) (citing *Dribelbis v. Scholton*, 274 Fed. App'x 183, 185 (3d Cir. 2008)). However, the Court prefers to address the RICO claims on their merits, rather than deny them on technical violations. *Hlad v. Hirsch*, No. 3:23-CV-00785, 2024 WL 1197516, at *1 n.1 (M.D. Pa. Mar. 20, 2024) (citation omitted).

(1) legal entities such as corporations and partnerships, and (2) associations-in-fact. *See Ins. Brokerage Litig.*, 618 F.3d at 364 (citing *United States v. Turkette,* 452 U.S. 576, 581-52 (1981)).

Here, A&B asserts that Defendants formed an association-in-fact enterprise. (Doc. 216, ¶ 305- 07). In an association-in-fact enterprise, entities act together "for a common purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Therefore, an association-in-fact must share "(1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle,* 556 U.S. at 946; *see also Fleetwood Servs., LLC v. Complete Bus. Sols. Grp., Inc.*, 374 F. Supp. 3d 361, 373 (E.D. Pa. 2019).

"The Third Circuit has made clear that normal business relationships, without more, are insufficient to support an association-in-fact enterprise." *Zakheim*, 2023 WL 5339606, at *3. A&B must allege that Defendants are "an entity separate and apart from the pattern of activity in which it engages." *Turkette*, 452 U.S. at 583. A&B has not amended its allegations to contain "descriptive details about the relationships between members of the enterprise." *Zakheim*, 2023 WL 5339606, at *1, 3 (discussing the dismissal of RICO claims because plaintiff had failed to allege a common purpose among defendants and stating "requires pleading some descriptive details about the relationships between members of the enterprise."). A&B does not allege that Defendants knowingly agreed to participate together in an enterprise intended to defraud A&B. In the SAC, A&B added the conclusory allegation that the Enterprise's purpose was "to maximize the revenues and profits to its members from the anticompetitive contracts, combinations, and conspiracies among them[.]" (Doc. 216, ¶ 306). However, this alleges nothing more than an ordinary business relationship among the

Defendants, not a RICO enterprise. *Zakheim*, 2023 WL 5339606, at *3. Thus, A&B fails to allege a RICO enterprise. (Doc. 216).

While A&B alleges the Enterprise's purpose was to maximize revenues and profits for members of the Enterprise, A&B fails to sufficiently allege a relationship among all Defendants to perpetuate this purpose. (Doc. 216, ¶ 306); *Boyle*, 556 U.S. at 946. Although the SAC alleges that Defendants participated in the affairs of a RICO enterprise "by means of the joint ventures, contracts and transactions," there are still no factual allegations supporting global, coordinated, and unified activity among all the Defendants beyond A&B's conclusory allegation that such activity occurred. *See Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 307 (S.D.N.Y. 2010) (dismissing RICO claim where plaintiffs failed to allege how the members of the association-in-fact "came to an agreement to act together"). A&B's allegations of Defendants' conduct are insufficient to establish all Defendants acted in concert. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 374 (3d Cir. 2010).

The SAC does not contain allegations that Defendants "understood the essential nature of the plan and knowingly agreed to participate in the plan." *Schwartz v. Lawyers Title Ins. Co.*, 970 F. Supp. 2d 395, 405 (E.D. Pa. 2013). "Simply identifying the allegedly associated components does not serve to put defendants on notice of the RICO claim." *In re Ins. Brokerage*, 618 F.3d at 369. Accordingly, the Fourth Cause of Action is **DISMISSED with prejudice**.[8] (Doc. 216, ¶¶ 303-25); *see Kingfly Spirits, LLC v. Ragghianti*, No. CV 22-50E, 2023

---

[8] A&B alleges mail and wire fraud to be the predicate racketeering activity. (Doc. 216, at 127). Specifically, A&B alleges "Defendants engaged in an intentional scheme or artifice to defraud [A&B] and other owners of royalty interests under oil and gas leases with the Lessees, in order to obtain or retain money or property through false or fraudulent pretenses,

WL 6214262, at *3 (W.D. Pa. Sept. 25, 2023) (dismissing RICO claim where it was "bereft of connective tissue plausibly establishing an 'enterprise structure' tying together the various actors").

### 2. A&B fails to allege a RICO conspiracy claim.

RICO provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c)." 18 U.S.C. §1962(d). To plead a conspiracy in violation of § 1962(c), a plaintiff must allege "(1) knowledge of the corrupt enterprise's activities and (2) agreement to facilitate those activities." *Smith v. Berg*, 247 F.3d 532, 535 (3d Cir. 2001) (citing *Salinas v. United States*, 522 U.S. 52, 66 (1997)). Liability for a RICO conspiracy "will arise only from services which were purposefully and knowingly directed at facilitating a criminal pattern of racketeering activity." *Berg*, 247 F.3d at 538. RICO conspiracy claims are subject to Fed. R. Civ. P. 8(a)'s pleading standards, not the heightened standard of Rule 9(b). *See Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989).

"Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993). Accordingly, because A&B's underlying RICO claim is to be dismissed, the Court is compelled to **GRANT** Defendants' motions as to A&B's RICO conspiracy claim.(Doc. 235; Doc. 237; Doc. 239);

---

representations or promises." (Doc. 216, at 127). Anadarko and MEPUSA argue that A&B's RICO claim fails also because they do not state their predicate claims with particularity, as required under Rule 9. (Doc. 236, at 24-25; Doc. 238, at 31-33). Access does not argue this element of A&B's RICO claim. (Doc. 240). Having found other grounds for A&B's RICO claims to be dismissed, the Court need not address these arguments.

*see Lightning Lube, Inc.,* 4 F.3d at 1191; *see also McLaughlin v. Int'l Bhd. Of Teamsters, Loc. 249,* 641 F. Supp.3d 177, 201 (W.D. Pa. 2022). A&B's RICO conspiracy claim, its Fifth Cause of Action, is therefore **DISMISSED with prejudice**.(Doc. 216, ¶¶ 326-35); see *Zakheim,* 2023 WL 5339606, at *4 ("Because I find that Plaintiffs have sufficiently pleaded a claim under Section 1962(c), I will also deny Defendant's Motion as to Plaintiffs' conspiracy claim under Section 1964(d).").

### C. Breach of Contract Claim

Lessee Defendants dispute the viability of A&B's breach of contract claims.[9] (Doc. 236, at 26-27; Doc. 238, 33-36). A&B alleges that under the terms of the leases, the Lessee Defendants are not entitled to deduct post-production costs in calculating the royalties payable to A&B, and thus, breached their obligations under the leases by deducting such costs. (Doc. 216, ¶ 341; Doc. 241, at 41). Lessee Defendants aver that the Court should dismiss the breach of contract claim in the SAC because it is identical to the claim the Court previously dismissed. (Doc. 212, at 30; Doc. 236, at 26; Doc. 238, at 33). The Court agrees. (Doc. 212).

To state a breach of contract claim under Pennsylvania law, a plaintiff must allege: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages. *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 255 (3d Cir.2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)); *Gottselig v. Energy Corp. of Am.*, No. CIV.A. 15-971, 2015 WL 5820771, at *6 (W.D. Pa. Oct. 5, 2015). The general principles of contract interpretation govern oil and gas leases. *Smith v. Steckman*

---

[9] Access does not argue this issue because it is not a Lessee Defendant.

*Ridge, LP*, 2014 WL 1278120, at \*4 (W.D. Pa. March 27, 2014); *Gottselig*, 2015 WL 5820771, at \*6. Here, the parties continue to dispute whether Lessee Defendants breached their obligations under the terms of A&B's leases by deducting post-production costs from royalties payable to A&B. In accordance with Pennsylvania Supreme Court precedent and the Court's previous memorandum (Doc. 212, at 30), the Court finds that, per the allegations in the SAC, Lessee Defendants have not breached their obligations in the applicable leases.

In *Kilmer v. Elexco Land Services,* 605 Pa. 413, 415, 429-30 (Pa. 2010), the Pennsylvania Supreme Court found that lessee gas producers may deduct their post-production costs from royalty payments under an "at the wellhead" lease provision like the ones at bar, which permits the "net-back" method to determine deductions. Courts have interpreted this holding broadly. *Slamon v. Carrizo (Marcellus) LLC*, 654 F. Supp. 3d 405, 435 (M.D. Pa. 2023); *see also Ulmer v. Chesapeake Appalachia*, LLC, No. 4:08-CV-2062, 2011 WL 1344596, at \*3 ("it is our considered view that *Kilmer* was not meant to be read narrowly, and thus we find that the deduction of post-production costs contained in the lease *sub judice* is a permissible use of the net-back method under the GMRA"). Applying *Kilmer*, federal courts have dismissed breach of contract claims premised on producers deducting post-production costs from their royalty payouts. *See Ulmer,* 2011 WL 1344596, at \*2 ("The holding of *Kilmer* is that the GMRA permits the calculation of the royalties at the wellhead utilizing the net-back method. That is exactly what the leases here provide, and as a result, we decline to void them"); *see also Pollock v. Energy Corp. of Am.*, No. CIV.A. 10-1553, 2011 WL 3667289, at \*5 (W.D. Pa. June 27, 2011), *report and recommendation adopted*, No. CIV.A. 10-1553, 2011 WL 3667385 (W.D. Pa. Aug. 22, 2011) (adopting a Magistrate Judge's recommendation that defendants' motion to

dismiss a breach of contract claim where the relevant oil and gas leases contemplate calculation of royalties by the net-back method.).

Here, it is apparent from the allegations in the SAC that A&B's leases entitled it to royalties based on the market value of the gas at the well using the netback method. (Doc. 216, ¶ 151). Specifically, the applicable lease provision states:[10]

> The LESSEE covenants and agrees as follows: 1st – LESSEE … shall pay the LESSOR on gas … produced from the premises and used off the premises or lands pooled therewith or in the manufacture of gasoline, or other products therefrom, or sold (whether to an affiliated or non-affiliated purchaser) the market value at the well of one-eighth (1/8th) of the gas so used or sold. In no event shall the gas royalty payable hereunder be computed on the basis of a price the collection of which by LESSEE is unlawful or prohibited by order or regulation of any governmental authority having jurisdiction, and market value at the well *shall not exceed the amount realized by LESSEE for such production computed at the well*…. LESSEE may pay all taxes and fees levied upon LESSOR's royalty share of production of oil and gas and deduct the amount so paid from any monies payable to LESSOR hereunder….

(Doc. 216, ¶ 151) (emphasis added).

Whereas A&B attempts to argue that this language is ambiguous, courts have recognized the "generally accepted industry-specific use of the term 'at the wellhead'" as an industry specific, technical term that should be construed as much." *Coastal Forest Res. Co. v. Chevron U.S.A., Inc.*, No. 2:20-CV-1119, 2021 WL 1894596, at *4 (W.D. Pa. May 11, 2021). The language at bar includes language that other courts, such as the Western District of

---

[10] The Court acknowledges that A&B amended the allegations supporting the contract claim by referring to habendum provisions. (Doc. 216, ¶¶ 153-58). A&B does not respond to Defendants' arguments favoring dismissal with these new allegations. (Doc. 241, at 39-42). Instead, A&B relies on principles of contract law, specifically the implied covenant of good faith and fair dealing. (Doc. 241, at 39). The Court will not address these amended allegations. Given A&B does not reiterate the amended allegations in its reply brief to bolster the contract claim, the Court considers them conclusory allegations. (Doc. 216, ¶¶ 153-58).

Pennsylvania, have found "expressly and unequivocally call for the calculation of royalties 'at the wellhead.'" (Doc. 216, ¶ 151); *Coastal Forest*, 2021 WL 1894596, at \*6. Courts have found that this language requires that a contract "be interpreted as permitting the net-back method" and therefore as permissive of deducting post-production costs from royalty payments. *Coastal Forest*, 2021 WL 1894596, at \*6. Because A&B's claims stem from alleged netback deductions of post-production costs, their breach of contract claims cannot be sustained, even given their allegations that such deductions were unjust, unreasonable, or wrongful. Pennsylvania law allows for such deductions and does not impose a "reasonableness" standard in deciding them. *See Kilmer*, 990 A.2d at 1149 & n.3, 1158 (citing 30 C.F.R. § 206.151). Accordingly, Lessee Defendants' motion to dismiss A&B's breach of contract claim is **GRANTED**. A&B's Sixth Cause of Action is hereby **DISMISSED with prejudice**.[11] *See Coastal Forest*, 2021 WL 1894596, at \*7 (dismissing a breach of contract claim where lease provisions expressly and unequivocally call for the calculation of royalties "at the wellhead.").

## IV. LEAVE TO AMEND

The Third Circuit has instructed that if a complaint is vulnerable to dismissal for failure to state a claim, the district court must permit a curative amendment, unless an amendment would be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir.

---

[11] A&B's allegation of an implied-in-fact lease obligation that deductions for post-production costs must not be "grossly excessive or otherwise unreasonable" fairs no better. *Kilmer* anticipated and rejected this argument, finding that lessors' and lessees' interests are typically aligned. 605 Pa. at 429. Further, A&B does not provide any additional facts to support their conclusory allegation that the post-production costs they were charged were excessive, unreasonable, or artificially inflated. (Doc. 216, ¶ 344).

2002). Further, "[a] district court has 'substantial leeway in deciding whether to grant leave to amend.'" *In re Avandia Mktg., Sales Practices & Products Liab. Litig.*, 564 F. App'x 672, 673 (3d Cir. 2014) (not precedential) (quoting *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000)). Here, A&B had ample opportunity to rectify the deficiencies. The SAC mostly repleads the first amended complaint's conclusory allegations, and further leave to amend is not warranted. *See Rolo v. City Investing Co. Liquidating Tr.*, 155 F.3d 644, 654 (3d Cir. 1998) (affirming denial of leave to amend where "plaintiff's proposed Second Amended Complaint primarily seeks to replead facts and arguments that could have been pled much earlier in the proceedings"), *abrogated on other grounds by Forbes v. Eagleson*, 228 F.3d 471, 483 (3d Cir. 2000); *see also Vincent C. v. Pennsbury Sch. Dist.*, No. CV 24-06340-PAC, 2025 WL 2524221, at *14 (E.D. Pa. Sept. 2, 2025) (finding that further amendments to the complaint would be inequitable after plaintiff failed to "substantively change[] *any* of the facts or legal theories of his claims") (citing *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006)). Accordingly, the Court **DENIES** leave to amend.

## V.    CONCLUSION

Based on the foregoing, Anadarko, MEPUSA, and Access's motions to dismiss are **GRANTED**. (Doc. 235; Doc. 237; Doc. 239). A&B's SAC is **DISMISSED with prejudice**. (Doc. 216). The Court **DENIES** leave to amend.

An appropriate Order follows.

Dated: December 22, 2025                    BY THE COURT:

                                            */s/ Karoline Mehalchick*
                                            **KAROLINE MEHALCHICK**
                                            **United States District Judge**